Eric D. Miller, Bar No. 218416
EMiller@perkinscoie.com
Michael A. Sussmann, D.C. Bar No. 433100
(*pro hac vice*)
MSussmann@perkinscoie.com
James G. Snell, Bar No. 173070
JSnell@perkinscoie.com
Hayley L. Berlin, D.C. Bar No. 1011549
(*pro hac vice*)
HBerlin@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Tel:  650-838-4300
Fax:  650-838-4350

Attorneys for Plaintiff
Twitter, Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| TWITTER, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>ERIC H. HOLDER, JR., Attorney General<br>of the United States, *et al.*,<br><br>              Defendants. | Case No. 14-cv-04480-YGR<br><br>**PLAINTIFF'S OPPOSITION TO PARTIAL MOTION TO DISMISS**<br><br>Date:  March 10, 2015<br>Time:  2:00 p.m.<br>Courtroom 1, Fourth Floor<br>Hon. Yvonne Gonzalez Rogers |

1

# TABLE OF CONTENTS

2

Page

3    INTRODUCTION ....................................................................................................... 1

4    STATEMENT ............................................................................................................. 2

5    A.    Statutory background ....................................................................................... 2

6    B.    The DAG Letter ............................................................................................... 3

7    C.    Twitter's efforts to provide transparency ....................................................... 4

8    STANDARD OF REVIEW ......................................................................................... 5

9    ARGUMENT .............................................................................................................. 5

10   A.    The complaint states a claim under the APA .................................................. 5

11   B.    This Court should adjudicate Twitter's claims based on FISA ....................... 9

12         1.    Twitter's challenge to FISA is not limited to orders issued by the
                 FISC ..................................................................................................... 9

13

14         2.    The FISC is not an appropriate forum for considering Twitter's
                 claims ................................................................................................... 10

15         3.    The interests of judicial economy would not be served by splitting
                 Twitter's claims between this Court and the FISC ............................. 13

16   C.    The complaint states a claim that the NSL statute is facially unconstitutional ............ 13

17

18         1.    The Court should not stay this litigation to await the Ninth Circuit's
                 decision in *In re National Security Letter* ......................................... 14

19         2.    The Court should not evaluate Twitter's challenge to the NSL
                 statute in the piecemeal fashion that the government suggests ........... 15

20

21         3.    The NSL statute violates the First Amendment because it fails to
                 satisfy strict scrutiny .......................................................................... 16

22   CONCLUSION ........................................................................................................... 21

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ACLU* v. *Clapper*,
No. 14-42 (2d Cir. argued Sept. 2, 2014)..................................................................12

*ACLU* v. *FBI*,
No. 11 Civ. 7562 (S.D.N.Y.) ...............................................................................11, 12

*Alexander* v. *United States*,
509 U.S. 544 (1993)................................................................................................16

*Appalachian Power Co.* v. *EPA*,
208 F.3d 1015 (D.C. Cir. 2000) ...............................................................................6

*Ashcroft* v. *Iqbal*,
556 U.S. 662 (2009)..................................................................................................5

*Bantam Books, Inc.* v. *Sullivan*,
372 U.S. 58 (1963)..................................................................................................17

*Bell Atl. Corp.* v. *Twombly*,
550 U.S. 544 (2007)..................................................................................................5

*Bennett* v. *Spear*,
520 U.S. 154 (1997)...............................................................................................5, 6

*Brown* v. *Entm't Merchants Ass'n*,
131 S. Ct. 2729 (2011)............................................................................................18

*Carey* v. *Brown*,
447 U.S. 455 (1980)................................................................................................18

*Clapper* v. *Amnesty Int'l USA*,
133 S. Ct. 1138 (2013)............................................................................................12

*Ctr. for Cmty. Action & Envtl. Justice* v. *BNSF Ry. Co.*,
764 F.3d 1019 (9th Cir. 2014)..................................................................................5

*Dependable Highway Express, Inc.* v. *Navigators Ins. Co.*,
498 F.3d 1059 (9th Cir. 2007).................................................................................15

*Doe, Inc.* v. *Mukasey*,
549 F.3d 861 (2d Cir. 2008)....................................................................................19

*Dugong* v. *Rumsfeld*,
No. C 03-4350 MHP, 2005 WL 522106 (N.D. Cal. Mar. 2, 2005) ............................8

*Electronic Frontier Found.* v. *Dep't of Justice*,
No. 4:11-cv-05221-YGR (N.D. Cal. Aug. 11, 2014).........................................12, 13

*Freedman* v. *Maryland*,
   380 U.S. 51 (1965) ...................................................................................16, 17

*Frisby* v. *Schultz*,
   487 U.S. 474 (1988) ............................................................................................18

*Gen. Elec. Co.* v. *EPA*,
   290 F.3d 377 (D.C. Cir. 2002) ............................................................................6

*Haig* v. *Agee*,
   453 U.S. 280 (1981) ............................................................................................18

*Hinds Invs., L.P.* v. *Angioli*,
   654 F.3d 846 (9th Cir. 2011) ...............................................................................5

*In re Motion for Consent to Disclosure of Court Records or, in the Alternative, a
   Determination of the Effect of the Court's Rules on Statutory Access Rights*,
   No. Misc. 13-01 (F.I.S.C. June 12, 2013) ........................................................12

*In re Motion for Release of Court Records*,
   526 F. Supp. 2d 484 (F.I.S.C. 2007) .................................................................11

*In re National Security Letter*,
   930 F. Supp. 2d 1064 (N.D. Cal. 2013) .............................................14, 15, 17, 18

*Klayman* v. *Obama*,
   No. 14-5004 (D.C. Cir. argued Nov. 4, 2014) ..................................................12

*Landis* v. *N. Am. Co.*,
   299 U.S. 248 (1936) ...........................................................................................14

*Lockyer* v. *Mirant Corp.*,
   398 F.3d 1098 (9th Cir. 2005) ......................................................................14, 15

*Miller* v. *French*,
   530 U.S. 327 (2000) ...........................................................................................19

*Mills* v. *Alabama*,
   384 U.S. 214 (1966) ...........................................................................................20

*NAACP* v. *Button*,
   371 U.S. 415 (1963) ...........................................................................................18

*Nat'l Ass'n of Home Builders* v. *U.S. Army Corps of Eng'rs*,
   417 F.3d 1272 (D.C. Cir. 2005) ..........................................................................6

*Nat'l Mining Ass'n* v. *McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) .........................................................................7, 8

*Near* v. *Minnesota ex rel. Olson*,
   283 U.S. 697 (1931) ...........................................................................................17

*Pac. Gas & Elec. Co.* v. *FPC*,
   506 F.2d 33 (D.C. Cir. 1974) ...............................................................................7

*R.A.V.* v. *City of St. Paul, Minn.*,
   505 U.S. 377 (1992) ....................................................................................................20

