Thomas R. Burke (CA State Bar No. 141930)
*thomasburke@dwt.com*
Deborah A. Adler (CA State Bar No. 209525)
*deborahadler@dwt.com*
DAVIS WRIGHT TREMAINE LLP
505 Montgomery Street, Suite 800
San Francisco, California 94111
Telephone: (415) 276-6500
Facsimile: (415) 276-6599

Peter Karanjia (*Pro Hac Vice* Pending)
*peterkaranjia@dwt.com*
DAVIS WRIGHT TREMAINE LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C. 20006-3401
Telephone: (202) 973-4200
Facsimile: (202) 973-4499

Attorneys for *Amici Curiae*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| TWITTER, INC. | Case No. 14-cv-04480 (YGR) |
| Plaintiff, | **BRIEF FOR MEDIA AND WRITERS** ***AMICI*** |
| vs. | |
| ERIC HOLDER, Attorney General of the United States, *et al.*, | |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

**PAGE(S)**

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF *AMICI* INTEREST ...................................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................... 1

ARGUMENT ............................................................................................................................... 3

    I.    Twitter Is Entitled to Bring Its FISA-Based Claims Before an Article III
           Court ............................................................................................................................... 3

    II.    The Aggregate Information Contained in Twitter's Proposed Transparency
          Reports Is Core First Amendment Speech .......................................................... 6

          A.    Government Surveillance Is a Matter of Intense Ongoing Public
                 Discussion ........................................................................................................ 6

          B.    The Media and Recipients of NSLs and FISA Orders Have Mutually
                 Reinforcing First Amendment Interests in Disclosure ................................ 7

    III.    The Nondisclosure Rules Cannot Survive Strict Scrutiny ........................................ 9

          A.    The Nondisclosure Rules Are a Prior Restraint Subject to Strict
                 Scrutiny .......................................................................................................... 10

          B.    The Nondisclosure Rules Are Content-Based Restrictions on Speech
                 Independently Subject to Strict Scrutiny ..................................................... 12

          C.    Strict Scrutiny Requires That Service Providers Be Permitted to
                 Disclose At Least the Aggregate Number of Requests They Have
                 Received .......................................................................................................... 13

CONCLUSION ........................................................................................................................... 16

ADDENDUM:  DESCRIPTIONS OF *AMICI CURIAE* .............................................................. 17

Brief for Media and Writers *Amici*
Case No. 14-cv-04480 (YGR)
DWT 26220844v1 0050033-000277

DAVIS WRIGHT TREMAINE LLP

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*ACLU v. Clapper*,
   959 F. Supp. 2d 724 (S.D.N.Y. 2013), *appeal pending*,
   No. 14-42 (2d Cir. Jan. 2014)...................................................................4, 7

*Alexander v. United States*,
   509 U.S. 544 (1993) ...................................................................11, 12

*Bartnicki v. Vopper*,
   532 U.S. 514 (2001) ...................................................................11

*Brown v. Entertainment Merchants Ass'n*,
   131 S. Ct. 2729 (2011) ...................................................................13

*Consolidated Edison Co. of New York v. Public Serv. Comm'n*,
   447 U.S. 530 (1980) ...................................................................12

*Curtis Publ'g Co. v. Butts*,
   388 U.S. 130 (1967) ...................................................................8

*Doe v. Gonzales*,
   500 F. Supp. 2d 379 (S.D.N.Y. 2007) ...................................................................7

*First Nat'l Bank of Boston v. Bellotti*,
   435 U.S. 765 (1978) ...................................................................2, 9, 11

*Gannett Co v. DePasquale*,
   443 U.S. 368 (1979) ...................................................................5

*Garrison v. Louisiana*,
   379 U.S. 64 (1964) ...................................................................8

*Grand Jury Subpoena For: [Redacted]@Yahoo.com*, Order Denying Motion
   Pursuant to 18 U.S.C. § 2705(b), ECF No. 1, No. 5:15-xr-90096-PSG
   (N.D. Cal. Feb. 5, 2015) ...................................................................5

*In re Application of FBI for an Order Requiring the Production of Tangible Things*,
   No. BR 14-01 (F.I.S.C. Apr. 25, 2014) ...................................................................4

*In re Motion for Release of Court Records*,
   526 F. Supp. 2d 484 (F.I.S.C. 2007) ...................................................................5

*In re Nat'l Sec. Letter*,
   930 F. Supp. 2d 1064 (N.D. Cal. 2013), *appeal pending*,
   Nos. 13-15957 & 13-16731, 13-16732 (9th Cir. 2013) ...................................................................3, 7, 13, 14

-ii-

DAVIS WRIGHT TREMAINE LLP

*In re Nat'l Sec. Agency Telecomms. Records Litig.*,
   671 F.3d 881 (9th Cir. 2011) ........................................................................4

*John Doe, Inc. v. Mukasey*,
   549 F.3d 861 (2d Cir. 2008) ..............................................................*passim*

*Klayman v. Obama*,
   957 F. Supp. 2d 1 (D.D.C. 2013), *appeal pending*,
   Nos. 14-5004, 14-5005, 14-5016 & 14-5017 (D.C. Cir. Jan. 2014) ......................4, 7

*Marbury v. Madison*,
   1 Cranch 137 (1803) ........................................................................3

