1   Eric D. Miller, Bar No. 218416
    EMiller@perkinscoie.com
2   Michael A. Sussmann, D.C. Bar No. 433100
    (Admitted *pro hac vice*)
3   MSussmann@perkinscoie.com
4   James G. Snell, Bar No. 173070
    JSnell@perkinscoie.com
5   Hayley L. Berlin, D.C. Bar No. 1011549
    (Admitted *pro hac vice*)
6   HBerlin@perkinscoie.com
7   PERKINS COIE LLP
    3150 Porter Drive
8   Palo Alto, CA  94304-1212
    Tel:  650-838-4300
9   Fax:  650-838-4350

10  Attorneys for Plaintiff
    Twitter Inc.
11

12                    UNITED STATES DISTRICT COURT

13                  NORTHERN DISTRICT OF CALIFORNIA

14                     SAN FRANCISCO DIVISION

15

16  TWITTER INC.,                    Case No. 14-cv-4480

17            Plaintiff,

18     v.                            **PLAINTIFF'S OPPOSITION TO
                                     MOTION TO DISMISS**
19
    LORETTA E. LYNCH, Attorney General
20  of the United States, *et al.*,      Date:  March 15, 2016
                                         Time:  2:00 p.m.
21            Defendants.               Courtroom 1, Fourth Floor
                                        Hon. Yvonne Gonzalez Rogers
22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

STATEMENT ...................................................................................................................... 2

    A.    Statutory background ............................................................................... 2

    B.    Twitter's efforts to provide transparency ............................................... 3

    C.    Prior proceedings .................................................................................... 4

STANDARD OF REVIEW ................................................................................................... 5

ARGUMENT ...................................................................................................................... 5

    A.    This Court should adjudicate Twitter's claims based on the FISA statute ............ 5

        1. Twitter's amended complaint does not challenge specific FISC orders ............ 6

        2. This Court is an appropriate forum for considering Twitter's claims; the FISC is not ................................................................................... 8

    B.    Twitter has adequately alleged facts establishing standing to challenge the application of the Espionage Act to its speech ...................................... 12

    C.    All three counts of the amended complaint state claims under the First Amendment .......................................................................................... 16

        1. The government's classification decision does not defeat Twitter's First Amendment claim ................................................................. 16

        2. Twitter has a First Amendment right to speak about its compelled participation in judicial proceedings ........................................ 18

CONCLUSION ................................................................................................................. 22

# TABLE OF AUTHORITIES

Page

**CASES**

*ACLU of Nev. v. Heller,*
  378 F.3d 979 (9th Cir. 2004)................................................................14

*ACLU v. Clapper,*
  804 F.3d 617 (2d Cir. 2015)................................................................10

*ACLU v. FBI,*
  No. 11 Civ. 7562 (S.D.N.Y.) ................................................................9

*Ariz. Right to Life Political Action Comm. v. Bayless,*
  320 F.3d 1002 (9th Cir. 2003)................................................................13

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................5

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)................................................................5, 18

*Brandenburg v. Ohio,*
  395 U.S. 444 (1969) (per curiam) ................................................................22

*Brown v. Entm't Merchs. Ass'n,*
  131 S. Ct. 2729 (2011) ................................................................16, 19, 22

*Butterworth v. Smith,*
  494 U.S. 624 (1990)................................................................20, 21

*Cal. Pro-Life Council, Inc. v. Getman,*
  328 F.3d 1088 (9th Cir. 2003)................................................................13

*Chaplinsky v. New Hampshire,*
  315 U.S. 568 (1942)................................................................19, 22

*City of L.A. v. Patel,*
  135 S. Ct. 2443 (2015)................................................................6

*Clapper v. Amnesty Int'l USA,*
  133 S. Ct. 1138 (2013)................................................................10

*Cohens v. Virginia,*
  19 U.S. (6 Wheat.) 264 (1821)................................................................5

*Colo. River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976)................................................................6

-i-

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Ctr. for Cmty. Action & Envtl. Justice v. BNSF Ry. Co.*,
   764 F.3d 1019 (9th Cir. 2014)..............................................................................5, 18

4

5

*Dep't of the Navy v. Egan*,
   484 U.S. 518 (1988) ...............................................................................................17

6

*Earl of Shaftesbury's Case*, 8 St. Tr. 759 (1681) ........................................................21

7

*Hinds Invs., L.P. v. Angioli*,
   654 F.3d 846 (9th Cir. 2011)....................................................................................5

8

9

*Human Life of Wash. Inc. v. Brumsickle*,
   624 F.3d 990 (9th Cir. 2010)..................................................................................13

10

*In the Matter of the Search Warrant for: [redacted]@hotmail.com et al.*,
   74 F. Supp. 3d 1184 (N.D. Cal. 2014) ...................................................................17

11

*In re Motion for Consent to Disclosure of Court Records or, in the Alternative, a
   Determination of the Effect of the Court's Rule on Statutory Access Rights*,
   No. 13-01 (FISA Ct. June 12, 2013) ......................................................................10

12

13

14

*In re Motion for Release of Court Records*,
   526 F. Supp. 2d 484 (FISA Ct. 2007) ......................................................................9

15

*In re Orders of this Court Interpreting Section 215 of the Patriot Act*,
   No. 13-02 (FISA Ct. Sept. 13, 2013) .......................................................................9

16

17

*In re Russo*,
   53 F.R.D. 564 (C.D. Cal. 1971) .............................................................................21

18

19

*In re Sealing & Non-Disclosure*,
   562 F. Supp. 2d 876 (S.D. Tex. 2008) ...................................................................17

20

*John Doe, Inc. v. Mukasey*,
   549 F.3d 861 (2d Cir. 2008)...................................................................................18

21

22

*Libertarian Party of L.A. Cty. v. Bowen*,
   709 F.3d 867 (9th Cir. 2013)...........................................................................13, 14

23

24

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ...............................................................................................13

25

*McCormack v. Hiedeman*,
   694 F.3d 1004 (9th Cir. 2012)................................................................................13

26

27

28

-ii-

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Nixon v. Warner Commc'ns, Inc.*,
4
    435 U.S. 589 (1978)..........................................................................................................9

*Obama v. Klayman*,
5
    800 F.3d 559 (D.C. Cir. 2015) .........................................................................................10

6

*Oregon v. Legal Servs. Corp.*,
7
    552 F.3d 965 (9th Cir. 2009) ...........................................................................................13

8

*Papasan v. Allain*,
    478 U.S. 265 (1986) .........................................................................................................18
9

*Roth v. United States*,
10
    354 U.S. 476 (1957) .........................................................................................................22

11

*Seattle Times Co. v. Rhinehart*,
12
    467 U.S. 20 (1984) ...........................................................................................................20

13

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991) .........................................................................................................19
14

*Snepp v. United States*,
15
    444 U.S. 507 (1980) .........................................................................................................17

16

*Treadaway v. Acad. of Motion Picture Arts & Scis.*,
17
    783 F.2d 1418 (9th Cir. 1986) ...........................................................................................6

18

*United States v. Abu-Jihaad*,
19
    630 F.3d 102 (2d Cir. 2010).............................................................................................15

*United States v. Alvarez*,
20
    132 S. Ct. 2537 (2012) (plurality opinion).......................................................................19

