1

2

3

4

5             UNITED STATES DISTRICT COURT

6           NORTHERN DISTRICT OF CALIFORNIA

7

8   **TWITTER, INC.**,                         Case No.  14-cv-04480-YGR

                    Plaintiff,

9                                              **ORDER DENYING GOVERNMENT'S MOTION
                                               FOR SUMMARY JUDGMENT WITHOUT
10      v.                                     PREJUDICE; GRANTING TWITTER'S
                                               MOTION FOR ORDER DIRECTING
11  **JEFFERSON B. SESSIONS, III, *ET AL*.,**  DEFENDANTS TO EXPEDITE SECURITY
                                               CLEARANCE**
                    Defendants.
12                                             Re: Dkt. Nos. 124, 145

13

14          Defendants Jefferson B. Sessions, III,[1] the United States Department of Justice, and the

15  Federal Bureau of Investigation ("the Government") filed a motion for summary judgment on the

16  claims in Plaintiff Twitter, Inc.'s second amended complaint.  (Dkt. No. 145.)  Twitter filed a

17  motion for an order directing the Government to expedite a security clearance process for lead

    counsel in this matter to review materials relevant to this litigation.  (Dkt. No. 124.)

18
            Having carefully considered the papers submitted, the admissible evidence[2], and the
19
    pleadings in this action, and for the reasons set forth below, the Court **DENIES** the motion for
20

21          ─────────────────────

22          [1] Mr. Sessions has been substituted as the Attorney General of the United States by
    automatic operation of Fed. R. Civ. P. 25(d).

23
            [2] Twitter seeks judicial notice of documents obtained on the internet, purporting to be
24  transparency reports and annual reports of various companies.  Twitter offers them to show that
    such reports and data are publicly available and accessible to foreign enemies of the United States.
25  "The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can
    be accurately and readily determined from sources whose accuracy cannot reasonably be
26  questioned."  *See* Fed. R. Evid. 201(b)(2).  Further, any evidence considered by the Court must be
    relevant evidence.  Here, the documents neither appear to be relevant to any matter at issue nor do
27  they appear to be from a source the accuracy of which cannot be questioned.  The request for
    judicial notice is therefore **DENIED**.

28

United States District Court
Northern District of California

summary judgment **WITHOUT PREJUDICE**.  The Court finds the Government has not met its high burden to overcome the strong presumption of unconstitutionality on the record before the Court. The Government's restrictions on Twitter's speech are content-based prior restraints subject to the highest level of scrutiny under the First Amendment.  The restrictions are not narrowly tailored to prohibit only speech that would pose a clear and present danger or imminent harm to national security.  The Government argues that the limitations imposed on Twitter are necessary because disclosure of data concerning the number and type of national security legal process that it received in a time period would impair national security interests and is properly classified. However, the Government has not presented evidence, beyond a generalized explanation, to demonstrate that disclosure of the information in the Draft Transparency Report would present such a grave and serious threat of damage to national security as to meet the applicable strict scrutiny standard.

The Court **GRANTS** the motion for an order directing the Government to expedite the appropriate national security clearances for lead counsel, Andrew J. Pincus and Lee H. Rubin.

# I.     BACKGROUND

The procedural history of this case is lengthy and is detailed in the Court's prior orders. (*See* October 14, 2015 Order Denying Motion To Dismiss As Moot (Dkt. No. 85); May 2, 2016 Order Granting In Part and Denying In Part Motion to Dismiss Amended Complaint (Dkt. No. 113).)  The Court offers an abbreviated summary of the history relevant here.

On April 1, 2014, Twitter submitted to the Government a draft transparency report containing information and discussion about the aggregate numbers of national security letters ("NSLs") and court orders pursuant to the Foreign Intelligence Surveillance Act of 1978 ("FISA"), if any, it received in the second half of 2013.  Twitter requested "a determination as to exactly which, if any, parts of its Transparency Report are classified or, in the [government's] view, may not lawfully be published online."  (Second Amended Complaint, Dkt. No. 114, ¶ 55.)  Several months later, the Government notified Twitter that "information contained in the report is classified and cannot be publicly released," because it did not comply with the government's approved framework for reporting data about FISA orders and NSLs, as set forth in a letter from

1    then-Deputy Attorney General James M. Cole ("the DAG Letter"). (*Id.* ¶¶ 49, 57.)  The

2    framework set forth in the DAG Letter was abrogated subsequently by the USA FREEDOM Act,

3    which codified and broadened the scope of the reporting bands.  However, the essentials of the

4    dispute continue unchanged.

5    **II.   SUMMARY JUDGMENT STANDARDS**

6            Summary judgment is appropriate when there is no genuine dispute as to any material fact

7    and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a).  Any party

8    seeking summary judgment bears the initial burden of identifying those portions of the pleadings

9    and discovery responses that demonstrate the absence of a genuine issue of material fact.  *Celotex*

10   *Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Material facts are those that might affect the outcome

11   of the case.  *Anderson v. Liberty Lobby. Inc.,* 477 U.S. 242, 248 (1986).  A dispute as to a material

12   fact is "genuine" if there is sufficient evidence for the finder of fact to return a verdict for the

13   nonmoving party.  *Id.*

14           If the moving party meets its initial burden, the opposing party must then set out

15   specific facts showing a genuine issue for trial in order to defeat the motion.  *Anderson*, 477

16   U.S. 242, 250; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir 2007); *see also*

17   Fed. R. Civ. P. 56(c), (e).  A court may only consider admissible evidence in ruling on a motion

18   for summary judgment. *See* Fed.R.Civ.P. 56(c)(2); *Beyene v. Coleman Sec. Servs., Inc.,* 854 F.2d

19   1179, 1181 (9th Cir.1988) ("It is well settled that only admissible evidence may be considered by

20   the trial court in ruling on a motion for summary judgment.").  However, when deciding a

21   summary judgment motion, "the court does not make credibility determinations or weigh

22   conflicting evidence."  *Soremekun,* 509 F.3d at 984.  Instead, the court must view the evidence in

23   the light most favorable to the nonmoving party and draw all justifiable inferences in its favor.

