CHAD A. READLER
Acting Assistant Attorney General
BRIAN STRETCH
United States Attorney
ANTHONY J. COPPOLINO
Deputy Branch Director
JULIA A. BERMAN
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 616-8480
Facsimile:  (202) 616-8470
Email: julia.berman@usdoj.gov

Attorneys for Defendants the Attorney General, et al.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480 |
| Plaintiff, | |
| v. | |
| JEFFERSON B. SESSIONS, III United States Attorney General, *et al.*, | |
| Defendants. | **DEFENDANTS' MOTION FOR RECONSIDERATION**<br><br>Date: October 24, 2017<br>Time: TBD<br>Courtroom 1, Fourth Floor<br>Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

    I.     Procedural Background Preceding the Second Amended Complaint................... 2

    II.    Plaintiff's Claims in the Second Amended Complaint ........................................... 3

    III.   The Government's Motion for Summary Judgment and the
          Court's July 6, 2017 Order ....................................................................................... 5

ARGUMENT ..................................................................................................................... 8

    I.     The Government's Classification Determination Satisfies the Standard of
         Review Set Out by the Ninth Circuit in *In re NSL*. .................................................. 8

         A.     The Ninth Circuit's Approach in *In re NSL*................................................. 8

         B.     Application of *In re NSL* to the Instant Case ............................................ 11

    II.    *In re NSL* Confirms that the Restrictions on Speech at Issue Here
         Are Not Censorship or Licensing Schemes, But Are Instead
         Analogous to Government Confidentiality Requirements that
         Courts Have Approved ........................................................................................... 16

CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**

*Burson v. Freeman*,
　504 U.S. 191 (1992).................................................................................. 8

*Butterworth v. Smith*,
　494 U.S. 624 (1990)................................................................................ 17

*Doe v. Mukasey*,
　549 F.3d 861 (2d Cir. 2008) ........................................................... 6, 10, 17

*Freedman v. Maryland*,
　380 U.S. 51 (1965)........................................................... 7, 16, 17, 18

*Holder v. Humanitarian Law Project*,
　561 US. 1 (2010)..................................................................................... 11

*In re Mot. For Release of Court Records*,
　526 F. Supp. 2d 484 (F.I.S.C. 2007).................................................... 18

*In re Nat'l Sec. Letter*,
　930 F. Supp. 2d 1064 (N.D. Cal. 2013) ................................................ 6

*In re National Security Letter*,
　863 F.3d 1110 (9th Cir. 2017) ....................................................... *passim*

*Nebraska Press Ass'n v. Stuart*,
　427 U.S. 539 (1976)................................................................................. 8

*New York Times Co. v. United States*,
　(Pentagon Papers), 403 U.S. 713 (1971) ......................................... 6, 8

*Reno v. Am. Civil Liberties Union*,
　521 U.S. 844 (1997)................................................................................ 9

*Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*,
　5 F.3d 1255 (9th Cir. 1993) ................................................................... 1

*Seattle Times Co. v. Rhinehart*,
　467 U.S. 20 (1984)........................................................................... 9, 17

*Shaffer v. DIA*,
    102 F. Supp. 3d 1, 11 (D.D.C. 2015) ...................................................................15

*Stillman v. CIA*,
    319 F.3d 546 (D.C. Cir. 2003) ................................................................... 3, 15

*Twitter v. Holder*,
    183 F. Supp. 3d 1007 (N.D. Cal. 2016) ........................................................ 3

*Twitter v. Lynch*,
    139 F. Supp. 3d 1075 (N.D. Cal. 2015) ................................................. 1, 2–3

*Twitter, Inc. v. Sessions*,
    2017 WL 2876183, --- F. Supp. 3d --- (N.D. Cal. July 6, 2017)  ............................... 1

*Williams-Yulee v. Fla. Bar*,
    135 S. Ct. 1656 (2015) ................................................................. *passim*


Statutes

18 U.S.C. § 2709 ................................................................................ *passim*

18 U.S.C. § 3511 ................................................................................ *passim*

50 U.S.C. § 1874 ................................................................................ *passim*


Other Authorities

Executive Order 13526 ........................................................................ 4, 14, 18

**INTRODUCTION**

Plaintiff seeks declaratory and injunctive relief permitting it to publish classified data in its draft Transparency Report regarding its receipt of national security legal process.  The Government explained, in the classified and unclassified declarations of then-Executive Assistant Director Michael Steinbach of the Federal Bureau of Investigation ("FBI"), why harm to national security reasonably could be expected to result from the disclosure of such information.[1]  Based on those declarations, the Government moved for summary judgment.  *See* ECF No. 145.

On July 6, 2017, the Court denied the Government's motion, concluding that the Government had not demonstrated that the prohibition on disclosure of classified information at issue here was narrowly tailored to serve the compelling interest in avoiding harm to national security.  *See* ECF No. 172, *published as Twitter v. Lynch*, *Twitter, Inc. v. Sessions*, 2017 WL 2876183, --- F. Supp. 3d --- (N.D. Cal. July 6, 2017) ("July 6 Order").  Just eleven days later, however, the Ninth Circuit's decision in *In re National Security Letter*, 863 F.3d 1110 (9th Cir. 2017) ("*In re NSL*"), caused "a change in controlling law," *Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993), warranting briefing on this motion for reconsideration.  *See* Civil Minutes, ECF No. 176 at 1.

