MAYER BROWN LLP
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax: (202) 263-3300

MAYER BROWN LLP
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax: (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480-YGR |
| Plaintiff, | **TWITTER INC'S REPLY IN SUPPORT OF MOTION CHALLENGING PRIVILEGE DESIGNATIONS** |
| v. | Date:  April 2, 2018 |
| WILLIAM P. BARR, Attorney General of the United States, *et al.*, | Time:  2:00 p.m. |
| | Courtroom 1, Fourth Floor |
| Defendants. | Judge: Hon. Yvonne Gonzalez Rogers |

1

## INTRODUCTION

2      The Government's Opposition provides no new substantive information to justify its all-

3  encompassing assertions of privilege over every unclassified document reflecting its

4  contemporaneous reasons for classifying Twitter's draft Transparency Report—the decision at

5  the heart of Twitter's First Amendment challenge.  To be sure, the Government proffers new

6  declarations purporting to justify its assertions of privilege over the Bellwether Documents, but

7  those boilerplate and formulaic declarations simply continue to provide the same "vague and

8  generalized" legal conclusions, utterly devoid of any *facts* from which the Court could actually

9  assess the validity of those claims.  And its attempts to distinguish Twitter's authorities are

10  entirely circular.  The Government's apparent inability to shoulder its burden of articulating why

11  its privilege claims are proper—notwithstanding repeated opportunities to cure the same

12  specified defects—alone justifies granting Twitter's motion to compel.  *See, e.g.*, *Ecological*

13  *Rights Found. v. Fed. Emergency Mgmt. Agency*, 2017 WL 5972702, at *5 & n.3 (N.D. Cal.

14  Nov. 30, 2017), *appeal dismissed*, 2018 WL 3155689 (9th Cir. Jan. 12, 2018) (granting motion

15  to compel based on similarly boilerplate privilege logs); *Coleman v. Schwarzenegger*, 2007 WL

16  4328476, at *10 (E.D. Cal. Dec. 6, 2007) (same).

17      The Government has also failed to rebut Twitter's showing of need for contemporaneous

18  evidence of the Government's basis for restricting Twitter's speech.  The Government simply

19  reiterates its position that such contemporaneous evidence is irrelevant, and that the Court should

20  decide Twitter's as-applied challenge based solely on the Government's *post hoc* declarations

21  offered in the context of this litigation.  But those arguments have already been rejected by the

22  Court (when it granted Twitter's motion to compel the production of these 2014 materials).  And

23  for good reason, as the Government's rationale for classifying Twitter's report *at the time* it

24  classified it (in 2014) is far more probative of the Government's actual bases for suppressing

25  Twitter's speech (and whether that restriction was narrowly tailored as the First Amendment

26  requires) than a carefully crafted, litigation-tailored declaration could ever be.

27      In short, the Government has failed to justify its assertions of privilege over evidence central

28  to Twitter's First Amendment challenge.  As a consequence, Twitter's motion should be granted.

1

## ARGUMENT

2

**A.  The Government has not justified its invocation of the deliberative process privilege.**

3

The Government insists in boilerplate fashion that it has carried its burden,[1] but its arguments

4

that the Bellwether Documents are predecisional are circular and contrary to the record.  Nor has

5

the Government rebutted Twitter's showing that the documents are directly at issue in this

6

litigation—which independently dooms its deliberative process privilege claim.

7

**1.  The Bellwether Documents are post-decisional.**

8

The Government's claim that the Bellwether Documents are predecisional is contrary to the

9

record and defies common sense.  The Government argues that none of the Bellwether

10

Documents relate to the reporting framework published by the Office of the Director of National

11

Intelligence ("ODNI") on January 27, 2014 (the "ODNI Framework," *see* Dkt. No. 1, Ex. 1), but

12

the FBI's September 9, 2014 letter to Twitter *expressly* invoked the ODNI "framework" and

13

Twitter's non-compliance with its "bands" as the basis for restricting Twitter's speech (*see* Dkt.

14

No. 1, Ex. 5).  And the Government's attempt to avoid characterization of the ODNI Framework

15

as an official agency "position," Dkt. No. 278, at 6 & n.3,[2] misses the crux of Twitter's

16

challenge: that—to the extent the Bellwether Documents reflect the final application of *any*

17

official policy to Twitter—the deliberative process privilege does not apply, Dkt. No. 258-1, at 2.

