**MAYER BROWN LLP**
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax: (202) 263-3300

**MAYER BROWN LLP**
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax: (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480-YGR |
| Plaintiff, | **TWITTER'S NOTICE OF CROSS-MOTION & CROSS-MOTION FOR SUMMARY JUDGMENT; ALTERNATIVE MOTION FOR AN ORDER GRANTING CLEARED COUNSEL ACCESS TO THE CLASSIFIED TABB DECLARATION** |
| v. | |
| WILLIAM P. BARR, United States Attorney General, *et al.*, | Date:  January 7, 2020 |
| Defendants. | Time:  2:00 PM |
| | Courtroom 1, Fourth Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

## NOTICE OF CROSS-MOTION AND CROSS-MOTION

PLEASE TAKE NOTICE that, on January 7, 2020 at 2:00 p.m., or as soon thereafter as counsel may be heard, at 1301 Clay Street, Oakland, CA 94612, in the Oakland Courthouse, Courtroom 1 – Fourth Floor, before Judge Yvonne Gonzalez Rogers, Plaintiff Twitter, Inc. ("Twitter") will, and hereby does, move for an order granting summary judgment to Twitter on claims set forth in the Second Amended Complaint or, in the alternative, granting Twitter access to the Classified Declaration of Jay S. Tabb, Jr. (Dkt. No. 310), submitted in support of the Government's Renewed Motion for Summary Judgment (Dkt. No. 309).  This motion is based on this Notice of Motion and Motion, Twitter's Memorandum of Points and Authorities, the Declaration of Lee Rubin in Support thereof, Twitter's Separate Statement of Undisputed Facts, and Twitter's Request for Judicial Notice, the pleadings on file with the Court, and any further argument or briefing that may be presented prior to the Court's decision on the Motion.

Dated:  October 25, 2019

MAYER BROWN LLP

/s/ Lee H. Rubin
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone:     (650) 331-2000
Facsimile:      (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

1
2
3

**MAYER BROWN LLP**
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax: (202) 263-3300

4
5
6
7
8
9

**MAYER BROWN LLP**
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax: (650) 331-2060

10

*Attorneys for Plaintiff Twitter, Inc.*

11

**UNITED STATES DISTRICT COURT**

12

**NORTHERN DISTRICT OF CALIFORNIA**

13

**OAKLAND DIVISION**

14

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480-YGR |
| Plaintiff, | **TWITTER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF (1) ITS CROSS-MOTION FOR SUMMARY JUDGMENT & (2) ITS RENEWED MOTION FOR ACCESS TO CLASSIFIED MATERIALS** |
| v. | |
| WILLIAM P. BARR, United States Attorney General, *et al.*, | Date: January 7, 2020 |
| Defendants. | Time: 2:00 p.m. |
| | Courtroom 1, Fourth Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

MEMORANDUM OF POINTS & AUTHORITIES................................................................1

STATEMENT OF ISSUES TO BE DECIDED ......................................................................1

INTRODUCTION ................................................................................................................1

FACTUAL AND PROCEDURAL HISTORY ......................................................................3

ARGUMENT .......................................................................................................................5

A.   Twitter Is Entitled to Summary Judgment (and the Government's Motion Should Be Denied) Because the Government Has Not Satisfied Strict Scrutiny. .........................5

   1.   As a Content-Based Prior Restraint, the Government's Censorship Is Subject to the *Pentagon Papers* Strict Scrutiny Standard. .........................................5

   2.   The Government Cannot Satisfy Strict Scrutiny. .......................................................7

B.   Independently, Twitter Is Entitled to Summary Judgment Because the Government's Prior Restraint Lacked All of *Freedman*'s Procedural Safeguards. .........14

   1.   Twitter Adequately Pled that the Government's Censorship of Its 2014 Transparency Report Was an Unconstitutional Prior Restraint. ..............................15

   2.   *Freedman* Applies to the Executive's Discretionary Classification of Speech about the Receipt of National Security Process. ......................................................16

      a.   The Ninth Circuit's *Dictum* Is Neither Controlling Nor Consistent with Supreme Court Authority. ....................................................................................17

      b.   The FISA Process Does Not Save the Government's Prior Restraint on *Aggregate* Reporting from Constitutional Infirmity. ........................................20

   3.   Twitter Is Entitled to an Injunction Against Enforcement of the Government's Procedurally Unconstitutional Censorship Authority. .....................22

C.   Independently, the Government's Motion for Summary Judgment Should Be Denied Under Federal Rule of Civil Procedure 56(d)............................................23

CONCLUSION................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Al-Haramain Islamic Found. Inc. v. Bush*,
  507 F.3d 1190 (9th Cir. 2007) ................................................................................6

*Am. Timber & Trading Co. v. First Nat. Bank of Or.*,
  690 F.2d 781 (9th Cir. 1982) ...............................................................................15

*Berger v. City of Seattle*,
  569 F.3d 1029 (9th Cir. 2009) (en banc) ...............................................................5

*Butterworth v. Smith*,
  494 U.S. 624 (1990).................................................................................18, 19, 20

*Crull v. GEM Ins. Co.*,
  58 F.3d 1386 (9th Cir. 1995) ...............................................................................16

*Doe v. Gonzales*,
  386 F. Supp. 2d 66 (D. Conn. 2005) ......................................................................7

*Doe v. Mukasey*,
  549 F.3d 861 (2d. Cir. 2008)....................................................................19, 20, 22

*Forsyth Cty. v. Nationalist Movement*,
  505 U.S. 123 (1992) ................................................................................................7

*Freedman v. Maryland*,
  380 U.S. 51 (1965)...................................................................................... *passim*

*Garcia v. Google, Inc.*,
  786 F.3d 727 (9th Cir. 2015) .................................................................................7

*Microsoft Corp. v. U.S. Dep't of Justice*,
  233 F. Supp. 3d 887 (W.D. Wash. 2017)..............................................................14

*N.Y. Times Co. v. United States*,
  403 U.S. 713 (1971) ...................................................................................*passim*

*In re Nat'l Sec. Letter*,
  863 F.3d 1110 (9th Cir. 2017) ....................................................................*passim*

*In re Nat'l Sec. Letter*,
  930 F. Supp. 2d 1064 (N.D. Cal. 2013) ...............................................................23

*Nebraska Press Assn. v. Stuart*,
  427 U.S. 539 (1976)................................................................................................6

### TABLE OF AUTHORITIES
#### (continued)

Page(s)

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)................................................................................................7

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015)...........................................................................................5

*Rother v. Lupenko*,
  515 F. App'x. 672 (9th Cir. 2013)........................................................................16

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)........................................................................................14, 17

*In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*,
  562 F. Supp. 2d 876 (S.D. Tex. 2008) ...................................................................7

*Seattle Times Co. v. Rhinehart*,
  467 U.S. 20 (1984)........................................................................................18, 19

*Smith v. Butterworth*,
  866 F.2d 1318 (11th Cir. 1989) ...........................................................................18

*Thomas v. Chi. Park Dist.*,
  534 U.S. 316 (2002)..............................................................................................22

*United States v. Marchetti*,
  466 F.2d 1309 (4th Cir.1972) ..............................................................................20

*United States v. N.Y. Times Co.*,
  328 F. Supp. 324 (S.D.N.Y. 1971)........................................................................6

*United States v. Snepp*,
  897 F.2d 138 (4th Cir. 1990) ...............................................................................20

*Vance v. Universal Amusement Co.*,
  445 U.S. 308 (1980)..............................................................................................17

*In re Washington Post Co.*,
  807 F.2d 383 (4th Cir. 1986) .................................................................................7

**Statutes, Rules and Regulations**

18 U.S.C. § 3511(b)(1)(B) .....................................................................................23

18 U.S.C. § 3511(b)(1)(C) .....................................................................................23

**TABLE OF AUTHORITIES**
(continued)

Page(s)

50 U.S.C. § 1801(h) ...................................................................................................21

50 U.S.C. § 1805(a) ...................................................................................................21

50 U.S.C. § 1874 .............................................................................................. *passim*

50 U.S.C. § 1874(c) ......................................................................................... *passim*

50 U.S.C. § 1881a(i)(1)(B) ........................................................................................21

Fed. R. Evid. 902(5) ....................................................................................................9

Federal Rule of Civil Procedure 56(d) ..............................................................1, 3, 23

Federal Rule of Evidence 801(d)(2) ...........................................................................9

Federal Rule of Evidence 803(8) ................................................................................9

Foreign Intelligence Surveillance Act of 1978 ("FISA") .........................................3

Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective
    Discipline Over Monitoring Act of 2015 ("USAFA") ..................................... *passim*

**Other Authorities**

Twitter's 2014 Transparency Report ...................................................... *passim*

## MEMORANDUM OF POINTS & AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

A.     Is Twitter entitled to summary judgment on its First Amendment claims, because the Government cannot justify its censorship of Twitter's 2014 draft Transparency Report under strict scrutiny?