*Reno* v. *ACLU*,
   521 U.S. 844 (1997) ..............................................................................................18, 20

*Sackett* v. *EPA*,
   132 S. Ct. 1367 (2012) .................................................................................................5

*Se. Promotions, Ltd.* v. *Conrad*,
   420 U.S. 546 (1975) ....................................................................................................16

*Thomas* v. *Chi. Park Dist.*,
   534 U.S. 316 (2002) ....................................................................................................15

**STATUTES**

5 U.S.C. § 551(13) ...............................................................................................................5

5 U.S.C. § 553 ......................................................................................................................5

18 U.S.C. § 793 ............................................................................................................3, 9, 10

18 U.S.C. §§ 793, 1510(e) ....................................................................................................3

18 U.S.C. § 2709 ......................................................................................................... passim

18 U.S.C. § 2709(a), (b)(1) ...................................................................................................3

18 U.S.C. § 2709(b)(1) ........................................................................................................19

18 U.S.C. § 2709(c)(1) ..........................................................................................3, 16, 18

18 U.S.C. § 3511(b)(1) ........................................................................................................16

28 U.S.C. § 1331 ...................................................................................................................9

28 U.S.C. § 1391(b) ..............................................................................................................9

28 U.S.C. § 1404 .................................................................................................................13

50 U.S.C. § 1803 .................................................................................................................11

50 U.S.C. § 1805(c)(2)(B) .................................................................................................3, 9

50 U.S.C. § 1806(e) ............................................................................................................12

50 U.S.C. § 1861 .................................................................................................................10

Administrative Procedure Act .................................................................................... passim

Declaratory Judgment Act ...................................................................................................13

FISA Amendments Act of 2008 ..........................................................................................12

Foreign Intelligence Surveillance Act ...................................................................... passim

Freedom of Information Act ....................................................................... 11, 12, 13

No. Misc. 13-02 (F.I.S.C. Sept. 13, 2013) ................................................................ 11

Section 215 of the PATRIOT Act ............................................................................ 11

OTHER AUTHORITIES

First Amendment .................................................................................................... passim

Fourth Amendment .......................................................................................... 12, 19

*Black's Law Dictionary* 1068 (9th ed. 2009) ......................................................... 18

David S. Kris & J. Douglas Wilson, 1 *National Security Investigations & Prosecutions* § 5:2, at 128 (2d ed. 2012) ................................................... 11

Letter from Jonathan H. Levy, U.S. Dep't of Justice, Civil Div., Appellate Staff, to Molly C. Dwyer, Clerk of Court, *In re Nat'l Sec. Letter*, No. 13-15957 (9th Cir. Nov. 6, 2014) ................................................................. 7

*New York Times Co.*, 403 U.S. at 730 (Stewart, J., concurring) ................................. 17

Peter Baker & Charlie Savage, *Obama Seeks Balance in Plan for Spy Programs*, N.Y. Times, Jan. 9, 2014 .......................................................... 20

1

**INTRODUCTION**

2

In this lawsuit, Twitter challenges the rules that the government has imposed on Twitter's

3

ability to speak about the number and various kinds of national security related demands for

4

information it may have received. The terms of government-approved speech are set out in a

5

January 27, 2014, letter from Deputy Attorney General James M. Cole to five Internet companies

6

(not including Twitter) that was offered to settle claims brought by those companies (the "DAG

7

Letter"). Twitter seeks a declaration that the DAG Letter is invalid under the Administrative

8

Procedure Act ("APA") and the First Amendment, as well as a declaration that the statutes

9

defendants contend restrict Twitter's speech about national security process violate the First

10

Amendment both on their face and as applied to Twitter. The First Amendment violation is

11

particularly significant with regard to restrictions on Twitter's ability to say "zero," that is, to

12

truthfully deny receipt of *any* national security legal process, or of specific *kinds* of national

13

security legal process. In addition, Twitter seeks an injunction prohibiting the government from

14

enforcing the terms of the DAG Letter against Twitter.

15

The government has now filed a partial motion to dismiss. That motion is noteworthy for

16

what it does *not* say as much as for what it says.

17

*First*, the government does not argue that the promulgation of the DAG Letter satisfied the

18

procedural requirements of the APA; rather, it argues only that the Court should not consider

19

Twitter's APA challenge because, it says, the DAG Letter does not constitute final agency action.

20

In fact, the DAG Letter is final, and therefore reviewable, because the government has repeatedly

21

treated it—including in this case—and described it as prescribing binding legal norms. At a

22

minimum, there are serious factual questions as to exactly what sort of legal directive the DAG

23

Letter is and how the government has treated it, and those questions preclude dismissal at this

24

stage, before Twitter has had an opportunity to take any discovery.

25

*Second*, the government does not argue that the nondisclosure provisions of the Foreign

26

Intelligence Surveillance Act ("FISA") are constitutional facially or as applied; rather, it argues

27

that the Court should decline to rule on that question, and that Twitter should pursue that part of

28

its claim in the Foreign Intelligence Surveillance Court ("FISC"). But the FISC does not have

1   exclusive jurisdiction to consider constitutional issues arising from FISA; such issues are

2   routinely considered in district courts; the FISC cannot afford the same relief as Twitter seeks

3   here; and the uneven playing field in the FISC would give the government enormous advantages

4   over Twitter that, at the same time, would serve to further limit Twitter's ability to speak. Further,

5   the interests of judicial economy and comity would not be served by splitting closely related

6   claims and having them proceed, on separate tracks, in this Court and in the FISC.

7       *Third*, the government does not argue that the nondisclosure provisions in the national

8   security letter ("NSL") statute are constitutional as applied to Twitter, or even that Twitter's facial

9   challenge to that statute should be rejected; rather, it urges the Court to defer the portion of

10  Twitter's facial challenge that is based on the standard of review prescribed in the statute or to

11  dismiss this portion of Twitter's case. But there is no reason to rule on one part of Twitter's facial

12  challenge now while leaving the rest of it to be litigated later, and in any event, the government

13  fails to show that the statute can be reconciled with the First Amendment.

14      *Fourth*, the government does not even mention Twitter's claims that it is unlawfully and

15  unconstitutionally restricted from reporting receipt of "zero" aggregate NSLs or FISA orders, or

16  zero of a particular kind of FISA order.  Rather, the government limits its argument to restrictions

17  that relate to actual national security legal process.

18      The partial motion to dismiss should be denied in its entirety.

19                                    **STATEMENT**

20  **A.      Statutory background**

21      This case involves two statutes that the government uses to conduct surveillance in

22  national security investigations.