*Nebraska Press Ass'n v. Stuart*,
   427 U.S. 539 (1976) ........................................................................10

*New York Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ........................................................................1

*New York Times Co v. United States*,
   403 U.S. 713 (1971) ........................................................4, 10, 13, 14

*Organization for a Better Austin v. Keefe*,
   402 U.S. 415 (1971) ........................................................................10

*Police Dep't of City of Chicago v. Mosley*,
   408 U.S. 92 (1972) ........................................................................9

*Reno v. ACLU*,
   521 U.S. 844 (1997) ........................................................................13

*Richmond Newspapers, Inc v. Virginia*,
   448 U.S. 555 (1980) ........................................................................8

*Seattle Times Co. v. Rhinehart*,
   467 U.S. 20 (1984) ........................................................................11

*Sorrell v. IMS Health Inc.*,
   131 S. Ct. 2653, 2667 (2011) ........................................................11

*Sorrell v. IMS Health Inc.*,
   630 F.3d 263 (2d Cir. 2010) ........................................................11

*Stern v. Marshall*,
   131 S. Ct. 2594 (2011) ........................................................................4

*United States v. Moalin*,
   No. 10cr4246 JM, 2013 WL 6079518 (S.D. Cal. Nov. 18, 2013) ......................7

*United States v. Playboy Entm't Grp., Inc.*,
   529 U.S. 803 (2000) ........................................................................14

DAVIS WRIGHT TREMAINE LLP

*United States v. Stevens,*
    559 U.S. 460 (2010) ...........................................................................12, 14

*Zivotofsky ex rel. Zivotofsky v. Clinton,*
    132 S. Ct. 1421 (2012) .............................................................................3, 4

**Statutes**

18 U.S.C. § 2709 ...........................................................................5, 10, 11, 13

50 U.S.C. § 1805 ...................................................................................10, 13

**Other Authorities**

Mark Landler & Peter Baker, *Obama to Restrict Phone Surveillance,*
    N.Y. Times, Jan. 18, 2014 ...............................................................................7

Peter Baker & Charlie Savage, *Obama Seeks Balance in Plan for Spy Programs,*
    N.Y. Times, Jan. 9, 2014 ...............................................................................8

Pew Research Center, *Public Perceptions of Privacy and Security in the Post-Snowden Era*, Nov. 2014...............................................................................7

*Poll: Most Americans Now Oppose the NSA Program*, USA Today, Jan. 20, 2014 .......................8

Brief for Media and Writers *Amici*
Case No. 14-cv-04480 (YGR)
DWT 26220844v1 0050033-000277

DAVIS WRIGHT TREMAINE LLP

## STATEMENT OF *AMICI* INTEREST

Non-parties BuzzFeed, Inc., First Look Media, Inc., Guardian News & Media (publisher of *The Guardian*), National Public Radio, Inc., PEN American Center ("PEN"), and WP Company LLC d/b/a *The Washington Post* (collectively, the *amici*) are media organizations and a non-profit association of writers.

*Amici* are committed to the principle of transparency, and have a strong interest in exercising their First Amendment rights to inform the public about the ongoing debate concerning government surveillance activities. *Amici* are therefore keenly interested in the proper resolution of this case, which challenges the government's prior restraint regime restricting disclosures about its issuance of National Security Letters and orders under the Foreign Intelligence Surveillance Act to communications service providers such as Twitter.

## SUMMARY OF ARGUMENT

Edward Snowden's revelations in 2013 about the National Security Agency's surveillance programs sparked an intense and ongoing international debate over the proper balance between privacy interests and national security. But if "debate on public issues" is to be "uninhibited, robust, and wide-open,'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)—and if the First Amendment is to continue to preserve the conditions for informed debate in our democracy—the government must be held to a high burden before fundamental First Amendment freedoms can be sacrificed in the name of national security. The government has not met that burden in this case. Imposing a classic prior restraint, communications service providers such as Twitter are prohibited from publishing—and the media are prevented from reporting on—the aggregate numbers of National Security Letters (NSLs) and orders under the Foreign Intelligence Surveillance Act (FISA) they have received. At the same time, however, the government has not hesitated to engage in its own advocacy on the subject—for example, arguing that NSLs are a critical law enforcement tool. This regime virtually ensures a lop-sided release of information to the public on this subject of intense interest, handicaps the media in its efforts to correct government misstatements, and skews the marketplace of ideas in a way that invites viewpoint discrimination. It cannot be squared with the First Amendment.

DAVIS WRIGHT TREMAINE LLP

Brief for Media and Writers *Amici*
Case No. 14-cv-04480 (YGR)
DWT 26220844v1 0050033-000277

Among the procedural roadblocks to this action that the government raises in its Partial Motion to Dismiss, *amici* are particularly concerned by the argument that *only* the Foreign Intelligence Surveillance Court (FISC)—and not this Court—should hear Twitter's challenge to the rules barring disclosures about receipt of FISA orders.  If accepted, this argument would undermine the traditional role of Article III courts as neutral arbiters of constitutional rights, would defer adjudication—in a case about transparency—to a tribunal whose proceedings are shrouded in secrecy, and would needlessly complicate proceedings.  Contrary to the government's assertion, resolution of Twitter's FISA-related claims does not call for the FISC's interpretation of its own orders or jeopardize national security information.  It calls for this Court to test the constitutionality of rules banning disclosures of aggregate information about NSLs and FISA orders alike.  Those claims are inextricably intertwined, and this Court—like other courts that adjudicate constitutional claims in declaratory judgment actions every day—is fully capable of addressing them.