21

*United States v. Aquino*,
22
    555 F.3d 124 (3d Cir. 2009).............................................................................................15

23

*United States v. Kim*,
    808 F. Supp. 2d 44 (D.D.C. 2011) ...................................................................................15
24

*United States v. Kiriakou*,
25
    898 F. Supp. 2d 921 (E.D. Va. 2012)...............................................................................15

26

*United States v. Malki* ,
27
    718 F.3d 178 (2d Cir. 2013).............................................................................................15

28

PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*United States v. Mascheroni*,
    612 F. App'x 504 (10th Cir. 2015) ..........................................................................15

4

5

*United States v. Mohamud*,
    No. 3:10-CR-00475-KI-1, 2014 WL 2866749 (D. Or. June 24, 2014)....................10

6

7

*United States v. Navarro-Vargas*,
    408 F.3d 1184 (9th Cir. 2005)..................................................................................21

8

*United States v. Rosen*,
    557 F.3d 192 (4th Cir. 2009)....................................................................................15

9

10

*United States v. Sterling*,
    724 F.3d 482 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 2696 (2014) .......................15

11

*United States v. Stevens*,
    559 U.S. 460 (2010) ..................................................................................................19

12

13

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)....................................................................................................7

14

15

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)....................................................................................................6

16

**STATUTES**

17

18 U.S.C. § 2705(b) ........................................................................................................17

18

18 U.S.C. § 2709 .............................................................................................................18

19

18 U.S.C. § 3123(d) ........................................................................................................17

20

28 U.S.C. § 1331 ...............................................................................................................5

21

28 U.S.C. § 1391(b) ..........................................................................................................5

22

50 U.S.C. § 1803 ...............................................................................................................8

23

24

50 U.S.C. §§ 1805(c)(2)(B)...............................................................................................2

25

50 U.S.C. § 1806(e) ........................................................................................................10

26

50 U.S.C. § 1842(d)(2)(B) ............................................................................................3, 8

27

50 U.S.C. § 1861 ...........................................................................................................3, 8

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

Declaratory Judgment Act.................................................................................................6

Espionage Act, 18 U.S.C. § 793 .............................................................................. *passim*

Foreign Intelligence Surveillance Act, 50 U.S.C. § 1801 .......................................... *passim*

Freedom of Information Act ...........................................................................................9, 10

Section 215 of the USA Patriot Act ..............................................................................2, 9

## OTHER AUTHORITIES

First Amendment................................................................................................... passim

Fourth Amendment ........................................................................................................10

*Book of Oaths* 114 (H. Twyford ed., 1689) ..................................................................21

David S. Kris & J. Douglas Wilson, 1 *National Security Investigations &
    Prosecutions* § 5:2, at 128 (2d ed. 2012) ..................................................................8

District Court for the Southern District of New York. Op. 13....................................9

Exec. Order No. 13526 § 1.5(a) (Dec. 29, 2009) ........................................................16

Fed. R. Crim. P. 6..........................................................................................................22

Fed. R. Crim. P. 6(e)(2)(A) ...........................................................................................22

Fed. R. Crim. P. 6(e)(2)(B) ...........................................................................................22

Rule 63 ............................................................................................................................11

Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective
    Discipline Over Monitoring Act of 2015, Pub. L. No. 114-23, 129 Stat. 268...........................4

4 William Blackstone, *Commentaries on the Laws of England* 126 (1769)..................................21

1

2

3

**INTRODUCTION**

4      This case involves a First Amendment challenge to the government's restrictions on

5  Twitter's ability to contribute to an important public debate by speaking truthfully about the

6  extent of its receipt of national security legal process seeking information about its users. The

7  government, having engaged in extensive speech of its own on the issue of provider compliance

8  with government requests for user data, takes the position that providers such as Twitter are

9  indefinitely banned from speaking on that issue, with exceptions only for reporting in pre-

10  approved formats. It is in this context that Twitter seeks relief from this Court from

11  unconstitutional statutory restrictions on its speech.

12      The amended complaint states claims under the First Amendment, and this Court is the

13  appropriate forum for resolving those claims. The government, however, asks this Court to

14  dismiss Twitter's amended complaint. It advances three arguments, but none is meritorious.

15      First, the government argues that this Court should decline to rule on the merits of

16  Twitter's challenges to secrecy obligations imposed under the Foreign Intelligence Surveillance

17  Act ("FISA"), 50 U.S.C. § 1801 *et seq.*, and that Twitter should be directed to pursue those

18  challenges in the Foreign Intelligence Surveillance Court ("FISC"). But this Court *is* the

19  appropriate forum for considering a request for injunctive relief to protect First Amendment

20  rights. The FISC, which cannot grant such relief, is not an appropriate forum for hearing Twitter's

21  challenge. Also, this case does not involve any particular order of the FISC, but rather is a

22  broader challenge to the statutory regime.[1] Moreover, it is ironic to suggest that the FISC, a court

23  whose proceedings are largely conducted in secret, is the preferred forum for adjudicating First

24  Amendment claims about transparency and public disclosure.

25      Second, the government argues that Twitter lacks standing to challenge the application of

26  the Espionage Act to its speech about national security legal process. In fact, Twitter has

27

28      [1] References in this brief to FISA orders should not be taken to confirm (or deny) that Twitter has received any such orders.

-1-

1  established standing because it has articulated a concrete plan to engage in conduct—the

2  publication of a transparency report—that the government has already stated is unlawful. If

3  Twitter were to pursue that plan, it is reasonable to conclude Twitter would face a risk of

4  prosecution.

5       Third, the government says that all of the claims in the amended complaint should be

6  dismissed because Twitter has no First Amendment right to publish information that is properly

7  classified. That argument is inapplicable to Twitter's facial challenge to the indefinite duration of

8  FISA's secrecy obligations because that claim does not involve a request to publish classified

9  information. To the extent the government's argument pertains to Twitter's other claims, it is

10  untimely because—as the government has conceded—if the Court were to consider the propriety

11  of the government's classification decision, it would do so after disposition of the government's

12  motion to dismiss and only after considering evidentiary submissions. The motion to dismiss

13  should be denied.

14  **STATEMENT**

15  **A.      Statutory background**

16       The Foreign Intelligence Surveillance Act contains five separate titles that permit the

17  government to obtain court-ordered real-time surveillance or disclosure of stored user records

18  from a communications provider: Title I (electronic surveillance of communications content and

19  metadata); Title III (disclosure of stored content and non-content records); Title IV (provisioning

20  of pen register and trap and trace devices to obtain dialing, routing, addressing and signaling

21  information); Title V (disclosure of "business records") (also referred to as "Section 215 of the

22  USA Patriot Act"); and Title VII (surveillance of non-U.S. persons located beyond U.S. borders).

23       Each of these titles of FISA contains a restriction that limits a provider's ability to disclose

24  information relating to a specific FISA request. Several provisions require the FISC to direct the

25  recipient of a FISA request to comply in such a manner as will protect the secrecy of the court-

26  ordered electronic surveillance, physical search, or installation of a pen register or trap and trace

27  device, or the acquisition of foreign intelligence information, 50 U.S.C. §§ 1805(c)(2)(B) (Title

28

I), 1824(c)(2)(B) (Title III), 1842(d)(2)(B) (Title IV), 1881a(h)(1)(A) (Title VII). FISA also contains provisions that directly instruct the recipient of a FISA order that it may not disclose the existence of a pen register or trap and trace device "unless or until ordered by the court," 50 U.S.C. § 1842(d)(2)(B) (Title IV), and that it may not "disclose to any other person" the existence of a business records order, 50 U.S.C. § 1861(d)(1) (Title V). No provision in FISA directs the FISC to prohibit the disclosure of *aggregate* numbers of FISA orders that a provider has received or directly prohibits a provider from disclosing those numbers.