24   *Anderson,* 477 U.S. at 255; *Hunt v. City of Los Angeles,* 638 F.3d 703, 709 (9th Cir.2011).

25           Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for

26   specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer

27   considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take

28   discovery; or (3) issue any other appropriate order."  Fed. R. Civ. P. 56(d).  The non-moving party

United States District Court
Northern District of California

3

1    should set forth the particular facts it expects to obtain and why it cannot provide those facts at the

2    time for opposition.  *See Mackey v. Pioneer Nat. Bank*, 867 F.2d 520, 524 (9th Cir. 1989) (citing

3    former Rule 56(f)).

4    **III.**    **DISCUSSION**

5           **A.    Overview of Issues**

6           The Government moves for summary judgment on the grounds that the information

7    Twitter seeks to publish in its Draft Transparency Report is all properly classified information that

8    would harm national security if disclosed, and therefore the First Amendment does not prohibit the

9    Government's restrictions on Twitter's publication of the Draft Transparency Report.  Twitter

10   contends that the Government's restrictions violate the First Amendment both as prior restraints

11   on speech and content-based limitations.  Twitter asserts that more granular data on the volume of

12   process cannot be considered properly classified information under Executive Order 13526, since

13   the Government offers no specific evidence to demonstrate that the disclosure of this information

14   would pose a threat to national security, let alone one that is serious or exceptionally grave.

15   Twitter further argues that the motion is not ripe for consideration because it is entitled to

16   complete discovery pursuant to Rule 56(d) before the Court makes a determination on summary

17   judgment.

18          As the moving party, the burden is on the Government to show that Twitter's constitutional

19   challenges have no merit.  The Government's basis for prohibiting disclosure relies on three

20   interrelated arguments: (1) the aggregate data is classified under Executive Order 13526; (2) the

21   USA FREEDOM Act, at 50 U.S.C. section 1874, limits disclosure of aggregate data about the

22   volume national security process to reporting within certain numerical bands; and (3) the

23   underlying FISA statutes permit the FBI to restrict disclosure about the existence of FISA process.

24   While the Government relies primarily on the first argument here, it intertwines the statutory bases

25   as further support for its classification decision.

26          The Government submits an unclassified declaration of Michael B. Steinbach, Executive

27

28

United States District Court
Northern District of California

1   Assistant Director of the National Security Branch of the Federal Bureau of Investigation.  (Dkt.

2   No. 147-1, Steinbach Decl.)[3]  Steinbach attests that "[d]isclosure of the more detailed and

3   disaggregated information at issue in Twitter's report reasonably could be expected to result in

4   damage to the national security, and it pertains to intelligence activities [section l.4(c)]; foreign

5   relations or foreign activities of the United States [section l.4(d)]; and vulnerabilities or

6   capabilities of systems, installations, infrastructures, project, plans, or protection services relating

7   to the national security [ section 1.4(g)]."  (Steinbach Decl. at ¶ 29).  Steinbach concludes that the

8   information "Twitter seeks to publish—data reflecting its receipt of national security process with

9   a level of specificity that is far more granular than has been declassified by the DNI and allowed

10   by the USA Freedom Act—was properly classified at the time that Twitter's draft transparency

11   report was received by the FBI in 2014 and continues to be properly classified at this time."  (*Id.*)

12   The Government contends that Steinbach's declarations specifically address the proposed

13   disclosure that Twitter seeks to make, rather than simply addressing the classification of all

14   materials generally under the bands prescribed in the USA FREEDOM Act.  The Government

15   urges that Steinbach's determination should be given the "utmost deference" by this Court, given

16   his expertise in national security matters.

17       In opposition, Twitter argues that the Government's restrictions on its ability to report

18   more granular data regarding national security legal process requests it receives hinder its ability

19   communicate truthful information to users of the online information platform, and potentially chill

20   those users' speech.  Twitter seeks "to dispel . . . users' [well-documented] fears" about the

21   privacy of the information they share with Twitter by providing more precise (but aggregate) data

22   about "the limited scope of U.S. surveillance on its platform." (Notice Regarding Classified

23   Document, Dkt. No. 21–1, Exh. 1 Unclassified, Redacted Version of Twitter's Draft Transparency

24   Report ["Draft Transparency Report"] at 2.)  The Government's restrictions not only prevent

25

26   _____

27       [3]  Steinbach also submitted a declaration for the Court's review *in camera*.  Citations to the
    Steinbach Declaration in this Order refer only to the unclassified, publicly filed declaration.

28

Twitter from conveying this message, but also compel Twitter "to mislead [its] users by reporting overly broad ranges of requests." *Id.* Because social media users express concerns about government surveillance, Twitter's inability to report more detailed information about government legal process seeking information about Twitter's users could have a chilling effect on users' speech. More broadly, Twitter argues that restricting information about the scope of a government surveillance program will prevent the public from being able to scrutinize the program or hold government officials accountable for their conduct.