*In re NSL* addressed a First Amendment challenge by recipients of national security letters (NSLs) to what the Court of Appeals termed the "NSL law"—the set of statutes authorizing the Government to obtain information in furtherance of national security

---

[1] Former EAD Steinbach has retired from the FBI, and EAD Carl Ghattas now holds the office formerly held by Mr. Steinbach.  On August 28, 2017, the Government submitted a declaration from EAD Ghattas stating that he had reviewed the Declarations of former EAD Steinbach submitted in this matter, and, "[a]s an original classification authority, [EAD Ghattas] concur[s] with the conclusions reached by former EAD Steinbach and ha[s] also independently concluded that the public reporting of data reflecting the quantity and type of national security process served on an individual recipient of such process, in a manner that is more detailed or disaggregated than the methods of reporting which have been declassified by the Director of National Intelligence and as allowed under 50 U.S.C. § 1874, including the information contained in the draft transparency report prepared by plaintiff Twitter at issue in this case, is currently and properly classified under the criteria set forth in Executive Order 13526."  ECF No. 179-1 ¶ 6.

investigations through the use of National Security Letters ("NSLs") and prevent recipients of NSLs from disclosing that they have received such legal process.  In considering the recipients' claims in that case, the Court of Appeals had occasion to consider arguments closely resembling those asserted by Plaintiff here.  As a result, there is now Ninth Circuit guidance on several issues that go to the heart of the case before this Court: first, the Court of Appeals considered whether a statutory scheme that permits the Government to impose nondisclosure obligations as to "the bare fact of receiving [national security process]" satisfies narrow tailoring; second, the Court of Appeals considered the recipients' objections that the reporting bands in the USA FREEDOM Act,[2] were arbitrary; and, third, the Court of Appeals assessed whether a statute that "allows the government to prohibit disclosure indefinitely" could be considered the least restrictive means of protecting national security.  The principles that guided the Court of Appeals' analysis of these issues in *In re NSL* are dispositive of Plaintiff's claims here.

As set forth below, in applying the analysis of *In re NSL* to Plaintiff's claims, the Court should conclude that the nondisclosure requirements prohibiting Plaintiff's publication of the classified information in its draft Transparency Report are narrowly tailored to serve a compelling state interest.

## BACKGROUND

### I.       Procedural Background Preceding the Second Amended Complaint

Much of the background of this litigation is set forth in two previous opinions in this case, dismissing Plaintiff's original Complaint and Plaintiff's First Amended Complaint.  As this Court explained on October 14, 2015, Plaintiff initiated this action by bringing "(1) First Amendment challenges to 18 U.S.C. sections 2709(c) and 3511; and (2) a challenge under the Administrative Procedure Act ("APA") to an action by the Deputy Attorney General ("the DAG Letter") that Plaintiff contends was a 'final agency action' to regulate the ways in which communications providers could report data on government requests for its customers' information."  Order Denying Motion to Dismiss as Moot and, on the Court's Own Motion,

---

[2] The USA FREEDOM Act of 2015, Pub. L. No. 114-23, 129 Stat. 268 ("the USA FREEDOM Act").

Ordering Filing of Amended Complaint in Light of Recent Legislation, ECF No. 85, *published as Twitter v. Lynch*, 139 F. Supp. 3d 1075, 1076 (N.D. Cal. 2015) ("*Twitter I*").

Following that dismissal, Plaintiff filed an Amended Complaint on November 13, 2015, *see* ECF No. 88, which brought facial and as-applied challenges to provisions of the Foreign Intelligence Surveillance Act ("FISA") and the Espionage Act. *See id.* at 14–17. On May 2, 2016, the Court again dismissed, finding that having "conceded that the aggregate data [in the draft Transparency Report] is classified," Twitter had not "allege[d] viable claims." Order Granting in Part and Denying in Part Motion to Dismiss Amended Complaint, ECF No. 113, *published as Twitter v. Holder*, 183 F. Supp. 3d 1007, 1014 (N.D. Cal. 2016) (*Twitter II*"). The Court's ruling rested on its conclusion that "[t]he First Amendment does not permit a person subject to secrecy obligations to disclose classified national security information," *id.*, and the Court recognized the case law from the Supreme Court and the Courts of Appeals in other circuits, setting forth this principle as well as the "procedures for challeng[ing] [a] classification decision." *Id.* (citing *Stillman v. CIA*, 319 F.3d 546, 548-49 (D.C. Cir. 2003)).

## II.     Plaintiff's Claims in the Second Amended Complaint

On May 24, 2016, Plaintiff filed the currently operative Second Amended Complaint ("SAC"), ECF No. 114, asserting three duplicative causes of action, *see* SAC ¶¶ 71–96, based on which it seeks declaratory and injunctive relief to allow it to publish the information from the draft Transparency Report that the Government determined to be properly classified, as well as similar information covering future periods of time, *see id.*, Prayer for Relief. As discussed below, Plaintiff's constitutional claims include facial and as-applied challenges to FISA "secrecy provisions," as well as an as-applied challenge to the Espionage Act. All of these requests for declaratory relief, like the three counts of the SAC, turn on whether the Government properly determined that information in the draft Transparency Report is classified; if, as discussed herein, Plaintiff has no First Amendment right to publish such information, then all of its claims are subject to dismissal.