18

Far from carrying the Government's burden, its supplemental declarations provide further

19

reason to suspect that the Bellwether Documents contain at least some official agency opinions

20

and recommendations as to "what the law [was]" in 2014 and how it should apply to Twitter.

21

*See Tax Analysts v. I.R.S.*, 117 F.3d 607, 617 (D.C. Cir. 1997).  The Government describes

22

Samples 2 and 3, for example, as "opinions and recommendations concerning the manner in

23

which the FBI would respond to communications from Twitter to the FBI … and the process that

24

---

25

[1] "The party asserting the privilege has the burden of establishing all of its elements and, even if established, the privilege is strictly construed."  *N. Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1126 (N.D. Cal. 2003).

26

[2] The ODNI's characterization of its reporting "framework" as a "declassification" of information, Dkt. No. 1, Ex. 1, is irrelevant.  Fundamentally, the ODNI Framework is a statement about what companies could lawfully publish in 2014, and *that* is what makes it an official agency position.  *See Tax Analysts*, 117 F.3d at 617.

27

28

the FBI should follow in preparing that response," *see, e.g.*, Dkt. No. 278-1, at 6:9–11 (Sample 2), 7:20–22 (Sample 3)—in other words, precisely the kind of guidance that *Tax Analysts* found unprotected. *Compare Tax Analysts*, 117 F.3d at 617 (finding FSAs unprotected because "[t]hey contain the answers of the national office of the Office of Chief Counsel to legal questions submitted by … personnel in the field").

The Government's characterization of all its recommendations and opinions as "preliminary" suspends common sense: At some point before the Government redacted portions of Twitter's Report, someone in the agency made a final decision, or issued a final recommendation, regarding how to respond to Twitter's publication request. Such decisions, recommendations, or applications of established agency policy are not protected.

The Government relatedly suggests that an agency official cannot convey a "considered" recommendation or opinion over email, and that any application of Government policy that occurs via email (rather than in memoranda) is insulated from discovery as long as lawyers were involved. Yet even *Tax Analysts* (decided before email gained its modern ubiquity) rejected that kind of "formalism," finding FSAs to reflect the agency's official position even though they were "not formally binding" and sometimes "evaluate[d] the strengths and weaknesses of alternative views." 117 F.3d at 617. Furthermore, this District specifically found inter-agency *emails* "convey[ing] each agency's official policy to the other agency" to be post-decisional to the same extent as other forms of communication "implement[ing] an established [agency] policy." *Ecological Rights Found.*, 2017 WL 5972702, at *5 & n.3. So too here, any emails conveying or applying an established agency policy are not protected simply because they are in email form and lack a formal title like "Final Agency Decision."

### 2. Independently, the deliberative process privilege does not apply because the Government's reasons for classifying Twitter's Report are directly "at issue."

The Government's Opposition also fails to counter Twitter's showing, *see* Dkt. No. 258-1, at 7–9, that any valid claim of deliberative process privilege must give way to Twitter's need for documents reflecting deliberations directly at issue in this litigation. The Government rehashes the same well-worn arguments that it asserted in resisting this discovery in the first place—

1   namely, that contemporaneous evidence of the Government's *actual* reasons for engaging in the

2   *very acts* Twitter challenges as unconstitutional are somehow irrelevant to the constitutional

3   inquiry.  But the Court has already rejected the Government's specious relevance objection.

4   *Compare* Dkt. No. 188 (February 12, 2018 order overruling relevance objections to Twitter's

5   first set of discovery requests), *with* Dkt. No. 258-2, Ex. A (first set of discovery requests

6   seeking discovery into policies applied and the reasons offered in 2014 for classifying Twitter's

7   Transparency Report); *cf. N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 152 (1975) ("the

8   public is vitally concerned with" documents reflecting "the reasons which did supply the basis

9   for an agency policy actually adopted").

10      Indeed, as Twitter has previously explained, such contemporaneous evidence is highly

11  relevant—not only to whether the Government engaged in the kind of individualized analysis

12  that this Court has found the Ninth Circuit requires before restricting Twitter's speech, *see* Dkt.