B.     Alternatively, is Twitter entitled to summary judgment because the restriction on its speech was a prior restraint, yet neither the Government's classification criteria, nor the USAFA provision authorizing such discretionary classification, comports with *Freedman v. Maryland*?

C.     At minimum, should the Government's motion for summary judgment be denied under Federal Rule of Civil Procedure 56(d), in order to provide Twitter's cleared counsel access and a meaningful opportunity to respond to the classified evidence the Government claims is dispositive of Twitter's claims?

### INTRODUCTION

The Government's ongoing censorship of now *six-year-old aggregate* data in Twitter's 2014 Transparency Report is constitutionally unsustainable.  The Government cannot show—as it must under strict scrutiny—that those limited disclosures would cause any harm whatsoever to national security, much less the kind of "grave or imminent risk" that is necessary to justify a content-based prior restraint on speech about the operation of government.  Unable to show any harm that could result from the specific disclosures contained in Twitter's Transparency Report, the Government resorts to sweeping assertions about national security harms that could flow from hypothetical, future disclosures by Twitter and *other* communications providers, over an extended period of time.

The Government's exaggerated claims do not justify suppression of Twitter's proposed speech.  Most fundamentally, they ignore the governing First Amendment standard—which requires an "individualized" assessment of the speaker and speech at issue.  The Government cannot carry its burden of showing that *the speech in Twitter's 2014 Transparency Report* would harm national security by relying on harms that might result from *other* hypothetical future

disclosures.  Additionally, the Court should not credit the Government's mere speculation that a ruling authorizing publication of the 2014 Transparency Report would necessarily lead to broad-scale disclosures about other companies' receipt of national security process.  Even if other companies sought to make similar disclosures, courts would not necessarily grant those requests; numerous attributes potentially distinguish the speech here from future publication requests—including Twitter's size, its unique role in society, the age of the data Twitter seeks to publish, and other information about the Government's use (and Twitter's receipt) of national security process that is already in the public domain.

Independently, Twitter is entitled to summary judgment on its claims because the Government does not (and cannot) meaningfully dispute that its discretionary classification of Twitter's speech occurred without the procedural safeguards required by *Freedman v. Maryland*. Neither the classification guidelines that the Government applied, nor the statutory authority under which that classification review was conducted (50 U.S.C. § 1874(c)), provides a mechanism for a recipient of national security process to obtain expedited, government-initiated judicial review of a restraint on aggregate reporting, as required by *Freedman*.

The Government's attempts to avoid *Freedman* are unavailing.  It is bedrock law that in considering a First Amendment challenge to a Government-imposed prior restraint, a Court must apply strict scrutiny and consider both the substantive and procedural constitutionality of the Government's censorship.  Twitter's claims that the Government's classification decision was an "unconstitutional prior restraint" (Counts I and II) thus incorporated its challenge to the absence of procedural safeguards (under *Freedman*) as a matter of law.  Consistent with this legal principle, the Court specifically addressed the Government's lack of adherence to *Freedman* in its original order denying summary judgment and in its order denying reconsideration.  And the Government's attempts to avoid hornbook law by arguing that *Freedman* does not apply to its censorship of Twitter here are similarly unpersuasive.

Both these defects—substantive and procedural—independently render the Government's censorship of Twitter's 2014 Transparency Report unconstitutional.  Twitter's motion for summary judgment should be granted on this basis.  At absolute minimum, though, the

1  Government's competing motion should be denied under Federal Rule of Civil Procedure 56(d).

2  The Government has at every turn sought to thwart Twitter's access to key discovery—including

3  the opportunity for Twitter to respond (through cleared counsel) to the classified evidence on

4  which the Government now relies in seeking judgment on Twitter's claims.

5  **FACTUAL AND PROCEDURAL HISTORY**

6       The speech restriction at issue in this case dates back to April 1, 2014, when Twitter

7  submitted to the FBI for review a draft Transparency Report describing the amount of national

8  security process Twitter had received in 2012 and 2013 (the "Transparency Report").  In

9  particular, the Transparency Report sought to disclose the *total* number of National Security

10  Letters ("NSLs") and orders issued pursuant to the Foreign Intelligence Surveillance Act of 1978

11  (the "FISA") that Twitter had received in the second half of 2013—now more than six years ago.

12  Rubin Decl. ¶ 2, Ex. 4 ("unclassified" version).  Twitter also sought permission to disclose that it

13  had received "zero" of a particular kind of request, whenever that might be the case.  *Id.*  Twitter

14  sought in publishing the Transparency Report to participate in a public debate and respond to

15  concerns regarding then-recent revelations about the scope of NSA surveillance.

16       Five months later, the FBI informed Twitter that the Transparency "[R]eport was

17  "classified" to the extent it contained the "specific numbers of orders received, including

18  characterizing the numbers in fractions or percentages" and to the extent it "br[oke] out

19  particular types of process received" (*i.e.*, FISA orders versus NSLs).  *Id.* Ex. 3.  As justification,

20  the FBI's letter stated only that such data was "inconsistent with the January 27th framework"—

21  referring to the reporting framework adopted by the Director of National Intelligence ("DNI") on

22  January 27, 2014, which authorized Electronic Communications Service Providers ("ECSPs")

23  like Twitter to disclose the amount of national security process they received in certain broad

24  bands (*e.g.*, 0-250 or 0-500).  *Id.*  The FBI later issued an "unclassified" version of Twitter's

25  report with all numerical data (and narrative descriptions of that data) redacted.  *Id.* Ex. 4.

26  Twitter filed suit in late 2014.

27       In 2015 and while this case was pending, Congress passed the Uniting and Strengthening

28  America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015

("USAFA").  The USAFA confirmed that recipients of individual FISA orders and NSLs could

lawfully disclose *aggregate* data about their receipt of those orders in the broad reporting bands

codified in 50 U.S.C. § 1874(a) (part of the FISA).[1]  However, the USAFA makes clear that the

bands are permissive—nothing prohibits the Executive from "agreeing to the publication of

information" about an ECSP's receipt of national security process in a "form" other than the

safe-harbor bands.  *Id.* § 1874(c).

Twitter filed its currently operative complaint ("SAC") on May 24, 2016.  Dkt. No. 114.

The SAC alleged, in pertinent part, that the Government's "decision to censor Twitter's

transparency report" was unconstitutional—because it imposed both a "content-based restriction

on [Twitter's] speech" and a "prior restraint."  *See* SAC pp. 17–21.  The SAC sought, *inter alia*,

a declaratory judgment that "Twitter has a First Amendment right to release the entire report

publicly in unredacted form."  Prayer for Relief ¶ A(ii).

In November 2016, the Government moved for summary judgment.  Dkt. No. 145.  In an

order dated July 6, 2017 (Dkt. No. 172), the Court denied that motion, ruling, in pertinent part,

that: (1) the speech restriction here is a content-based, prior restraint on the modern equivalent of

a public square (*id.* at 2, 14); (2) the restraint was subject to the *Pentagon Papers* strict scrutiny

standard, which requires the Government to show that Twitter's proposed disclosures "would

pose a clear and present danger or imminent harm to national security" (*id.* at 2, 14–15, 21); (3)

the Classified Declaration of Executive Assistant Director Michael Steinbach ("Classified

Steinbach Declaration") failed to carry the Government's burden (*id.* at 17); and (4) "[n]either

the Government's classification decision" nor any other specified statutory provisions provide

"any procedural safeguards to ensure that the decision [to restrict speech] is one that comports

with the appropriate high level of scrutiny warranted by such prior restraints."  *Id.* at 18–19.