23      FISA permits the government to seek court-ordered real-time surveillance or disclosure of

24  stored user records from a communications service provider. Several different statutes restrict the

25  ability of a provider to disclose information about a FISA order it has received. FISA itself

26  requires that a recipient of a court order provide the government with "all information, facilities,

27  or technical assistance necessary to accomplish the electronic surveillance *in such a manner as*

28  *will protect its secrecy*." 50 U.S.C. § 1805(c)(2)(B) (emphasis added). In addition, the Espionage

1  Act, 18 U.S.C. § 793, criminalizes unauthorized disclosures of national defense information under

2  certain circumstances.  Those statutes do not contain a prohibition on a company's disclosing that

3  it has *not* received a FISA order or a specific kind of FISA order.

4       Under 18 U.S.C. § 2709, the FBI Director may issue an NSL to a provider, compelling the

5  provider to disclose "subscriber information and toll billing records information" upon a

6  certification that the information sought "is relevant to an authorized investigation to protect

7  against international terrorism or clandestine intelligence activities." 18 U.S.C. § 2709(a), (b)(1).

8  Section 2709(c) authorizes the FBI Director to prohibit the recipient of an NSL from "disclos[ing]

9  to any person (other than those to whom such disclosure is necessary to comply with the request

10 or an attorney to obtain legal advice or legal assistance with respect to the request) that the

11 Federal Bureau of Investigation has sought or obtained access to information or records" by

12 means of an NSL. 18 U.S.C. § 2709(c)(1). A person who violates an NSL nondisclosure order

13 may be subject to criminal penalties. 18 U.S.C. §§ 793, 1510(e).  Section 2709 does not contain a

14 prohibition on a company's disclosing that it has *not* received an NSL.

15 **B.    The DAG Letter**

16      The government's approved disclosure framework is set forth in the DAG Letter, which

17 was issued and filed with the FISC on January 27, 2014, contemporaneously with the stipulated

18 dismissal without prejudice of a lawsuit brought by five Internet companies (not including

19 Twitter) seeking to disclose more information about the total number of FISA- and NSL-related

20 requests they receive.  In return for the companies' dismissal of the FISC action, the government

21 agreed that the companies could publish information about national security surveillance of their

22 networks in one of two preapproved disclosure formats set out in the DAG Letter. When it

23 informed the FISC of this deal, the government stated that the DAG Letter "define[s] the limits of

24 permissible reporting for the parties and other similarly situated companies." Compl., Ex. 2.

25      Under option one, a provider may report, in bands of 1000 starting with 0-999, the

26 numbers of NSLs received, customer accounts affected by those NSLs, FISA orders for content,

27 customer selectors targeted under those orders, FISA orders for non-content, and customer

28 selectors targeted under those non-content orders. Compl., Ex. 1. The starting point of zero, rather

1   than one, is significant because it means that a provider may not disclose that it has *not* received

2   any of the specified kinds of process, nor may it disclose that it has received at least one of those

3   kinds of process (unless it has received 1000 or more).

4          Under option two, a provider may use smaller reporting bands of 250, again starting at

5   zero (*e.g.*, 0-249). Compl., Ex. 1. But if it chooses option two, a provider may report only the total

6   number of all national security process received, without distinguishing among NSLs, FISA

7   orders for content, and FISA orders for non-content. It may similarly report the total number of

8   all customer selectors targeted under national security process, again without distinguishing

9   among the different types of process.

10  **C.    Twitter's efforts to provide transparency**

11         Twitter seeks to give its users meaningful information—beyond that permitted by the

12  DAG Letter—about the degree of government surveillance on its network. On April 1, 2014,

13  Twitter submitted to the government a draft transparency report containing information and

14  discussion about the aggregate numbers of NSLs and FISA orders it received in the second half of

15  2013.[1] Twitter requested "a determination as to exactly which, if any, parts of its Transparency

16  Report are classified or, in the [government's] view, may not lawfully be published online."

17  Compl., Ex. 3. Five months later, on September 9, 2014, the government informed Twitter that

18  "information contained in the report is classified and cannot be publicly released" because it does

19  not comply with the government's approved framework for reporting data about FISA orders and

20  NSLs. Compl., Ex. 5. The government refused to identify what specific language in the draft

21  transparency report could or could not be disclosed. Twitter filed this lawsuit on October 7, 2014.

22  Six weeks later, on November 17, 2014, the government prepared a redacted version of the draft

23  transparency report that it said could be publicly released. Dkt. No. 21.

24         The government filed its Partial Motion to Dismiss on January 9, 2015, arguing that

25  Twitter failed to state a claim upon which relief can be granted for its (1) APA claim and (2)

26  facial challenge to the NSL statute concerning the statutory standard of review. The government

27

28         [1] References in this brief to NSLs and FISA orders should not be taken to confirm (or deny) that Twitter has received any NSLs or FISA orders.

1   did not argue that Twitter failed to state a claim with regard to its facial and as-applied challenges

2   to FISA (the government is merely asking the Court to transfer those claims to the FISC), its

3   facial challenge to the NSL statute as a prior restraint on speech, or its as-applied challenge to the

4   NSL statute. The government asked the Court to delay adjudication of Twitter's facial challenges

5   to the NSL statute until the Ninth Circuit ruled on unrelated NSL cases currently on appeal.

6                                    **STANDARD OF REVIEW**

7          On a motion to dismiss, the Court must "accept as true the factual allegations in the

8   complaint and construe those allegations in the light most favorable to the nonmoving party." *Ctr.*

9   *for Cmty. Action & Envtl. Justice* v. *BNSF Ry. Co.*, 764 F.3d 1019, 1022-23 (9th Cir. 2014). "To

10  survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

11  to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678

12  (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). The grant of a motion to

13  dismiss is appropriate only "where there is either a lack of a cognizable legal theory or the

14  absence of sufficient facts alleged under a cognizable legal claim." *Hinds Invs., L.P.* v. *Angioli*,

15  654 F.3d 846, 850 (9th Cir. 2011).

16                                         **ARGUMENT**

17  **A.      The complaint states a claim under the APA**

18         A major issue in this case is whether the DAG Letter constitutes a substantive "rule"

19  under the APA. If it does, it is invalid: the APA imposes procedural requirements on agencies

20  seeking to adopt rules, and there is no dispute that the government did not follow those

21  procedures in promulgating the DAG Letter. *See* 5 U.S.C. § 553. The government does not

22  address that issue but instead argues (PMTD 10-13) that the DAG Letter is not subject to judicial

23  review because it is not "final agency action." That argument lacks merit.

24         There is no dispute that the DAG Letter constitutes an "agency action" as that term is

25  defined in the APA, so the only question here is whether that action is "final." *See* 5 U.S.C.