The government also misses the mark in arguing that gag orders accompanying NSLs are not subject to strict scrutiny.  The nondisclosure regime for NSLs and FISA orders triggers that exacting standard of review both because it is a prior restraint and because it is a content-based restriction of speech.  The government points to *John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d Cir. 2008), a case in which the Second Circuit characterized the statute authorizing gag orders for NSLs as an atypical prior restraint—and hence subject to a lower level of scrutiny—supposedly because it is "not … imposed on those who customarily wish to exercise  rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *Id.* at 876.  The Second Circuit's analysis was flawed, and this Court should not follow it.  Twitter's proposed transparency report is no less entitled to free speech protections than "literature" or "movies." Publication of factual information is fully protected by the First Amendment, and any rule that made it easier for the government to impose prior restraints on some (favored) speakers than others would run afoul of the bedrock principle that, "[i]n the realm of protected speech, the [government] is constitutionally disqualified from dictating … the speakers who may address a public issue." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 784-85 (1978).

Finally, the government's nondisclosure rules cannot withstand strict scrutiny. As Judge Illston recently posited, a gag order might be justified in the limited situation where a recipient of NSLs "has only a handful of subscribers," and so "disclosure could compromise a national security investigation." *In re Nat'l Sec. Letter*, 930 F. Supp. 2d 1064, 1076 (N.D. Cal. 2013), *appeal pending*, Nos. 13-15957 & 13-16731, 13-16732 (9th Cir. 2013). To the extent that is the government's concern, it does not support the sweeping nondisclosure rules here. "The problem … is that the statute"—and the government's current policies—"do[] nothing to account for the fact that when no such national security concerns exist, thousands of recipients of NSLs are nonetheless prohibited from speaking out about the mere fact of their receipt of an NSL, rendering the [regime] impermissibly overbroad and not narrowly tailored." *Id.* That concern is particularly acute where, as here, a service provider seeks to release only aggregate information about NSLs or FISA orders.

The motion to dismiss should be denied.

## ARGUMENT

### I. TWITTER IS ENTITLED TO BRING ITS FISA-BASED CLAIMS BEFORE AN ARTICLE III COURT

In its Partial Motion to Dismiss, the government advances the remarkable claim that *only* the FISC—and not this Court—should hear Twitter's challenge to the rules prohibiting a service provider from disclosing the actual aggregate number of FISA orders it has received. *See* Mot. at 13. According to the government, to the extent Twitter challenges "FISA secrecy provisions," the Court should send that part of the case to the FISC. Mot. at 14-19. The government's argument has no basis in law, will not advance the interests of justice, and, if accepted, would set a dangerous precedent that undermines the traditional role of Article III courts as neutral arbiters of constitutional challenges to government action.

"At least since *Marbury* v. *Madison*, 1 Cranch 137 (1803)," the Supreme Court has "recognized that when an Act of Congress is alleged to conflict with the Constitution, '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427-28 (2012). The government does not

DAVIS WRIGHT TREMAINE LLP

dispute—nor could it—that Article III courts routinely adjudicate constitutional challenges to government action, often in the context of declaratory judgment actions like this one. The Ninth Circuit, for example, has not hesitated to adjudicate a challenge to the constitutionality of the Foreign Intelligence Surveillance Act, *see In re National Security Agency Telecommunications Records Litigation*, 671 F.3d 881 (9th Cir. 2011), and other courts have examined the constitutionality of the National Security Agency's program involving the bulk collection of telephone metadata, *see, e.g.*, *ACLU v. Clapper*, 959 F. Supp. 2d 724, 730 (S.D.N.Y. 2013), *appeal pending*, No. 14-42 (2d Cir. Jan. 2014); *Klayman v. Obama*, 957 F. Supp. 2d 1, 10 (D.D.C. 2013), *appeal pending*, Nos. 14-5004, 14-5005, 14-5016 & 14-5017 (D.C. Cir. Jan. 2014)—a subject that the FISC has also addressed. *See, e.g.*, *In re Application of FBI for an Order Requiring the Production of Tangible Things*, No. BR 14-01 (F.I.S.C. Apr. 25, 2014). Indeed, an Article III court has "a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" *Zivotofsky*, 132 S. Ct. at 1427 (citation omitted).

Vindicating the rights of litigants to have their constitutional challenges to government action heard by an Article III court is also fundamental to the separation of powers among the branches of government. "In establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'" *Stern v. Marshall*, 131 S. Ct. 2594, 2608-09 (2011) (quoting The Federalist No. 78, at 466 (A. Hamilton) (Clinton Rossiter ed., 1961)). That is because, "'there is no liberty if the power of judging be not separated from the legislative and executive powers.'" *Id.* at 2609 (quoting 1 Montesquieu, Spirit of Laws 181).