In addition, the Espionage Act, 18 U.S.C. § 793, criminalizes a number of actions involving the disclosure or improper handling of information "relating to the national defense." In particular, Subsection (d) makes it a crime for anyone who has lawful possession of any "information relating to the national defense" that "could be used to the injury of the United States or to the advantage of any foreign nation," to communicate that information "to any person not entitled to receive it." *Id*. § 793(d). Penalties for violations of the Espionage Act include fines and imprisonment. *Id.* § 793(h).

**B.    Twitter's efforts to provide transparency**

Twitter seeks to give its users meaningful information about the extent of government surveillance on its network. In April 2014, Twitter submitted to the government a draft transparency report, which included information and discussion about the volume of FISA orders Twitter received, if any, in the second half of 2013. Twitter requested "a determination as to exactly which, if any, parts of its Transparency Report are classified or, in the [government's] view, may not lawfully be published online." Dkt. No. 1, Exh. 3. Five months later, the government informed Twitter that, having "carefully reviewed Twitter's proposed transparency report," it had "concluded that information contained in the report is classified and cannot be publicly released" because the report did not comply with the government's approved framework for reporting data about FISA orders. Dkt. No. 1, Exh. 5. The government refused to identify what specific language in the transparency report could or could not be disclosed. After Twitter

1    filed this lawsuit, however, the government prepared a redacted version of the report that it said

2    could be publicly released. Dkt. No. 21.

3        The government's approved disclosure framework is set forth in a letter dated January 27,

4    2014, from Deputy Attorney General James M. Cole to the general counsels of five Internet

5    companies, not including Twitter (the "DAG Letter"). Dkt. No. 1, Exh. 3. (The DAG letter was

6    described in detail in Twitter's initial complaint, *see* Dkt. No. 1, pp. 6–8.) The DAG Letter was

7    prepared as part of a settlement of litigation the companies brought in the FISC. In a filing

8    informing the FISC of the settlement, the government stated that the DAG Letter "define[s] the

9    limits of permissible reporting for the parties and other similarly situated companies." Dkt. No. 1,

10   Exh. 2.

11   **C.    Prior proceedings**

12       In response to the government's refusal to allow it to publish its transparency report,

13   Twitter brought this action seeking declaratory and injunctive relief. Dkt. No. 1. Defendants filed

14   a partial motion to dismiss. Dkt. No. 28. On June 2, 2015, while that motion was pending,

15   President Obama signed into law the Uniting and Strengthening America by Fulfilling Rights and

16   Ensuring Effective Discipline Over Monitoring Act of 2015, Pub. L. No. 114-23, 129 Stat. 268

17   ("USA FREEDOM Act" or "USAFA"). The statute contains no express findings, and nothing in

18   the legislative history indicates that Congress made any factual finding as to the extent to which

19   information about FISA orders could be disclosed without harm to national security. The USAFA

20   provides four new options for providers such as Twitter to report the volume of national security

21   legal process received. On its face, the USAFA is permissive; that is, it allows providers to use

22   one of the reporting options it provides, but it contains no express prohibition on other

23   disclosures, and it does not amend or otherwise affect any of the nondisclosure requirements in

24   FISA.

25       In light of the USAFA, this Court denied the partial motion to dismiss as moot and, on its

26   own motion, directed Twitter to file an amended complaint. Dkt. No. 85. On November 13, 2015,

27   Twitter filed an amended complaint. Dkt. No. 88. The amended complaint sets forth three claims

28

1    based on the First Amendment. First, it alleges that the FISA nondisclosure provisions are facially

2    unconstitutional because they require that FISA orders and directives be kept secret for an

3    indefinite period of time. Second, it alleges that, to the extent that FISA's nondisclosure

4    provisions are construed to prohibit Twitter from publishing information about the aggregate

5    number of FISA orders it receives, those provisions are unconstitutional as applied to Twitter.

6    Third, it alleges that, to the extent the Espionage Act can be used to punish Twitter for publishing

7    information about the aggregate number of FISA orders it receives, that statute is also

8    unconstitutional as applied to Twitter.

9                                   **STANDARD OF REVIEW**

10           On a motion to dismiss, the Court must "accept as true the factual allegations in the

11   complaint and construe those allegations in the light most favorable to the nonmoving party." *Ctr.*

12   *for Cmty. Action & Envtl. Justice v. BNSF Ry. Co.*, 764 F.3d 1019, 1022–23 (9th Cir. 2014). "To

13   survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true,

14   to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

15   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The grant of a motion to dismiss

16   is appropriate only "where there is either a lack of a cognizable legal theory or the absence of

17   sufficient facts alleged under a cognizable legal claim." *Hinds Invs., L.P. v. Angioli*, 654 F.3d

18   846, 849–50 (9th Cir. 2011).

19                                        **ARGUMENT**

20   **A.       This Court should adjudicate Twitter's claims based on the FISA statute**

21           The government does not dispute that this Court has subject-matter jurisdiction over

22   Twitter's FISA claims, *see* 28 U.S.C. § 1331, nor does it dispute that the Northern District of

23   California is an appropriate venue for this action, *see* 28 U.S.C. § 1391(b). Instead, it argues

24   (MTD 10–16) that this Court should "decline to hear" Counts I and II of the amended complaint

25   so that Twitter can pursue those claims in the FISC. That argument lacks merit.

26           A federal court has "no more right to decline the exercise of jurisdiction which is given,

27   than to usurp that which is not given." *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821).

28

1    When jurisdiction exists, a federal court's "obligation" to hear and decide a case is "virtually

2    unflagging." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).

3    The government points out (MTD 11) that the Declaratory Judgment Act confers discretion, and

4    that a court presented with a claim under that statute may decline to exercise jurisdiction based on

5    "considerations of practicality and wise judicial administration." *Wilton v. Seven Falls Co.*, 515

6    U.S. 277, 288 (1995). But Twitter's amended complaint seeks more than a declaratory judgment;

7    it also seeks an injunction "prohibiting Defendants . . . from seeking to enforce the

8    unconstitutional prohibitions on Twitter's speech, or to prosecute or otherwise seek redress from

9    Twitter for exercising its First Amendment rights." Am. Compl. ¶ 17. Because Twitter is not

10   seeking only a declaratory judgment, this Court does not have the discretion the government

11   suggests. That is, the Court does *not* have discretion simply to ignore an allegation that an

12   injunction is necessary to remedy an ongoing constitutional violation, and none of the cases cited

13   by the government establishes otherwise. In any event, even if this Court does have discretion to

14   decide whether or not to adjudicate this case, it should exercise that discretion by ruling on the

15   merits of Twitter's amended complaint because the equities strongly favor adjudication of this

16   case in a United States District Court.