Whether the restriction here on Twitter's speech is viewed as a product of the FBI's classification decision, the underlying FISA statutes permitting the FBI to restrict disclosure about the existence of FISA process, or the FISA public disclosure statute, 50 U.S.C. section 1874, the fact remains that the Government has limited Twitter's ability to speak on the subject of the number of orders it may have received. For the reasons set forth below, the Court finds that such limitations are subject to strict scrutiny under the First Amendment.

**B.      First Amendment Framework**

"The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 [*Pentagon Papers*] (1964)). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983).

At the same time, First Amendment rights are not absolute and do not automatically override all other constitutional values. *See Nebraska Press Ass'n v. Stuart,* 427 U.S. 539, 570 (1976) ("We reaffirm that the guarantees of freedom of expression are not an absolute prohibition under all circumstances, but the barriers to prior restraint remain high and the presumption against its use continues intact."). Government limitations on speech are subject to varying levels of scrutiny depending upon such factors as substance of the speech and limitations involved. Strict

1    scrutiny is reserved for speech implicating core concerns of the First Amendment.  *Republican*

2    *Party of Minn. v. White,* 536 U.S. 765, 774–75 (2002).  Our Supreme Court has held repeatedly

3    that both prior restraints and content-based restrictions are subject to strict scrutiny.

4         Prior restraints on speech are "the most serious and the least tolerable infringement on First

5    Amendment rights." *Nebraska Press Ass'n*, 427 U.S. at 559; *Near v. Minnesota ex rel. Olson*, 283

6    U.S. 697 (1931) ("chief purpose of the (First Amendment's) guaranty [is] to prevent previous

7    restraints upon publication").  The term prior restraint is used to describe administrative and

8    judicial orders forbidding certain communications when issued in advance of the time that such

9    communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993)

10   ("Temporary restraining orders and permanent injunctions—*i.e.,* court orders that actually forbid

11   speech activities—are classic examples of prior restraints.")  A system of prior restraints "bear[s] a

12   heavy presumption against its constitutional validity," and the Government "carries a heavy

13   burden of showing justification for the imposition of such a restraint." *Capital Cities Media, Inc.*

14   *v. Toole,* 463 U.S. 1303, 1305 (1983) (citation omitted).  In order to justify a prior restraint, the

15   government must demonstrate that the restraint is justified without reference to the content of the

16   speech, and is narrowly tailored to serve a compelling governmental interest.  *See Nebraska Press*

17   *Ass'n,* 427 U.S. at 571; *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992);

18   *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989).

19        Similarly, "[c]ontent-based laws—those that target speech based on its communicative

20   content—are presumptively unconstitutional and may be justified only if the government proves

21   that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*,

22   __ U.S.__, 135 S.Ct. 2218, 2226 (2015).  "Government regulation of speech is content based if a

23   law applies to particular speech because of the topic discussed or the idea or message expressed.

24   *Id.* at 2227 (citing *Sorrell v. IMS Health, Inc.,* 564 U.S. 552, 564 (2011)); *Consol. Edison Co. of*

25   *New York v. Pub. Serv. Comm'n,* 447 U.S. 530, 536 (1980) (government regulation "may not be

26   based upon either the content or subject matter of speech."); *Berger v. City of Seattle*, 569 F.3d

27   1029, 1051 (9th Cir. 2009) (*en banc*) (restriction "is content-based if either the underlying purpose

28   of the regulation is to suppress particular ideas or if the regulation, by its very terms, singles out

7

United States District Court
Northern District of California

particular content for differential treatment.").  Even if facially content-neutral, restrictions will be considered content-based if they cannot be "justified without reference to the content of the regulated speech," and must likewise satisfy strict scrutiny.  *Reed,* 1135 S.Ct. at 2227, quoting *Ward,* 491 U.S. at 791; *see also Al Haramain Islamic Found.*, *Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 997, 1001 (9th Cir. 2012) ("*Al Haramain v. Treasury*") (applying strict scrutiny and finding content-based prior restraints unconstitutional despite government's stated justification of preventing terrorism); *Doe v. Gonzales*, 386 F. Supp. 2d 66, 75 (D. Conn. 2005) (finding FISA restriction on ability to disclose receipt of NSL was content-based and subject to strict scrutiny because disclosure could be a means of expressing a particular view about the reach of federal investigative powers).

In addition to substantive concerns warranting heightened scrutiny, courts also consider whether the First Amendment requires procedural safeguards to minimize the extent of any government restrictions on speech.  *John Doe, Inc. v. Mukasey*, 549 F.3d 861, 871 (2d Cir. 2008), *as modified* (Mar. 26, 2009) ["*Doe v. Mukasey*"] ("Where expression is conditioned on governmental permission, such as a licensing system for movies, the First Amendment generally requires procedural protections to guard against impermissible censorship.") (citing *Freedman v. State of Md.*, 380 U.S. 51, 58 (1965)).  Such procedural protections include: (1) restraints prior to judicial review may be imposed "only for a specified brief period during which the status quo must be maintained;" (2) availability of "expeditious judicial review;" and (3) the government entity seeking to restrain the speech bears the burden seeking judicial review and the burden of proof in court.  *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321 (2002) (citing *Freedman*, 380 U.S. 58-60).  Courts considering whether content-based governmental restrictions or prior restraints on speech will pass constitutional muster take into account both the procedural safeguards and substantive strict scrutiny requirements.  *See Microsoft Corp. v. United States Dep't of Justice*, No. C16-0538JLR, 2017 WL 530353, at *11 (W.D. Wash. Feb. 8, 2017) ("even if the procedural safeguards outlined in *Freedman* are met, the Government must show that the statute in question meets strict scrutiny"); *In re Nat'l Sec. Letter*, 930 F.Supp.2d 1064, 1071 (N.D. Cal. 2013) ["*In re NSL*"] (government must "meet the heightened justifications for sustaining prior-restraints" in