Count I is styled as an implied cause of action under the First Amendment. *See id.* at 17. Plaintiff acknowledges that there is no First Amendment right to publish the information at issue if it is properly classified, *see id.* ¶ 73, but alleges, in sum, that because the information redacted from the draft Transparency Report is not properly classified, any prohibition on its disclosure constitutes an unconstitutional prior restraint on its speech, *see id.* ¶¶ 72, 76, 79–82, 84–86. There are several separate components to Count I, but all turn on whether Plaintiff has a First Amendment right to publish the information at issue.

First, Plaintiff alleges that the information redacted from the draft Transparency Report is not properly classified because it does not satisfy the requirements of Executive Order 13526, *id.* ¶¶ 73–81; Plaintiff contends that by "improperly classif[ying] information and then prevent[ing] its publication," the Government has violated the First Amendment. *Id.* ¶ 85.

Also as part of Count I, Plaintiff contends that the Court should issue a declaratory judgment that "the standards set forth in Executive Order 13526 constitute the only grounds on which the government may rely to prohibit disclosure of the redacted information in the draft Transparency Report." *Id.* It appears that this request is based on Plaintiff's contention that "[i]f the information that Twitter seeks to publish is not properly classified under Executive Order 13526, then the government has no other basis for prohibiting its disclosure." *Id.* ¶ 82. Although Plaintiff discusses its contention that the FISA and FISC orders do not prohibit disclosure of aggregate data, and its alternative argument that the FISA and FISC orders are unconstitutional if they do restrict the publication of such information, *id.* ¶¶ 83–84, Plaintiff does not otherwise explain the grounds for its position that no other authority, apart from Executive Order 13526, could restrict the disclosure of the information at issue. *See id.* ¶¶ 71–86.

Count II is a duplicative First Amendment claim that mirrors the substance of the claim and relief sought in Count I, *compare id.* ¶¶ 85–86 *with id.* ¶¶ 90–91, but is asserted through the waiver of sovereign immunity provided under the Administrative Procedure Act ("APA"), *see id.* at 21. Like Count I, the essence of Count II is Plaintiff's allegation that the information redacted from the draft Transparency Report is not properly classified, and that Plaintiff therefore has a First Amendment right to publish it. *See id.* ¶¶ 88–89.

In Count III, Plaintiff raises another First Amendment claim, again nearly identical in scope, asserting that the Espionage Act is unconstitutional as it would allegedly be applied to it to foreclose publication of the information the Government has determined to be classified. *See id.* ¶¶ 92–96. Plaintiff avers that it has a "reasonable concern" that it would face prosecution if it were to disclose the classified information redacted from its draft Transparency Report. *Id.* ¶ 93. Arguing that any such prosecution would violate its First Amendment right to speak truthfully about matters of public interest, Plaintiff seeks declaratory and injunctive relief barring any such prosecution. *Id.* ¶¶ 95–96. Here again, resolution of the Espionage Act claim would turn on whether Plaintiff has a First Amendment right to publish the information at issue.

The Prayer for Relief reflects the requests for relief in Plaintiff's Counts I–III, but also contains a freestanding request that the Court enter a declaratory judgment that "[t]he FISA secrecy provisions are facially unconstitutional under the First Amendment because they do not require nondisclosure orders to contain a defined duration." *See id.* Prayer for Relief, (A)(v). That request is not tethered to Plaintiff's request to publish its draft Transparency Report, which, as described above, is the focus of all three of the Counts asserted in the SAC. *See id.* ¶¶ 71–96.[3]

### III.   The Government's Motion for Summary Judgment and the Court's July 6, 207 Order

On November 22, 2016, the Government moved for summary judgment, explaining how the disclosures proposed in Plaintiff's draft Transparency Report reasonably could be expected to harm national security. *See* ECF No. 145. The unclassified declaration of former EAD Steinbach filed in support of the Government's motion contains former EAD Steinbach's conclusion that "the information redacted from the draft Transparency Report prepared by Twitter is properly classified and [] its unauthorized disclosure reasonably could be expected to

---

[3] Although Plaintiff's counsel, at the August 14, 2017 Case Management Conference, stated that Plaintiff's SAC includes a constitutional challenge to the USA FREEDOM Act, there is no such challenge asserted in the SAC. To the contrary, the SAC expressly disclaims any challenge to the USA FREEDOM Act, stating that: "[the USA FREEDOM Act] is permissive: that is, it allows communications providers to use one of the reporting options it provides, but it contains no express prohibition on other disclosures, and it does not amend or otherwise affect any of the nondisclosure requirements in FISA." SAC ¶ 65.

result in serious damage to the national security." Unclassified Decl. of EAD Michael Steinbach, ECF No. 147-1 ("Unclass. Steinbach Decl.").[4]  In that declaration—and in far greater detail in a classified declaration submitted for *ex parte*, *in camera* review—former EAD Steinbach explained the specific national security harms that reasonably could be expected to result from disclosure of this properly classified information.  *See* Unclass. Steinbach Decl. ¶¶ 7–8, 30–38.

Following the completion of briefing and argument, the Court issued its July 6, 2017 Order denying the Government's motion without prejudice.  The Court noted its previous determination that "the First Amendment does not allow individuals subject to secrecy obligations to disclose classified national security information," July 6, 2017 Order at *6, but held that in the absence of secrecy obligations like those imposed on Government employees and contractors, "[t]hat the information is classified is not, in itself, a sufficient basis for the Government's prohibition on its disclosure." *Id.*

The Court then focused on the treatment of classified information in *New York Times Co. v. United States* (*Pentagon Papers*), 403 U.S. 713 (1971), as well as decisions in the Second Circuit and the Northern District of California, which the Court determined to be "the most closely analogous" to the instant case, wherein recipients of NSLs challenged the constitutionality of restrictions on their disclosure of information regarding receipt of such process.  *See* July 6, 2017 Order at *7–8 (discussing *Doe v. Mukasey*, 549 F.3d 861, 864 (2d Cir. 2008), *as modified* (Mar. 26, 2009); and *In re Nat'l Sec. Letter*, 930 F. Supp. 2d 1064, 1071 (N.D. Cal. 2013)).[5]  The Court then concluded that, because "the Government's decision to restrict information in Twitter's Draft Transparency Report is based upon its content and a prior restraint of publication," that decision is subject to strict scrutiny.  July 6, 2017 Order at *8.