13  No. 186 (Order on Reconsideration), at 7;[3] *In re NSL*, 863 F.3d 1110, 1125 (9th Cir. 2017), but

14  also to the adequacy of (and deference due) the Government's *post hoc* explanations (in the

15  Steinbach and Ghattas Declarations) for those restrictions.  And the Government's admission

16  that "the unclassified Steinbach Declaration provides … far greater … detail" about the

17  Government's supposed "individualized consideration[]" of Twitter's unique attributes than the

18  contemporaneous documents, Dkt. No. 278, at 8, further suggests the lack of any meaningful

19  Government process in 2014—*underscoring* the likely unconstitutionality of the Government's

20  original classification decision.  The fact that "relevant information exists elsewhere" (*id.* at 9)—

21  in the form of litigation-driven declarations prepared in 2016 and 2017—does not render the

22  Government's 2014 contemporaneous deliberations any less "at issue" in the case.  Indeed, given

23  the Government's silence throughout this litigation about what precisely it did or considered in

24  2014, Twitter's discovery into these communications is essential.

25      The Government's attempt to distinguish *Karnoski* is likewise unpersuasive because it, too,

26

27  [3] The Government's attempt to distinguish *In re NSL* as a case about restrictions in individual
    NSLs rather than restrictions on aggregate reporting is a distinction with no consequence.  Both
28  are quintessential content-based prior restraints on speech that must pass constitutional muster.

rests on the mistaken premise that the Government's *actual* reasons for restricting Twitter's speech are irrelevant.  As in *Karnoski*, the Government here has demanded deference to a proffered justification for intruding on a plaintiff's constitutional rights, while simultaneously seeking to bar discovery into evidence necessary to test whether that justification passes strict scrutiny.  *Karnoski*'s reasoning that the Government may not simultaneously claim that its decision comported with governing constitutional standards "while also withholding" evidence "central" to that determination, *Karnoski v. Trump*, 328 F. Supp. 3d 1156, 1162 (W.D. Wash. 2018), applies with equal force here.

**B. The Government cannot show that the work product doctrine applies.**

As explained in Twitter's motion (at 11), the work product doctrine (a qualified privilege) gives way to Twitter's need for highly probative evidence and is inapplicable for the same reasons as the deliberative process privilege.  But the Court need not even address the need exception here, because the Government has not carried its burden of showing that the documents in question were materially affected by the prospect of future litigation with Twitter. Dkt. No. 258-1, at 9–11.  Where "a document serves a dual purpose, that is, where it was not prepared exclusively for litigation," the work product doctrine applies only if the party claiming privilege can show that the document "'would not have been created in substantially similar form but for the prospect of litigation.'"  *United States v. Richey*, 632 F.3d 559, 568 (9th Cir. 2011) (quoting *In re Grand Jury Subpoena*, 357 F.3d 900, 908 (9th Cir. 2004)).

The Government is incorrect in suggesting that Twitter's public threat to sue effectively transformed all of the Government's subsequent discussions over the draft Transparency Report into protected work product.  Because the documents indisputably were not prepared exclusively for litigation, the Government retains the burden of identifying some concrete way in which that public threat of litigation materially affected the form or content of the documents in question, which it has not done.  Rather, the Government has simply cut-and-paste the same formulaic assertion that each and every Bellwether Document was "prepared and developed in anticipation of litigation concerning Twitter's draft transparency report."  Dkt. No. 278, at 12; Dkt. No. 278-1 (Declaration of Cecilia Bessee ISO Opp.).  That legal conclusion is insufficient.

The Government also invokes *In re Grand Jury Subpoena* to support its work product assertion; but there, the record provided a concrete and identifiable basis for believing that the defendant's response—prepared by the attorney it hired after learning that it was under criminal and civil investigation by the EPA—was shaped by the impending threat of litigation.  357 F.3d at 908.  Conversely, as noted above, the Government has identified nothing it would have said or done differently had Twitter not threatened litigation.

The Government also invokes the omnipresent risk that Twitter or "other providers seeking to publish [similar] information" might challenge the Government's position regarding aggregate reporting on national security process.  Dkt. No. 278, at 12.  But that is *precisely* the kind of overly general risk of litigation that courts have consistently rejected as insufficient to demonstrate work product protection.  *See* Dkt. No. 258-1, at 10.

## C. The Government's supplemental privilege logs do not cure the fatal deficiencies in its attorney-client privilege claims.