The Government thereafter moved for reconsideration of the Court's denial of its

summary judgment motion on the basis of the Ninth Circuit's intervening *In re NSL* decision.

---

[1] The USAFA also ended the NSA's bulk collection of Americans' telephone data, revised the NSL law to incorporate a mechanism for expeditious, government-initiated judicial review of individual NSL nondisclosure obligations, and added annual public reporting obligations about the Executive's use of national security process.

On November 28, 2017, the Court denied that motion, too, finding that *In re NSL* only confirmed the Court's bases for its prior summary judgment ruling.  Dkt. No. 186.

Now, nearly three years later, the Government has renewed its motion for summary judgment.  That motion is as insupportable today as it was three years ago—if not more so, given that the information at issue is now even older and thus the Government's claim that its disclosure would harm national security is even more untenable.

The Court should accordingly resolve this case once and for all by denying the Government's Renewed Motion for Summary Judgment, and granting Twitter's Cross-Motion for the same.  In particular, Twitter is entitled to a ruling (1) authorizing publication of the 2014 Transparency Report and (2) enjoining the Government from restraining Twitter's disclosure of the aggregate amount of national security process it has received until the Government adopts procedural safeguards for the censorship of this information that comport with *Freedman v. Maryland*.

## ARGUMENT

### A.  Twitter Is Entitled to Summary Judgment (and the Government's Motion Should Be Denied) Because the Government Has Not Satisfied Strict Scrutiny.

The Government cannot carry its burden under strict scrutiny of showing that Twitter may constitutionally be prohibited from publishing *aggregate* data about the amount of national security process it received more than *six years ago*.

#### 1.  As a Content-Based Prior Restraint, the Government's Censorship Is Subject to the *Pentagon Papers* Strict Scrutiny Standard.

The Government's Motion takes issue with both this Court's and the Ninth Circuit's application of strict scrutiny to restraints on speech about the Government's use of NSLs and FISA orders.  Mot. at 14.  But a long line of precedent requires strict scrutiny of the speech restrictions here—not only because they are content-based,[2] but also because they impose a

---

[2] "The Government's restrictions on Twitter's speech are [indisputably] content-based."  Dkt. No. 172, at 2.  They "target[]" Twitter's speech specifically "because of the topic discussed or the idea or message expressed," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2227 (2015); *Berger v. City of Seattle*, 569 F.3d 1029, 1051 (9th Cir. 2009) (en banc)—namely, aggregate numerical data about Twitter's receipt of compulsory national security process that does not conform with the Government's preapproved reporting bands in 50 U.S.C. § 1874(a).

viewpoint-based prior restraint on Twitter's ability to contribute to public debate about the Government's use of national security process.  Accordingly, as the Court has already correctly recognized, the Government's prior restraint is "presumptively unconstitutional and may be justified only if the [G]overnment" can show that Twitter's proposed speech "would pose a clear and present danger or imminent harm to national security." Dkt. No. 172, at 2, 7; *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) [hereinafter "*Pentagon Papers*"]; *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 589 (1976) (prior restraints are "the essence of censorship").

The Government cannot carry that burden simply by asserting that the information was properly "classified under the Executive Order."  Dkt. No. 172, at 16; *Al-Haramain Islamic Found. Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007) ("Simply saying 'military secret,' 'national security,' . . . 'terrorist threat' or invoking an ethereal fear that disclosure will threaten our nation is insufficient" to justify a content-based restraint).  Rather, narrow tailoring requires the Government to show—based on "an individualized analysis of" the speaker and speech at issue (*In re Nat'l Sec. Letter*, 863 F.3d 1110, 1125 (9th Cir. 2017))—that the "disclosure . . . will surely result in direct, immediate, and irreparable damage to our Nation or its people." *Pentagon Papers*, 403 U.S. at 730 (Stewart. J, concurring).[3]

Applying that standard in *Pentagon Papers*, the Supreme Court held that the government failed to carry that burden with respect to a far more detailed "study" on the United States' engagement in Vietnam.  *Id.* at 714.  The Court found the restraint on publication unconstitutional, even though the United States was still engaged in Vietnam at the time of publication, and the study involved material that had been classified as "Top Secret" and "Secret." *United States v. N.Y. Times Co.*, 328 F. Supp. 324, 326 (S.D.N.Y. 1971).

As this Court has recognized, that standard applies here because, with respect to Twitter's publication of its Transparency Report, Twitter is akin to the "speakers in public fora, distributors of literature, or exhibitors of movies" to whom courts have historically conferred the

---

[3] This standard, which derives from Justice Stewart's concurrence, is controlling because Justice Stewart's rationale offered the narrowest grounds (*i.e.*, the least expansive view of the First Amendment) that still supported the majority holding.

highest First Amendment protection.  Dkt. No. 172, at 14–15; *see, e.g.*, *Pentagon Papers*, 403

U.S. at 725–26 (Brennan, J., concurring) ("[T]he First Amendment tolerates absolutely no prior

judicial restraints of the press predicated upon surmise or conjecture that untoward consequences

may result."); *In re Washington Post Co.*, 807 F.2d 383, 391–92 (4th Cir. 1986).  The same

interests are implicated here, where "Twitter acts as the modern, electronic equivalent of a public

square."  Dkt. No. 172, at 14.  Furthermore, the content of Twitter's speech implicates a matter

of significant public concern:  "[D]isclosure of the existence and number of surveillance orders is

important to an informed public" since suppression of this information tends to "'conceal from

the public the actual degree of government intrusion that current legislation authorizes.'"  Dkt.

No. 172, at 16 & n.7 (quoting *In re Sealing & Non-Disclosure of Pen/Trap/2703(d) Orders*, 562

F. Supp. 2d 876, 882 (S.D. Tex. 2008)); *see also Pentagon Papers*, 403 U.S. at 717 (Black, J.,

joined by Douglas, J., concurring) (First Amendment was intended to prevent the government

from suppressing newsworthy speech that "reveal[s] the workings of government" and to

"prevent[] … the government from deceiving the people."); *Garcia v. Google, Inc.*, 786 F.3d

727, 730 (9th Cir. 2015).  And finally, suppression of Twitter's ability to speak about this topic

has the practical effect of suppressing "'a particular point of view'"—"the view that certain

federal investigative powers impose profoundly on individual civil liberties to the point that they

violate our constitution."  *Doe v. Gonzales*, 386 F. Supp. 2d 66, 75 (D. Conn. 2005) (quoting

*Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130–31 (1992)); *R.A.V. v. City of St. Paul*,

505 U.S. 377, 392 (1992).

All of these factors amplify Twitter's (and the public's) First Amendment interests in the

speech the Government seeks to restrict, and confirm the need for the most exacting standard of

review here.  Accordingly, the more robust *Pentagon Papers* standard applies.

## 2.  The Government Cannot Satisfy Strict Scrutiny.

The Government cannot carry its heavy burden of showing, based on "an individualized

analysis" of Twitter and the restricted speech, that disclosure will "surely result in direct,

immediate, and irreparable damage to our Nation or its people."  *Pentagon Papers*, 403 U.S. at

730.  To prove that, the Government would have to show that even taking into account key

factual considerations including the "size of [Twitter's] customer base," *In re NSL*, 863 F.3d at

1125, the age and aggregated nature of the proposed numerical reporting, and other quantitative

information already in the public domain about the Government's use of national security

process, the disclosure of the specific information in the Transparency Report would cause

"imminent harm to national security," Dkt. No. 172, at 2.

Though Twitter has yet to be given access to the Classified Declaration of Jay S. Tabb, Jr.

("Classified Tabb Declaration") submitted with the Government's current motion (yet another

factor requiring denial of that motion, *see infra*, pp. 23–25), the reasons offered in the

Unclassified Tabb Declaration fall well short of that demanding standard and strongly suggest

that the classified submission does too.

To start, the Unclassified Tabb Declaration makes clear that the Government's proffered

justifications are not tethered to *Twitter*'s proposed disclosures, and that they ignore the

information already in the public domain about *Twitter*'s receipt of national security process.