26  § 551(13); *Sackett* v. *EPA*, 132 S. Ct. 1367, 1371 (2012). An agency action is "final" if (1) it

27  "mark[s] the consummation of the agency's decisionmaking process" and (2) it is "one by which

28  rights or obligations have been determined, or from which legal consequences will flow." *Bennett*

v. *Spear*, 520 U.S. 154, 177-78 (1997) (internal quotation marks and citation omitted). The government does not appear to question that the first requirement is satisfied—that is, it does not suggest that the DAG Letter is "of a merely tentative or interlocutory nature." *Id.* at 178. Instead, it focuses on the second requirement, arguing (PMTD 11) that the DAG Letter is purely an "advisory statement[]" that does not "impose[] new rights or obligations." That argument is contradicted by the government's own statements about the DAG Letter, which demonstrate that the government views the DAG Letter as legally binding.

"[T]he finality inquiry is a pragmatic and flexible one," and the label that an agency chooses to attach to its action is not determinative. *Nat'l Ass'n of Home Builders* v. *U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1279 (D.C. Cir. 2005) (internal quotation marks and citation omitted). The government emphasizes (PMTD 11) that, on its face, the DAG Letter "does not purport to restrain plaintiff's behavior in any way" but merely "provides guidelines as to *permissible* disclosures." Not so. By its terms, the DAG Letter "memorializes the new and additional ways in which the government will permit [providers] to report data concerning requests for customer information." Compl., Ex. 5. The necessary implication is that the government does *not* permit other ways of reporting data; it would make no sense to say that providers "may" say some things if there were no prohibition on saying other things. That implication is made explicit in the body of the DAG Letter, which sets out "two"—and only two—"alternative ways in which companies may inform their customers about requests for data." *Id.* If a provider selects option one, which allows reporting the numbers of various different types of process in bands of 1000, it must wait two years before including data relating to a platform or service that has not previously been subject to process, and it is expressly prohibited from "confirming or denying that it has received such new capability orders." *Id.* In short, the DAG Letter reads like a binding rule—"[i]t commands, it requires, it orders, it dictates." *Appalachian Power Co.* v. *EPA*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

Even if the binding nature of the DAG Letter were not apparent on its face, "an agency pronouncement will be considered binding as a practical matter if it . . . is applied by the agency in a way that indicates it is binding." *Gen. Elec. Co.* v. *EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002);

1    *see Nat'l Mining Ass'n* v. *McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014) (Courts have "looked to

2    post-guidance events to determine whether the agency has applied the guidance as if it were

3    binding on regulated parties."). The government's actions have made clear that the government

4    regards the DAG Letter as setting out the limits of permissible disclosure. Significantly, those

5    limits are prescribed nowhere else (such as in a statute, executive order, or regulation). In this

6    case, for example, the government informed Twitter that "the information contained in" Twitter's

7    draft transparency report "is classified and cannot be publicly released." Compl., Ex. 5. That

8    conclusion—that the speech in which Twitter wishes to engage "cannot be publicly released"—is

9    based entirely on the DAG Letter. The government cited no other legal authority, evidently

10    deeming it sufficient to point out that the draft transparency report would "go beyond what the

11    government has permitted other companies to report" under the DAG Letter. *Id.* That reasoning

12    demonstrates that the DAG Letter is not merely a general statement of policy, for as the D.C.

13    Circuit has explained, when the government applies a policy statement "'in a particular situation,

14    it must be prepared to support the policy just as if the policy statement had never been issued,'"

15    something it evidently is not prepared to do here. *Nat'l Mining Ass'n*, 758 F.3d at 253 (quoting

16    *Pac. Gas & Elec. Co.* v. *FPC*, 506 F.2d 33, 38 (D.C. Cir. 1974)).

17      Similarly, in a letter the government submitted to the Ninth Circuit in *In re National*

18    *Security Letter*, the government relied on the DAG Letter to explain what disclosures a provider

19    may and may not make about NSLs. Letter from Jonathan H. Levy, U.S. Dep't of Justice, Civil

20    Div., Appellate Staff, to Molly C. Dwyer, Clerk of Court, *In re Nat'l Sec. Letter*, No. 13-15957

21    (9th Cir. Nov. 6, 2014). In that letter, the government explained that "[t]he fact that a company

22    may disclose that it has received 0-249 national security processes or 0-999 NSLs in a given

23    period does not, by itself, allow that company to disclose that it has actually received one or more

24    NSLs; the lower end of these bands was set at 0, rather than 1, in order to avoid such disclosures."

25    *Id.* at 2. But the DAG Letter would not "avoid such disclosures" unless it prohibited those

26    disclosures that it does not allow.

27      The government's treatment of providers who have received zero NSLs or FISA orders or

28    zero of a particular *kind* of FISA order is particularly significant evidence that the government

1    treats the DAG Letter as prescribing a binding legal rule. If a provider of email service has *never*

2    received an NSL or FISA order, under the DAG Letter, that provider is prohibited from stating

3    publicly, "We have never received an NSL or FISA order." The government has never explained

4    how the NSL and FISA statutes or any order of the FISC could be construed to prohibit a

5    provider that has *not* received an NSL or FISA order, or a particular kind of FISA order, from

6    publicly revealing that fact. Yet the government takes the position that providers are prohibited

7    from revealing that they have received zero such orders. That prohibition is stated explicitly in the

8    DAG Letter, which sets the lower ends of the permissible reporting bands at zero, not one, but it

9    is found nowhere else.

10          The DAG Letter and the government's public statements about it sufficiently support

11   Twitter's view that the DAG Letter is a "final agency action" that this Court may properly review

12   in connection with Twitter's APA claim. But even if that were not the case, at a minimum, there

13   is a serious question whether the government is treating the DAG Letter as prescribing binding

14   legal norms, rather than merely setting out advisory guidance. In answering that question, the

15   Court will have to examine the circumstances under which the DAG Letter was adopted—that the

16   DAG Letter was promulgated to settle litigation aimed at clarifying the legal rights of providers is

17   at least some evidence that the government views it as prescribing binding legal norms. In

18   addition, the Court will have to examine "post-guidance events," such as the government's

19   application of the DAG Letter to Twitter and other providers and the government's treatment of

20   the DAG Letter in other contexts. *Nat'l Mining Ass'n*, 758 F.3d at 253. The Court should not

21   decide the issue on a motion to dismiss before Twitter has had any opportunity for discovery into

22   those factual questions. *See Dugong* v. *Rumsfeld*, No. C 03-4350 MHP, 2005 WL 522106, at *17

23   (N.D. Cal. Mar. 2, 2005) (examining "[f]actual information yielded through discovery" in

24   assessing the finality of agency action).

25          For similar reasons, the Court should reject the government's suggestion (PMTD 12-13)

26   that Twitter lacks standing, a suggestion that is largely derivative of the government's argument

27   that the DAG Letter lacks legal effect. The government's reliance on the DAG Letter in its refusal

28   to allow Twitter to publish its draft transparency report makes clear that Twitter's injury is

1    directly traceable to the DAG Letter. Nor is it correct, as the government argues (PMTD 13), that

2    the prohibition on publication of classified information means that "[a] declaratory judgment

3    directed at the DAG Letter would . . . not redress any injury." The classification decision on

4    which the government relies is itself a product of the DAG Letter, so a determination that the

5    government violated the APA in issuing the DAG Letter would provide meaningful relief.