In a case about prior restraints (*see* Point II, *infra*)—one of the principal colonial abuses that galvanized adoption of the First Amendment, *see New York Times Co. v. United States*, 403 U.S. 713, 719 (1971) (*per curiam*)—the independence of Article III courts takes on singular importance. *See Stern*, 131 S. Ct. at 2609 (explaining that "[t]he Framers undertook in Article III to protect citizens subject to the judicial power of the new Federal Government from a repeat of [such] abuses."). And those concerns are magnified where, as here, the government urges the

federal judiciary to refrain from adjudicating First Amendment claims in favor of a tribunal that meets in secret, does not ordinarily publish its opinions, and sits as part of the Executive Branch.[1]

"[A]s a rule," the FISC issues its orders in a "nonpublic fashion." *In re Motion for Release of Court Records*, 526 F. Supp. 2d 484, 490 (F.I.S.C. 2007). Indeed, "[i]t is this highly classified, and fundamentally secret, nature of FISC records that distinguishes them from the records of other courts." *Id.* As Justice Blackman reasoned, "[s]ecret hearings—though they be scrupulously fair in reality—are suspect by nature. Public confidence cannot long be maintained where important judicial decisions are made behind closed doors and then announced in conclusive terms to the public, with the record supporting the court's decision sealed from public view." *Gannett Co v. DePasquale*, 443 U.S. 368, 429 (1979) (Blackmun, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted); *see also Grand Jury Subpoena For: [Redacted]@Yahoo.com*, Order Denying Motion Pursuant to 18 U.S.C. § 2705(b), ECF No. 1, at 7, No. 5:15-xr-90096-PSG (N.D. Cal. Feb. 5, 2015) (Mag. J.) (acknowledging the "increasing public demand for transparency about the extent of government demands for data" from electronic communications service providers).

Because the FISC's proceedings defeat transparency—the very principle this case is about—and disserve the public's interest in access to judicial proceedings, depriving Twitter of an Article III forum to adjudicate its FISA-related First Amendment claims assuredly would not be "equally fair to the litigants," as the government contends. Mot. at 15. Nor is there any plausible need for secrecy in adjudicating those claims: Twitter has filed a public complaint, and both sides have publicly filed briefs on the government's Partial Motion to Dismiss. Any classified information on which the government may rely could be filed under seal.

The government argues (Mot. at 15) that considerations of "the orderly administration of justice" should persuade this Court to decline jurisdiction in favor of the FISC, but that contention rings hollow. It is undisputed that, under the January 2014 letter from the Deputy Attorney

---

[1] The decisions cited by the government (*see* Mot. at 15-16) are inapposite, as those cases involved situations where the transferee forum was an *Article III court*—not a court of "specialized jurisdiction" such as the FISC. The government does not cite a single case for the proposition that Article III courts may not adjudicate challenges to FISA orders. That is unsurprising, as *nothing* in FISA suggests that the FISC has exclusive jurisdiction to hear such claims.

DAVIS WRIGHT TREMAINE LLP

General to five Internet companies (the "DAG letter"), *any* communications service provider is prohibited from revealing more about its receipt of FISA orders (or NSLs) than the extremely broad-brush form of disclosures the government has approved.[2] Thus, contrary to the government's current theory (Mot. at 16-19), it is not necessary to examine particular FISC orders and directives in order to adjudicate Twitter's First Amendment claims. The government has unequivocally stated its "position that the terms outlined in the [DAG letter] define the limits of permissible reporting for the parties and other similarly situated companies." Compl., Ex. 2 at 2. By imposing such a blanket gag order, the government cannot now evade this Court's review by contending that the case turns in significant part on the FISC's interpretation of its own orders. The DAG letter sets forth a general nondisclosure rule and in no way suggests that further elaboration from the FISC is required.

In any event, this Court—like the courts cited above (*see* p. 4)—is fully capable of interpreting the relevant provisions of law in this case. And judicial economy will be best served by deciding both the FISA-related claims and NSL-related claims. As the discussion below demonstrates, both sets of claims are inextricably intertwined: The nondisclosure rules that apply to FISA orders and NSLs equally function as prior restraints; are equally subject to strict scrutiny; and are equally indefensible under that standard of review. *See* Points II & III, *infra*.

For all these reasons, plaintiffs like Twitter should continue to have their choice of forum when challenging the constitutionality of FISA-based orders or directives. The government should not be allowed to close the Article III courthouse doors on such claims.

## II.     THE AGGREGATE INFORMATION CONTAINED IN TWITTER'S PROPOSED TRANSPARENCY REPORTS IS CORE FIRST AMENDMENT SPEECH

### A.     Government Surveillance Is a Matter of Intense Ongoing Public Discussion

In June 2013, *amici The Guardian* and *The Washington Post* reported—based on disclosures by Edward Snowden, a former NSA contractor—that the NSA had engaged in a secret

---

[2] Under the DAG letter, service providers can either (1) report *in bands of 1000,* starting with 0-999, the number of NSLs or FISA orders they have received or (2) report *in bands of 250*, starting with 0-249, the total number of all national security process received, provided that they do not distinguish between NSLs and FISA orders. *See* Compl., Ex. 1. More meaningful, granular disclosures, such as the actual aggregate amounts of NSLs a service provider has received within a six-month period, are banned. *See* Compl., Ex. 5.

surveillance program involving the bulk collection of metadata for the phone calls of millions of U.S. citizens. *See United States v. Moalin*, No. 10cr4246 JM, 2013 WL 6079518, at *3 (S.D. Cal. Nov. 18, 2013); *Clapper*, 959 F. Supp. 2d at 730; *Klayman*, 957 F. Supp. 2d at 10. NSA director Keith Alexander later confirmed that the NSA was "collect[ing] and stor[ing] all phone records of American citizens." *Moalin*, 2013 WL 6079518, at *3.