17          **1.      Twitter's amended complaint does not challenge specific FISC orders**

18          The premise of the government's argument is that Counts I and II of Twitter's amended

19   complaint "concern legal process issued by the FISC." MTD 10; *see id.* at 12 (suggesting that a

20   court should not "entertain[] an independent action for relief from the final order of another

21   court") (quoting *Treadaway v. Acad. of Motion Picture Arts & Scis.*, 783 F.2d 1418, 1422 (9th

22   Cir. 1986)). That premise is false.

23          Count I of the amended complaint does not challenge any particular FISA order that

24   Twitter may have received. Instead, it is a *facial* challenge to the secrecy provisions of the FISA

25   statute. Am. Compl. ¶ 52 ("Twitter therefore seeks a declaration that the FISA secrecy provisions

26   violate the First Amendment on their face."). "A facial challenge," the Supreme Court has

27   explained, "is an attack on a statute itself as opposed to a particular application." *City of L.A. v.*

28

-6-

1    *Patel*, 135 S. Ct. 2443, 2449 (2015); *see Wash. State Grange v. Wash. State Republican Party*,

2    552 U.S. 442, 449 (2008). It therefore does not require a court to consider specific applications of

3    the statute to the plaintiff.

4         Similarly, Count II claims that, "[t]o the extent that FISA's secrecy provisions are

5    construed to prohibit Twitter from publishing information about the aggregate number of FISA

6    orders it receives, the FISA secrecy provisions are unconstitutional." Am. Compl. ¶ 57. That

7    count, too, does not challenge any particular order. Indeed, the amended complaint does not

8    allege that Twitter has necessarily received *any* FISA orders. Am. Compl. ¶ 7 (alleging that

9    "Twitter either has received a FISA order in the past or has a reasonable fear of receiving one in

10   the future").

11        In footnote 2 of its motion, the government quotes a nondisclosure provision from a FISA

12   order—conspicuously without citation to the order from which the quotation is drawn—and says

13   that "disclosing the number of Title I orders received would violate such a provision as it would

14   'disclose . . . the existence' of each of the orders." [2] (MTD 6 n.2). Significantly, the quoted

15   language was extracted from an unidentified but presumably *classified* FISA order. Applying the

16   government's reasoning, the public disclosure of that language in the government's motion would

17   seem to violate the quoted nondisclosure requirement just as much as "disclosing the number of

18   Title I orders received" would. In fact, the government has gone so far as to reveal the specific

19   content of a classified order, while Twitter merely seeks to publish numbers that would only

20   reveal the existence of orders (to the extent they have been received). The government's

21   discussion of that language in a public filing illustrates the flaw in the government's argument

22   because it demonstrates that it is indeed possible to reveal certain information *about* FISA orders

23   without having to review or scrutinize the contents of any particular order. That is precisely what

24   Twitter is attempting to do by asserting Count II.

25        Although the government argues that all FISA nondisclosure obligations are the product

26   of FISC orders, it concedes (MTD 10–11) that FISA itself imposes nondisclosure obligations

27

28        _____
          [2] The government describes the quoted order as a "typical[]" FISA order.

1   directly on the recipients of an important class of FISA orders—those under Title V requiring

2   "[a]ccess to certain business records for foreign intelligence and international terrorism

3   investigations." 50 U.S.C. § 1861. The government says that the statute channels those challenges

4   to the FISC, but that is incorrect. Section 1861(f) provides a mechanism for challenging FISA

5   nondisclosure orders in the FISC, but nothing in that provision indicates that it is the *exclusive*

6   mechanism for such challenges. The government also overlooks that the nondisclosure provisions

7   contained in other kinds of FISA orders are dictated by the statute and that these provisions do not

8   reflect an exercise of discretion on the part of the FISC. *See, e.g.*, 50 U.S.C. § 1842(d)(2)(B)

9   (Title IV) (requiring that an order "*shall direct* that [the provider] shall not disclose the existence

10   of the investigation or of the pen register or trap and trace device to any person unless or until

11   ordered by the court") (emphasis added). Thus, even if Count II of Twitter's amended complaint

12   did also apply to particular orders, it is still first and foremost a challenge to the statute, not to any

13   particular decisions of the FISC.

14       **2.       This Court is an appropriate forum for considering Twitter's claims; the**

15               **FISC is not**

16       The government does not suggest that this Court is prohibited from or incapable of

17   adjudicating Twitter's claims related to FISA. Instead, it asserts (MTD 15) that the FISC would

18   be a superior forum because of its "expertise" and "specialized knowledge." In fact, the FISC is

19   not an appropriate forum for hearing this case and, as explained above, does *not* have expertise or

20   specialized knowledge relating to Twitter's claims.

21       The FISC is a specialized court with a limited jurisdiction to issue orders authorizing

22   surveillance or searches under FISA. *See* 50 U.S.C. § 1803; David S. Kris & J. Douglas Wilson, 1

23   *National Security Investigations & Prosecutions* § 5:2, at 128 (2d ed. 2012). It does not have

24   authority to issue a declaratory order or an injunction such as that sought here. The government

25   cites no authority suggesting otherwise. It states (MTD 11 n.5) that five companies sought

26   declaratory relief in an action in the FISC in 2013, but that is not accurate: one company (Google)

27   sought declaratory relief in the FISC and thereafter four other companies joined the litigation.

28

-8-

1    Moreover, the government does not state—and indeed it does not know—*why* Google chose to

2    file in the FISC, but it is unlikely to be because Google perceived that court to be its only option.

3    Finally, the case was not litigated to judgment, so the FISC never determined whether it had

4    authority to grant the requested relief. Simply put, the relief Twitter seeks, which this Court is

5    authorized to grant, is not available in the FISC.

6         Of course, the FISC does have an inherent "supervisory power over its own records and

7    files." *In re Motion for Release of Court Records*, 526 F. Supp. 2d 484, 486 (FISA Ct. 2007)

8    (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)). But that power would not

9    allow the FISC to enter the relief Twitter seeks in this case because, as explained above, the

10   challenged prohibition on Twitter's speech emanates from federal statutes, not exclusively FISA

11   orders. More importantly, that aspect of the FISC's authority is not exclusive. To the contrary, in

12   *In re Orders of this Court Interpreting Section 215 of the Patriot Act*, No. 13-02 (FISA Ct. Sept.

13   13, 2013), the FISC held that *a federal district court* was the appropriate forum to decide whether

14   to disclose FISC opinions. In that case, the ACLU had previously filed a Freedom of Information

15   Act ("FOIA") lawsuit in the United States District Court for the Southern District of New York,

16   seeking disclosure of FISC opinions relating to Section 215 of the USA Patriot Act. *ACLU v.*

17   *FBI*, No. 11 Civ. 7562 (S.D.N.Y.). When the ACLU subsequently filed a motion in the FISC for

18   the release of the opinions, the FISC held that "as a matter of comity, and in order to conserve

19   judicial resources and avoid inconsistent judgments," it would defer to the District Court for the

20   Southern District of New York. Op. 13. Specifically, the FISC noted that "[t]he present

21   motion . . . asks the FISC to do the same thing that the ACLU is asking the District Court in New

22   York to do in the FOIA litigation: ensure that the opinions are disclosed, with only properly

23   classified information withheld. Having both courts proceed poses the risks of duplication of

24   effort and inconsistent outcomes that the first-to-file rule is intended to avoid." *Id.* at 15. Nowhere

25   in its opinion did the FISC suggest that it was better suited, because of its "expertise" or

26   "specialized knowledge," to handle the issue.