*Freedman* and "must be narrowly tailored to serve a compelling government interest"); *Admiral Theatre v. City of Chi.*, 832 F.Supp. 1195, 1203 (N.D. Ill. 1993) (noting that even if procedural safeguards are met "the system is still subject to 'least restrictive means' scrutiny to determine its constitutionality").

### C.   Constitutional Analysis of Restrictions on Twitter's Transparency Report

#### 1.   *Application of Strict Scrutiny Standard*

The Government argues its decision to preclude Twitter from disclosing and publishing in its Draft Transparency Report information the Government deemed classified should be subject to no greater First Amendment scrutiny than simply ascertaining whether the classification determination was made "with reasonable specificity, demonstrat[ing] a logical connection between the detailed information [at issue] and the reasons for classification." *Shaffer v. D.I.A.*, 102 F. Supp. 3d 1, 11 (D.D.C. 2015) (citing *McGehee v. Casey*, 718 F.2d 1137, 1148 (D.C. Cir. 1983)); *see Stillman v. C.I.A.*, 319 F.3d 546, 549 (D.C. Cir. 2003). The Government contends that the Court should not "second guess" its classification determinations so long as it has provided a reasonably specific explanation of the logical connection between the information classified and its reasons for doing so, citing *Shaffer*, 102 F. Supp. 3d at 11, and *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("*Al-Haramain v. Bush*").[4]   Further, the

---

[4]   Executive Order 13526 stated four conditions for classifying information:
(1) the information must be classified by an "original classification authority";
(2) the information must be "owned by, produced by or for, or [be] under the control of" the Government;
(3) the information must fall within one of the authorized classification categories listed in section 1.4 of the Executive Order; and
(4) the original classification authority must "determine[ ] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage."
(Exec. Order 13526, § 1.1.)   For classification at the "Secret" and "Top Secret" levels, the classifying entity must expect "serious" and "exceptionally grave" damage, respectively. (*Id.* § 1.2.)   In addition to the categories listed in Executive Order 13526, the Federal Bureau of Investigation National Security Information Classification Guide ("NSICG") provides guidance concerning the classification of national security information, advising that information should be classified as "Secret" if it pertains to "investigative methods or techniques used in counterterrorism or national security investigations, including the use of national security legal (*cont'd . . .* )

9

United States District Court
Northern District of California

Government argues that the judgment of Congress, as reflected in the USA FREEDOM Act's adoption of the disclosure band framework espoused by the Department of Justice, provides further reason to give deference to the Executive's determination that the more granular information cannot be disclosed without incurring unacceptable risk to national security.  The Government's position, however, ignores the important First Amendment safeguards that would be imperiled by such extreme deference to the Executive's classification decisions.

The Court previously determined that the First Amendment does not allow individuals subject to secrecy obligations to disclose classified national security information.  However, the Court does not agree with the Government's position that simply determining information meets the requirements for classification under Executive Order 13526 ends the Constitutional analysis.  That the information is classified is not, in itself, a sufficient basis for the Government's prohibition on its disclosure in the absence of the sorts of secrecy obligations on government employees and contractors present in *Snepp*, *Wilson*, and *Stillman*.  *See Stillman*, 319 F.3d at 548 (citing longstanding principles of judicial restraint to avoid reaching constitutional questions where it is unnecessary, court determined propriety of classification decision first because proper restrictions on employee meant he had not First Amendment right to publish information); *cf. Snepp v. United States,* 444 U.S. 507 (1980) (former CIA employee sought prepublication review of confidential information in book draft); *Wilson v. C.I.A.*, 586 F.3d 171 (2d Cir. 2009) (CIA employee brought action against her employer).

The First Amendment requires strict scrutiny of content-based restrictions and prior restraints, regardless of the Government's basis for nondisclosure.  Even in the context of

---

( . . . *cont'd*)

process, where disclosure of that method or technique would, if made public, reduce the effectiveness of that technique."  (*Id.*) (Steinbach Decl. ¶ 27 n.10.)

Steinbach indicates that specific aggregate data concerning NSLs and FISA orders reported in Department of Justice annual reports to Congress is classified as "Secret," and that a 2013 order containing aggregate numbers of NSLs and FISA orders by type, issued in 2013, was initially classified as Top Secret, but declassified by the Director of National Intelligence on June 23, 2014. (Steinbach Decl. ¶¶ 15 n. 7, 17.)  He does not indicate any aggregate data is classified as "Top Secret."

classified information, as the Supreme Court held in *Pentagon Papers*, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity and the Government thus carries a heavy burden of showing justification for the imposition of such a restraint." *Pentagon Papers*, 403 U.S. at 714 (internal citations omitted); *see also Nebraska Press Ass'n*, 427 U.S. at 591 (Brennan, J., concurring) (while *Near* and *Pentagon Papers* cases contemplated that there might be an exception to the near-complete ban on prior restraints of speech due to countervailing interests such as national security, such an exception "has only been adverted to in dictum and has never served as the basis for [the Supreme Court] actually upholding a prior restraint against the publication of constitutionally protected materials"); *In re Washington Post Co.*, 807 F.2d 383, 391–92 (4th Cir. 1986) ("[T]roubled as we are by the risk that disclosure of classified information could endanger the lives of both Americans and their foreign informants, we are equally troubled by the notion that the judiciary should abdicate its decisionmaking responsibility to the executive branch whenever national security concerns are present.")