---

[4] Former EAD Steinbach oversaw, *inter alia*, the national security operations of the FBI's Counterintelligence Division, Counterterrorism Division, and Terrorist Screening Center, and held original classification authority delegated by the Director of the FBI.

[5] It is the Ninth Circuit's disposition of the latter case, *In re Nat'l Sec. Letter*, that gives rise to the instant motion for reconsideration.

Having determined that strict scrutiny applies, the Court turned to the evidence that the Government had submitted in support of its determination that the information at issue cannot be published—the classified and unclassified declarations of former EAD Steinbach.  *See id.* at *9. The Court found that both declarations "fail[ed] to provide sufficient details indicating that the decision to classify the information in the Draft Transparency Report was based on anything more specific than the reporting bands in section 1874 and the FBI's position that more granular information 'could be expected to harm national security.'"  *Id.*  The Court assessed that "the declarations do not provide an indication of grave or imminent harm arising from the disclosures in the Draft Transparency Report."  *Id.*  Characterizing the Government's evidence as "generic, and seemingly boilerplate," the Court stated that former EAD Steinbach "does not indicate that the classification decision reflected any narrow tailoring of the decision to take into consideration, for instance, the nature of the provider, the volume of any requests involved or the number of users on the platform."  *Id.*  In sum, the Court held that "[t]he Government has not sufficiently explained how a restriction on reporting, beyond the bands in section 1874, could be characterized as narrowly tailored to prevent a national security risk of sufficient gravity to justify the restraint, either in general or with respect to Twitter."  *Id.*

Additionally, the Court noted that "the Supreme Court has held that restrictions of this type require procedural safeguards to ensure that they are imposed for a limited time and subject to review at the earliest juncture."  *Id.* (citing *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965)).  The Court observed that neither the Government's classification decision nor the challenged FISA nondisclosure provisions seemed to provide for such review or contain a limit to the duration of nondisclosure, and concluded that the restriction at issue does not include the required procedural safeguards.  *Id.* at *10.

Less than two weeks after this Court issued its July 6, 2017 Order, the Court of Appeals decided *In re NSL*, the appeal of one of two decisions this Court had identified as "the most closely analogous" to the instant case, *id.* at *7.  The Government identified this change in controlling law in the parties' Joint Case Management Statement, and sought briefing and argument on whether *In re NSL* should lead to reconsideration of the July 6, 2017 Order.  *See*

1    ECF No. 174 at 8.  At the August 14, 2017 case management conference, the Court ordered such

2    briefing, *see* Civil Minutes, ECF No. 176 at 1, and the Government respectfully submits the

3    instant motion pursuant to the Court's order.

### ARGUMENT

4
5    I.    **The Government's Classification Determination Satisfies the Standard of Review Set Out by the Ninth Circuit in *In re NSL*.**

6            As this Court did in its July 6, 2017 Order, the Court of Appeals in *In re NSL* held that a

7    prohibition on the disclosure of "the bare fact of receiving" national security legal process is a

8    content-based restriction to which the Supreme Court's strict scrutiny test applies.[6]  *In re NSL*,

9    863 F.3d at 1123, 1124.  That is, the Court of Appeals concluded that such prohibitions must be

10   "narrowly tailored to serve a compelling state interest."  *Id.* at 1123.

11       **A. The Ninth Circuit's Approach in *In re NSL***

12           The Ninth Circuit, however, emphasized the Supreme Court's admonition that "strict

13   scrutiny is not 'fatal in fact.'"  *Id.* at 1124 (quoting *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656,

14   1671 (2015)).[7]  Consistent with the principle, the Court of Appeals held that "strict scrutiny

15   requires that a content-based restriction 'be narrowly tailored, not that it be 'perfectly tailored.'"

16   *Id.* (quoting *Williams-Yulee*, 135 S. Ct. at 1671 (quoting *Burson v. Freeman*, 504 U.S. 191, 209

17   (1992)).  Additionally, the Court of Appeals explained that "[a] restriction is not narrowly

18   tailored 'if less restrictive alternatives would be at least as effective in achieving the legitimate

19
20   _____

21           [6] To be sure, the Government does not agree with the Ninth Circuit (or this Court) that a
22   challenge to a nondisclosure requirement imposed on the recipient of a FISC Order or NSL must
     satisfy strict scrutiny as a content-based restriction on speech and reserves the right to argue
23   otherwise, as it has previously in this action, on a subsequent appeal.  For purposes of this
     motion, however, the Government acknowledges that the analysis in *In re NSL* is presently
24   controlling.