The Government's declarations offered in opposition to Twitter's privilege motion contain boilerplate incantations of the elements of the attorney-client privilege and therefore add nothing *meaningful* to those privilege claims.  For example, the Government's submissions do not identify in any reasonable level of detail "what *sorts* of legal issues" are supposedly discussed in the Bellwether Documents.  Nor has the Government offered any *factual basis* upon which the Court could conclude that the Government attorneys in these communications were wearing their "legal"—as opposed to political, strategic, or policymaking—hats at the time of the challenged communications.  *See* Dkt. No. 258-1, at 12–14.  Take Sample 2, for example, where the Government merely repeats the various elements of the attorney-client privilege:

> This document contains confidential communications among [agency] attorneys … made during the process of seeking and conveying legal advice, in order for the General Counsel to issue a statement on behalf of the agency. These communications were made in furtherance of the FBI's legal representation by professional legal advisers in their capacities as lawyers. These communications also reflect the General Counsel seeking and receiving operational advice from the FBI OGC attorney in furtherance of the General Counsel's representation of the agency, in particular, to inform the legal advice he would be providing to the agency.

This hopelessly opaque description tells the Court nothing of substance about the

1   communications in question except that many of the participants hold a law degree.  But as

2   explained in Twitter's Motion (at 13–14), "[t]he fact that a person is a lawyer does not make all

3   communications with that person privileged."  *United States v. Martin*, 278 F.3d 988, 999 (9th

4   Cir. 2002); *In re Lindsey*, 158 F.3d 1263, 1270 (D.C. Cir. 1998) (Government lawyers advise on

5   a range of "political, strategic, [and] policy issues," none of which is "shielded from disclosure

6   by the attorney-client privilege.").

7       The Government claims that its logs and declarations are meaningfully different from those

8   rejected in the precedent Twitter cites, but a simple review of the Government's boilerplate

9   explanations belies that conclusion.[4]  The Government has now had three chances to produce

10  sufficiently detailed and tailored descriptions to support its privilege logs, but instead has offered

11  only generic and conclusory summaries that fail to carry its burden.[5]  The Court should not

12  afford the Government another bite at the apple.  *See Ecological Rights Found.*, 2017 WL

13  5972702, at *7 (granting motion to compel over privilege objections where government had

14  "three opportunities" to offer something beyond "boilerplate recitation[s] of the elements of [the]

15  attorney-client privilege" and failed to do so).

16                              **<u>CONCLUSION</u>**

17      Accordingly, Twitter respectfully requests that its Motion Challenging Defendants' Privilege

18  Designations be granted.

19

20  _____

21  [4] Moreover, the Government is wrong in urging that the rule announced in *Weiner v. FBI*—that privilege claims must be "tailor[ed] … to the specific document withheld," 943 F.2d 972, 978–

22  79 (9th Cir. 1991)—does not apply to attorney-client privilege claims, *see* Dkt. No. 278, at 10 n.6.  That portion of the Court's analysis was not confined to any particular FOIA exemption, but

23  was a *general* criticism of the government's privilege logs that, as later decisions have confirmed, applies equally to *all* kinds of privilege claims.  *See, e.g.*, *Ctr. for Biological

24  Diversity v. Office of Mgmt. & Budget*, 625 F. Supp. 2d 885, 892 (N.D. Cal. 2009) (rejecting the Government's attorney-client privilege claims, *specifically* because the Government had failed to

25  "tailor [its] explanation[s] to the specific document withheld" (quoting *Weiner*, 843 F.2d at 978–

26  79)); *Our Children's Earth Found. v. Nat'l Marine Fisheries Serv.*, 85 F. Supp. 3d 1074, 1088 (N.D. Cal. 2015) (same); *accord Coleman*, 2007 WL 4328476, at *6 (same analysis as to

27  deliberative process privilege claim).
    [5] In its initial logs, in its logs following Twitter's July 31, 2018 notice of various deficiencies

28  (Dkt. No. 258-4), and in its supplemental declarations offered in opposition to Twitter's Motion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: March 18, 2018                MAYER BROWN LLP

/s/ Lee H. Rubin
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone:    (650) 331-2000
Facsimile:    (650) 331-2060

Attorneys for Plaintiff
TWITTER, INC.