The Government claims, for example, that "disclosure of the information Twitter seeks to

publish"—aggregate statistics about its receipt of national security process in 2012 and 2013—

would provide "highly valuable insights into where and how the United States is or is not

deploying its investigative and intelligence resources" and whether Twitter is a "secure"

platform.  Dkt. No. 309-1, ¶ 7.  But it is hard to see how that could be so.  Not only is the

information at issue over six years old, but adversaries certainly know (because it is a matter of

public record) that Twitter receives national security process, as well as the types of information

that the Government seeks with that process.

As of April 2019, Twitter had published 14 individual NSLs dating back to 2009,

samples of which were introduced into evidence in connection with the parties' briefing on the

Government's state secrets claim.  *See* Rubin Decl. Ex. 13.  Those disclosures were far more

comprehensive than the aggregate data here—revealing not only the *fact* that the NSLs had been

received, but also their *content*.  *Id.*  For example, the NSLs disclosed the "types of information"

the Government sought from Twitter with respect to particular accounts, such as the date the

account was opened, associated email and physical addresses, billing information, Internet

1    Protocol ("IP") address and Uniform Resource Locator ("URL") information, and the names of

2    all "upstream and downstream providers facilitating th[e] account's communications." *See, e.g.*,

3    *id.* Ex. 13 (Islay Decl., Exs. A–C, at 3).

4         Disclosure of the *total* number of NSLs and FISA orders Twitter received more than six

5    years ago would tell the public far less about the extent to which Twitter is (or was) a "safe"

6    platform and the "extent, scope, and reach of the Government's national security collection

7    capabilities" than the public already knows.

8         Nor could disclosure of the mere *fact* of whether Twitter received any *FISA* process

9    during 2012 and 2013 tell adversaries anything meaningful about the Government's national

10   security collection capabilities (*i.e.*, to the extent the Government claims that fact would permit

11   adversaries to piece together harmful, nonpublic information about its collection capabilities as

12   to Twitter).  The Government's arguments are premised on the notion that the type of

13   information that it can obtain under each FISA title is a secret; it is not.  The statutes themselves

14   indicate whether the Government can collect content or non-content information, as well as the

15   types of records it may target.  Moreover, as the Government has observed, the FISA is not

16   monolithic:  Title I permits electronic surveillance; Title III permits physical searches; Title IV

17   permits the use of pen register and trap and trace devices; and Title V permits the collection of

18   business records, including call detail records.  Thus, Twitter's proposed disclosure of the *total*

19   number of FISA orders it has received across *all* titles would not, in fact, permit adversaries to

20   identify the type of information that was sought in those orders (if any).

21        The Government's argument further ignores the detailed information *already in the*

22   *public domain* as a result of annual reporting by the Administrative Office of the United States

23   Courts ("AOUSC"), the U.S. Department of Justice Office of Legal Affairs ("OLA") and the

24   Office of the Director of National Intelligence ("ODNI").  *See* RJN, Exs. A–N.[4]  These reports,

25

26   _____
     [4] These annual government reports are judicially noticeable.  *See* Twitter's Request for Judicial
27   Notice ("RJN") filed concurrently herewith.  And as government documents, they are self-
     authenticating as a "publication purporting to be issued by a public authority."  Fed. R. Evid.
28   902(5).  Independently, the Government's reports are admissible as opposing party admissions

both individually and collectively, already tell adversaries far more about the Government's

collection capabilities and *how* the Government uses its authority under various *specific* FISA

titles than Twitter's far higher-level disclosures could.  For example, for *each year* since at least

2014,[5] the AOUSC has disclosed the exact number of DOJ applications made, and how many of

those applications were granted, modified, denied in part, or denied in full—both in the

aggregate *and broken down by specific sections of the FISA*.  *See, e.g.*, RJN Ex A. at 3, Exs. B–

D, at 4 (AOUSC reporting charts).  The ODNI's reporting further discloses—again, for *specific*

*sections of the FISA*—the total number of orders issued, as well as the exact number of *targets*

covered by those orders, the number of unique identifiers used to collect information about those

targets, and (in the context of business records sought under FISA Title V) the number of call

detail records collected and stored by the NSA.  *See, e.g.*, RJN Exs. E–I.  The ODNI reporting

also provides details about how collection works under different FISA provisions and the types

of information that is targeted.  *See, e.g.*, RJN Ex. H, at 4–12; Ex. E, at 1–2, Ex. F, at 1–2.[6]

In sum, a highly generalized disclosure that Twitter received over six years ago a

specified number of orders under the *entire FISA statutory scheme*—which does not identify the

precise authority the orders (if any) were issued under—could not possibly tell adversaries

anything beyond what they can already discern from public information about the Government's

collection capabilities.

The Government's remaining efforts to justify its suppression of Twitter's speech rest on

the straw man that Twitter's claim constitutes a facial attack on the USAFA safe-harbor bands.

---

under Federal Rule of Evidence 801(d)(2), and as "[a] record or statement of a public office" that "sets out … the office's activities" under Rule 803(8).

[5] Much of this reporting is required by the USAFA, and therefore began to be published in 2015 (covering the year 2014).  However, the DOJ has been publicly reporting regarding its foreign surveillance activities since 1996.  *See* https://www.justice.gov/nsd/nsd-foia-library .

[6] For example, FISC orders typically authorize surveillance of specific "targets," which may be "an individual person, a group, or an entity … or a foreign power that possesses or is likely to communicate foreign intelligence information."  RJN Ex. E, at 2.  "Under Section 702," however, "the FISC issues a single order approving certifications that describe *categories* of foreign intelligence information to be acquired," *id.* Ex. F, at 1–2 (emphasis in original), through the "'tasking' [of] selectors…. [*i.e.*,] specific communications facilities assessed to be used by a target (*e.g.*, an email address or telephone number)."  *Id.* Ex. E, at 2.

In particular, the Government contends that Twitter's proposed disclosures over time would permit adversaries to glean valuable macro trends regarding the Government's overall use of national security surveillance—including about "incremental increases or decreases in collection over time" (Dkt. No. 309-1, ¶ 17).  This argument has nothing to do with the aggregate reporting in the Transparency Report and, in any event, suffers from multiple defects.

Perhaps most fundamentally, those arguments ask the Court to consider the potential national security implications of *all* ECSPs publishing similar data over an extended period of time.  But the question before the Court in this motion is far narrower—whether publication of one set of data from 2012 and 2013 by Twitter would result in grave and imminent harm to the United States, given the unique attributes of Twitter and its speech, and the information already in the public domain.[7]  On that discrete issue, the Government cannot carry its burden.

The Government seeks to justify its restraint on Twitter's speech by pointing to harm that could result from hypothetical aggregate disclosures in the future by all ECSPs.  But that entirely ignores that governing law requires an "individualized assessment" of any proposed disclosure about a provider's receipt of national security process.  It also incorrectly speculates that an order permitting publication of the now six- to seven-year-old information in Twitter's Transparency Report would trigger an avalanche of requests by other providers to publish similar information, *and* that courts would necessarily grant all those requests.  However, the Government has offered no evidence whatsoever (and there is no reason to believe) that either assumption is correct.

Even if the Government were to be inundated with publication requests (a doubtful proposition),[8] the speech before the Court bears numerous unique attributes that could readily

---

[7] To be sure, the SAC *also* seeks a declaration that similar restrictions on reporting in later transparency reports would be unconstitutional.  But presently, Twitter is opposing and seeking summary judgment on the basis that the Government's prior restraint of its 2014 Transparency Report is unconstitutional, as the Government cannot show that each of the redactions therein would result in "direct, immediate, and irreparable damage to our Nation," and because they were imposed without the procedural safeguards required for systems of prior restraint.

[8] The Government's speculation (Dkt. No. 309-1, ¶ 20) also ignores the significant expense to an ECSP of challenging nondisclosure obligations, even if the Government were to adopt—as Twitter contends it must—a *Freedman*-compliant method to bring such a challenge.

distinguish it from a future publication request—including, but not limited to, the size of Twitter's user base, Twitter's unique role in publishing its reports, and the age of the data Twitter seeks to publish.  If, for example, an ECSP was lesser known, had not already revealed itself to be a recipient of national security process, or had a materially smaller user base, the Government might be able to show that disclosures similar to those Twitter seeks to make here could reveal harmful information (*e.g.*, that a platform that adversaries thought was safe was in fact a target of surveillance, or that a significant portion of the users on that platform were under surveillance). Alternatively, if a speaker sought to publish more recent or more granular information—such as total orders received, broken down by specific FISA provisions—those factors, too, might permit the Government to show harm to national security in another case.  It is even possible that a court could consider the impact of any prior approved disclosures to determine whether, when combined with the proposed new disclosures, that new information would result in grave and imminent harm to national security.  But none of these hypothetical considerations about what may or may not be restricted in the future should impact the Court's individualized assessment of the harm that would result from the disclosure of the Transparency Report.