6    **B.      This Court should adjudicate Twitter's claims based on FISA**

7            The government does not dispute that this Court has subject-matter jurisdiction over

8    Twitter's FISA claims. *See* 28 U.S.C. § 1331. Nor does it dispute that the Northern District of

9    California is an appropriate venue for this action. *See* 28 U.S.C. § 1391(b). Nor does it argue that

10   this Court could not fairly adjudicate these claims. Instead, it argues (PMTD 14) that "this Court

11   should decline to exercise its jurisdiction over" Twitter's challenge to the prohibition on

12   disclosing aggregate information about the number of FISA orders it receives, if any, because that

13   challenge "should properly be brought before the FISC." That argument lacks merit.

14           **1.      Twitter's challenge to FISA is not limited to orders issued by the FISC**

15           The premise of the government's argument (PMTD 14) is that Twitter's "challenge to

16   'FISA secrecy provisions' amounts to a challenge to FISC orders and to directives issued

17   pursuant to a FISC-approved program." That premise is incorrect.

18           Twitter's complaint challenges "Defendants' refusal to allow Twitter to publish

19   information about its exposure to national security surveillance that does not conform to either of

20   the two preapproved formats set forth in the DAG Letter." Compl. ¶ 43. It alleges that "[t]he

21   FISA statute, the Espionage Act, and other nondisclosure authorities do not prohibit service

22   providers like Twitter from disclosing aggregate information about the number of FISA orders

23   they receive." Compl. ¶ 49. And it argues that, "[t]o the extent that the Defendants read FISA

24   secrecy provisions, such as 50 U.S.C. § 1805(c)(2)(B), as prohibiting Twitter from publishing

25   information about the aggregate number of FISA orders it receives, . . . the FISA secrecy

26   provisions are unconstitutional." *Id.*

27           As the complaint thus makes clear, this case is about the government's position that the

28   DAG Letter and related national security statutes restrict the disclosure of aggregate information

1    about FISA orders; it is not about secrecy provisions in FISA orders themselves. In the portion of

2    its motion addressing NSLs (PMTD 20 n.9), the government appears to understand that fact,

3    noting that the complaint "does not challenge or contain allegations regarding any particular NSL

4    it may have received, but rather challenges restrictions on disclosure of aggregate data concerning

5    such NSLs." That is equally true of the complaint's treatment of FISA orders, so the

6    government's premise that Twitter is challenging FISC orders and directives issued as part of a

7    FISC-approved program is wrong. Indeed, the complaint does not even allege that Twitter has

8    received any FISA orders. *See* Compl. ¶ 43 (noting that Twitter is prohibited "from publishing

9    facts that reveal *whether* and the extent to which *it may have received* one or more . . . court

10    orders pursuant to FISA") (emphasis added).

11          Although the government argues that all FISA nondisclosure obligations are the product

12    of FISC orders, it concedes (PMTD 18) that FISA itself imposes nondisclosure obligations

13    directly on the recipients of an important class of FISA orders—those requiring "[a]ccess to

14    certain business records for foreign intelligence and international terrorism investigations." 50

15    U.S.C. § 1861. And the government does not deny that it construes the Espionage Act to bar at

16    least some FISA-related disclosures, independent of anything in a FISC order. Nor does the

17    government dispute that the DAG Letter categorically prohibits the disclosure of aggregate

18    information about FISC orders except under the two approved disclosure methods. In short, this

19    case involves a challenge to disclosure prohibitions that are not the product of any single FISC

20    order.

21          **2.**       **The FISC is not an appropriate forum for considering Twitter's claims**

22          The government does not suggest that this Court is prohibited from or incapable of

23    adjudicating Twitter's claims related to FISA. To the contrary, it concedes (PMTD 15) that

24    "either forum"—that is, this Court or the FISC—"would be equally fair to the litigants." But it

25    suggests (PMTD 19-20) that the FISC would be a superior forum because of its "expertise" and

26    "specialized knowledge." In fact, the FISC is not an appropriate forum for hearing this case.

27          The FISC was created by statute in 1978 and afforded limited jurisdiction to issue orders

28    authorizing surveillance or searches under FISA. *See* 50 U.S.C. § 1803; David S. Kris & J.

1  Douglas Wilson, 1 *National Security Investigations & Prosecutions* § 5:2, at 128 (2d ed. 2012). It

2  does not have authority to issue a declaratory order or an injunction such as that sought here. The

3  government cites no authority suggesting otherwise. Accordingly, the relief that Twitter seeks,

4  and that this Court is authorized to grant, is not available in the FISC.

5        The government neglects to mention a number of advantages that the FISC would afford

6  the government. The FISC is a nonpublic court, with certain recent exceptions for public filing of

7  pleadings and other documents, that offers no ability for the public or any nonparty to view FISC

8  proceedings. The FISC offers far greater opportunity than a district court for *ex parte* and

9  classified hearings that are closed to any party but the government. And the government would

10  enjoy significant advantage from its familiarity with the court, judges, and procedures that could

11  not be reproduced by private litigants and their counsel.

12        Of course, the FISC does have an inherent "supervisory power over its own records and

13  files." *In re Motion for Release of Court Records*, 526 F. Supp. 2d 484, 486 (F.I.S.C. 2007)

14  (internal quotation marks and citation omitted). But that authority would not allow the FISC to

15  enter the relief Twitter seeks in this case because, as explained above, the challenged prohibition

16  on Twitter's speech comes from the DAG Letter and federal statutes, not just FISA orders. More

17  importantly, that aspect of the FISC's authority is not exclusive. To the contrary, in *In re Orders*

18  *of this Court Interpreting Section 215 of the PATRIOT Act* ("*In re Orders*"), No. Misc. 13-02

19  (F.I.S.C. Sept. 13, 2013), the FISC held that *a federal district court* was the appropriate forum to

20  decide whether to disclose FISC opinions. In that case, the ACLU had previously filed a Freedom

21  of Information Act ("FOIA") lawsuit in the United States District Court for the Southern District

22  of New York, seeking disclosure of FISC opinions relating to Section 215 of the USA PATRIOT

23  Act. *ACLU* v. *FBI*, No. 11 Civ. 7562 (S.D.N.Y.). When the ACLU subsequently filed a motion in

24  the FISC for the release of the opinions, the FISC held that "as a matter of comity, and in order to

25  conserve judicial resources and avoid inconsistent judgments," it would defer to the District Court

26  for the Southern District of New York. *In re Orders*, No. Misc. 13-02, slip op. at 13. Specifically,

27  the FISC noted that "[t]he present motion . . . asks the FISC to do the same thing that the ACLU

28  is asking the District Court in New York to do in the FOIA litigation: ensure that the opinions are

1   disclosed, with only properly classified information withheld. Having both courts proceed poses

2   the risks of duplication of effort and inconsistent outcomes that the first-to-file rule is intended to

3   avoid." *Id.* at 15. Nowhere in its opinion did the FISC suggest that it was better suited, because of

4   its "expertise" or "specialized knowledge," to handle the issue.