These revelations initiated a widespread and far-reaching debate over the government's use of NSLs and FISA orders as surveillance tools in investigations involving national security. *In re Nat'l Sec. Letter*, 930 F. Supp. 2d at 1076 (Illston, J.) (noting "the active, continuing public debate over NSLs, which has spawned a series of Congressional hearings, academic commentary, and press coverage"), *appeal pending*, Nos. 13-15957 & 13-16731, 13-16732 (9th Cir.); *Clapper*, 959 F. Supp. 2d at 730 ("[R]obust discussions are underway across the nation, in Congress, and at the White House …."). There can be no serious dispute that this debate is "a matter of the utmost public interest." *Doe v. Gonzales*, 500 F. Supp. 2d 379, 395 (S.D.N.Y. 2007) (noting—even before the Snowden revelations—that "[t]he government's use of NSLs to obtain private information about activities of individuals using the internet is a matter of the utmost public interest."), *aff'd in part and rev'd in part sub nom. John Doe, Inc. v. Mukasey*, 549 F.3d 861 (2d Cir. 2008). Indeed, President Obama has "acknowledged that the disclosures raised profound issues in the balance between liberty and security." Mark Landler & Peter Baker, *Obama to Restrict Phone Surveillance*, N.Y. Times, Jan. 18, 2014.

### B. The Media and Recipients of NSLs and FISA Orders Have Mutually Reinforcing First Amendment Interests in Disclosure

As this litigation vividly illustrates, many recipients of NSLs and FISA Orders *want to* disclose basic, aggregate information—information that does not reveal specifics about any particular surveillance request—about the general extent of the government's surveillance activities. The media likewise *want to* report this information to the public which, in turn, *wants to* receive it. Indeed, recent surveys confirm the public's concerns about government surveillance and its impact on personal privacy. *See, e.g.*, Pew Research Center, *Public Perceptions of Privacy*

*and Security in the Post-Snowden Era*, Nov. 2014, at 3; *Poll: Most Americans Now Oppose the*

*NSA Program*, USA Today, Jan. 20, 2014.

The government's current rules defining the outer limits of disclosure—reflected in the DAG letter —flatly prohibit publication of such aggregate information, and thus impinge on the First Amendment rights of both recipients of national security process and the media.  Worse still, the rules strike at the heart of the First Amendment's structural protections of the democratic process.  "Customarily, First Amendment guarantees are interposed to protect communication between speaker and listener.…  But the First Amendment embodies more than a commitment to free expression and communicative interchange for their own sakes; it has a *structural* role to play in securing and fostering our republican system of self-government."  *Richmond Newspapers, Inc v. Virginia*, 448 U.S. 555, 586-87 (1980) (Brennan, J., concurring in the judgment).  As Justice Brennan explained in *Richmond Newspapers*, this ensures not only that "'debate on public issues [remains] uninhibited, robust, and wide-open,'" but also that it is "informed" and thus contributes to "th[e] process of communication necessary for a democracy to survive."  *Id.* at 587-88 (citing, *inter alia*, *New York Times Co. v. Sullivan*, 376 U.S. at 270); *see also Garrison v. Louisiana*, 379 U.S. 64, 74-75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government."), *overruled on other grounds by Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 134 (1967).  As President Obama has recognized, "in the absence of institutional requirements for regular debate—and oversight that is public, as well as private or classified—the danger of government overreach becomes more acute.  And this is particularly true when surveillance technology and our reliance on digital information is evolving much faster than our laws."  Remarks by the President on Review of Signals Intelligence, Jan. 14, 2014.

The government's current nondisclosure regime further undermines the First Amendment's structural protections by skewing the marketplace of ideas in a way that invites viewpoint discrimination.  While communications service providers have been entirely muzzled in their efforts to inform the public of even the most basic, aggregate information about the extent of the government's surveillance, the government has not hesitated to engage in its own advocacy on the subject.  *See, e.g.*, Peter Baker & Charlie Savage, *Obama Seeks Balance in Plan for Spy*

The government's use of gag orders in this manner is not to safeguard sensitive information, but instead to control the *message* that both recipients of national security process and the media wish to convey. "Especially where … the [government's] suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785-86 (1978) (footnote omitted); *see also Doe v. Gonzales*, 500 F. Supp. 2d at 397-98 ("By … allowing the FBI to pick and choose which NSL recipients are prohibited from discussing the receipt of an NSL, conceivably the FBI can engage in viewpoint discrimination by deciding to certify nondisclosure when it believes the recipient may speak out against the use of the NSL and not to require nondisclosure when it believes the recipient will be cooperative."). Indeed, the mere existence of a regulatory framework that creates a serious risk of selectively suppressing viewpoints is constitutionally intolerable. *Cf. Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 97 (1972) ("[B]ecause of their potential use as instruments for selectively suppressing some points of view, this Court has condemned licensing schemes that lodge broad discretion in a public official to permit speech-related activity.") (citing cases).