27

28

1          Similarly, in *In re Motion for Consent to Disclosure of Court Records or, in the*

2    *Alternative, a Determination of the Effect of the Court's Rule on Statutory Access Rights*, No. 13-

3    01 (FISA Ct. June 12, 2013), a FOIA requestor had sought the disclosure of FISC records in the

4    government's possession. In litigation in the United States District Court for the District of

5    Columbia, the government argued that the rules of the FISC prohibited the disclosure of a certain

6    FISC opinion. The requestor then sought relief from the FISC, which held that its rules would not

7    prohibit the government's disclosure of the subject FISC opinion in the event it was determined

8    by the district court to be subject to disclosure under FOIA. Again, nowhere in the opinion did the

9    FISC intimate that the FISC would be better suited, because of its expertise or specialized

10   knowledge, to handle any request for the disclosure of FISC records.

11         Conversely, district courts routinely review the legality of orders entered by the FISC as

12   well as the government's compliance with those orders. For example, whenever the government

13   uses FISA-derived evidence in a criminal proceeding, 50 U.S.C. § 1806(e) permits the target of

14   the surveillance to "move to suppress the evidence obtained or derived from such electronic

15   surveillance [in a district court] on the grounds that—(1) the information was unlawfully

16   acquired; or (2) the surveillance was not made in conformity with an order of authorization or

17   approval." *See, e.g.*, *United States v. Mohamud*, No. 3:10-CR-00475-KI-1, 2014 WL 2866749 (D.

18   Or. June 24, 2014) (defendant moved to suppress evidence obtained pursuant to Title VII of

19   FISA). And outside of the suppression context, district courts have heard constitutional

20   challenges to FISA and to orders issued under it. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 133 S.

21   Ct. 1138 (2013) (declaratory judgment action filed in federal district court challenging

22   constitutionality of FISA Amendments Act of 2008); *ACLU v. Clapper*, 804 F.3d 617 (2d Cir.

23   2015) (declaratory judgment action arguing that NSA telephony metadata program exceeds

24   statutory authority under FISA and violates the Fourth Amendment); *Obama v. Klayman*, 800

25   F.3d 559 (D.C. Cir. 2015). There is no reason for a different result here.

26         To the contrary, considerations of fairness and practicality weigh heavily in favor of

27   resolving this case in this Court. The government claims (MTD 11) that considerations of fairness

28

1    to the litigants are "neutral" between this Court and the FISC, but that is not a fair or accurate

2    assessment, and it overlooks the significant advantages that the FISC affords the government. In

3    the context of this case, a proceeding in the FISC would differ from one in this Court in the

4    following ways:

5         a.   Twitter's officers and its in-house lawyers could not appear before the

6              FISC. The Rules of Procedure for the FISC require all attorneys

7              appearing before it to have a national security clearance, and no Twitter

8              officer or Twitter lawyer—apart from its outside counsel—currently has a

9              national security clearance. *See* FISC Rule 63. Sending this case to the

10             FISC therefore will end all company participation in court proceedings.

11        b.   The FISC offers far greater opportunity than a district court for the

12             presentation of *ex parte* and classified submissions that are closed to any

13             party but the government; indeed, that is the usual practice of the FISC.

14             (The government's suggestion that there would be "open access to any

15             *unclassified* submissions" in the FISC is therefore not a meaningful

16             promise of openness. MTD 12 (emphasis added).)

17        c.   The FISC's public docket is a limited, selective docket, posting filings at

18             the discretion of the court.

19        d.   The government is more familiar with the FISC, its judges, and

20             procedures than non-government lawyers, and that knowledge could not

21             be reproduced by private litigants and their counsel.

22        e.   The government has exclusive access to and familiarity with the body of

23             classified case law that has been generated by the FISC since its inception

24             in 1978.

25        f.   Finally—and in stark contrast with federal district courts—the FISC is a

26             nonpublic court that provides no way for the public or any nonparty to

27             view its proceedings (with certain recent exceptions for public filing of

28

-11-

1          pleadings and other documents). Indeed, so far as we are aware, the FISC

2          has *never* held a hearing or oral argument that was open to the public.

3          Twitter believes it would be particularly inappropriate to resolve this

4          case—which involves a claim of a First Amendment right to public

5          disclosure—in a nonpublic forum.

6      Judicial economy also favors resolving Counts I and II in this Court. The government

7 appears to concede that the Espionage Act issues raised by Count III are appropriate for

8 resolution in this Court. The government thus does not seek to have the entire case heard by the

9 FISC; instead, it seeks to bifurcate the case, so that Count III is heard in this Court while Counts I

10 and II are heard by the FISC. Given the close relationship between the issues the government

11 seeks to have sent to the FISC and those it seeks to have resolved here, such bifurcation would

12 create the possibility of inconsistent adjudication, and it would ill serve the interests of judicial

13 economy.

14    **B.**      **Twitter has adequately alleged facts establishing standing to challenge the**

15            **application of the Espionage Act to its speech**

16      In Count III of the amended complaint, Twitter alleges that it wishes to disclose

17 information about the aggregate number of FISA orders it has received, including as set forth in

18 its draft transparency report. Am. Compl. ¶ 36. The government has informed Twitter that "the

19 information contained in the report is classified and cannot be publicly released." Dkt. No. 1,

20 Exh. 5. And the government acknowledges (MTD 2) what is evident on the face of the statute,

21 namely, that "a person who possesses classified national security information and has been

22 advised that he is bound not to disclose such information could be prosecuted under the

23 Espionage Act if he does so." Because the Espionage Act has the concrete and immediate effect

24 of restricting Twitter's speech, Twitter has standing to challenge the application of that statute to

25 it.

26      The government errs when it argues (MTD 16–19) that Twitter nevertheless lacks

27 standing. As an initial matter, the government notes (MTD 16) that the plaintiff has the burden of

28

1   establishing standing. At the motion-to-dismiss stage, however, a plaintiff can carry that burden

2   simply by alleging facts that, if proved, would show an injury. *Oregon v. Legal Servs. Corp.*, 552

3   F.3d 965, 971 (9th Cir. 2009); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

4   Moreover, as the government recognizes (MTD 17), the Ninth Circuit has held that "a chilling of

5   the exercise of First Amendment rights is, itself, a constitutionally sufficient injury" and

6   therefore, in First Amendment cases such as this one, "the inquiry tilts dramatically toward a

7   finding of standing." *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013)

8   (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir.

9   2003)). "[W]here a plaintiff has refrained from engaging in expressive activity for fear of

10  prosecution under the challenged statute," the plaintiff need only show that its "self-

11  censorship . . . is based on 'an actual and well-founded fear' that the challenged statute will be

12  enforced." *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1001 (9th Cir. 2010) (quoting

13  *Cal. Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)). In assessing whether

14  a plaintiff has adequately alleged a credible threat of prosecution, "courts examine three factors:

15  (1) whether the plaintiffs have articulated a 'concrete plan' to violate the law in question, (2)

16  whether the prosecuting authorities have communicated a specific warning or threat to initiate

17  proceedings, and (3) the history of past prosecution or enforcement under the challenged statute."