In *Pentagon Papers*, while certain justices acknowledged their concern that disclosure of the classified information at issue might be harmful to the national interest, the Supreme Court nevertheless held that the Government had not met its burden under the First Amendment to justify enjoining publication of that classified information. *Pentagon Papers*, 403 U.S. at 714.[5] As Justice Stewart stated in his concurrence to the *per curiam* opinion, the government had not shown that publication would result in "direct, immediate, and irreparable damage to our Nation or its people" so as to support an injunction. *Id*. at 729 (Stewart, J. concurring). "[T]he First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." *Id.* at 725–26 (Brennan, J., concurring). Such

---

[5]  At the time of publication in the *Pentagon Papers* case, the United States was still engaged in a war in Vietnam, and the information at issue contained material about the war that had been classified as "Top Secret" and "Secret." *See United States v. N.Y. Times Co.*, 328 F. Supp. 324, 326 (S.D.N.Y. 1971).

restraints are only permitted in an extremely narrow class of cases such as in times of war to prevent disclosure of such information as troop locations and movements. *Id.* In the words of Justice Black, "[t]he guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic." *Id.* at 719. Thus, while observing that the Executive branch is charged with great power in the areas of national defense and international relations, the Supreme Court nevertheless found that it could not obstruct the flow of information to its citizenry based solely on a statement that the matters were classified. *Id.* at 727-28.[6]

The Court finds the most closely analogous cases have applied a high degree of scrutiny in the context of constitutional challenges to restrictions on disclosure of information with national security implications, though stopping short of unequivocally adopting the *Pentagon Papers* standard. In *Doe v. Mukasey,* the plaintiff was an internet service provider upon which the FBI had served an NSL seeking certain information about electronic communication records in furtherance of an investigation, pursuant to 18 U.S.C. section 2709. *Doe v. Mukasey*, 549 F.3d at 864. Section 2709 permits the FBI to seek records relevant to an authorized investigation to protect against international terrorism or clandestine intelligence activities. If the Director of the FBI or his designee certifies that disclosure of the request may result in "a danger to the national security of the United States; interference with a criminal, counterterrorism, or counterintelligence investigation; interference with diplomatic relations; or danger to the life or physical safety of any person," section 2709(c) prohibits the recipient of an NSL from disclosing that such a request has

---

[6] As stated by Justice Stewart, to simply rely on a classification decision to justify a prior restraint would risk overuse of the classification authority:

> For when everything is classified, then nothing is classified, and the system becomes one to be disregarded by the cynical or the careless, and to be manipulated by those intent on self-protection or self-promotion. I should suppose, in short, that the hallmark of a truly effective internal security system would be the maximum possible disclosure, recognizing that secrecy can best be preserved only when credibility is truly maintained.

*Pentagon Papers,* 403 U.S. at 729. (Stewart, J., concurring).

United States District Court
Northern District of California

been received.  The Second Circuit, in considering the appropriate level of scrutiny to apply to a constitutional challenge to section 2709(c)'s nondisclosure requirement, found that "[a]lthough the nondisclosure requirement is in some sense a prior restraint . . . it is not a typical example of such a restriction for it is not a restraint imposed on those who customarily wish to exercise rights of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *Id.* at 876.  The court held that the nondisclosure requirement in the statute was "not a typical prior restraint or a typical content-based restriction warranting the most rigorous First Amendment scrutiny," but at the same time was not a context which warranted "a significantly diminished standard of review." *Id.* at 877.

Though the context was narrow and limited to a single nondisclosure order, the corporate plaintiff nonetheless had been restrained from public expression of information relevant to and critical of a government activity, a core concern of the First Amendment. *Id.* at 877–78, citing *Gentile v. State Bar of Nevada,* 501 U.S. 1030, 1034 (1991) ("There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment."); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 838 (1978) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.") (internal citation and quotation marks omitted).  While the panel could not agree on whether to apply traditional strict scrutiny or something slightly less than that, it ultimately determined that the distinction would not have changed the outcome. *Doe v. Mukasey*, 549 F.3d at 878.  Moreover, the Government conceded strict scrutiny was the appropriate standard. *Id.*

In another closely aligned case, *In re NSL,* the district court stated that it was adopting the analysis in *Doe v. Mukasey*, but nevertheless hesitated to apply the "extraordinarily rigorous *Pentagon Papers* test." *In re NSL*, 930 F. Supp. 2d at 1071.  There, an electronic communication service provider petitioned the court to set aside an NSL received from the FBI under section 2709, as well as the associated nondisclosure requirement, seeking subscriber information. *Id.* at 1066.  The court found that "while section 2709(c) may not be a 'classic prior restraint' or a 'typical' content-based restriction on speech, the nondisclosure provision clearly restrains speech

1   of a particular content—significantly, speech about government conduct." *Id.* at 1071.  The court

2   determined that the *Pentagon Papers* standard would be "too exacting" given the "text and

3   function of the NSL statute."  *Id.*  However, the court found that the government was required to

4   offer "heightened justifications for sustaining prior restraints on speech," as required by *Freeman*,

5   and to demonstrate that its restrictions were "narrowly tailored to serve a compelling

6   governmental interest."  *Id.* at 1071; *see also Microsoft v. DOJ,* 2017 WL 530353, at *10-12

7   (W.D. Wash. Feb. 8, 2017) (plaintiff stated a constitutional challenge to statutory provisions

8   indefinitely restraining communication about the existence of electronic surveillance orders

9   whether strict scrutiny or some standard short of that, applied).