25           [7] The Court of Appeals in *In re NSL* neither referred to a "heavy presumption against
26   [the] constitutional validity" of such restrictions, July 6, 2017 Order, at *6 (quoting *Pentagon
     Papers*, 403 U.S. at 714), nor suggested that the NSL statute must overcome "a near-complete
27   ban on prior restraints of speech," *id.* at *6 (quoting *Nebraska Press Ass'n v. Stuart*, 427 U.S.
     539, 591 (1976) (Brennan, J. concurring)).  *See In re NSL*, 863 F.3d at 1123–31.  Indeed, the
28   Court of Appeals rejected an argument that the *per curiam* opinion in *Pentagon Papers* specified
     a test applicable to prior restraints.  *See id.* at 1127 n.21.

purpose that the statute was enacted to serve.'" *Id.* (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997)).[8]

In assessing whether the statute satisfied the above-described standards, the Court of Appeals focused on the statutory framework of the NSL law as a whole. *Id.* at 1125. The Court of Appeals explained that a "granular focus" on each provision of the NSL law individually would be irreconcilable "with the Supreme Court's direction that narrow tailoring is not perfect tailoring." *Id.* (quoting *Williams-Yulee*, 135 S. Ct. at 1671).

Applying the above-described approach, the Court of Appeals determined that the NSL law—including the authorization of orders prohibiting disclosure of "the bare fact of receiving an NSL"—withstood strict scrutiny. *In re NSL*, 863 F.3d at 1123–1127. After "readily conclud[ing] that national security is a compelling government interest," *In re NSL*, 863 F.3d at 1123, the Court of Appeals held that the NSL law was narrowly tailored to serve that interest.

Three arguments that the Court of Appeals considered and rejected as to narrow tailoring in *In re NSL* are strikingly similar to the arguments upon which Plaintiff relies here. There, recipients of NSLs argued that the NSL law was not narrowly tailored because it "prevent[ed] disclosures that are not harmful to national security." 863 F.3d at 1124. Specifically, the recipients argued that, although the law permitted the Government to restrict disclosure of "the bare fact of receiving an NSL," "a recipient who has millions of customers could disclose receipt of a single NSL without impeding national security interests." *Id.* The recipients in that case also complained that 50 U.S.C. § 1874, the provision of the USA FREEDOM Act that sets forth the reporting bands that providers may use to report their receipt of national security legal process, "arbitrarily differentiates between recipients who receive fewer than 500 NSLs (who must include "0" in the lowest reporting band) from recipients who receive more than 500 NSLs." *Id.* at 1124–25. Under such a framework, the recipients argued, "recipients who

---

[8] The Court also recognized that the Government's right to restrict speech concerning receipt of national security process may be subject to "a test closer to intermediate scrutiny." *Id.* at 1129 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 – 34 (1984) (upholding restriction on disclosure of information obtained for a government source, which the speaker did not know prior to the government action)).

receive fewer than 500 NSLs are forced to make the false assertion that they might receive no NSLs." *Id.* at 1125.  Finally, as pertinent here, the recipients argued that one aspect of the NSL law was not narrowly tailored because it "authorize[d] restraints of overly long or indefinite duration."  Id. at 1126.

In response to the recipients' first contention, that the NSL law permitted the Government to prevent disclosures that would not harm national security—that is, disclosure of "the bare fact of receiving an NSL," *id.* at 1124—the Court of Appeals explained that the law "[did] not authorize the government to issue a nondisclosure requirement based on a mere possibility of harm; rather, a high ranking official must certify that disclosure 'may result' in one of four enumerated harms, meaning that there is 'some reasonable likelihood' that harm will result from the disclosure," *id.* at 1125 (quoting *Doe v. Mukasey*, 549 F.3d at 875) .[9]  To make such a certification, the government "must engage in an individualized analysis of each recipient . . . which may include consideration of the recipient's customer base."  *Id.*  "If disclosure of the receipt of an NSL would not result in one of the enumerated harms," the Court of Appeals reasoned, "the government could not properly make the certification required under the statute." *Id.*  Additionally, the Court of Appeals noted that the court reviewing the nondisclosure requirement under 18 U.S.C. § 3511, another provision that is part of the NSL law, would not uphold a nondisclosure requirement if there were not "good reason to believe that continued nondisclosure as to the fact of receipt is necessary."  *Id.*

Turning to the argument that the reporting bands set forth in the USA FREEDOM Act were arbitrary, the Court of Appeals held that the availability of the reporting bands "[did] not affect [the Court's] conclusion that the NSL statute"—including those provisions that authorize a nondisclosure requirement as to the fact of receipt, id. at 1125— "is narrowly tailored."  *Id.* at 1126.  Following the instruction of the Supreme Court in *Williams-Yulee*, the Court of Appeals explained that "a reviewing court should 'decline to wade into th[e] swamp' of calibrating the

---

[9] The four potential harms enumerated in the NSL law are:  "(i) a danger to the national security of the United States; (ii) interference with a criminal, counterterrorism, or counterintelligence investigation; (iii) interference with diplomatic relations; or (iv) danger to the life or physical safety of any person." 18 U.S.C. § 2709(c)(1)(B).

individual mechanisms of restriction," *id.* at 1124 (quoting *Williams-Yulee*, 135 S. Ct. at 1671), and, for that reason, rejected "the recipients' invitation to quibble with the particular ranges selected by Congress" in the USA FREEDOM Act, *id.* at 1126.[10]

Finally, with respect to the duration of the nondisclosure requirements authorized by the NSL law, the Court of Appeals agreed that "a nondisclosure requirement must terminate when it no longer serves [the government's compelling interest in national security]," but declined to hold that the First Amendment required the statute to include a definite time limitation. *Id.* Instead, the Court of Appeals concluded that sufficient safeguards were provided by the FBI's review of nondisclosure requirements after three years and at the conclusion of an investigation, together with the availability of judicial review. *Id.* at 1126–27.