Second, the Government's arguments that the revelation of macro trends would harm national security ignores that multiple government entities already publish far more up-to-date, annual data about the Executive's use of the FISA and NSLs.  RJN, Ex. I (2018 ODNI Report); *see also* RJN Exs. E–H.  As discussed above, the ODNI since 2015 has been publicly reporting about the estimated total number of orders issued and targets targeted, respectively, under *each* Title of the FISA.  *See generally id.*  These reports—both individually and collectively—*already* show the kinds of changes in the Government's enforcement priorities over time that the Government claims cannot be revealed without serious harm to national security.  For example, the total number of orders issued under FISA Title IV (authorizing pen registers and trap and trace devices) has fallen from 319 targets in 2013 to only 29 targets in 2018.  *Id.* Ex. I, at 24. Over the same time period, the number of persons targeted under FISA Section 702, which broadly authorizes surveillance of non-U.S. targets by "'tasking' selectors (*e.g.*, telephone numbers and email addresses)," *id.* at 10, has risen from 89,138 in 2013 to 164,770 in 2018, *id.*

1   at 13.  In assessing the Government's claim that any disclosures which reveal macro trends about

2   its use of national security process cause grave and imminent harm to national security, the Court

3   should take into account the macro trends the Government itself has already disclosed (in

4   addition to the unique attributes of Twitter's speech).

5       At bottom, the Government's current attempt to justify its restraint by reference to the

6   harm that might occur if *all* companies abandoned the USAFA reporting bands is but a

7   repackaged version of the Government's original reliance on the reporting bands.  That argument

8   fails because it effectively reads 50 U.S.C. § 1874(c) out of the statute.

9       Likewise, the limited evidence available to Twitter belies the Government's attempt to

10  recast its reliance on the bands as any sort of individualized inquiry.  Despite Twitter's claim that

11  it was not "similarly situated" to other ECSPs, Rubin Decl., Ex. 2, the FBI justified its

12  classification decision in September 2014 based solely on the grounds that Twitter's proposed

13  disclosures were "inconsistent" with the governing reporting bands and would "go beyond what

14  the government has permitted other companies to report," *id.* Ex. 3.  And the Government

15  offered materially identical reasons for denying similar requests by Facebook, Microsoft, Apple,

16  AOL, and Yahoo in 2013.  *Id.* Exs. 6–10.  Indeed, a letter sent to AOL in June 2013 still includes

17  placeholders for "X Company" and "ADDRESS," further underscoring that the Government was

18  sending the same boilerplate letter to all ECSPs, with only the company name changed.  *See id.*

19  Ex. 9.  That treatment of the USAFA bands as a rigid ceiling confirms that the Government has

20  never engaged in the kind of individualized analysis of proposed aggregate reporting that strict

21  scrutiny demands.  Nor does EAD Tabb's Unclassified Declaration contain even a hint that the

22  Government is conducting an individualized assessment of Twitter's Transparency Report—

23  indeed, the declaration contains no analysis of how the addition of this six- to seven-year-old

24  aggregate data into the public domain would place the country's security in grave danger.

25      Finally, the absence of any durational limitation on the Government's restraint

26  underscores the lack of narrow tailoring here.  Indeed, in upholding restraints on disclosure of

27  NSLs as narrowly tailored, the Ninth Circuit highlighted that NSLs were subject to the

28  Government's "Termination Procedures"—which require periodic Government re-review of the

necessity of nondisclosure—and those procedures were further "supplemented by the availability of [*Freedman*-compliant] judicial review." *In re NSL*, 863 F.3d at 1126–27. As this Court has recognized, no similar limitations on the duration of aggregate reporting exist. Dkt. No. 186, at 9. Moreover, the Government has conceded that it has discretion to limit the temporal scope of prohibitions on public aggregate reporting on a case-by-case basis, but that it has never exercised that discretion to limit the temporal scope of its restrictions on aggregate reporting outside of the USAFA bands. Rubin Decl. Ex. 5 (Responses to Interrogatory Nos. 9–11).

For all of these reasons, the Government has not carried its burden of showing that—under an "individualized analysis" of Twitter, the speech at issue, and the information already in the public domain—disclosure of the aggregate numerical data in the Transparency Report would pose a grave or imminent risk of harm to national security.

**B. Independently, Twitter Is Entitled to Summary Judgment Because the Government's Prior Restraint Lacked All of *Freedman*'s Procedural Safeguards.**

Separate and apart from the Government's inability to justify its prior restraint of Twitter's 2014 Transparency Report under strict scrutiny, that restraint as applied to Twitter is still procedurally unconstitutional under *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965). *See* Dkt. No. 186, at 4–5; *In re NSL*, 863 F.3d at 1129–30 (separately assessing the substantive constitutionality (under strict scrutiny) and procedural constitutionality (under *Freedman v. Maryland*) of non-disclosure obligations imposed under the NSL regime); *Microsoft Corp. v. U.S. Dep't of Justice*, 233 F. Supp. 3d 887, 905–07 (W.D. Wash. 2017) (same).

It is well "settled . . . that a system of prior restraint 'avoids constitutional infirmity only if it takes place under procedural safeguards designed to obviate the dangers of a censorship system.'" *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) (quoting *Freedman*, 380 U.S. at 58) (collecting authorities). These procedural safeguards include that (1) "the burden of instituting judicial proceedings, and of proving that the material is unprotected, must rest on the censor"; (2) "any restraint prior to judicial review [must] be imposed only for a specified brief period and only for the purpose of preserving the status quo"; and (3) "a prompt final judicial determination must be assured." *Id.* at 560; *see also* Dkt. No. 186, at 5.

As this Court has previously found, the prior restraint on Twitter's Transparency Report was imposed without these procedural safeguards.  Neither the Government's classification guidelines, nor the USAFA safe-harbor bands that the Government treats as the effective line between classified and unclassified speech, provide a mechanism for expeditious, Government-initiated judicial review of restrictions on disclosures of "aggregate volume data."  Dkt. No. 172, at 18.  Notably, 50 U.S.C. § 1874(c) explicitly contemplates that the Government may authorize reporting outside of the USAFA's safe-harbor bands.  But the statute "offers no procedure to petition for [the] exercise of discretion."  Dkt. No. 172, at 18.  Nor does it provide any mechanism for a speaker like Twitter to obtain prompt judicial "review of any Government decisions under [§ 1874(c)], or [of any] classification decision in connection with such [aggregate] disclosures generally."  *Id.*  This defect is perhaps best exemplified by this extended litigation, which Twitter was forced to initiate in order to obtain judicial review of the Government's classification of aggregate data in its 2014 Transparency Report.

### 1. Twitter Adequately Pled that the Government's Censorship of Its 2014 Transparency Report Was an Unconstitutional Prior Restraint.

The Government's argument that Twitter failed to plead that the censorship of its Transparency Report was an unconstitutional prior restraint rests on a misconception of governing First Amendment law and an overly cramped reading of the SAC.