5           Similarly, in *In re Motion for Consent to Disclosure of Court Records or, in the*

6   *Alternative, a Determination of the Effect of the Court's Rules on Statutory Access Rights*, No.

7   Misc. 13-01 (F.I.S.C. June 12, 2013), a FOIA requestor had sought the disclosure of FISC records

8   in the government's possession. In litigation in the United States District Court for the District of

9   Columbia, the government argued that the rules of the FISC prohibited the disclosure of a certain

10  FISC opinion. The requestor then sought relief from the FISC, which held that its rules would not

11  prohibit the government's disclosure of the subject FISC opinion in the event it was determined

12  by the district court to be subject to disclosure under FOIA. Again, nowhere in the opinion did the

13  FISC intimate that the FISC would be better suited, because of its expertise or specialized

14  knowledge, to handle any request for the disclosure of FISC records.

15          Conversely, district courts routinely review the legality of orders entered by the FISC as

16  well as the government's compliance with those orders. For example, whenever the government

17  uses FISA-derived evidence in a criminal proceeding, 50 U.S.C. § 1806(e) permits the target of

18  the surveillance to "move to suppress the evidence obtained or derived from such electronic

19  surveillance [in a district court] on the grounds that . . . (1) the information was unlawfully

20  acquired; or (2) the surveillance was not made in conformity with an order of authorization or

21  approval." And outside the suppression context, district courts have heard challenges to FISA and

22  to orders issued under it. *See*, *e.g.*, *Clapper* v. *Amnesty Int'l USA*, 133 S. Ct. 1138 (2013)

23  (declaratory judgment action filed in federal district court challenging constitutionality of FISA

24  Amendments Act of 2008); *ACLU* v. *Clapper*, No. 14-42 (2d Cir. argued Sept. 2, 2014)

25  (declaratory judgment action arguing that National Security Agency telephony metadata program

26  exceeds statutory authority under FISA and violates the Fourth Amendment); *Klayman* v. *Obama*,

27  No. 14-5004 (D.C. Cir. argued Nov. 4, 2014); *cf. Elec. Frontier Found.* v. *Dep't of Justice*, No.

28

1    4:11-cv-05221-YGR (N.D. Cal. Aug. 11, 2014) (FOIA litigation involving FISC orders and

2    related documents). There is no reason for a different result here.

3         **3.    The interests of judicial economy would not be served by splitting Twitter's
              claims between this Court and the FISC**

4

5         Ordinarily, a litigant who believes that a case has been brought in the wrong forum will

6    seek a transfer under 28 U.S.C. § 1404 or 1631. The government has not sought a transfer here,

7    and with good reason: it concedes that many of the issues in this case are appropriate for

8    resolution in this Court. The government does not seek to have this *entire* case heard by the FISC;

9    instead, it seeks to bifurcate the case, so that part of it is heard in this Court and part of it is heard

10   by the FISC. Given the close relationship between the issues the government seeks to have sent to

11   the FISC and those it seeks to have resolved here, such bifurcation would create the possibility of

12   inconsistent adjudication, and it would ill-serve the interests of judicial economy.

13        The government argues (PMTD 14-15) that the Declaratory Judgment Act confers

14   discretion on this Court. That is true, but the government cites no authority for the proposition

15   that it would be appropriate to exercise that discretion by hearing part of a case while leaving

16   another part to be heard in a different forum. Nor does the government address the portion of the

17   complaint that seeks an injunction against the enforcement of the DAG Letter and related statutes

18   against Twitter. Compl. at 17. The Court does not have discretion simply to ignore an allegation

19   that ongoing governmental activity violates the Constitution and justifies an injunction, and none

20   of the cases cited by the government establishes otherwise.

21   **C.    The complaint states a claim that the NSL statute is facially unconstitutional**

22        The government asks the Court (PMTD 20) "to dismiss plaintiff's challenge to the NSL

23   statutory standard of review." It does not take issue with Twitter's as-applied challenge to NSL

24   nondisclosure requirements, nor does it seek dismissal of the entirety of Twitter's facial challenge

25   to the statute. Instead, it invites the Court to rule that the statute satisfies the standard of review

26   required by the First Amendment. The Court should decline the invitation.

27

28

1       **1.      The Court should not stay this litigation to await the Ninth Circuit's decision
                  in *In re National Security Letter***

2

3       The government suggests—but does not quite say explicitly—that the Court should

4       decline to consider Twitter's claims related to NSLs while it waits for the Ninth Circuit to rule on

5       *In re National Security Letter*, 930 F. Supp. 2d 1064, 1077 (N.D. Cal. 2013), *appeal pending*, No.

6       13-15957 (9th Cir. argued Oct. 8, 2014), in which Judge Illston concluded that the NSL statute

7       violates the First Amendment. The government does not expressly ask this Court for a stay

8       pending the Ninth Circuit's decision, but it suggests (PMTD 20) that "[b]ecause the outcome of

9       those cases . . . is likely to impact, if not control, the outcome of plaintiff's NSL-related claims in

10      this case, judicial economy would be served by the Court's considering those claims after the

11      Court of Appeals has ruled." It is unclear precisely what relief the government is seeking, but

12      staying this litigation or otherwise deferring consideration of Twitter's claims is unwarranted.

13      Although the Ninth Circuit is indeed considering issues similar to some of those presented

14      here, the Supreme Court has observed that "[o]nly in rare circumstances will a litigant in one

15      cause be compelled to stand aside while a litigant in another settles the rule of law that will define

16      the rights of both." *Landis* v. *N. Am. Co.*, 299 U.S. 248, 255 (1936). Instead, before district

17      courts may exercise their "discretionary power to stay proceedings," they must consider "the

18      possible damage which may result from the granting of a stay, the hardship or inequity which a

19      party may suffer in being required to go forward, and the orderly course of justice measured in

20      terms of the simplifying or complicating of issues, proof, and questions of law which could be

21      expected to result from a stay." *Lockyer* v. *Mirant Corp.*, 398 F.3d 1098, 1109-10 (9th Cir. 2005)

22      (internal quotation marks and citation omitted).