The nondisclosure rules reflected in the DAG letter virtually ensure an uneven flow of information to the public about this subject of intense interest, prevent the media from correcting misstatements by government officials about the use and utility of NSLs and FISA orders, and generally handicap the media and writers in their efforts to inform the public about government surveillance. As explained below, the government cannot come close to carrying its heavy burden to justify this sweeping sacrifice of First Amendment rights in the name of national security.

## III. THE NONDISCLOSURE RULES CANNOT SURVIVE STRICT SCRUTINY

The nondisclosure framework reflected in the DAG letter builds on the gag orders that the FBI (for NSLs) and the FISC (for FISA orders) typically impose when requiring service providers

to turn over information as part of government surveillance efforts. *See* 18 U.S.C. § 2709(c)(1)

(NSL recipient "shall not disclose to anyone," except counsel, "that the FBI has sought or obtained

access to information or records sought in the NSL," where FBI director or designee certifies that

"there may result a danger to the national security of the United States, interference with a

criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic

relations, or danger to the life or physical safety of ant person"); 50 U.S.C. § 1805(c)(2)(B)

(recipients of FISA orders approving electronic surveillance shall provide the government with

"all information, facilities, or technical assistance necessary to accomplish electronic surveillance

in such a manner as will protect its secrecy"); 50 U.S.C. § 1805(d)(2)(B)(i) (similar requirement

for FISA orders authorizing pen registers and trap and trace devices). Together, these rules

impose a prior restraint on speech that could survive Twitter's First Amendment challenge only by

satisfying "strict scrutiny"—the most exacting standard of constitutional review, and one the

government cannot meet here.

### A.     The Nondisclosure Rules Are a Prior Restraint Subject to Strict Scrutiny

"Any prior restraint on expression comes to [a court] with a 'heavy presumption' against

its constitutional validity." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971).

Indeed, a prior restraint is "the most serious and the least tolerable infringement on First

Amendment rights," *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976), and "the barriers

to" such a restriction on speech are "high," *id.* at 570. "The Government 'thus carries a heavy

burden of showing justification for the imposition of such a restraint.'" *New York Times Co. v.

United States*, 403 U.S. at 714 (citation omitted).

The rules banning service providers like Twitter from disclosing aggregate information

about the general extent of the government's surveillance activities—and instead limiting them to

broad-brush statements that they have received, for example, anywhere between zero and 999

NSLs or FISA orders—are a classic prior restraint. As the Supreme Court has explained, "[t]he

term prior restraint is used to describe administrative and judicial orders forbidding certain

communications when issued in advance of the time that such communications are to occur."

Brief for Media and Writers *Amici*
Case No. 14-cv-04480 (YGR)
DWT 26220844v1 0050033-000277

DAVIS WRIGHT TREMAINE LLP

DAVIS WRIGHT TREMAINE LLP

*Alexander v. United States*, 509 U.S. 544, 550 (1993) (internal quotation marks and citation omitted). That precisely describes the nondisclosure regime here.

Relying on *John Doe, Inc. v. Mukasey*, 549 F.3d 861, the government disputes that strict scrutiny applies to the nondisclosure rule set forth in 18 U.S.C. § 2709(c)(1)—the provision of the NSL statute authorizing the FBI to prohibit any statements about a service provider's receipt of an NSL. Mot. at 20-21. In *Mukasey*, the Second Circuit recognized that Section 2709(c)(1) "is in some sense a prior restraint," but deemed the prior restraint atypical—and hence subject to a less "exacting" level of scrutiny—based on the theory that "it is not … imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." 549 F.3d at 876 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984)).

The Second Circuit's analysis was deeply flawed, and this Court should not follow it. Whether a speaker distributes handbills on a public street or publishes a report on a matter of indisputable public concern, it is "exercis[ing] [its] rights of free expression," *id.*—as are the media and writers when they seek to communicate this information to the public. Twitter's proposed transparency report is no less entitled to the protections of the First Amendment than "literature" or "movies," *id.* "[I]f the acts of 'disclosing' and 'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001). "Facts, after all, are the beginning point for much of the speech that is most essential to advance human knowledge and to conduct human affairs." *Sorrell v. IMS Health Inc.*, 131 S. Ct. 2653, 2667 (2011), *aff'g* 630 F.3d 263 (2d Cir. 2010); *see also Sorrell*, 630 F.3d at 271-72 ("[T]he First Amendment protects 'even dry information, devoid of advocacy, political relevance, or artistic expression.'") (citation omitted). Moreover, the notion that some prior restraints are constitutionally more tolerable because they affect certain disfavored speakers—as opposed to, for example, "distributors of literature," *Mukasey*, 549 F.3d at 876—is antithetical to core First Amendment principles. "In the realm of protected speech, the [government] is constitutionally disqualified from dictating the subjects about which persons may speak *and the speakers who may address a public issue*." *Bellotti*, 435 U.S. at 784-85 (emphasis added). Nor

1    does such a myopic understanding of the First Amendment make sense as a practical matter, as

2    means of communication constantly evolve with new technology.  Indeed, Twitter created an

3    entirely novel medium (communication in 140-character messages or "tweets") that did not even

4    exist a decade ago.  It is no less entitled to the full protections of the First Amendment than the

5    founding-era citizens who communicated using quill pens.