18  *Libertarian Party of L.A. Cty.*, 709 F.3d at 870 (quoting *McCormack v. Hiedeman*, 694 F.3d

19  1004, 1021 (9th Cir. 2012)). Here, all three factors weigh heavily in favor of finding standing.

20          First, Twitter has articulated a concrete plan to engage in conduct that, according to the

21  government, would violate the Espionage Act. Specifically, it has drafted a transparency report

22  that it wishes to publish, a report that the government says contains classified information. Am.

23  Compl. ¶ 36; Dkt. No. 1, Exh. 5. The government asserts (MTD 18) that Twitter "has not avowed

24  that it intends to violate the law by disclosing classified information" and that it "evinces no

25  concrete plan to violate the law," but that statement ignores Twitter's transparency report.

26  Similarly, the government quotes paragraph 7 of the amended complaint, which alleges that

27  Twitter wishes "to disclose details about specific FISA orders it has received or will received as

28

-13-

soon as doing so will no longer harm national security," and it reasons (MTD 18) that Twitter has "expressly disavow[ed] a desire to publish classified information." The quoted passage of the amended complaint, however, refers to Count I, Twitter's claim that the FISA statute is unconstitutional because it imposes no time limit on the secrecy of individual FISA orders. That claim is distinct from Count II, which claims that the Espionage Act is unconstitutional to the extent it criminalizes publication of the aggregate number of FISA orders, as reflected in the transparency report. Count III turns on Twitter's plan to disclose information that could be defined under the Espionage Act as "national defense information."

Crucially, Twitter is not relying on vague or speculative allegations that it might wish to engage in speech at some point in the future. Rather, it has provided both the government and this Court with the text of the specific statement it wishes to make. Because that statement has been determined to contain classified information, which is necessarily "national defense information" under Section 793(d), Twitter's plan to publish it is nothing less than a plan "to violate the law by disclosing classified information," MTD 18. Indeed, Twitter's plans are considerably more concrete than others that have been found sufficient to establish standing. For example, in *Libertarian Party of Los Angeles County*, the Ninth Circuit held that a plaintiff who "allege[d] that he intends to gather signatures for . . . candidates in future elections but will be prohibited by state law from doing so" had alleged a concrete plan. 709 F.3d at 871; *see also ACLU of Nev. v. Heller*, 378 F.3d 979, 984 (9th Cir. 2004) (plaintiffs established standing by alleging that they planned "to circulate petitions to place certain referendum measures on statewide or local ballots"). Under the standard applied in those cases, Twitter has shown that it has a sufficiently concrete plan to engage in conduct that will violate the statute.

As to the second factor—a threat of prosecution—the government argues (MTD 18) that Twitter "does not allege that the Government has specifically threatened to initiate Espionage Act proceedings against it." That is untrue. As noted above, the government has sent a letter to Twitter's counsel stating that "the information contained in [Twitter's draft transparency report] is classified and cannot be publicly released." Dkt. No. 1, Exh. 5. To be sure, that letter did not

1   use the word "prosecute" or contain a citation to 18 U.S.C. § 793, but the standing doctrine does

2   not impose a magic-words requirement. The Espionage Act is the statute that criminalizes the

3   disclosure of classified information. A letter informing Twitter that it "cannot" engage in the

4   speech in which it wishes to engage because that speech "is classified" is necessarily a threat of

5   prosecution under the Espionage Act. Lest there be any doubt, the remainder of the government's

6   motion (MTD 19–23) argues that Twitter's challenge to the Espionage Act fails on the merits

7   because "Congress . . . may properly restrict the disclosure of information that would harm

8   national security," an argument that assumes that Twitter's speech has indeed been restricted. The

9   government cites no authority for the proposition that a more specific threat is necessary to

10  establish standing.

11      The government suggests (MTD 19) that "the need to threaten or undertake any

12  prosecution in circumstances like this . . . rarely arises because the law provides other adequate

13  remedies." Even if that were true, it is not relevant here in light of the specific statements the

14  government has already made about Twitter's proposed transparency report. To the extent the

15  government means to argue that Twitter has other remedies available to it, that too is not relevant

16  to the standing analysis.

17      The government addresses the third factor—the history of prosecution under the statute—

18  only in passing, but that factor also supports Twitter's position. The Espionage Act has not fallen

19  into desuetude. To the contrary, in just the last few years, the government has brought several

20  criminal prosecutions based on the unlawful disclosure of classified information in violation of

21  Section 793(d). *See, e.g.*, *United States v. Sterling*, 724 F.3d 482, 488 (4th Cir. 2013), *cert.*

22  *denied*, 134 S. Ct. 2696 (2014); *United States v. Kiriakou*, 898 F. Supp. 2d 921 (E.D. Va. 2012);

23  *United States v. Kim*, 808 F. Supp. 2d 44 (D.D.C. 2011); *United States v. Abu-Jihaad*, 630 F.3d

24  102, 108 (2d Cir. 2010); *United States v. Rosen*, 557 F.3d 192, 194 (4th Cir. 2009); *see also*

25  *United States v. Mascheroni*, 612 F. App'x 504, 505 (10th Cir. 2015) (prosecution for unlawfully

26  retaining national defense information, in violation of 18 U.S.C. § 793(e)); *United States v. Malki*,

27  718 F.3d 178, 180 (2d Cir. 2013) (same); *United States v. Aquino*, 555 F.3d 124, 125 (3d Cir.

28

2009) (same). If Twitter were to publish its unredacted transparency report, there is no reason why Twitter would not be at risk of prosecution under the statute.

**C.      All three counts of the amended complaint state claims under the First Amendment**

The government argues (MTD 19) that "none of plaintiff's claims asserts a cognizable legal theory under the First Amendment." Significantly, the government does not attempt to show that its restrictions on Twitter's speech satisfy strict scrutiny; that is, that they are "justified by a compelling government interest and [are] narrowly drawn to serve that interest." *Brown v. Entm't Merchs. Ass'n*, 131 S. Ct. 2729, 2738 (2011). Instead, the government argues that "*any* restrictions*" on the disclosure of the information at issue here would be consistent with the First Amendment because Twitter lacks a First Amendment right to publish that information. MTD 23 (emphasis added). That is so, the government says, for two reasons: first, the government has declared that the information is classified, and second, the information was obtained as a result of Twitter's involvement in confidential judicial proceedings. Neither of those arguments provides a basis for dismissing the amended complaint.

**1.      The government's classification decision does not defeat Twitter's First Amendment claim**

As an initial matter, the government errs in arguing (MTD 19–20) that all of the claims in the amended complaint "are based on alleged First Amendment harm resulting from an inability to publish information that plaintiff does not dispute is classified." As noted above, Count I of the amended complaint is a facial challenge to the FISA statute. In that count, Twitter claims that the statute is unconstitutional because it provides for secrecy obligations of indefinite duration.[3] That count does not seek a declaration or an injunction allowing Twitter to disclose any particular information, but rather asks this Court to hold that restrictions on speech about FISA orders must

---

[3] We note that all classification determinations are of *limited duration* and classified documents resulting therefrom are required to contain a "declassify on" date. *See* Exec. Order No. 13526 § 1.5(a) (Dec. 29, 2009) ("At the time of original classification, the original classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information. Upon reaching the date or event, the information shall be automatically declassified.").