10        Both *In re NSL* and *Doe v. Mukasey* counsel application of a heightened level of scrutiny

11   in the case at bar.  At the same time, they are distinguishable from the present case in ways that

12   suggest the Supreme Court's usual strict scrutiny standard, rather than some modified version,

13   should apply here.  *In re NSL* and *Doe v. Mukasey* concerned challenges to nondisclosure

14   provisions in *individual* orders, implicating different concerns from those attending the

15   dissemination of abstracted data about the volume of requests at issue here.  The relative balance

16   of jeopardy to an investigation, or to national security generally, as compared to the public's need

17   for information about the functioning of its government weighs very differently when the

18   disclosure concerns the details of a single, particular FBI request as compared to data about the

19   mere quantity of requests without touching upon the specifics of any of them.

20        Further, both *In re NSL* and *Doe v. Mukasey* were focused on the circumstance where the

21   recipient of the NSL or other legal process was a telephone or internet service provider, not a

22   social media outlet that functions as an information broadcast medium more akin to a newspaper

23   or television network.  The challenges in those cases arose from nondisclosure restrictions on

24   entities which arguably do not occupy the same sort of communicative role as Twitter does.  In

25   some ways, Twitter acts as the modern, electronic equivalent of a public square.  The court in *Doe*

26   *v. Mukasey* determined it should apply something other than strict scrutiny because, "[a]lthough

27   the nondisclosure requirement is in some sense a prior restraint . . . it is not a typical example of

28   such a restriction for it is not a restraint imposed on those who customarily wish to exercise rights

United States District Court
Northern District of California

14

of free expression, such as speakers in public fora, distributors of literature, or exhibitors of movies." *Doe v. Mukasey*, 549 F.3d at 876 (analogizing to *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984), where prohibitions on disclosure of pretrial discovery was held not to be a "class prior restraint" subject to strict scrutiny). Here, restrictions on Twitter's ability to disclose information relevant to its own functioning as a social media outlet appear much more like the kind of restraints on "speakers in public fora, distributors of literature, or exhibitors of movies" that would not permit an exception to strict scrutiny. *Doe v. Mukasey*, 549 F.3d at 876; *see also Bland v. Roberts*, 730 F.3d 368, 386 (4th Cir. 2013), *as amended* (Sept. 23, 2013) ("liking a political candidate's campaign page [on Facebook] communicates the user's approval of the candidate and . . . is the Internet equivalent of displaying a political sign in one's front yard," implicating First Amendment protections).

Thus, the Court finds the Government's decision to restrict the information in Twitter's Draft Transparency Report is based upon its content and a prior restraint of publication. Accordingly, Supreme Court authority requires that such restrictions be subject to strict scrutiny. *See, e.g., Pentagon Papers*, 403 U.S. at 714 (prior restraints bear "a heavy presumption against [their] constitutional validity" and are subject to strict scrutiny, regardless of assertions of national security); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971); *Nebraska Press Assn.*, 427 U.S. at 589 (prior restraints are "the essence of censorship" and accorded greater First Amendment protection than subsequent punishments for particular speech); *Forsyth County*, 505 U.S. at 130 (permitting regulation on free speech cannot be based upon content and must be narrowly tailored with objective and definite standards for abridgment); *Reed*, 135 S. Ct. at 2227 (content-based regulations subject to strict scrutiny).

Even where courts have hesitated to apply the highest level of scrutiny due to competing secrecy and national security concerns, they have nevertheless held that heightened or rigorous scrutiny of such restrictions on speech is required. *Doe v. Mukasey*, 549 F.3d at 876; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010) (applying "rigorous scrutiny," and rejecting "intermediate scrutiny," in context of statute that criminalized knowing provision of material support to terrorist organizations standard, and distinguishing facts from a prior restraint

United States District Court
Northern District of California

restriction on "pure political speech" which would be even less likely to survive review); *see also Matter of Grand Jury Subpoena for: [Redacted]@yahoo.com*, 79 F.Supp.3d 1091, 1091 (N.D. Cal. 2015) (striking down gag order under Stored Communications Act because "an indefinite order would amount to an undue prior restraint of Yahoo!'s First Amendment right to inform the public of its role in searching and seizing its information."); *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d 876, 882 (S.D. Tex. 2008) (nondisclosure requirements in connection with FBI surveillance orders were subject to "rigorous scrutiny")[7]; *cf. Defense Distributed v. United States Dep't of State*, 838 F.3d 451, 466 (5th Cir. 2016) (holding, under strict scrutiny analysis, that regulation on export of technical data related to prohibited munitions via publication on the internet of instructions for 3-D printing of firearms violated plaintiff's First Amendment as an unconstitutional prior restraint and content-based regulation, despite State Department's national security concerns).  Though it has been classified by the FBI as information that "reasonably could be expected to result in damage to the national security," that fact alone does not exempt the restriction from rigorous scrutiny.  Simply asserting that information is classified under the Executive Order does not meet the Government's burden to justify the disclosure in the face of such rigorous scrutiny.  *See Pentagon Papers*, 403 U.S. at 714; *see also Al-Haramain v. Bush*, 507 F.3d at 1203 ("[s]imply saying 'military secret,' 'national security,' . . . 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient" to justify a content-based restraint on speech)[8].