## B.  Application of *In re NSL* to the Instant Case

Applying *In re NSL* to the facts of this case, the classification determination with respect to Plaintiff's publication of the information at issue here comports with the First Amendment, as it is narrowly tailored to serve a compelling state interest.  As to the latter half of the test, there is no question—"the Court has recognized that 'everyone agrees that the Government's interest in combatting terrorism is an urgent objective of the highest order."  *In re NSL*, 863 F.3d at 1123 (quoting *Holder v. Humanitarian Law Project*, 561 US. 1, 28 (2010)).  So, too, with the other aspects of the Government's national security efforts.  *See*, *e.g.*, *C.I.A. v. Sims*, 471 U.S. 159, 175 (1985) ("The Government has a compelling interest in protecting . . . the secrecy of information

---

[10] Indeed, the reasoning of the Supreme Court in *Williams-Yulee* forecloses an inquiry into whether the permissible disclosure bands are correctly drawn.  There, a candidate for a county court in Florida sent a solicitation for campaign contributions, in contravention of a Florida rule prohibiting candidates for judicial office from directly soliciting contributions.  *See* 135 S. Ct. at 1663–64.  The candidate brought a First Amendment challenge to the prohibition, and the Court held that the speech at issue there "command[ed] the highest level of First Amendment protection."  *Id.* at 1665.  The prohibition therefore had to withstand strict scrutiny to pass muster.  *Id.*  Notwithstanding that exacting level of review, however, the Supreme Court categorically "decline[d] to wade into [the] swamp" of determining whether certain kinds or volumes of solicitation may more precisely serve the state's compelling interest in preserving public confidence in the integrity of the judiciary, concluding that "the lines [the candidate] asks [the Court] to draw are unworkable."  *Id.* 1671.  As the Court of Appeals concluded in *In re NSL*, the same is true of any inquiry into the precise contours of the reporting bands in the instant case.

important to our national security.").  As to the first half of the test, narrow tailoring, the Court of Appeals has now provided guidance, which, as discussed above, considered and rejected objections mirroring those that Plaintiff raises here.

Before turning to Plaintiff's objections as to narrow tailoring, however, it is important to note that, "[b]y any measure," the redactions in the Transparency Report at issue here would only "restrict[] a narrow slice of speech." *Williams-Yulee*, 135 S. Ct. at 1670.  Although the SAC complains that "Defendants have allowed speech on this issue that conforms to their own viewpoint, but barred other interested parties from expressing different views on the same topic," SAC ¶ 84, the restrictions at issue do not prevent Plaintiff from expressing any viewpoint or opinion as to its receipt of national security legal process.  The sole prohibition at issue is with respect to the number of NSLs and/or FISC orders Plaintiff may have received,[11] and, even then, Twitter may publish a range of numbers consistent with the USA FREEDOM Act.  Furthermore, as FBI General Counsel Jim Baker explained in his September 9, 2014 letter to Mr. Sussmann, Twitter's counsel, "there is significant room for Twitter to place the [published] numbers in context."  ECF No. 1-1.  For example, "Twitter can explain that only an infinitesimally small percentage of its total number of users was affected" by all national security process served on Twitter by publishing that "national security legal process received from the United States affected, at maximum, only 0.00000919 percent . . . of Twitter's users."  *Id.*; *see also* SAC ¶ 57.  The classification determination at issue prevents Plaintiff from quantifying its receipt of national security legal process with greater precision than that, but it does not restrict any other form of Plaintiff's speech.[12]

---

[11] As in the Government's prior submissions, the Government does not herein intend to confirm or deny whether Plaintiff has received any specific form of national security legal process.

[12] The narrow focus of the classification determination actually at issue here—drawn solely as to the precision with which receipt of national security process may be quantified— distinguishes the instant case from cases addressing "speech critical of the exercise of the State's power," July 6, 2017 Order at *7 (quotation omitted), and even from cases in which the court was motivated by a concern that "secret orders issued by the thousands year after year . . . may conceal from the public the actual degree of government intrusion," *id.* at *8 n.7 (quotation omitted).  Here, Twitter can of course criticize the Government's secrecy requirements, and the

Plaintiff nonetheless objects that:  1) the quantitative information that it seeks to publish does not pose a threat to national security, *see* SAC ¶ 79; 2) it should be permitted to publish data regarding its receipt of national security process in precise aggregate numbers or narrower bands than have been declassified, *see id.* ¶ 56; and 3) the nondisclosure obligations to which it is subject are of unlimited duration, *see id.* ¶¶ 9, 10.  *In re NSL* addresses each of these objections.