Counts I and II of the SAC specifically plead that "the government's prior restraint on Twitter's speech violates the First Amendment."  SAC pp. 17, 21.  In Count II, Twitter further pled that Twitter was challenging "Defendants' decision to censor Twitter's transparency report" as unconstitutional.  *Id.* ¶ 88; *see also id.* ¶ 84.  This pleading was more than sufficient to put the Government on notice that the First Amendment-mandated procedural requirements under *Freedman* are at play here.  "A party need not plead specific legal theories in the complaint, so long as the other side receives notice as to what is at issue in the case."  *Am. Timber & Trading Co. v. First Nat. Bank of Or.*, 690 F.2d 781, 786 (9th Cir. 1982).  And it is hornbook law that "prior restraints on speech will pass constitutional muster" only if they comply with both *Freedman*'s "procedural safeguards and substantive strict scrutiny requirements."  Dkt. No. 172,

at 8.  Thus, by alleging that the Government's "[censor]ship" decision was an "unconstitutional prior restraint" (*see* Counts I and II), Twitter has adequately pled a challenge to "both the procedural safeguards and substantive strict scrutiny requirements" associated with the prior restraints at issue in this case.  *See Rother v. Lupenko*, 515 F. App'x. 672, 674 (9th Cir. 2013) (affirming ruling allowing the plaintiff's claim to proceed because "[a]lthough Plaintiff's Second Amended Complaint did not spell out their unpaid break claims in so many words, Defendants nonetheless had sufficient notice of those claims by the summary judgment stage."); *Crull v. GEM Ins. Co.*, 58 F.3d 1386, 1391 (9th Cir. 1995).  Indeed, the Court explicitly addressed whether the Government's restraint here satisfied *Freedman*'s procedural safeguards in denying the Government's initial motion for summary judgment. Dkt. No. 172, at 8.[9]

### 2. *Freedman* Applies to the Executive's Discretionary Classification of Speech about the Receipt of National Security Process.

The Court was correct to hold that the Government's prior restraint in this case must include *Freedman*'s procedural safeguards in order to be constitutional.  Dkt. No. 172, at 8, 18; Dkt. No. 186, at 4–5.  Contrary to the Government's claim (*see* Dkt. No. 309, at 18), its discretionary classification of the aggregate data in Twitter's draft Transparency Report was a prior restraint that bears all the "dangers of a censorship system" that the Supreme Court sought in *Freedman* to "obviate" by requiring certain procedural safeguards.

First, the Government's classification decision—like any "censorship proceeding"— "puts the initial burden on the [speaker]" to seek permission to speak.  *Freedman*, 380 U.S. at 57. The Government forbids recipients of individual FISA orders and NSLs from disclosing the aggregate number of orders they have received.  Though Congress has carved out a narrow safe harbor for aggregate reporting made in conformity with the bands in 50 U.S.C. § 1874(a),[10] any

---

[9] The Government's position also fails because it has repeatedly addressed the application of *Freedman* to this case without ever suggesting this claim was not adequately pled or not a legal theory at issue in the case. *See, e.g.*, Dkt. Nos. 180, 184 (Motion for Reconsideration briefing).

[10] Section 1874(a) permits "person[s] subject to a nondisclosure requirement accompanying an order or directive under [the FISA] or a national security letter" to "publicly report" information "with respect to such order, directive, or national security letter" if they do so in accordance with one or more of the large bands set forth therein.  50 U.S.C. § 1874(a).

1  speaker who wishes to publish more granular data about its receipt of national security process

2  still bears the initial burden of seeking permission from the Executive under § 1874(c).[11]

3        The second "danger" of a censorship system is that, "[b]ecause a censor's business is to

4  censor, there inheres the danger that he may well be less responsive than a court—part of an

5  independent branch of government—to the constitutionally protected interests in free

6  expression." *Freedman*, 380 U.S. at 57–58.  The Government's discretionary authority to

7  classify information under Executive Order ("EO") 13526 about its use of national security

8  process shares this attribute of a classic censorship regime as well.  Indeed, even more so than

9  the typical censor, the FBI faces a strong incentive to overclassify (or overcensor) speech about

10  its use of national security process—both because the national security interests at stake will lead

11  classifying authorities to err on the side of censorship *and* because the information at issue is

12  about the FBI's (the censor's) own activities.  Indeed, the overclassification of information in the

13  Department of Justice is well documented.  Rubin Decl. Ex. 11, at 13 (OIG audit finding

14  evidence of overclassification and "persistent misunderstanding and lack of knowledge of certain

15  classification processes by officials within various DOJ components").

16        For these reasons, the Government's broad discretion to classify data about its use of

17  national security process carries both of the "dangers" of censorship that have consistently

18  prompted the Court to require prior restraints to comply with *Freedman*.  *See, e.g.*, *Vance v.*

19  *Universal Amusement Co.*, 445 U.S. 308, 317 (1980) (statute authorizing prior restraint on movie

20  exhibitors of indefinite duration failed to comply with *Freedman*); *Conrad*, 420 U.S. at 559–60

21  (denial of facility use permit to procedures of a play under scheme lacking *Freedman's*

22  procedural safeguards was unconstitutional).

23        **a.  The Ninth Circuit's *Dictum* Is Neither Controlling Nor Consistent with Supreme Court Authority.**

24        The Government quotes *dicta* in *In re NSL* suggesting that the law authorizing

25  nondisclosure obligations in individual NSLs "is more similar to governmental confidentiality

---

[11] Section 1874(c) authorizes "the Government" to permit "the publication of information" related to NSLs and FISA Orders in any other "form."  *Id.* § 1874(c).

1    requirements that have been upheld by the courts" (referring to two cases, *Butterworth* and

2    *Seattle Times*, discussed *infra*). Mot. at 20 (quoting *In re NSL*, 863 F.3d at 1129).

3         That *dicta* is not controlling or persuasive here.  First, it is in tension with the Ninth

4    Circuit's actual *holding*—which examined the NSL statute at length and held that it "in fact

5    provides all of [*Freedman*'s procedural safeguards]."  *Id.* at 1129–30.  As important, the Ninth

6    Circuit's statement was made in the context of a wholly different statutory scheme which, unlike

7    Section 1874(c),[12] did not specifically contemplate pre-publication submission and review of

8    publication requests for government censorship.  *See id.* at 1127–29 ("The NSL law . . . neither

9    require[d] [the plaintiffs] to submit proposed speech for review and approval, nor . . . to obtain a

10   license before engaging in business.").

11        Moreover, the court's suggested analogy to *Butterworth* and *Seattle Times* ignores the

12   principal rationales behind those decisions.  In *Butterworth v. Smith*, 494 U.S. 624 (1990), the

13   Supreme Court found a Florida statute substantively unconstitutional to the extent it prohibited

14   the plaintiff, a grand jury witness, from disclosing his own testimony after the conclusion of

15   grand jury proceedings.  *Id.* at 628, 632–36.  The Court reasoned that the restriction was not

16   justified by any of the state's proffered interests (*e.g.*, in preventing flight by the accused,

17   avoiding public ridicule of exonerated persons and encouraging witnesses to testify freely

18   without fear of retribution).  *Id.* at 632.  However, the Court affirmed that prohibitions on

19   disclosure of *other* witnesses' testimony were justified by the state's interest in "enhancing the

20   integrity of the grand jury system."  *Smith v. Butterworth*, 866 F.2d 1318, 1320–21 (11th Cir.

21   1989), *aff'd*, 494 U.S. 624 (1990) ("effectiveness of the grand jury system itself would be

22   impaired if jurors were not completely assured that their identities would remain unknown").

23        To the extent *Butterworth* has any relevance here at all, it cuts in Twitter's favor.  The

24   restriction on Twitter's ability to disclose information about its *own* experience as the recipient

25

26

27   [12] The Government has applied its classification guidelines (in EO 13526), pursuant to its
     authority under 50 U.S.C. § 1874(c), to consider publication requests more granular than those
28   permitted under the safe-harbor bands in § 1874(a).

1    of coercive national security process is far more akin to the restrictions on disclosure of one's

2    *own* testimony that the Court *struck down.*[13]

3        The second case, *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), held that protective

4    orders prohibiting civil plaintiffs from disclosing sensitive information they had compelled

5    defendants to turn over in discovery did "not offend the First Amendment." *Id.* at 37.  The Court

6    reasoned that the orders were justified by the "[t]he unique character of the discovery process,"

7    through which litigants may compel disclosure of "damaging" information about adversaries.  *Id.*

8    at 35–36.  The Court further observed that, because the purpose of a protective order is to

9    "prevent[] . . . the abuse that can attend the coerced production of information," *id.* at 35, it "does

10   not raise the same specter of government censorship that such control might suggest in other

11   situations," *id.* at 32.