23      Here, deferring consideration of all or part of Twitter's First Amendment claim would

24      result in significant harm because the complaint alleges an ongoing deprivation of Twitter's First

25      Amendment rights, and it seeks declaratory and injunctive relief to remedy that deprivation. *See,*

26      *e.g.*, *Lockyer*, 398 F.3d at 1112 (recognizing that delay is particularly harmful to a party

27      "seek[ing] injunctive relief against ongoing and future harm"). And the potential for delay is

28      significant: *In re National Security Letter* is a complex case presenting novel constitutional

1    issues, and the losing party may well file petitions for rehearing en banc and for certiorari once

2    the panel issues its decision. Most importantly, the government has offered no reason beyond

3    judicial economy for why this claim should not move forward. The Ninth Circuit will not

4    necessarily decide *In re National Security Letter* in a way that resolves this case, so the benefits to

5    judicial economy from waiting are doubtful. But in any event, "while it is the prerogative of the

6    district court to manage its workload, case management standing alone is not necessarily a

7    sufficient ground to stay proceedings." *Dependable Highway Express, Inc.* v. *Navigators Ins. Co.*,

8    498 F.3d 1059, 1066 (9th Cir. 2007). Nor has the government identified any harm it will suffer

9    from litigating this issue while awaiting the Ninth Circuit's decision. *See Lockyer*, 398 F.3d at

10   1112.

11              **2.      The Court should not evaluate Twitter's challenge to the NSL statute in the
                         piecemeal fashion that the government suggests**

12

13           As noted, the government has not sought dismissal of all of Twitter's challenges to the

14   NSL statute. It does not, for example, seek dismissal of as-applied challenges to NSL

15   nondisclosure requirements. PMTD 24 n.13. And it does not even seek dismissal of all facial

16   challenges to that statute, focusing only on the argument that the statute calls for overly

17   deferential review of a nondisclosure requirement in an NSL. But that is just one of the arguments

18   that Twitter intends to present. The statute is also unconstitutional because it imposes a prior

19   restraint on speech and does not provide the procedural safeguards required for prior restraints. It

20   makes little sense to disaggregate the standard-of-review argument from those other closely

21   related arguments. For example, because the procedural requirements for a prior restraint include

22   the availability of expeditious judicial review, *see Thomas* v. *Chi. Park Dist.*, 534 U.S. 316, 321

23   (2002), the Court could reasonably conclude that the statute is invalid based on some combination

24   of its procedural infirmities and the overly deferential review that it prescribes. Since the

25   government concedes that at least some components of the facial challenge to the statute should

26   go forward, there is nothing to be gained from ruling certain arguments in support of that

27   challenge out of bounds at this early stage of the litigation.

28

3. **The NSL statute violates the First Amendment because it fails to satisfy strict scrutiny**

Under 18 U.S.C. § 2709, the FBI Director has the authority to issue an NSL that not only orders a communications service provider to turn over information about its customers but also prohibits the provider from speaking about the NSL. The government errs in arguing that the statute can survive First Amendment scrutiny.

a. Section 2709 is invalid on its face because an NSL nondisclosure requirement is a prior restraint, and the government cannot satisfy the demanding substantive standards for a prior restraint. In *Alexander* v. *United States*, 509 U.S. 544, 550 (1993), the Supreme Court explained that "[t]he term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." (Emphasis, internal quotation marks, and citation omitted). Section 2709(c) provides for just such administrative orders. Specifically, the statute authorizes the FBI Director or his designee to prohibit the recipient of an NSL from "disclos[ing] to any person (other than those to whom such disclosure is necessary to comply with the request or an attorney to obtain legal advice or legal assistance with respect to the request) that the Federal Bureau of Investigation has sought or obtained access to information or records" by means of an NSL. 18 U.S.C. § 2709(c)(1). Under the statute, a party who receives such an NSL containing a nondisclosure requirement and who wishes to speak about an NSL must litigate the validity of the nondisclosure requirement before speaking. 18 U.S.C. § 3511(b)(1). In other words, while the prior-restraint doctrine recognizes that "a free society prefers to punish the few who abuse rights of speech *after* they break the law than to throttle them and all others beforehand," *Se. Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 559 (1975) (emphasis added), Section 2709(c) does the exact opposite.

The prior-restraint regime created by Section 2709(c) is particularly troubling because the restraints on speech are issued by an Executive Branch official, not by a court. The Supreme Court has observed that "[b]ecause the censor's business is to censor, there inheres the danger that he may well be less responsive than a court—part of an independent branch of government— to the constitutionally protected interests in free expression." *Freedman* v. *Maryland*, 380 U.S.

1  51, 57-58 (1965). That danger is especially acute in this context because the official who decides

2  whether to restrain speech is the same official whose conduct—that is, the issuance of an NSL—

3  would be the subject of the speech, creating the risk that a gag order will be used to conceal

4  government overreaching.

5        The nature of Section 2709(c)'s prior-restraint regime is illustrated by the government's

6  conduct leading to this litigation. When several large providers sought to be more transparent

7  with their users in describing government requests for data, they had to engage in extensive

8  negotiations with the government *before* they could speak; ultimately, the government directed

9  them to disclose only the information permitted by the DAG Letter. When Twitter sought to

10  provide additional information, the government decreed that the information in Twitter's draft

11  transparency report "cannot be publicly released"—again, *before* Twitter could speak. A regime

12  in which parties who wish to speak about government surveillance requests must first obtain the

13  government's permission, or file a complaint challenging the government's conduct, cannot

14  plausibly be described as anything other than a regime of prior restraint.

15        "Any system of prior restraints of expression," the Supreme Court has held, is subject to

16  "a heavy presumption against its constitutional validity." *Bantam Books, Inc.* v. *Sullivan*, 372

17  U.S. 58, 70 (1963); *see New York Times Co.* v. *United States*, 403 U.S. 713, 730 (1971) (Stewart,

18  J., concurring); *Near* v. *Minnesota ex rel. Olson*, 283 U.S. 697, 716 (1931). The government

19  makes no effort to show that the statute could survive the substantive scrutiny accompanying

20  prior restraints, and it cannot.

21        b. Even if the statute is not viewed as a prior-restraint regime, it at least imposes a content-

22  based restriction on speech and is therefore subject to strict scrutiny, which it cannot survive.

23  Section 2709(c)(1) prohibits the recipient of an NSL from disclosing "that the Federal Bureau of

24  Investigation has sought or obtained access to information or records." Determining whether

25  speech by the recipient falls within the statute's prohibition requires examining the content of that

26  speech. If the speech is about the fact "that the Federal Bureau of Investigation has sought or

27  obtained access to information or records," it is unlawful; if it is about something else, it is not. In

28  other words, the applicability of the prohibition turns on the content of the speech. *In re Nat'l Sec.*

*Letter*, 930 F. Supp. 2d at 1071. Because "it is the content of the speech that determines whether it is" prohibited, the statute is content-based. *Carey* v. *Brown*, 447 U.S. 455, 462 (1980).