6         Because transparency reports such as Twitter's constitute speech that is fully protected by

7    the First Amendment, and because the government's nondisclosure rules "forbid" publication of

8    such reports "in advance of the time that such [publication is] to occur," *Alexander*, 509 U.S. at

9    550, the nondisclosure rules are a classic prior restraint.[3]

10    **B.**    **The Nondisclosure Rules Are Content-Based Restrictions on Speech**

11             **Independently Subject to Strict Scrutiny**

12         Even if the nondisclosure rules did not impose a presumptively unconstitutional prior

13    restraint, they trigger strict scrutiny on the independent ground that they are content-based

14    restrictions of speech.

15         "The First Amendment's hostility to content-based regulation extends not only to

16    restrictions on particular viewpoints, but also to prohibition of public discussion of an entire

17    topic." *Consolidated Edison Co. of New York v. Public Serv. Comm'n*, 447 U.S. 530, 537 (1980);

18    *United States v. Stevens*, 559 U.S. 460, 468 (2010) ("'[A]s a general matter, the First Amendment

19    means that government has no power to restrict expression because of its message, its ideas, its

20    *subject matter*, or its content.'") (emphasis added; citation omitted).

21         Here, the government has broadly prohibited speech about "an entire topic"—the actual

22    numbers of NSLs and FISA orders that service providers have received.  And that content-based

---

[3] The *Mukasey* court's reliance on *Seattle Times* as a basis for applying a lower level of First Amendment scrutiny is perplexing because, elsewhere in its opinion, the court took pains to distinguish that case.  *See* 549 F.3d at 877 ("[T]he Government seeks to enlist cases involving … a prohibition on disclosure of information obtained by a litigant through court-ordered discovery, *see Seattle Times*.... We fail to appreciate the analogy between the individuals or the entity seeking disclosure in [that] case[] and John Doe, Inc. [the party challenging the NSL nondisclosure provision before the court], who had no interaction with the Government until the Government imposed its nondisclosure requirement upon it.").  Perhaps for this reason, the opinion in *Mukasey* notes that the panel was "not in agreement" about whether the traditional standard of strict scrutiny applied or some lesser standard of review that is "not quite as 'exacting'" but is nonetheless "a form of strict scrutiny."  *Id.* at 878.

restriction on speech triggers strict scrutiny. *See In re Nat'l Sec. Letter*, 930 F. Supp. 2d at 1071 ("[T]he nondisclosure provision clearly restrains speech of a particular content—significantly, speech about government conduct."); *see also id.* at 1075 (applying strict scrutiny).

### C. Strict Scrutiny Requires That Service Providers Be Permitted to Disclose At Least the Aggregate Number of Requests They Have Received

The nondisclosure rules can survive strict scrutiny only if they are "narrowly drawn to serve" a "compelling government interest," *Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2738 (2011), and there are no "less restrictive alternatives [that] would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve," *Reno v. ACLU*, 521 U.S. 844, 874 (1997). This is "a demanding standard," and "'[i]t is rare that a regulation restricting speech because of its content will ever be permissible.'" *Brown*, 131 S. Ct. at 2738 (citation omitted).

Under the NSL statute, the prerequisite for obtaining a gag order is merely an FBI certification that various enumerated harms—including "interference with" any "criminal, counterterrorism, or counterintelligence investigation"—"may" occur. 18 U.S.C. § 2709(c)(1).[4] While *amici* recognize that protection of national security is a compelling governmental interest, the NSL statute's nondisclosure provision flunks strict scrutiny because it allows members of the Executive—including any "designee" of the FBI director—to ban speech in advance of publication based on purely hypothetical harms.

More is needed before fundamental First Amendment freedoms are sacrificed in the name of national security. In the "Pentagon Papers" case, for example, the Supreme Court rejected the government's request to enjoin *The New York Times* and *Washington Post* from publishing "the contents of a classified study entitled 'History of U.S. Decision-Making Process on Viet Nam Policy.'" *New York Times Co.*, 403 U.S. at 714. As Justice Brennan's concurring opinion explained, such hypothetical claims of harm fall short where, as here, First Amendment rights are compromised: "The entire thrust of the Government's claim … has been that publication of the

---

[4] The FISA statute does not even require such a minimal showing to authorize electronic surveillance. *See* 50 U.S.C. § 1805(c)(2)(B) (order shall direct that service provider give the government with "all information, facilities, or technical assistance necessary to accomplish electronic surveillance in such a manner as will protect its secrecy").

material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." *Id.* at 725-26 (Brennan, J., concurring).

As a matter of "*noblesse oblige*," *Stevens*, 559 U.S. at 480, the government now allows service providers to disclose that they have received some non-specific number of NSLs or FISA orders within very broad ranges (for example, any number between zero and 999). *See* Compl., Ex. 1 (DAG letter). But even under this framework—which the government suggests it is free to change at any moment[5]—recipients of NSLs and FISA orders may not publish the actual aggregate numbers of such requests. *Id.* For example, Twitter would like to inform the public of the actual aggregate number of NSLs and FISA Orders it has received from July 1 to December 13, 2013, but it is prohibited from doing so. *See* Compl. ¶ 40 & Ex. 5 (FBI letter, asserting that information in report is "classified and cannot be publicly released"). And that prohibition applies even though it is undisputed that the data would be anonymized and would not disclose any specific information about a particular surveillance request.

Under strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the [Government] *must* use that alternative." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000) (emphasis added). That dooms the government's nondisclosure rules.