-16-

1  be more narrowly tailored by being limited in time. Count I therefore does not involve a request

2  to publish classified information.[4]

3     As to Counts II and III, the government correctly points out (MTD 20–21) that the

4  President has authority to "classify and control access to information bearing on national

5  security," *Dep't of the Navy v. Egan*, 484 U.S. 518, 527 (1988), and that "[t]he Government has a

6  compelling interest in protecting . . . the secrecy of information important to our national

7  security," *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980). Those observations do not

8  resolve this case, however, because the government's mere statement that the information at issue

9  is classified does not, by itself, establish that the information is indeed "important to our national

10  security." *Id.* Rather, as the government itself acknowledges, restrictions on the "First

11  Amendment right to publish" apply only to "*properly* classified information." MTD 21 (emphasis

12  added). The government's *ipse dixit* is not sufficient to defeat a First Amendment claim; this

13  Court must assess whether classification is appropriate on the basis of an evidentiary record and

14  after resolving any factual disputes. Indeed, the government previously acknowledged that if the

15  court were to consider the propriety of the government's classification decision, it would do so

16  only after considering evidentiary submissions. Dkt. No. 29, at 8 (government's portion of joint

17  case-management statement) ("[T]he proper course for proceeding would be for the Court to first

18  determine, based on submissions by the Government, whether the information is properly

19  classified by the Executive Branch."). At this stage of the case, dismissal is inappropriate because

20

21

22     [4] Count I asks this Court to apply the principle that indefinite gag orders are unconstitutional in
*any* context. *Cf. In re Sealing & Non-Disclosure*, 562 F. Supp. 2d 876, 886–87 (S.D. Tex. 2008)

23  ("[B]ecause the statutes authorizing these non-disclosure orders must be construed whenever possible in a
manner that avoids constitutional infirmity, it follows that neither 18 U.S.C. § 2705(b) nor § 3123(d) may

24  be interpreted to permit a gag order of indefinite duration."). Therefore, "[a]s a rule, sealing and non-
disclosure of electronic surveillance [demands] must be neither permanent nor, what amounts to the same

25  thing, indefinite." *Id.* at 877–78, 895 (rejecting indefinite nondisclosure provisions that prohibit providers
from disclosing a legal demand to their users "until further order of the court"). Instead, when a

26  nondisclosure order is appropriate, it should be limited to a definite period, subject to the government's
right to seek similarly definite extensions if needed. *See, e.g.*, *In the Matter of the Search Warrant for:*

27  *[redacted]@hotmail.com et al.*, 74 F. Supp. 3d 1184, 1186 (N.D. Cal. 2014) ("Section 2705(b) clearly
requires the court to define some end. That end could come in less than 90 days, 90 days exactly or even

28  more than 90 days.").

-17-

1    the government has made no effort to establish that the information at issue is properly classified

2    nor is this the appropriate time for it to do so.

3         The government argues (MTD 20) that "plaintiff's Amended Complaint does not allege

4    the information it wishes to publish is not, in fact, properly classified." But the amended

5    complaint does allege that Twitter has a First Amendment right to publish the information, which

6    necessarily means that it was not properly classified. Am. Compl. ¶ 61. The amended complaint

7    also questions the reliability of the classification, noting the government's "pattern of selective

8    declassification of specific FISA-related and other national security matters to allow government

9    speech." Am. Compl. ¶ 60. Adding an explicit statement to the effect that the information was

10   improperly classified would have been unnecessary and inappropriate, as it would merely have

11   stated Twitter's legal conclusion. *See Twombly*, 550 U.S. at 555 (courts "are not bound to accept

12   as true a legal conclusion couched as a factual allegation") (quoting *Papasan v. Allain*, 478 U.S.

13   265, 286 (1986)). In any event, to the extent there is any doubt on the adequacy of the allegations,

14   the amended complaint must be construed "in the light most favorable to the nonmoving party."

15   *Ctr. for Cmty. Action & Envtl. Justice*, 764 F.3d at 1022–23. This Court should reject the

16   government's invitation to jump ahead and decide the propriety of the government's classification

17   decision without considering an evidentiary record.

18        **2.      Twitter has a First Amendment right to speak about its compelled**

19                **participation in judicial proceedings**

20        The government also argues (MTD 22) that "restrictions on a party's disclosure of

21   information obtained through involvement in confidential judicial proceedings do not offend the

22   First Amendment." Here, the government again tries to re-cast this case as being about individual

23   FISA orders, which Twitter has never affirmatively stated that it has received, rather than the

24   FISA statute. Moreover, the government's argument is incorrect. *See John Doe, Inc. v. Mukasey*,

25   549 F.3d 861, 876 (2d Cir. 2008) (holding that recipients of national security letters under 18

26   U.S.C. § 2709 may assert First Amendment challenges to the statutory prohibition on disclosing

27   such letters, and rejecting "the Government's contentions that the nondisclosure requirement can

28

-18-

1  be considered to satisfy First Amendment standards based on analogies to secrecy rules

2  applicable to grand juries, judicial misconduct proceedings, and certain interactions between

3  individuals and governmental entities").

4           While there are indeed some categories of speech that are not protected by the First

5  Amendment, the speech at issue here is not one of them. The Supreme Court has made clear that

6  the categories of unprotected speech are "well-defined and narrowly limited." *Chaplinsky v. New*

7  *Hampshire*, 315 U.S. 568, 571 (1942). In *United States v. Stevens*, 559 U.S. 460 (2010), the Court

8  rejected, as "startling and dangerous," the proposition that "[t]he First Amendment's guarantee of

9  free speech . . . extend[s] only to categories of speech that survive an ad hoc balancing of relative

10 social costs and benefits." *Id.* at 470; *accord Brown*, 131 S. Ct. at 2734 ("[N]ew categories of

11 unprotected speech may not be added to the list by a legislature that concludes certain speech is

12 too harmful to be tolerated."); *United States v. Alvarez*, 132 S. Ct. 2537, 2544 (2012) (plurality

13 opinion). Instead, the categories of unprotected speech are limited to those "historic and

14 traditional categories long familiar to the bar." *Stevens*, 559 U.S. at 468 (quoting *Simon &*

15 *Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127 (1991) (Kennedy,

16 J., concurring in the judgment)). Although there may be "'some categories of speech that have

17 been historically unprotected, but have not yet been specifically identified or discussed as such in

18 our case law,'" in the absence of "persuasive evidence that a novel restriction on content is part of

19 a long (if heretofore unrecognized) tradition of proscription, a legislature may not revise the

20 'judgment [of] the American people,' embodied in the First Amendment, 'that the benefits of its

21 restrictions on the Government outweigh the costs.'" *Brown*, 131 S. Ct. at 2734 (quoting *Stevens*,

22 559 U.S. at 470, 472).