---

[7] As the district court in *In re Sealing* aptly noted, disclosure of the existence and numbers of surveillance orders is important to an informed public since, "[c]umulatively considered, these secret orders, issued by the thousands year after year by court after court around the country, may conceal from the public the actual degree of government intrusion that current legislation authorizes." *In re Sealing*, 562 F. Supp. 2d at 886.  "It may very well be that, given full disclosure of the frequency and extent of these orders, the people and their elected representatives would heartily approve without a second thought.  But then again, they might not." *Id.*

[8] The Ninth Circuit's decision in *Al-Haramain v. Bush*, although not a constitutional challenge, is instructive.  The Ninth Circuit reached its conclusion there only after "spen[ding] considerable time examining the government's declarations (both publicly filed and those filed under seal)," and finding that the government's assertions were "*exceptionally* well documented." *Id.* at 1203 (emphasis added).  While the court "acknowledge[d]" the need for some "defer[ence] (*cont'd . . .* )

16

1      Here, the declarations of Steinbach, both *in camera* and public, fail to provide sufficient

2   details indicating that the decision to classify the information in the Draft Transparency Report

3   was based on anything more specific than the reporting bands in section 1874 and the FBI's

4   position that more granular information "could be expected to harm national security."  The

5   declarations do not provide an indication of grave or imminent harm arising from the disclosures

6   in the Draft Transparency Report.  Rather, the concerns raised to relate to the overall concern from

7   one or more of *any* electronic communication service regardless of the specific provider or

8   circumstance.  Merely declaring a view that more granular reporting would create an unacceptable

9   risk does not make it so, especially in light of the Government's acknowledgement of the strong

10  public interest in the information.

11     The Government has not sufficiently explained how a restriction on reporting, beyond the

12  bands in section 1874, could be characterized as narrowly tailored to prevent a national security

13  risk of sufficient gravity to justify the restraint, either in general or with respect to Twitter

14  specifically.  Steinbach does not indicate that the classification decision reflected any narrow

15  tailoring of the decision to take into consideration, for instance, the nature of the provider, the

16  volume of any requests involved or the number of users on the platform.  These considerations are

17  significant, since Twitter, by recent estimation, had users numbering in the hundreds of millions.

18  Despite it being over three years since the decision, Steinbach stands by the continued

19  classification of the information therein.  (Steinbach Decl. at ¶ 29.)[9]  Rather, the declaration

20

---

21  ( . . . *cont'd*)
    to the Executive on matters of foreign policy and national security," it nonetheless insisted that the
22  Government produce "sufficient detail" to permit "meaningful examination" of its state secrets
    privilege claim.  *Id.* at 1203.
23

24     [9]  The Government concedes that it previously classified its own report summarizing the
    aggregate number of NSLs and FISA orders issued in 2013 as "Top Secret," reflecting an
25  assessment that public disclosure was "expected to cause exceptionally grave damage to the
    national security." (Steinbach Decl. ¶ 17.)  That report was declassified on June 23, 2014—within
26  six months—and is now available to public. (*Id.*)  The Government does not indicate that
    "exceptionally grave damage" to national security resulted from disclosure of that report or other
27  subsequently declassified material.

28

United States District Court
Northern District of California

largely relies on a generic, and seemingly boilerplate, description of the mosaic theory and a broad brush concern that the information at issue will make more difficult the complications associated with intelligence gathering in the internet age. *Cf. Detroit Free Press v. Ashcroft*, 303 F.3d 681, 709–10 (6th Cir. 2002) (seemingly unlimited logic of mosaic theory would permit the government to "operate in virtual secrecy in all matters dealing, even remotely, with 'national security,' resulting in a wholesale suspension of First Amendment rights.")  Without some more specific articulation of the inference the Government believes can be drawn from the information Twitter itself seeks to publish, even years later, the Court cannot find that the Government has met the high burden to overcome a presumption that its restrictions are unconstitutional.

Moreover, the Supreme Court has held that restrictions of this type require procedural safeguards to ensure that they are imposed for a limited time and subject to review at the earliest juncture. *Freedman*, 380 U.S. at 58-60.  Neither the Government's classification decision nor the disclosure reporting statute provide such safeguards, nor do the FISA nondisclosure provisions at issue provide for review that would encompass just the aggregate volume data.  Indeed, the ban on disclosure of this aggregate data, relying as it does on section 1874, does not appear to have a limit to the duration of nondisclosure, only a narrowing of the disclosure bands after one year.  50 U.S.C. § 1874(a)(4).  Despite section 1874(c)'s grant of discretion to permit greater detail in reporting, the statute offers no procedure to petition for such exercise of discretion.  It does not provide a mechanism for review of any Government decisions under that exception, or classification decisions in connection with such disclosures generally.  Further, as noted it does not distinguish in any way between large and small providers, the nature of the provider itself, and the levels of information they may report.