First, as discussed above, *see supra* 9–10, the recipients in *In re NSL* argued that the restriction at issue there was unconstitutional because it permitted the Government to prohibit a disclosure of the fact of receipt of national security process.  Like Plaintiff here, they argued that disclosure of such information could not harm national security.  The Court of Appeals responded to this concern by explaining that, prior to the imposition of a nondisclosure obligation, the law required a high ranking official to conduct an individualized assessment to certify that disclosure 'may result' in one of four enumerated harms, and that judicial review could later confirm that there was "good reason to believe that continued nondisclosure as to the fact of receipt is necessary."  *Id.* at 1125.  While *In re NSL* concerned the nondisclosure obligation imposed in connection with a single NSL under the NSL law, the instant case concerns the Government's consideration of the similar harms likely to result from Plaintiff's proposed release of aggregate data and the Government's classification determination with respect to that information, and the Government has provided an "individualized analysis" in this case focused specifically on the aggregate data Twitter seeks to publish.  And applying the *In re NSL* standard to this case—the Court should find that even greater safeguards than in *In re NSL* are present here to ensure that only information that requires protection will be subject to the nondisclosure requirement.  Two high ranking officials, first EAD Steinbach and now EAD Ghattas, have attested that serious national security harm "reasonably could be expected" to result from Plaintiff's contemplated disclosure.  *See* ECF Nos. 147-1, 179.  Moreover, EAD

---

particular concern at issue is the disclosure of "complete information about the *limited* scope of U.S. government surveillance of Twitter user accounts."  SAC ¶ 10 (emphasis added).  That is, Twitter seeks to disclose the precise amount of national security process it has received, which it contends is *less than* the public might otherwise assume.

Steinbach's classified declaration specifies that his determination was based on an examination of Plaintiff's situation in particular, and took into consideration the nature of the provider, the volume of any requests involved, and the number of users on the platform.[13]

Second, following Supreme Court precedent, the Court of Appeals categorically rejected recipients' argument that the Court of Appeals should consider whether the ranges of the USA FREEDOM Act are drawn appropriately because the Supreme Court instructed that a reviewing court should not delve into "calibrating the individual mechanisms of restriction," *id.* at 1124. *See supra* 10–11.  On the same grounds, this Court should reject Plaintiff's "invitation to quibble with the particular ranges selected by Congress" in the USA FREEDOM Act.  *Id.* at 1126.

And, third, with respect to Plaintiff's argument regarding the duration of the nondisclosure obligations at issue here, *In re NSL* also cuts against Plaintiff's position.  In that case, the information that the recipients sought to disclose was not classified, and the NSL law at issue authorizes (and many NSLs are issued with) no specified termination date on the applicable nondisclosure obligation.  Applying the principle of reviewing the statutory scheme holistically rather than by piecemeal, the Ninth Circuit concluded that such nondisclosure requirements satisfied the narrow tailoring component of strict scrutiny because of periodic review provided by the FBI for NSL nondisclosure requirements and the availability of judicial review.  *See supra* 11.  Here, the nondisclosure requirements at issue pertain to classified national security information, which original classification authorities have determined reasonably could be expected to cause serious harm to national security if disclosed.  Moreover, under existing requirements, "the original classification authority shall establish a specific date or event for declassification based on the duration of the national security sensitivity of the information." Exec. Order 13526 § 1.5; *see id.* ("Upon reaching the date or event, the information shall be automatically declassified").  In these circumstances, it is doubtful whether the *In re NSL* opinion requires any further consideration of the duration of nondisclosure here.

---

[13] If the Court has questions regarding where such evidence appears in the classified record, Defendants would respectfully request the opportunity to make a classified *ex parte*, *in camera* presentation to answer the Court's questions.

But if the Court does consider the issue, viewed as a whole, the framework at issue here satisfies narrow tailoring requirements. First, judicial oversight is present here from the outset: rather than occurring only when the recipient of a nondisclosure requirement requests review, any classified FISA orders that underlie the aggregate classified data at issue arise from judicial process, regarding which the recipient may seek recourse from the FISC.[14] Additionally, comparable to the NSL nondisclosure review scheduled for three years after the opening of the underlying investigation, the USA FREEDOM Act adjusts the scope of nondisclosure after just one year by providing narrower disclosure bands. *See* 50 U.S.C. § 1874(a)(4).

Most importantly, to apply another formulation of the test for narrow tailoring that the Court of Appeals articulated in *In re NSL*: it is clear that there are no available, less restrictive alternatives that "would be at least as effective," 863 F.3d at 1124, as the nondisclosure obligation at issue in preventing harm to national security. Plaintiff has proposed only two: Twitter contends that it should be permitted to publish the precise numbers that appear in its draft Transparency Report; or, in the alternative, it should be permitted to publish in narrower bands because it purports to be a company with millions of users that receives only a limited amount of national security process. *See* SAC ¶¶ 8, 56.

*In re NSL* requires that both of these be rejected based on the evidence presented by then-EAD Steinbach in his classified and unclassified declarations. First, Mr. Steinbach articulated specific national security harms that are reasonably likely to occur if Twitter were permitted to disclose the classified data in its draft Transparency Report. *See* Steinbach Decl. ¶¶ 7–8, 30–38. He explained that these harms are not only a function of the fact that these numbers are more granular than the disclosures permitted by the USA FREEDOM Act and similar declassification bands promulgated by the Director of National Intelligence, but are a result of the specific conclusions that foreign adversaries could draw from the disclosure that Twitter itself specifically had, or had not, received certain national security process in a particular year.

---

[14] Further review could also be available through a process such as the Government has advanced in this case following the procedures reflected in *Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003), whereby the Court can assess whether the Government "in fact had good reason to classify, and therefore censor," *Shaffer v. DIA*, 102 F. Supp. 3d 1, 11 (D.D.C. 2015), the information redacted from the Plaintiff's draft Transparency Report.

Because disclosure would fail to avoid these national security harms, permitting disclosure is not an alternative "at least as effective" at serving the compelling government interest in national security.