12       Again though, this case presents precisely the *opposite* issue:  While *Seattle Times*

13   expressed a concern that a *would-be speaker* might "abuse" its access to "coerc[ive]" discovery

14   tools, Twitter (the would-be speaker here) is the *subject or target* of the coercive action.  To be

15   sure, Twitter knows how many national security process requests it has received because of its

16   interaction with the Government.  But it was the Government—not Twitter—that unilaterally

17   initiated all of those interactions.  Indeed, the Second Circuit in *Doe v. Mukasey* (a case from

18   which the Government selectively and misleadingly quotes (Mot. at 20)) specifically *rejected* the

19   government's analogy to *Seattle Times* on these precise grounds.  *See* 549 F.3d 861, 877 (2d. Cir.

20   2008) ("We fail to appreciate the analogy between the individuals or the entity seeking

21   disclosure in [*Seattle Times*] and [plaintiff], who had no interaction with the Government until

22   the Government imposed its nondisclosure requirement upon it.").[14]

23

24   [13] Further, *Butterworth* made no mention of *Freedman*.

     [14] Because of this important difference, *Seattle Times* cuts in favor of applying *Freedman* to the
25   Government's prior restraint here (to the extent applicable here at all).  As the Supreme Court
     has recognized, the best defense against Executive abuses is an informed public.  *See Pentagon*
26   *Papers*, 403 U.S. at 723–24 (Douglas, J., concurring) ("immunity" "from previous restraint" in
     speaking about "the administration of government" is "vital to our national health").  Requiring
27   the Executive's classification of aggregate data to comport with *Freedman* advances that interest
     by mitigating the inherent risk that, because its "business is to censor," the Executive will
28   overclassify and thereby keep out of public view information necessary to hold it accountable.

1    For the same reason, the Second Circuit distinguished the Government's cases (Mot. at

2  21) involving nondisclosure obligations imposed on *former employees* as a condition of their

3  *voluntary* employment relationship with the government.  *See Mukasey*, 549 F.3d at 877 (citing

4  *United States v. Snepp*, 897 F.2d 138 (4th Cir. 1990) and *United States v. Marchetti*, 466 F.2d

5  1309 (4th Cir.1972)).  And the court in *Mukasey* ultimately held that, notwithstanding some

6  (immaterial) differences between the NSL law and other censorship schemes, *Freedman*'s

7  safeguards "must be observed."  549 F.3d at 881.

8    In sum, Section 1874 and the Government's discretionary classification scheme bear far

9  greater resemblance to the classic censorship scheme that *Freedman*'s safeguards were designed

10 to address than to the unique restraints on grand jury testimony and civil discovery that were

11 addressed in *Butterworth* and *Seattle Times*.  In the latter cases, the justifications for secrecy

12 "inhere[d] in the nature of the proceeding[s]" themselves.  *Mukasey*, 549 F.3d at 876.  In neither

13 did the speech restriction turn on an administrative censor's discretionary application of criteria

14 that may or may not, in fact, justify restriction under the First Amendment.

### b.  The FISA Process Does Not Save the Government's Prior Restraint on *Aggregate* Reporting from Constitutional Infirmity.

16   The Government next argues that it would not make sense to apply *Freedman* here

17 because individual FISA Orders and NSLs may be challenged in proceedings that comport with

18 *Freedman* (Mot. at 21).  Regardless of whether that is accurate in all cases,[15] the "Government

19 offers no similar provisions applicable to the [aggregate] reporting restrictions in the statutory

20 scheme here."  Dkt. No. 186, at 9 ("The argument that each of the underlying orders comprising

21 the aggregate number is subject to individual judicial review does not address … whether the

22 Government's prohibition on publication of *a completely different set of information—the*

23 *aggregate numbers* … requires judicial review be provided.") (emphasis added).

24   Relatedly, the Government argues that *some* of the orders included in Twitter's aggregate

25 disclosures *may* have emanated from "the FISA process" that included judicial review.  Mot. at

---

[15] The Government itself has repeatedly emphasized the disparities across FISA Titles.  *See, e.g.*, Dkt. No. 290, at 3; Dkt. No. 309, at 22–23.

1    21.  The Government claims that the involvement of the FISC in issuing orders obviates

2    *Freedman*'s concerns about government censorship, and therefore *Freedman* should not apply to

3    restraints on aggregate reporting.  This is wrong for several reasons.

4         As a threshold matter, that argument ignores that at least some of the orders encompassed

5    in Twitter's aggregate reporting emanated from the NSL regime—not the FISA.  But more

6    fundamentally, the Government's suggestion that FISC judges review *the Executive's censorship*

7    *decisions* is contrary to the plain text of the FISA, which shows that the FISC has no role in

8    approving the nondisclosure obligations that accompany FISA directives.  The FISA (like the

9    NSL regime) consistently vests authority to define the contours of any "security procedures"

10   (which include the applicable nondisclosure obligations) in "the Attorney General and the

11   Director of National Intelligence."  *E.g.*, 50 U.S.C. § 1881a(i)(1)(B) (authorizing the "Attorney

12   General and the Director of National Intelligence" to "direct" an ECSP to "maintain under

13   security procedures *approved by the Attorney General and the Director of National Intelligence*

14   any records concerning the acquisition or the aid furnished" by the ECSP); *id.* § 1805(c)(2)(C)

15   ("An order approving an electronic surveillance under this section shall direct . . . that such

16   [ECSP] maintain [any records] under *security procedures approved by the Attorney General and*

17   *the Director of National Intelligence*") (emphases added); *id.* § 1824(c)(2)(C) (same language).

18        Likewise, the provisions governing the FISC's review of the Executive's FISA

19   applications do not permit the FISC judge to consider the necessity or scope of the Executive's

20   security procedures.  Section 1805, for example, provides that a FISC judge "***shall*** enter an ex

21   parte order" authorizing electronic surveillance "if he finds that" certain conditions are met (none

22   of which require review of any nondisclosure provisions).  *See, e.g.*, 50 U.S.C. §§ 1805(a),

23   1824(a) (emphasis added).[16]  Indeed, it is telling that the Government's argument fails to cite a

24   single statutory provision.  *See* Mot. at 21.

_____

25   [16] The conditions for FISC approval are:  (1) the application has been made by the appropriate
26   authorities; (2) "there is probable cause to believe that . . . the target of the electronic surveillance
     is a foreign power"; (3) the government's "proposed minimization procedures" meet the
27   statutory requirements (meaning they are designed "to minimize the acquisition and retention" of
     nonpublic information about "United States persons," 50 U.S.C. § 1801(h)); and (4) the
28   application "contains all the statements and certifications required."

1  Moreover, the Government's argument that "no case" requires the Government to initiate

2 expedited judicial review in order to protect classified information is incorrect.  That is precisely

3 the holding of *Doe v. Mukasey*, which found that *Freedman* applies to restrictions on disclosure

4 of individual NSLs (which are also "classified").  *Mukasey*, 549 F.3d at 879–81.

5  Finally, the Government's discussion of other sources of censorship authority is a red

6 herring.  Dkt. No. 309, at 22–24.  Twitter is presently seeking only a declaration that the

7 Government's censorship of the redacted portions of the Transparency Report violates the First

8 Amendment and an injunction against classification of aggregate data under 50 U.S.C. § 1874

9 and EO 13526 without *Freedman*'s procedural safeguards.  Likewise, the Government has

10 consistently identified the reporting bands and its classification authority under EO 13526 as the

11 basis for the Government's discretionary censorship (authorized by 50 U.S.C. § 1874(c)) of

12 Twitter's speech.  *See* Tabb Decl., Dkt. No. 309-1, ¶¶ 27–30; Rubin Decl. Ex. 3.

13  And irrespective of the statutory or regulatory source of the speech restrictions here, the

14 substantive First Amendment standard is the same:  The Government must show that

15 nondisclosure is necessary to prevent grave and imminent risk to national security.  Nor does it

16 matter, for purposes of *Freedman*, that the Government may in other circumstances impose

17 nondisclosure obligations under other statutes.  As the Court has previously observed, the

18 Government has not pointed to any provision in *any* statute which permits recipients of national

19 security process to challenge restrictions on aggregate reporting under the procedures

20 contemplated in *Freedman*.  Dkt. No. 172, at 9.

### 3. Twitter Is Entitled to an Injunction Against Enforcement of the Government's Procedurally Unconstitutional Censorship Authority.