As a content-based restriction on speech, Section 2709 is invalid unless the government "can demonstrate that it passes strict scrutiny—that is, unless it is justified by a compelling government interest and is narrowly drawn to serve that interest." *Brown* v. *Entm't Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011). The narrow-tailoring component of the test requires the government to show that there are no "less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno* v. *ACLU*, 521 U.S. 844, 874 (1997).

There is no doubt that the government has a compelling interest in protecting national security. *Haig* v. *Agee*, 453 U.S. 280, 307 (1981). Nor is there any dispute, as the government points out (PMTD 21), that the government's predictive judgments about potential harms to national security are entitled to some measure of deference. Section 2709(c), however, is not narrowly tailored to promote the government's interest in national security. Moreover, because NSLs are not ordinarily classified, the statute is not narrowly tailored to any interest the government may have in preventing the dissemination of classified information to unauthorized persons. The statute permits the FBI Director to prohibit disclosure whenever he finds that "there may result a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person." 18 U.S.C. 2709(c)(1). That language falls short of narrow tailoring in two respects.

First, the statute is satisfied whenever the FBI Director says that the specified harms "may" occur. That imposes hardly any limit at all, as the word "may" requires only a mere possibility. *See Black's Law Dictionary* 1068 (9th ed. 2009) (defining "may" as "[t]o be a possibility"). Narrow tailoring requires more. *See Frisby* v. *Schultz*, 487 U.S. 474, 485 (1988) (narrow tailoring is satisfied "only if each activity within the proscription's scope is an appropriately targeted evil"); *NAACP* v. *Button*, 371 U.S. 415, 438 (1963) ("Broad prophylactic rules in the area of free expression are suspect."); *accord In re Nat'l Sec. Letter*, 930 F. Supp. 2d

1   at 1077-78.

2         Second, the enumerated harms in the statute cover far more than harm to national security.

3   For example, "interference with a criminal . . . investigation" could refer to even minor

4   interference with an investigation of a misdemeanor offense having nothing to do with national

5   security. Similarly, as the Second Circuit observed in *Doe, Inc.* v. *Mukasey*, 549 F.3d 861, 874

6   (2d Cir. 2008), the "danger to the . . . physical safety of any person" clause "could extend the

7   Government's power to impose secrecy to a broad range of information relevant to such matters

8   as ordinary tortious conduct."

9         c. The government relies heavily (PMTD 21-24) on the Second Circuit's decision in *Doe*,

10   but its reliance is misplaced. Having correctly identified the constitutional problems posed by

11   Section 2709(c)'s broad language, the court in *Doe* mistakenly concluded that they could be

12   avoided by reading the statute to require that there be "an adequate demonstration that a good

13   reason exists reasonably to apprehend a risk of an enumerated harm," 549 F.3d at 882, and that

14   the harm be "related to 'an authorized investigation to protect against international terrorism or

15   clandestine intelligence activities,'" *id.* at 875 (quoting 18 U.S.C. § 2709(b)(1)). Although that

16   reading mitigates the First Amendment problems to some degree, it cannot be reconciled with the

17   statutory text. *See Miller* v. *French*, 530 U.S. 327, 341 (2000) ("We cannot press statutory

18   construction to the point of disingenuous evasion even to avoid a constitutional question.")

19   (internal quotation marks and citation omitted).

20         In any event, even assuming that the broad statutory language could be read in such a

21   limited way, the Second Circuit's standard, which appears to be akin to the reasonable-suspicion

22   standard of the Fourth Amendment, is not sufficient when strict scrutiny is applicable. To be sure,

23   a prohibition on speech might satisfy strict scrutiny if there were "a good reason . . . reasonably to

24   apprehend a risk" of a very serious harm from the speech.  But even as rewritten by the Second

25   Circuit, the statute does not require that the harm be serious—or even more than *de minimis*—

26   only that it be somehow related to a terrorism investigation. That is, it permits speech to be

27   suppressed upon a determination that there is a risk that it might lead to some kind of

28   "interference with [an] investigation" that is in some way related to terrorism, no matter how

PLAINTIFF'S OPPOSITION TO PARTIAL MOTION TO DISMISS
Case No. 14-cv-04480-YGR

1  minimal the interference may be. The statute is not narrowly tailored to promote the interest of

2  national security.

3       d. The highly restrictive nature of Section 2709(c) provides additional reason to conclude

4  that it cannot be the least restrictive means of achieving the government's asserted objective. *See*

5  *Reno*, 521 U.S. at 874. The statute prohibits speech on matters of vital public concern: the

6  government's exercise of coercive authority against recipients—or potential recipients—of NSLs.

7  *See Mills* v. *Alabama*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about

8  interpretations of the First Amendment, there is practically universal agreement that a major

9  purpose of that Amendment was to protect the free discussion of governmental affairs.").

10      The public interest in the speech that Section 2709(c) prohibits is highlighted by the

11  government's many disclosures about its use of NSLs. The government's use of its authority

12  under the NSL statute is a matter of significant public debate, and the government has engaged in

13  that debate by defending its use of the statute. *See, e.g.*, Peter Baker & Charlie Savage, *Obama*

14  *Seeks Balance in Plan for Spy Programs*, N.Y. Times, Jan. 9, 2014 (FBI Director James Comey

15  described the NSL statute as "a very important tool that is essential to the work we do"). Some

16  NSL recipients may agree that the government has used the statute appropriately; others may not.

17  Some, like Twitter, while not seeking to disclose individual NSLs they received, have a strong

18  commitment to transparency and want their users to know in the aggregate how many such

19  demands they receive and the number of accounts affected. Together with the DAG Letter, which

20  allows providers to engage only in speech approved by the government, the nondisclosure

21  provisions impermissibly suppress the speech of those who might be best positioned to offer an

22  informed perspective on the government's position. The First Amendment does not permit the

23  government to engage in viewpoint discrimination by silencing key participants in a debate about

24  the government's activities. *R.A.V.* v. *City of St. Paul, Minn.*, 505 U.S. 377 (1992).

25

26

27

28

1

**CONCLUSION**

2          The partial motion to dismiss should be denied.

3

4      DATED:  February 6, 2015                    Respectfully submitted,

5                                                  **PERKINS COIE** LLP

6                                                  By:  /s/  James G. Snell

7                                                      Eric D. Miller, Bar No. 218416
                                                       EMiller@perkinscoie.com
8                                                      Michael A. Sussmann, D.C. Bar No.
                                                       433100
9                                                      (Admitted *pro hac vice*)
                                                       MSussmann@perkinscoie.com
10                                                     James Snell, Bar No. 173070
                                                       JSnell@perkinscoie.com
11                                                     Hayley L. Berlin, D.C. Bar No. 1011549
                                                       (Admitted *pro hac vice*)
12                                                     HBerlin@perkinscoie.com

13                                                 Attorneys for Plaintiff
                                                   Twitter, Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPPOSITION TO PARTIAL MOTION TO DISMISS
Case No. 14-cv-04480-YGR