As Judge Illston recently explained in the litigation challenging the NSL statute, "the government has *not* shown that it is generally necessary to prohibit recipients from disclosing the mere fact of their receipt of NSLs," *In re Nat'l Sec. Letter*, 930 F. Supp. 2d at 1076—much less that it is necessary to maintain an embargo on all data (including even aggregate data) about NSLs and FISA orders that anyone other than the government wishes to publish.

---

[5] While *amici* agree with Twitter (*see* Pl. Opp. to Mot. at 5-8) that the DAG letter represents a binding "rule," the government has argued that the framework set forth in the letter has no "legal consequences" and does not impose any "new rights or obligations." Mot. at 11. In other words, according to the government, it exists purely as a matter of executive grace—the very definition of *noblesse oblige* that the Court emphatically repudiated in *Stevens*. *See* 559 U.S. at 480 ("[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*.").

Judge Illston posited a situation where the government may have a legitimate justification for imposing a gag order: a recipient of NSLs "has only a handful of subscribers," such that "disclosure could compromise a national security investigation." *Id.* To the extent that is the government's concern, it does not justify the sweeping breadth of the nondisclosure rules here. The government instead could restrict disclosure only in cases where the recipient has such a small number of subscribers (say, fewer than 100) that any disclosure of the number of requests received might alert the subject of surveillance to an ongoing investigation and potential government action. "The problem … is that the statute"—and the DAG letter—"do[] nothing to account for the fact that when no such national security concerns exist, thousands of recipients of NSLs are nonetheless prohibited from speaking out about the mere fact of their receipt of an NSL, rendering the statute impermissibly overbroad and not narrowly tailored." *Id.* That concern is exacerbated where a service provider such as Twitter wishes to release only aggregate information (but actual numbers, rather than the "anywhere within a range of 1000" categories the government currently permits).

In sum, the government does not come close to satisfying its heavy burden of establishing that its prior restraint regime satisfies strict scrutiny. That exacting standard of review requires that service providers be allowed to disclose at least the aggregate number of NSLs and FISA orders they have received.

## CONCLUSION

The Court should deny the government's Partial Motion to Dismiss.

Dated:   February 17, 2015

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:_____/s/ Thomas R. Burke_____

Thomas R. Burke (CA State Bar No. 141930)
Deborah A. Adler (CA State Bar No. 209525)
Davis Wright Tremaine LLP
505 Montgomery Street, Suite 800
San Francisco, California  94111
Telephone:     (415) 276-6500
Facsimile:      (415) 276-6599

By:_____/s/ Peter Karanjia_____

Peter Karanjia (*Pro Hac Vice* Pending)
Davis Wright Tremaine LLP
1919 Pennsylvania Avenue, N.W.
Suite 800
Washington, D.C.  20006-3401

*Attorneys for* Amici Curiae *BuzzFeed, Inc., First Look Media, Inc., Guardian News & Media, National Public Radio, Inc., PEN American Center, and WP Company LLC (d/b/a* The Washington Post)

**BuzzFeed, Inc.** is a social news and entertainment company. It provides the breaking news, original reporting, entertainment, and video across the social web to its global audience of more than 200 million users.

**First Look Media, Inc.** is a non-profit digital media venture that produces The Intercept, a digital magazine focused on national security reporting. First Look Media, Inc. believes that democracy depends on a citizenry that is highly informed and deeply engaged with the issues that affect their lives. First Look seeks to improve society through journalism and technology, to help individuals hold the powerful accountable, build responsive institutions and, most important, shape their communities and what happens in their lives for the better.

**Guardian News and Media** is the publisher of *The Guardian*, a British national daily newspaper, and *The Observer*, a British Sunday newspaper. Founded in 1821 as a local paper, *The Guardian* has grown into a national paper with an associated international multimedia and web presence at www.theguardian.com. *The Guardian*'s U.S. team is most recently renowned for its Pulitzer Prize-winning reporting (based on the disclosures by Edward Snowden) on the National Security Agency's surveillance programs.

**National Public Radio, Inc.** is an award-winning producer and distributor of noncommercial news programming. A privately supported, not-for-profit membership organization, NPR serves a growing audience of more than 26 million listeners each week by providing news programming to 285 member stations that are independently operated, noncommercial public radio stations. In addition, NPR provides original online content and audio streaming of its news programming. NPR.org offers hourly newscasts, special features and 10 years of archived audio and information.

**PEN American Center** is a non-profit association of writers with approximately 4,000 members. PEN International was founded in 1921, in the aftermath of the first World War, by leading European and American writers who believed that the international exchange of ideas was the only way to prevent disastrous conflicts born of isolation and extreme nationalism. Today,

PEN works along with the other chapters of PEN International to advance literature, protect freedom of expression, and advocate for writers all over the world who are persecuted because of their work.

**WP Company LLC (d/b/a The Washington Post)** publishes one of the nation's most prominent daily newspapers, as well as a website, www.washingtonpost.com, that is read by an average of more than 20 million unique visitors per month." Along with *The Guardian*, *The Washington Post* won the 2014 Pulitzer Prize for its revelation of widespread secret surveillance by the National Security Agency, marked by authoritative and insightful reports that helped the public understand how the disclosures fit into the larger framework of national security.

DAVIS WRIGHT TREMAINE LLP