23         No historical tradition supports denying protection to speech by parties such as the

24 recipients of FISA orders, who are *compelled* to participate in what the government refers to as

25 "confidential judicial proceedings." Because the speech at issue here is not within any

26 traditionally unprotected category, it is entitled to full First Amendment protection. The

27 government's efforts to demonstrate otherwise are unavailing.

28

-19-

a. The government relies (MTD 22) on *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), in which the Supreme Court held that, as a condition of obtaining access to information through civil discovery, a party may be subjected to a protective order requiring that it preserve the confidentiality of that information. But the restriction upheld in *Seattle Times* differs from that at issue here in that it applied to a party who voluntarily sought out the information at issue and thereby accepted the attendant limitations on its speech. Recipients of FISA orders, on the other hand, have not asked to be subject to such orders. That distinction is critical to the First Amendment analysis: it is one thing to say that a party seeking access to confidential information can be prohibited from disclosing that information, but it is quite another to say that the government may impose a broad and indefinite gag order on a party simply because it has also demanded that the party assist in an investigation.

b. Similarly unhelpful to the government is *Butterworth v. Smith*, 494 U.S. 624 (1990), in which the Supreme Court struck down a Florida statute prohibiting a grand-jury witness from "divulg[ing] information of which he was in possession before he testified before the grand jury." *Id.* at 632. The government notes (MTD 22) that the Court in *Butterworth* did not consider "information which [the witness] may have obtained as a result of his participation in the proceedings of the grand jury," such as the fact that he received a subpoena, or the questions he was asked—information analogous to that covered by a nondisclosure order in an NSL. 494 U.S. at 632; *see id.* at 637 (Scalia, J., concurring) (noting that the issues raised by a prohibition on the disclosure of such information "are not presented by the narrow question we decide today"). Although the government suggests that the First Amendment does not protect speech that discloses such information, there is no tradition of suppressing it, and the history of the law governing grand-jury witnesses illustrates the lack of support for the government's position.

At common law, grand jurors were required to maintain the confidentiality of grand-jury proceedings. But the recipients of FISA orders—persons whose only role in the government's investigation is that they have been compelled to provide information to it—are more appropriately analogized to grand-jury witnesses, who were *not* subject to a duty of

1    confidentiality. Blackstone noted that "antiently it was held, that if one of the grand jury disclosed

2    to any person indicted the evidence that appeared against him, he was thereby made accessory to

3    the offence, if felony; and in treason a principal. And at this day it is agreed, that he is guilty of a

4    high misprision, and liable to be fined and imprisoned." 4 William Blackstone, *Commentaries on*

5    *the Laws of England* 126 (1769). He made no mention, however, of any similar rule for grand-

6    jury *witnesses*. Similarly, grand jurors were required to swear that "the Kings Majesties Counsel,

7    your fellows and your own, you shall keep Secret," while witnesses were required to swear only

8    that "[t]he Evidence that you shall give to the Inquest, upon this Bill shall be the truth, and the

9    whole truth, and nothing but the truth." *Book of Oaths* 114 (H. Twyford ed., 1689).

10        It is not surprising that witnesses were not sworn to secrecy. One major reason for grand-

11   jury secrecy was to protect the grand jury—and the accused—from the undue influence of the

12   Crown, a rationale that would not have applied to witnesses. *See Earl of Shaftesbury's Case*, 8

13   How. St. Tr. 759, 773–74 (1681) (grand jury asserted the right to sit in secret, with one of the

14   grand jurors arguing that "the jury do apprehend, that in private they are more free to examine

15   things in particular, for the satisfying their own consciences, and that without favour or

16   affection"); *id.* at 821 (explaining that although the grand jury was not permitted to examine the

17   witnesses in secret, it was permitted to deliberate in secret, and it ultimately refused to indict);

18   *United States v. Navarro-Vargas*, 408 F.3d 1184, 1191 (9th Cir. 2005) (observing that the *Earl of*

19   *Shaftesbury's Case* "established grand jury secrecy, which continues to be a crucial element in

20   grand juries serving as an independent screen"); *see also In re Russo*, 53 F.R.D. 564, 568 (C.D.

21   Cal. 1971) (noting that the grand jury "gradually developed independence of action from the

22   Crown" by "enclosing its proceedings in a veil of secrecy which the Crown was unable to

23   penetrate"). Shielding the grand jury from improper governmental influence does not require

24   gagging those called upon to give evidence.

25        After the American Revolution, no State appears to have adopted a founding-era statute

26   requiring witness secrecy. Beginning several decades later, a handful of States adopted such

27   restrictions—the statute at issue in *Butterworth* is one example. But the Federal Rules of Criminal

28

1  Procedure expressly reject restrictions on disclosures by witnesses. *See* Fed. R. Crim. P.

2  6(e)(2)(B) (listing persons, not including witnesses, who "must not disclose a matter occurring

3  before the grand jury"); Fed. R. Crim. P. 6(e)(2)(A) ("No obligation of secrecy may be imposed

4  on any person except in accordance with Rule 6(e)(2)(B)."); Fed. R. Crim. P. 6 advisory

5  committee's note (1944) (noting that "[t]he seal of secrecy on witnesses seems an unnecessary

6  hardship"). Under the Federal Rules, a grand-jury witness is free to disclose the questions he or

7  she was asked and the testimony that he or she gave.

8  In short, the government has not come close to establishing that there is an "American

9  tradition of forbidding" the kind of speech at issue here—that is, speech by involuntary

10  participants in a government investigation about their compelled participation. *Brown*, 131 S. Ct.

11  at 2734. Certainly there is nothing comparable to the kind of historical tradition identified by the

12  Supreme Court in recognizing other categories of unprotected speech, such as obscenity, *see Roth*

13  *v. United States*, 354 U.S. 476 (1957), incitement, *see Brandenburg v. Ohio*, 395 U.S. 444 (1969)

14  (per curiam), and fighting words, *see Chaplinsky*, *supra*.

15  c. The government cites (MTD 22) cases from other circuits upholding restrictions on

16  speech by various participants in grand-jury proceedings. But none of those cases establishes the

17  broad proposition that such speech is unprotected by the First Amendment, or that "restrictions on

18  a party's disclosure of information obtained through involvement in confidential judicial

19  proceedings do not offend the First Amendment." *Id.* Of course, to say that the First Amendment

20  protects speech like that at issue here is not to say that such speech may never be restricted.

21  Restrictions may be permissible, but only when they can withstand scrutiny under ordinary First

22  Amendment standards, which the government has not attempted to satisfy here.

**CONCLUSION**

23

24  The motion to dismiss should be denied.

25  Respectfully submitted.

26

27

28

-22-

1

2

DATED:  February 5, 2016

**PERKINS COIE LLP**

3

4

5

6

7

8

9

10

11

By:/s/ *Eric D. Miller*

Eric D. Miller, Bar No. 218416
EMiller@perkinscoie.com
Michael A. Sussmann, D.C. Bar No. 433100
(Admitted *pro hac vice*)
MSussmann@perkinscoie.com
James Snell, Bar No. 173070
JSnell@perkinscoie.com
Hayley L. Berlin, D.C. Bar No. 1011549
(Admitted *pro hac vice*)
HBerlin@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Telephone:  650.838.4300
Facsimile:  650.838.4350

12

13

Attorneys for Plaintiff
Twitter Inc.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-23-