In short, the Government's restrictions here are not the product of an individualized inquiry or narrow tailoring.  They impose a prior restraint on Twitter's speech, not based on an actual finding that permitting the speech would seriously damage national security, but because Twitter's proposed disclosure was more precise than the permissive band structure in the USA FREEDOM Act and its predecessor DAG Letter.  Finally, they do not include any procedural safeguards to ensure that the decision is one that comports with the appropriate high level of

scrutiny warranted by such prior restraints.

### 2. *Government's Authorities Espousing Deferential Review Are Not Applicable*

The Government relies on *Stillman*, *Wilson*, and *Shaffer*, in which employees or contractors of the Government were prohibited from publishing classified information. These cases do not persuade. As the Supreme Court has held, a government employee "voluntarily assume[s] a duty of confidentiality, governmental restrictions on disclosure are not subject to the same stringent standards that would apply to efforts to impose restrictions on unwilling members of the public." *United States v. Aguilar,* 515 U.S. 593, 606 (1995); *see United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 465-66 (1995) ("Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."). *Stillman* concerned restrictions on a government employee, and the court there specifically held that "[o]nce a government employee signs an agreement not to disclose information properly classified pursuant to executive order, that employee 'simply has no first amendment right to publish' such information. *Stillman* 319 F.3d at 548, *citing Snepp,* 444 U.S. at 510 n. 3 ("When Snepp accepted employment with the CIA [Central Intelligence Agency], he voluntarily signed the agreement that expressly obligated him to submit any proposed publication for prior review"). *Stillman* held that the CIA, as the employer had the power to "impos[e] reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment." *Id.* Similarly, the court in *Wilson* very specifically stated that the "CIA's requirement that current and former employees obtain Agency clearance before disseminating any material related to their employment is not, however, a 'system of prior restraints' in the classic sense." *Wilson,* 586 F.3d at 183-84 (citing *McGehee,* 718 F.2d at 1147-48); *accord Doe v. Mukasey,* 549 F.3d at 871, 876 n. 12, 877 (distinguishing between former CIA employees and entities that "had no interaction with the Government until the Government imposed its nondisclosure requirement upon [them]"). The courts in these cases subject the Government agency's censorship to a minimal and deferential review: "if the Agency censors a manuscript because it contains classified information, the author is entitled to judicial review of that decision

to ensure that the information in question is, in fact, properly classified under the standards set forth in the applicable executive order," not more.  *Wilson*, 586 F.3d at 185-86; *see also Shaffer*, 102 F.Supp.3d at 14-15 (conducting review of classification decision precluding former military officer's request to publish information in his memoir under *Stillman*).  Here, the caselaw offers no basis to treat restraints on speech by Twitter the same as "reasonable restrictions on employee activities," worthy of less than the full panoply of rights under the First Amendment.

### 3.     *Government's efforts to distinguish* **Pentagon Papers** *fail*

The Government seeks a lower level of scrutiny contending that *Pentagon Papers* is distinguishable because the *New York Times* and *Washington Post* had obtained the classified information at issue through an apparent leak of information while here the information at issue arises from Twitter's "participation" in judicial proceedings.  Thus, the Government argues that, like a party in discovery or a grand jury witness, Twitter can be restricted from disclosing information.

The Government's analogies are not particularly apt.  Restrictions on disclosure of grand jury testimony have only been upheld when they were limited in duration, allowed for broad judicial review, and did not preclude an individual from disclosing information known outside of their direct participation in the proceedings.  *See Butterworth v Smith*, 494 U.S. 624, 632 (1990).  Further, the justification for limitations on disclosure of information learned in pre-trial civil litigation yields when the information bears on public proceedings or concerns.  *Cf. Seattle Times*, 467 U.S. at 33 (distinguishing restrictions on pretrial discovery disclosure from information admitted into evidence).

The Government also distinguishes *Pentagon Papers* on the ground that it concerned an injunction against publication rather than a statutory limitation on publication or a Court-ordered limitation imposed pursuant to a statute permitting the Executive to request nondisclosure.  These distinctions lack substance.  Whether a Government restriction is imposed as a flat-out injunction or a nondisclosure order by a court, it still constitutes a prior restraint based upon the content of the message.  Similarly, regardless of whether the Executive's decision to limit the scope of the disclosure arises out of a statutory framework enacted by Congress or a request made to the Court,

1  the Executive's exercise of discretion results in the same prohibition on speech.

2        The Government offers no evidence that Congress's decision to adopt the disclosure

3  framework, first applied in the DAG letter, was based upon a determination that disclosure of any

4  more granular information would be, in all cases, a clear and present danger or a serious and

5  imminent threat to a compelling government interest such that less restrictive, more narrowly

6  tailored means to protect that interest did not exist.  *See generally Nebraska Press Ass'n*, 427 U.S.

7  at 565; *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562 F. Supp. 2d at 882.

8  Thus, while evidence may exist, the Government has not yet made a sufficient showing.

9  **IV.    CONCLUSION**

10        The motion for summary judgment is **DENIED WITHOUT PREJUDICE** to a renewed motion

11  upon a more fulsome record.  Twitter has sought a security clearance to be permitted to review any

12  *in camera* filing by the Government.

13        The Government is **ORDERED** to move forward on granting Twitter's lead counsel,

14  Andrew J. Pincus and Lee H. Rubin, security clearances that would permit review of relevant

15  classified materials in this matter.

16        **IT IS SO ORDERED.**

17        This terminates Docket Nos. 124 and 145.

18  Dated: July 6, 2017

19                                                          _____

20                                                          **YVONNE GONZALEZ ROGERS**
                                                            **UNITED STATES DISTRICT JUDGE**