As discussed above, the *In re NSL* opinion likewise rejected the suggestion that the Executive Branch, Congress, or this Court could tailor the ranges of permissible disclosures under the USA FREEDOM Act more carefully, such as in the instance of "a recipient who has millions of customers [and who] could disclose the receipt of a single NSL" or other national security process.  Here, the Ninth Circuit was clear: the existence of these ranges is not a separate "provision of the [nondisclosure] law" to be analyzed "individually to ensure that each is itself narrowly tailored."  863 F.3d at 1125.  Rather, the Court indicated that it is not in the judicial review role "to quibble with the particular ranges selected by Congress," because those ranges "allow recipients to make additional specified disclosures regarding the receipt" of process, thereby enhancing the tailoring of the underlying nondisclosure provision. *Id.* at 1126. Thus, as long as the Government may properly restrict disclosure regarding the receipt of national security process, the disclosure ranges in the USA FREEDOM Act are not subject to separate challenge.

*  *  *  *  *  *  *

For all of these reasons, under the analysis of *In re NSL*, the nondisclosure requirements on Plaintiff's publication of the classified information redacted from its draft Transparency Report comport with the First Amendment.[15]

## II.     *In re NSL* Confirms that the Restrictions on Speech at Issue Here Are Not Censorship or Licensing Schemes, But are Instead Analogous to Government Confidentiality Requirements that Courts Have Approved.

The Court of Appeals in *In re NSL* also considered whether nondisclosure requirements analogous to those at issue here must have the procedural safeguards set forth by the Supreme Court in *Freedman v. Maryland*.  *See* 863 F.3d at 1127–29.  The Court of Appeals concluded

---

[15]  This conclusion is dispositive of all of Plaintiff's claims, because all three counts asserted in the SAC depend on Plaintiff having a First Amendment right to publish the information redacted from its draft Transparency Report.

that "[t]he NSL law does not resemble [the] government censorship and licensing schemes" in which the Supreme Court has required such safeguards. *Id.* at 1128 (collecting cases involving censorship and licensing schemes). The Court of Appeals distinguished those cases, wherein speakers were required to submit proposed speeches for review, or obtain a license to engage in business, and emphasized that "the NSL law prohibits the disclosure of a single, specific piece of information that was generated by the government: the fact that the government has requested information to assist an investigation addressing sensitive national security concerns." *Id.*

The Court of Appeals explained that, "[r]ather than resembling a censorship or licensing scheme, the NSL law is more similar to governmental confidentiality requirements that have been upheld by the courts" in grand jury cases. *Id.* at 1129 (citing *Butterworth v. Smith*, 494 U.S. 624 (1990), and *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)). In *Butterworth*, for example, the Court of Appeals noted that the Supreme Court upheld a prohibition that restricted a grand jury witness "from ever disclosing" the testimony that another witness gave before the grand jury. *Id.* (citing 494 U.S. at 626). Noting a parallel, the Court of Appeals observed: "[s]imilarly, the only information subject to nondisclosure under [the NSL law] relate to the NSL and its contents—information of which a recipient was not in possession prior to the NSL's issuance." *Id.* The Court of Appeals stopped short of resolving whether such a government confidentiality restriction must include the safeguards enumerated by *Freedman*, but noted that the Supreme Court "has not held that . . . such restrictions must have the sorts of procedural safeguards required for censorship and licensing schemes." *Id.*

Similarly, the nondisclosure obligation at issue here does not call for the same safeguards as are needed in the "censorship and licensing schemes" that the Court of Appeals found to be so readily distinguishable. *Id.* Likewise, the logic of *Doe v. Mukasey*, the Second Circuit decision in which the court held that the NSL statutes were subject to the requirements of *Freedman v. Maryland*, also does not support extending *Freedman* to the present situation. *See* 549 F.3d at 877. The Second Circuit in *Doe* explained that the application of the *Freedman* requirements was appropriate in the NSL setting because, unlike in grand jury proceedings—where "the interests in secrecy arise from the nature of the proceedings"—the nondisclosure requirements

accompanying an NSL "at the demand of the Executive Branch" are imposed "under circumstances where secrecy might or might not be warranted." *Id.* Of course, in contrast, where proceedings pursuant to FISA are concerned, there is a "tradition of secrecy, based on the vitally important need to protect national security," and a "comprehensive statutory scheme designed to protect FISC records from routine public disclosure." *In re Mot. For Release of Court Records*, 526 F. Supp. 2d 484, 490–91 (F.I.S.C. 2007); *see also id.* at 494 ("the detrimental consequences of broad public access to FISC proceedings or records would greatly outweigh any . . . benefits."). As the FISC has explained, "applications submitted to it by the government are classified," *id.* at 487, and therefore, an original classification authority has determined that national security harm reasonably could be expected to result from their disclosure, *see* Exec. Order 13526. Because, even more so than in the case of grand jury proceedings, the need for secrecy with respect to the classified information at issue here "arises from the nature of the proceedings," the reasoning of the Second Circuit in *Doe* would not support imposing the *Freedman* requirements here.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the instant motion for reconsideration; enter summary judgment for the Government; and dismiss the Plaintiff's Second Amended Complaint.

Dated: September 5, 2017                    Respectfully submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            BRIAN STRETCH
                                            United States Attorney

                                            ANTHONY J. COPPOLINO
                                            Deputy Branch Director

                                            */s/ Julia A. Berman*
                                            JULIA A. BERMAN, Bar No. 241415
                                            Trial Attorney

U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
julia.berman@usdoj.gov

*Attorneys for Defendants*