22  In sum, Twitter is entitled to summary judgment on its claim that the Government's

23 classification of the 2014 Transparency Report was an "unconstitutional prior restraint," because

24 it was imposed pursuant to a system of censorship that lacks *Freedman*'s procedural safeguards.

25 First, none of the Government's proffered bases for its censorship here—including its

26 classification guidelines in EO 13526 (nor 50 U.S.C. § 1874) require that any pre-judicial review

27 restraints be "brief."  *Thomas v. Chi. Park Dist.*, 534 U.S. 316, 321 (2002).  This stands in sharp

contrast to the procedures upheld by the Ninth Circuit in *In re NSL*, which guaranteed that the government would "'go to court' within 30 days of receiving notice" from a recipient. 863 F.3d at 1129 (quoting 18 U.S.C. § 3511(b)(1)(B)). *Freedman*'s second requirement is also lacking: As this Court previously noted, "[Section 1874(c)] does not provide a mechanism for [expeditious] review of any Government decisions under that exception, or classification decisions in connection with such disclosures generally." Dkt. No. 172, at 18; *compare In re NSL*, 863 F.3d at 1129 (quoting 18 U.S.C. § 3511(b)(1)(C) (specifically requiring courts to "rule expeditiously" on challenges to non-disclosure of individual NSLs)). And third, the framework applied here does not require *the Government* to initiate those judicial proceedings, upon receipt of notice of a legal challenge from the recipient. *Compare In re NSL*, 863 F.3d at 1129.

Given these defects, Twitter is entitled to a declaratory judgment that the Government's censorship of the 2014 Transparency Report was procedurally unconstitutional because the system of censorship applied failed to comport with *Freedman*. The Government's restriction on Twitter's aggregate reporting should accordingly be *enjoined* until the Government adopts procedures by which Twitter can obtain *Freedman*-compliant judicial review of aggregate reporting restrictions. *See In re Nat'l Sec. Letter*, 930 F. Supp. 2d 1064, 1081 (N.D. Cal. 2013) (adopting such remedy).[17]

## C. Independently, the Government's Motion for Summary Judgment Should Be Denied Under Federal Rule of Civil Procedure 56(d).

Independently, the Government's Renewed Motion for Summary Judgment should be denied because Twitter has been precluded at every turn from obtaining discovery into "facts essential to justify its opposition." Fed. R. Civ. P. 56(d). For the past three years (since November 2016), Twitter has sought exhaustively to obtain basic discovery of information highly relevant to its claims. The Government first asserted groundless relevance objections, and then went through the motions of discovery while asserting privilege over virtually all substantive, non-public information.

---

[17] Should the Court deem it appropriate, Twitter would not object to a stay of the Court's judgment pending appeal or, if no appeal is filed, for 90 days—consistent with the Northern District's opinion in *In re NSL*. *Id.* at 1081.

1    The Government has also prevented Twitter's access (through its cleared counsel) to the

2    classified declaration on which the Government originally relied in moving for judgment (the

3    Classified Steinbach Declaration).  Though the Court directed the Government to initiate

4    expedited security clearance for Twitter's lead counsel, Lee H. Rubin (Dkt. No. 172), and Mr.

5    Rubin's application was "favorably adjudicated," Rubin Decl. ¶ 17, Ex. 12, the Government

6    ultimately refused to issue a security clearance.[18]  The Government claimed that Mr. Rubin, as

7    private counsel in civil litigation against the Government, had no "need to know" classified

8    evidence submitted in this case.  *Id.* ¶ 17; Dkt. No. 244, at 9.  The Government then opposed

9    Twitter's request to the Court for access to the Classified Steinbach Declaration (Dkt. No. 250)

10   on the dual grounds that (1) the Court had no authority to compel discovery of classified

11   information over its need-to-know objection (Dkt. Nos. 256, 264), and (2) the declaration was a

12   "state secret" (Dkt. No. 281).  Twitter has vigorously contested both objections as insufficient to

13   justify the Government's refusal to disclose classified information to cleared counsel, *see* Dkt.

14   Nos. 265, 292; this dispute remains live.

15   Now, in connection with its Renewed Motion for Summary Judgment, the Government

16   has submitted the Classified Tabb Declaration, which it again claims constitutionally justifies its

17   restrictions on Twitter's Transparency Report.  Just as with the Classified Steinbach Declaration,

18   Twitter needs access to the Classified Tabb Declaration—the core of the Government's

19   defense—in order to meaningfully counter the Government's claim that its prior restraint is

20   constitutional.  As Twitter previously explained, such access would occur only through cleared

21   counsel and under any security procedures the Government deems appropriate.  Twitter's request

22   is supported by fundamental principles of due process and fully consistent with the Court's broad

23   inherent authority to control discovery.  *See id.*  Simultaneously, the Government has articulated

24   no valid basis to believe that the nation's security would be endangered by permitting one

25   cleared counsel access to one classified document—subject to whatever security protocols the

26   Government may require.  *Id.*

27
28   [18] For simplicity, Twitter uses the term "cleared counsel" to refer to this favorable suitability
     determination.

1       The Court's recent Order to Show Cause (Dkt. No. 301) only underscores Twitter's need

2   for such discovery.  The Court has indicated that it is inclined to hold that evidence contained in

3   the Classified Declaration of Michael C. McGarrity (submitted in support of the Government's

4   state secrets briefing) "meets the Government's burden under strict scrutiny to justify

5   classification … of information in the Draft Transparency Report."  Dkt. No. 301, at 2.  The

6   Government objected to the Court's consideration of the Classified McGarrity Declaration for

7   purposes of summary judgment, but requested an opportunity to submit that evidence through a

8   "new motion[] for summary judgment and supporting declarations."  Dkt. No. 306, at 2 n.1. That

9   evidence is now presumably contained in the Classified Tabb Declaration, submitted in support

10  of the Government's Renewed Motion for Summary Judgment.

11      The Court's stated inclination to uphold a presumptively unconstitutional prior restraint

12  on the basis of classified evidence only heightens the need for adversarial testing of that

13  evidence.  Thus, even if the Court were to conclude that discrete portions of the Classified Tabb

14  Declaration could not be disclosed to cleared counsel without serious risk of harm to national

15  security, the Court should at least permit access to those portions of the declaration the Court

16  finds potentially dispositive (subject, of course, to reasonable security protocols).

17      Simply put, Twitter needs access to the Government's most critical evidence to vindicate

18  its First Amendment rights.  This provides yet another basis for denying the Government's

19  Motion for Summary Judgment.

## CONCLUSION

20      For the reasons set forth herein, the Court should *grant* Twitter's Cross-Motion for

21  Summary Judgment and *deny* the Government's Motion.  Specifically, Twitter seeks judgment in

22  its favor on the portions of Counts I and II discussed herein, as well as on Count III to the extent

23  derivative of any relief granted under Twitter's Counts I and II.

24    Dated:  October 25, 2019          MAYER BROWN LLP

25

26                      /s/ Lee H. Rubin
                    LEE H. RUBIN (SBN 141331)

27                      SAMANTHA C. BOOTH (SBN 298852)
                    *Attorneys for Plaintiff Twitter, Inc.*

28

MAYER BROWN LLP
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax (202) 263-3300

MAYER BROWN LLP
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TWITTER, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM P. BARR, United States Attorney General, *et al.*,<br><br>Defendants. | Case No. 14-cv-4480-YGR<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFF TWITTER'S CROSS-MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, GRANTING TWITTER'S MOTION FOR ACCESS TO THE CLASSIFIED TABB DECLARATION** |

1       The Court having considered the Government's Motion for Summary Judgment

2   ("Government's Motion"), Twitter's Opposition thereto and Cross-Motion for Summary

3   Judgment ("Twitter's Cross-Motion"), the Defendants' opposition to Twitter's Cross-Motion,

4   and any replies and other documents submitted in opposition to and in support of Twitter's

5   Cross-Motion, IT IS HEREBY ORDERED THAT the Twitter's Cross-Motion is **GRANTED**,

6   and the Government's Motion is **DENIED**.

7       In the alternative, Twitter's motion that its cleared counsel be granted access to the

8   Classified Declaration of Jay S. Tabb, Jr. is **GRANTED**.

9       IT IS SO ORDERED.

10

11   Dated: _____

12                                       The Hon. Yvonne Gonzalez Rogers
United States District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1