**MAYER BROWN LLP**
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax: (202) 263-3300

**MAYER BROWN LLP**
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax: (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480-YGR |
| Plaintiff, | **TWITTER'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF ITS OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND ITS CROSS-MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| WILLIAM P. BARR, United States Attorney General, *et al.*, | **[NOTICE OF MOTION AND MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES FILED CONCURRENTLY]** |
| Defendants. | Date:  January 7, 2020 |
| | Time:  2:00 PM |
| | Courtroom 1, Fourth Floor |
| | Judge: Hon. Yvonne Gonzalez Rogers |

PLEASE TAKE NOTICE that, pursuant to Federal Rule of Evidence 201, Plaintiff Twitter, Inc. ("Twitter") hereby respectfully requests that, in considering Twitter's Opposition to Defendants' Motion for Summary Judgment and Twitter's Cross-Motion for Summary Judgment, the Court take judicial notice of the existence and contents of the following documents:

1. The Director of the Administrative Office of the U.S. Courts' ("AOUSC") 2015 Annual Report[1] on activities of the Foreign Intelligence Surveillance Courts, a true and correct copy of which is attached hereto as **Exhibit A**.

2. AOUSC's 2016 Annual Report on activities of the Foreign Intelligence Surveillance Courts, a true and correct copy of which is attached hereto as **Exhibit B**.

3. AOSUC's 2017 Annual Report on activities of the Foreign Intelligence Surveillance Courts, a true and correct copy of which is attached hereto as **Exhibit C**.

4. AOUSC's 2018 Annual Report on activities of the Foreign Intelligence Surveillance Courts, a true and correct copy of which is attached hereto as **Exhibit D**.

5. The Office of the Director of National Intelligence's ("ODNI") 2014 Annual Report on Statistical Transparency Regarding the use of National Security Authorities, a true and correct copy of which is attached hereto as **Exhibit E**.

6. ODNI's 2015 Annual Report on Statistical Transparency Regarding the use of National Security Authorities, a true and correct copy of which is attached hereto as **Exhibit F**.

7. ODNI's 2016 Annual Report on Statistical Transparency Regarding the use of National Security Authorities, a true and correct copy of which is attached hereto as **Exhibit G**.

8. ODNI's 2017 Annual Report on Statistical Transparency Regarding the use of National Security Authorities, a true and correct copy of which is attached hereto as **Exhibit H**.

9. ODNI's 2018 Annual Report on Statistical Transparency Regarding the use of National Security Authorities, a true and correct copy of which is attached hereto as **Exhibit I**.

10. The U.S. Department of Justice Office of Legislative Affairs' ("OLA") 2014

---

[1] In referring to this and other reports referenced herein, we use the year covered by the report, not the year of publication (which is generally the following year).

Annual Report, a true and correct copy of which is attached hereto as **Exhibit J**.

11.   OLA's 2015 Annual Report, submitted pursuant to the Foreign Intelligence Surveillance Act of 1978 (as modified by the USA PATRIOT Improvement and Reauthorization Act of 2005 and USA FREEDOM Act), a true and correct copy of which is attached hereto as **Exhibit K**.

12.   OLA's 2016 Annual Report, submitted pursuant to the Foreign Intelligence Surveillance Act of 1978 (as modified by the USA PATRIOT Improvement and Reauthorization Act of 2005 and USA FREEDOM Act), a true and correct copy of which is attached hereto as **Exhibit L**.

13.   OLA's 2017 Annual Report, submitted pursuant to the Foreign Intelligence Surveillance Act of 1978 (as modified by the USA PATRIOT Improvement and Reauthorization Act of 2005 and USA FREEDOM Act), a true and correct copy of which is attached hereto as **Exhibit M**.

14.   OLA's 2018 Annual Report, submitted pursuant to the Foreign Intelligence Surveillance Act of 1978 (as modified by the USA PATRIOT Improvement and Reauthorization Act of 2005 and USA FREEDOM Act), a true and correct copy of which is attached hereto as **Exhibit N**.

The Court must take judicial notice of facts "not subject to reasonable dispute" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Civ. P. 201(b)(2).

Here, Twitter seeks judicial notice of publicly available reports prepared by various government agencies.  Courts have routinely taken judicial notice of official government reports on the grounds that they are not subject to reasonable dispute.  *See e.g.*, *De La Torre v. CashCall, Inc.*, 56 F. Supp. 3d 1073, 1092 (N.D. Cal. 2014) (taking judicial notice of annual reports by California government agencies), *vacated and remanded on other grounds*, 904 F.3d 866 (9th Cir. 2018); *Tex. & Pac. Ry. Co. v. Pottorff*, 291 U.S. 245, 254 n.4 (1934) (Comptroller of the Currency's

1   report), *amended on other grounds*, 291 U.S. 649 (1934); *Del Puerto Water Dist. v. U.S. Bureau*

2   *of Reclamation*, 271 F. Supp. 2d 1224, 1234 (E.D. Cal. 2003) (Senate and House Reports).

3       Accordingly, judicial notice here is proper, and Twitter respectfully requests this Court to

4   take judicial notice of the existence and contents of the documents attached hereto as Exhibits A

5   through N.

6    Dated:  October 25, 2019                    MAYER BROWN LLP

7

8                                                                 /s/ Lee H. Rubin
                                                                  LEE H. RUBIN (SBN 141331)
                                                                  lrubin@mayerbrown.com
9                                                                 SAMANTHA C. BOOTH (SBN 298852)
                                                                  sbooth@mayerbrown.com
10                                                                Two Palo Alto Square, Suite 300
                                                                  3000 El Camino Real
11                                                                Palo Alto, CA 94306-2112
                                                                  Telephone:      (650) 331-2000
12                                                                Facsimile:       (650) 331-2060

13                                                                *Attorneys for Plaintiff Twitter, Inc.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A
to Twitter's Request for Judicial Notice

**Report of the Director of the Administrative Office of the U.S. Courts
on activities of the Foreign Intelligence Surveillance Courts for 2015**

**Introduction**

Under 50 U.S.C. § 1873(a)(2), enacted as part of the USA FREEDOM Act of 2015 (Pub. L. No. 114-23), the Director of the Administrative Office of the United States Courts (AO) is required to publish statistical information on certain activities of the Foreign Intelligence Surveillance Court (FISC) and Foreign Intelligence Surveillance Court of Review (collectively referred to as the FISA courts) as detailed in 50 U.S.C. § 1873(a)(1). This includes the number of applications or certifications submitted to the court and whether those requests were granted, modified, or denied. It also includes information on amicus curiae appointments by the FISA courts.

Because Congress enacted the USA FREEDOM Act of 2015 on June 2, 2015, this report covers the period from June 8, 2015 (the beginning of the first full docket week after the effective date of the USA FREEDOM Act) through December 31, 2015. In future years, each report will include data for the entire calendar year.

**Summary of Findings**

From June 8, 2015, to December 31, 2015, the FISC disclosed that it received 1,010 applications. After consideration by the court, 836 orders were granted, 169 orders were modified, and 5 applications were denied. After completing the declassification review specified in 50 U.S.C. § 1873 (a)(1), the U.S. Department of Justice has advised the AO that the number of  certifications submitted and the number of orders modified under 50 U.S.C. § 1881a are classified for national security reasons and so are not included in these totals. Four appointments of individuals to serve as amicus curiae were made by the FISA courts during this period.

**Explanation of Selected Terms**

More detailed statistics appear in the table below. To help readers understand what is included and excluded in the stated totals, this explanation of selected terms is provided as a reference.

***Applications or Certifications***

The reported numbers include:

> (1)  applications or certifications that were filed in signed, final form pursuant to Rule 9(b) of the FISC Rules of Procedure; and

> (2)  proposed applications or certifications (submitted pursuant to Rule 9(a) of the FISC Rules of Procedure) for which the government decided not to submit a corresponding signed, final application or certification pursuant to Rule 9(b) after being advised that the Court, based on its

assessment of the proposed application or certification, would not grant the application or certification as proposed by the government.

The reported numbers do not include motions or other requests for relief made after the Court acted on the application or certification in that docket.

### Orders Granted

The reported numbers include orders granted without substantive modifications to the orders proposed by the government. They do not include any action taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in a docket.

### Orders Modified

The reported numbers include:

(1) any substantive modifications to proposed orders that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b), including when such modifications were effected through a supplemental order issued by the Court; and

(2) any substantive modifications to proposed orders that accompanied proposed applications or certifications submitted by the government pursuant to Rule 9(a) when such modifications resulted from the Court's assessment of such a submission, including when such modifications were subsequently reflected in a proposed order that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b).

**Substantive modifications** include, but are not limited to, those in which the Court granted in part the authorizations requested by the government (e.g., by approving some targets or forms of collection, but not others).

The reported numbers of orders modified do not include:

(1) any actions taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in that docket; or

(2) any modifications made by the government to an application or certification that it had submitted pursuant to Rule 9(a) or Rule 9(b) – as opposed to modifications to the proposed orders submitted therewith. Statistics previously reported by the Court to Congress relating to the prevalence of modifications to matters submitted to the Court have included all matters that "involved substantive changes to the information provided by the government or to the authorities granted as a result of Court inquiry or action." See, e.g., Letter from Hon. Reggie B. Walton to Patrick Leahy, October 11, 2013 (available online at www.fisc.uscourts.gov/sites/default/files/Correspondence%20Leahy-11-2013.pdf). In some instances, Court examination resulted in the government making material changes to

applications and certifications; for example, to proffer additional facts to support a required judicial finding of probable cause, or to address minimization concerns. Consistent with the statutory mandate in 50 U.S.C. § 1873(a), however, the Court includes here only cases in which there were substantive modifications to the government's proposed orders.

### *Applications or Certifications Denied*

The reported numbers include:

(1) any cases in which the Court denied in its entirety a final, signed application or certification submitted by the government pursuant to Rule 9(b);

(2) any cases in which the government withdrew a final, signed application or certification it had submitted pursuant to Rule 9(b) after being advised that the Court would not grant the application or certification as submitted by the government; and

(3) any cases in which the government decided not to submit a final, signed application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the corresponding proposed application or certification submitted pursuant to Rule 9(a), would not grant the application or certification as proposed by the government.

**Table 1**

In accordance with the reporting requirements specified in 50 U.S.C. § 1873(a)(1), the statistics in this table are itemized by section of the statute.

| Section | Applications or Certifications | Orders Granted | Orders Modified | Applications or Certifications Denied |
|---|---|---|---|---|
| 1805 only | 80 | 57 | 23 | 0 |
| 1824 only | 23 | 17 | 6 | 0 |
| 1805 and 1824[1] | 754 | 623 | 126 | 5 |
| 1842 | 40 | 33 | 7 | 0 |
| 1861 | 68 | 61 | 7 | 0 |
| 1881a | See note below[2] | 0 | See note below[2] | 0 |
| 1881b | 0 | 0 | 0 | 0 |
| 1881c | 45 | 45 | 0 | 0 |

[1]  Requests for combined authority to conduct  electronic surveillance and physical searches under 50 U.S.C. § 1805 and § 1824, respectively, are included in this row and are not separately reflected in the rows addressing requests for authority to conduct electronic surveillance (Section 1805) and physical search (Section 1824) above.
[2]  After completing the declassification review specified in 50 U.S.C. § 1873 (a)(1), the U.S. Department of Justice has advised the AO that this number is currently classified for national security reasons.

**Amicus Curiae**

50 U.S.C. § 1803(i)(2) authorizes the FISA courts to appoint individuals to serve as amicus curiae. Under 50 U.S.C. § 1803(i)(2)(A), a FISA court must appoint an individual to serve as amicus curiae to assist the court in the consideration of any application for an order or review that, in the opinion of the court, presents a novel or significant interpretation of the law, unless the court issues a finding that such appointment is not appropriate. Furthermore, a FISA court may appoint an individual or organization to serve as amicus curiae in any instance as such court deems appropriate or, upon motion, permit an individual or organization leave to file an amicus curiae brief. 50 U.S.C. § 1803(i)(2)(B).

During the reporting period, on four occasions individuals were appointed to serve as amicus curiae under 50 U.S.C. § 1803(i). The names of the three individuals appointed to serve as amicus curiae are as follows:  Preston Burton, Kenneth T. Cuccinelli II  (with Freedom Works), and Amy Jeffress. All four appointments in 2015 were made pursuant to § 1803(i)(2)(B). Five findings were made that an amicus curiae appointment was not appropriate under 50 U.S.C. § 1803(i)(2)(A) (however, in three of those five instances, the court appointed an amicus curiae under 50 U.S.C. § 1803(i)(2)(B) in the same matter).

# EXHIBIT B
to Twitter's Request for Judicial Notice



## ADMINISTRATIVE OFFICE OF THE
## UNITED STATES COURTS

JAMES C. DUFF
Director

WASHINGTON, D.C. 20544

April 20, 2017

Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I herewith transmit the annual report for 2016 regarding the activities of the
Foreign Intelligence Surveillance Courts as required in 50 U.S.C. § 1873.  Enclosed is a
copy of the version of the report that we are making available on an Internet Web site,
pursuant to 50 U.S.C. § 1873(a)(2).  We are separately providing to you a classified
version of the report.

The report indicates that in calendar year 2016 the Foreign Intelligence
Surveillance Court denied nine applications in full and 26 applications in part.  (This
year, we have started reporting "orders denied in part" as a separate category, rather than
including them in the category of "orders modified.")  The Court modified the orders
sought in an additional 339 applications and granted the orders sought without
modifications for 1,378 applications.  One amicus curiae was appointed during the
reporting period and no findings were made under 50 U.S.C. § 1803(i)(2)(A).

This report considers an application to have been "denied," "denied in part," or
"modified" if it was not approved in the form initially submitted by the government as a
proposed application pursuant to Rule 9(a), or if – after the government was notified
about concerns of the Court – the application was not subsequently submitted as a final
application pursuant to Rule 9(b).  We believe that characterizing dispositions based on
the content of proposed applications (rather than final applications) and separately
enumerating partial denials (as opposed to counting them as modifications) most
accurately reflects the dispositions of these matters.

Honorable Bob Goodlatte
Page 2

The Executive Branch has conducted the declassification review specified in 50 U.S.C. § 1873(a)(1). The Department of Justice advised us that one figure in the report is classified at this time. We are not reporting this figure in the public version of the report, but we included it in the classified version separately provided to you.

If we may be of further assistance to you in this or any other matter, please contact me or our Office of Legislative Affairs at (202) 502-1700.

Sincerely,

James C. Duff
Director

Enclosure

cc:    Honorable John Conyers, Jr.

Identical letter sent to:        Honorable Richard Burr
                                 Honorable Chuck Grassley
                                 Honorable Devin Nunes

**Report of the Director of the Administrative Office of the U.S. Courts
on Activities of the Foreign Intelligence Surveillance Courts for 2016**

**Introduction**

Under 50 U.S.C. § 1873(a)(2), enacted as part of the USA FREEDOM Act of 2015 (Pub. L. No. 114-23), the Director of the Administrative Office of the United States Courts (AO) is required to publish statistical information on certain activities of the Foreign Intelligence Surveillance Court (FISC) and Foreign Intelligence Surveillance Court of Review (collectively referred to as the FISA courts) as detailed in 50 U.S.C. § 1873(a)(1). This includes the number of applications or certifications submitted to the FISC and whether those requests were granted, modified, or denied. It also includes information on amicus curiae appointments by the FISA courts. This is the Director's report for calendar year 2016, and is the first such report to cover a full year.

**Summary of Findings**

The FISC disclosed that it received 1,752 applications in 2016. After consideration by the court, 1,378 orders were granted, 339 orders were modified, 26 orders were denied in part, and 9 applications were denied in full.

After completing the declassification review specified in 50 U.S.C. § 1873 (a)(1), the U.S. Department of Justice advised the AO that the number of  certifications submitted under 50 U.S.C. § 1881a is classified for national security reasons and so is not included in these totals. One appointment of an individual to serve as amicus curiae was made by the FISA courts during this period.

When making comparisons with the 2015 report, readers should note that Congress enacted the USA FREEDOM Act of 2015 on June 2, 2015, and the 2015 report covered only the period from June 8, 2015 (the beginning of the first full docket week after the effective date of the USA FREEDOM Act) through December 31, 2015, whereas this report covers the entire calendar year of 2016.  Furthermore, as discussed below, the current report reflects an adjustment to the categorization of certain case dispositions.

**Explanation of Selected Terms**

More detailed statistics appear in the table below. An explanation of selected terms is provided as a reference to help readers understand what is included and excluded in the stated totals.

***Applications or Certifications***

The reported numbers include:

(1)  applications or certifications that were filed in signed, final form pursuant to Rule 9(b) of the FISC Rules of Procedure; and

> (2)  proposed applications or certifications (submitted pursuant to Rule 9(a) of the FISC Rules of Procedure) for which the government decided not to submit a corresponding signed, final application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the proposed application or certification, would not grant the application or certification as proposed by the government.

The reported numbers do not include motions or other requests for relief made after the Court acted on the application or certification in that docket.

### Orders Granted

The reported numbers include orders granted without substantive modifications to the orders proposed by the government. They do not include any action taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in a docket.

### Orders Modified

The reported numbers include:

> (1)  any substantive modifications to proposed orders that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b), including when such modifications were effected through a supplemental order issued by the Court; and

> (2)  any substantive modifications to proposed orders that accompanied proposed applications or certifications submitted by the government pursuant to Rule 9(a) when such modifications resulted from the Court's assessment of such a submission, including when such modifications were subsequently reflected in a proposed order that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b).

The following Court actions are among those that would be regarded as substantive modifications to an order:

> (1)  imposing a new reporting requirement or modifying one proposed by the government;

> (2)  changing the description or specification of a targeted person, of a facility to be subjected to electronic surveillance or of property to be searched;

> (3)  modifying the minimization procedures proposed by the government; or

> (4)  shortening the duration of some or all of the authorities requested.

Unlike the Director's 2015 report, the numbers of modification in the table below *do not* include dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection

terms, and/or some forms of collection but not others. As discussed below, these modifications are now reported separately as partial denials of the relief sought in the application of certification.

The reported numbers of orders modified do not include:

> (1) any actions taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in that docket; or

> (2) any modifications made by the government to an application or certification that it had submitted pursuant to Rule 9(a) or Rule 9(b) – as opposed to modifications to the proposed orders submitted therewith.

> In some instances, the Court examination resulted in the government making material changes to applications and certifications; for example, proffering additional facts to support a required judicial finding of probable cause or to address minimization concerns. Consistent with the statutory mandate in 50 U.S.C. § 1873(a), however, the number reported in this category includes only cases in which there were substantive modifications to the government's proposed orders.

### *Orders Denied in Part*

As noted above, for the first time in this report, partial denials of the relief sought by the government are captured separately under the heading "Orders Denied in Part." These are dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection terms, and/or some forms of collection, but not others. In the report for 2015, these partial denials were included in the reported numbers of "Orders Modified." This more detailed accounting most accurately reflects the disposition of these matters, and they will be reported in this manner going forward.

### *Applications or Certifications Denied*

The reported numbers include:

> (1) any cases in which the Court denied in its entirety a final, signed application or certification submitted by the government pursuant to Rule 9(b);

> (2) any cases in which the government withdrew a final, signed application or certification it had submitted pursuant to Rule 9(b) after being advised that the Court would not grant the application or certification as submitted by the government; and

> (3) any cases in which the government decided not to submit a final, signed application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the corresponding proposed application or certification submitted pursuant to Rule 9(a), would not grant the application or certification as proposed by the government.

**Table 1**

In accordance with the reporting requirements specified in 50 U.S.C. § 1873(a)(1), the statistics in this table are itemized by section of the Statute. Some of the statistics reported herein differ from those in comparable reports prepared by the U.S. Department of Justice (DOJ) and the Director of National Intelligence (DNI) because those agencies track and tabulate actions taken only with respect to final applications and certifications filed pursuant to Rule 9(b).

| Section | Applications or Certifications | Orders Granted | Orders Modified | Orders Denied in Part | Applications or Certifications Denied |
|---|---|---|---|---|---|
| 1805 only | 105 | 61 | 39 | 5 | 0 |
| 1824 only | 42 | 28 | 11 | 3 | 0 |
| 1805 and 1824[1] | 1,338 | 1,052 | 260 | 18 | 8 |
| 1842 | 60 | 50 | 10 | 0 | 0 |
| 1861 | 125 | 108 | 16 | 0 | 1 |
| 1881a | [redacted] [2] | 0 | 0 | 0 | 0 |
| 1881b | 0 | 0 | 0 | 0 | 0 |
| 1881c | 82 | 79 | 3 | 0 | 0 |

[1] Requests for combined authority to conduct electronic surveillance and physical searches under 50 U.S.C. § 1805 and § 1824, respectively, are included in this row and are not separately reflected in the rows addressing requests for authority to conduct electronic surveillance (Section 1805) and physical search (Section 1824) above.

[2] The government submitted this number of certification(s) during calendar year 2016 but the Court did not take action on any such certification(s) within the calendar year. After completing the declassification review specified in 50 U.S.C. § 1873 (a)(1), the U.S. Department of Justice has advised the AO that this number is currently classified for national security reasons.

**Amicus Curiae**

50 U.S.C. § 1803(i)(2) authorizes the FISA courts to appoint individuals to serve as amicus curiae. Under 50 U.S.C. § 1803(i)(2)(A), a FISA court must appoint an individual to serve as amicus curiae to assist the court in the consideration of any application for an order or review that, in the opinion of the court, presents a novel or significant interpretation of the law, unless the court issues a finding that such appointment is not appropriate. Furthermore, a FISA court may appoint an individual or organization to serve as amicus curiae in any instance as such court deems appropriate or, upon motion, permit an individual or organization leave to file an amicus curiae brief. 50 U.S.C. § 1803(i)(2)(B).

During the reporting period, on one occasion an individual was appointed to serve as amicus curiae under 50 U.S.C. § 1803(i). The name of the individual appointed to serve as amicus curiae is Marc Zwillinger. No findings were made in 2016, pursuant to 50 U.S.C. § 1803(i)(2)(A), that an amicus curiae appointment was not appropriate.

# EXHIBIT C
to Twitter's Request for Judicial Notice



## ADMINISTRATIVE OFFICE OF THE
## UNITED STATES COURTS

JAMES C. DUFF
Director

WASHINGTON, D.C. 20544

April 25, 2018

Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I herewith transmit the annual report for 2017 regarding the activities of the Foreign Intelligence Surveillance Courts as required in 50 U.S.C. § 1873. Enclosed is a copy of the version of the report that we are making available on an Internet Web site, pursuant to 50 U.S.C. § 1873(a)(2). We are separately providing to you a classified version of the report.

The report indicates that in calendar year 2017 the Foreign Intelligence Surveillance Court denied 26 applications in full and 50 applications in part. The Court modified the orders sought in an additional 391 applications and granted the orders sought without modifications for 1,147 applications. No amicus curiae were appointed during the reporting period and no findings were made under 50 U.S.C. § 1803(i)(2)(A). The report addresses three matters in which the Court advised the government that it was considering appointment of an amicus curiae.

The Executive Branch has conducted the declassification review specified in 50 U.S.C. § 1873(a)(1). The Department of Justice advised us that one figure in the report is classified at this time. We are not reporting this figure in the public version of the report, but we included it in the classified version separately provided to you.

Honorable Bob Goodlatte
Page 2

     If we may be of further assistance to you in this or any other matter, please contact me or our Office of Legislative Affairs at (202) 502-1700.

Sincerely,

James C. Duff
Director

Enclosure

cc:    Honorable Dianne Feinstein

Identical letter sent to:    Honorable Richard Burr
                                Honorable Charles Grassley
                                Honorable Devin Nunes

**Report of the Director of the Administrative Office of the U.S. Courts
on Activities of the Foreign Intelligence Surveillance Courts for 2017**

**Introduction**

Under 50 U.S.C. § 1873(a)(2), enacted as part of the USA FREEDOM Act of 2015 (Pub. L. No. 114-23), the Director of the Administrative Office of the United States Courts (AO) is required to publish statistical information on certain activities of the Foreign Intelligence Surveillance Court (FISC) and Foreign Intelligence Surveillance Court of Review (collectively referred to as the FISA courts) as detailed in 50 U.S.C. § 1873(a)(1). This includes the number of applications or certifications submitted to the FISC and whether those requests were granted, modified, or denied. It also includes information on amicus curiae appointments by the FISA courts. This is the Director's report for calendar year 2017.

**Summary of Findings**

The FISC disclosed that it received 1,614 applications in 2017. After consideration by the court, 1,147 orders were granted, 391 orders were modified, 50 orders were denied in part, and 26 applications were denied in full. After completing the declassification review specified in 50 U.S.C. § 1873(a)(1), the U.S. Department of Justice advised the AO that the number of certifications modified under 50 U.S.C. § 1881a is classified for national security reasons and so is not included in these totals.

**Explanation of Selected Terms**

More detailed statistics appear in the table below. An explanation of selected terms is provided as a reference to help readers understand what is included and excluded in the stated totals.

***Applications or Certifications***

The reported numbers include:

> (1)  applications or certifications that were filed in signed, final form pursuant to Rule 9(b) of the FISC Rules of Procedure; and

> (2)  proposed applications or certifications (submitted pursuant to Rule 9(a) of the FISC Rules of Procedure) for which the government decided not to submit a corresponding signed, final application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the proposed application or certification, would not grant the application or certification as proposed by the government.

The reported numbers do not include motions or other requests for relief made after the Court acted on the application or certification in that docket.

***Orders Granted***

The reported numbers include orders granted without substantive modifications to the orders proposed by the government. They do not include any action taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in a docket.

***Orders Modified***

The reported numbers include:

> (1)  any substantive modifications to proposed orders that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b), including when such modifications were effected through a supplemental order issued by the Court; and

> (2)  any substantive modifications to proposed orders that accompanied proposed applications or certifications submitted by the government pursuant to Rule 9(a) when such modifications resulted from the Court's assessment of such a submission, including when such modifications were subsequently reflected in a proposed order that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b).

The following Court actions are among those that would be regarded as substantive modifications to an order:

> (1)  imposing a new reporting requirement or modifying one proposed by the government;

> (2)  changing the description or specification of a targeted person, of a facility to be subjected to electronic surveillance or of property to be searched;

> (3)  modifying the minimization procedures proposed by the government; or

> (4)  shortening the duration of some or all of the authorities requested.

The numbers of modification in the table below *do not* include dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection terms, and/or some forms of collection, but not others. As discussed below, these modifications are reported separately as partial denials of the relief sought in the application or certification.

The reported numbers of orders modified do not include:

> (1) any actions taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in that docket; or

(2) any modifications made by the government to an application or certification that it had submitted pursuant to Rule 9(a) or Rule 9(b) – as opposed to modifications to the proposed orders submitted therewith.

In some instances, the Court examination resulted in the government making material changes to applications and certifications; for example, proffering additional facts to support a required judicial finding of probable cause or to address minimization concerns. Consistent with the statutory mandate in 50 U.S.C. § 1873(a), however, the number reported in this category includes only cases in which there were substantive modifications to the government's proposed orders.

### Orders Denied in Part

As noted above, consistent with the Director's 2016 report, partial denials of the relief sought by the government are captured separately under the heading "Orders Denied in Part." These are dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection terms, and/or some forms of collection, but not others.

### Applications or Certifications Denied

The reported numbers include:

(1) any cases in which the Court denied in its entirety a final, signed application or certification submitted by the government pursuant to Rule 9(b);

(2) any cases in which the government withdrew a final, signed application or certification it had submitted pursuant to Rule 9(b) after being advised that the Court would not grant the application or certification as submitted by the government; and

(3) any cases in which the government decided not to submit a final, signed application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the corresponding proposed application or certification submitted pursuant to Rule 9(a), would not grant the application or certification as proposed by the government.

**Table 1**

In accordance with the reporting requirements specified in 50 U.S.C. § 1873(a)(1), the statistics in this table are itemized by section of the Statute. Some of the statistics reported herein differ from those in comparable reports prepared by the U.S. Department of Justice (DOJ) and the Director of National Intelligence (DNI) because those agencies track and tabulate actions taken only with respect to final applications and certifications filed pursuant to Rule 9(b).

| Section | Applications or Certifications | Orders Granted | Orders Modified | Orders Denied in Part | Applications or Certifications Denied |
|---|---|---|---|---|---|
| 1805 only | 104 | 60 | 36 | 4 | 4 |
| 1824 only | 33 | 20 | 9 | 2 | 2 |
| 1805 and 1824[†] | 1,235 | 868 | 308 | 41 | 18 |
| 1842 | 34 | 19 | 13 | 1 | 1 |
| 1861 | 118 | 92 | 23 | 2 | 1 |
| 1881a | 0 | 0 | ■[‡] | 0 | 0 |
| 1881b | 0 | 0 | 0 | 0 | 0 |
| 1881c | 90 | 88 | 2 | 0 | 0 |

[†] Requests for combined authority to conduct electronic surveillance and physical searches under 50 U.S.C. § 1805 and § 1824, respectively, are included in this row and are not separately reflected in the rows addressing requests for authority to conduct electronic surveillance (Section 1805) and physical search (Section 1824) above.

[‡] This number reflects certification(s) submitted during calendar year 2016 that were decided in 2017. No additional certifications were submitted during 2017. After completing the declassification review specified in 50 U.S.C. § 1873(a)(1), the U.S. Department of Justice has advised the AO that this number is currently classified for national security reasons.

**Amicus Curiae**

50 U.S.C. § 1803(i)(2) authorizes the FISA courts to appoint individuals to serve as amicus curiae. Under 50 U.S.C. § 1803(i)(2)(A), a FISA court must appoint an individual to serve as amicus curiae to assist the court in the consideration of any application for an order or review that, in the opinion of the court, presents a novel or significant interpretation of the law, unless the court issues a finding that such appointment is not appropriate. Furthermore, a FISA court may appoint an individual or organization to serve as amicus curiae in any instance as such court deems appropriate or, upon motion, permit an individual or organization leave to file an amicus curiae brief. 50 U.S.C. § 1803(i)(2)(B).

During the reporting period, no individual was appointed to serve as amicus curiae by the FISA courts. No findings were made in 2017, pursuant to 50 U.S.C. § 1803(i)(2)(A), that an amicus curiae appointment was not appropriate. There were three matters in which the Court advised the government that it was considering appointment of an amicus curiae to address a novel or significant question of law raised in proposed applications, but the government ultimately did not proceed with the proposed applications at issue, or modified the final applications such that they did not present a novel or significant question of law, thereby obviating a requirement for consideration as to the appropriateness of appointment of amicus. These matters are reflected in the table above as, respectively, a modification to a proposed order, an application denied in full, and an application denied

in part. This is the first report including information about such occurrences. A similarly small number of such events occurred during prior reporting periods but were not discussed in the reports for those years.

# EXHIBIT D
## to Twitter's Request for Judicial Notice



## ADMINISTRATIVE OFFICE OF THE
## UNITED STATES COURTS

JAMES C. DUFF
Director

WASHINGTON, D.C. 20544

April 25, 2019

Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
United States House of Representatives
Washington, DC 20515

Dear Mr. Chairman:

I herewith transmit the annual report for 2018 regarding the activities of the
Foreign Intelligence Surveillance Courts as required in 50 U.S.C. § 1873.  Enclosed is a
copy of the version of the report that we are making available on an internet website
pursuant to 50 U.S.C. § 1873(a)(2).  We are separately providing to you a classified
version of the report.

The report indicates that in calendar year 2018 the Foreign Intelligence
Surveillance Court denied 30 applications in full and 42 applications in part.  The Court
modified the orders sought in an additional 261 applications and granted the orders
sought without modifications for 1,318 applications.  Nine amicus curiae were appointed
during the reporting period, and no findings were made under 50 U.S.C. § 1803(i)(2)(A).

The Executive Branch has conducted the declassification review specified in
50 U.S.C. § 1873(a)(1).  The Department of Justice advised us that two figures in the
report are classified at this time.  We are not reporting these figures in the public version
of the report, but we included it in the classified version separately provided to you.

A TRADITION OF SERVICE TO THE FEDERAL JUDICIARY

Honorable Jerrold Nadler
Page 2


If we may be of further assistance to you in this or any other matter, please contact me or the Office of Legislative Affairs, Administrative Office of the United States Courts, at (202) 502-1700.

Sincerely,

James C. Duff
Director


Enclosure

cc:   Honorable Doug Collins

Identical letters sent to:         Honorable Lindsey Graham
                                    Honorable Adam B. Schiff
                                    Honorable Richard Burr

**Report of the Director of the Administrative Office of the U.S. Courts
on Activities of the Foreign Intelligence Surveillance Courts for 2018**

**Introduction**

Under 50 U.S.C. § 1873(a)(2), enacted as part of the USA FREEDOM Act of 2015 (Pub. L. No. 114-23), the Director of the Administrative Office of the United States Courts (AO) is required to publish statistical information on certain activities of the Foreign Intelligence Surveillance Court (FISC) and Foreign Intelligence Surveillance Court of Review (FISCR) (collectively referred to as the FISA courts) as detailed in 50 U.S.C. § 1873(a)(1). This includes the number of applications or certifications submitted to the FISC and whether those requests were granted, modified, or denied. It also includes information on amicus curiae appointments by the FISA courts. This is the Director's report for calendar year 2018.

**Summary of Findings**

The FISC disclosed that it received 1,318 applications in 2018. After consideration by the court, 985 orders were granted, 261 orders were modified, 42 orders were denied in part, and 30 applications were denied in full. After completing the declassification review specified in 50 U.S.C. § 1873(a)(1), the U.S. Department of Justice advised the AO that the number of certifications submitted and the number of orders modified under 50 U.S.C. § 1881a are classified for national security reasons and so are not included in these totals.  Nine appointments of a total of five individuals to serve as amicus curiae were made by the FISA courts during this period.

**Explanation of Selected Terms**

More detailed statistics appear in the table below. An explanation of selected terms is provided as a reference to help readers understand what is included and excluded in the stated totals.

***Applications or Certifications***

The reported numbers include:

> (1)  applications or certifications that were filed in signed, final form pursuant to Rule 9(b) of the FISC Rules of Procedure; and

> (2)  proposed applications or certifications (submitted pursuant to Rule 9(a) of the FISC Rules of Procedure) for which the government decided not to submit a corresponding signed, final application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the proposed application or certification, would not grant the application or certification as proposed by the government.

The reported numbers do not include motions or other requests for relief made after the Court acted on the application or certification in that docket.

***Orders Granted***

The reported numbers include orders granted without substantive modifications to the orders proposed by the government. They do not include any action taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in a docket.

***Orders Modified***

The reported numbers include:

(1)  any substantive modifications to proposed orders that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b), including when such modifications were effected through a supplemental order issued by the Court; and

(2)  any substantive modifications to proposed orders that accompanied proposed applications or certifications submitted by the government pursuant to Rule 9(a) when such modifications resulted from the Court's assessment of such a submission, including when such modifications were subsequently reflected in a proposed order that accompanied a signed, final application or certification submitted by the government pursuant to Rule 9(b).

The following Court actions are among those that would be regarded as substantive modifications to an order:

(1)  imposing a new reporting requirement or modifying one proposed by the government;

(2)  changing the description or specification of a targeted person, of a facility to be subjected to electronic surveillance or of property to be searched;

(3)  modifying the minimization procedures proposed by the government; or

(4)  shortening the duration of some or all of the authorities requested.

The numbers of modification in the table below *do not* include dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection terms, and/or some forms of collection, but not others. As discussed below, these modifications are reported separately as partial denials of the relief sought in the application or certification.

The reported numbers of orders modified likewise do not include:

(1) any actions taken by the Court in response to motions or other requests for relief made after the Court acted on the application or certification in that docket; or

(2) any modifications made by the government to an application or certification that it had submitted pursuant to Rule 9(a) or Rule 9(b) – as opposed to modifications to the proposed orders submitted therewith.

In some instances, the Court examination resulted in the government making material changes to applications and certifications; for example, proffering additional facts to support a required judicial finding of probable cause or to address minimization concerns. Consistent with the statutory mandate in 50 U.S.C. § 1873(a), however, the number reported in this category includes only cases in which there were substantive modifications to the government's proposed orders.

### Orders Denied in Part

As noted above, consistent with the Director's reports since 2016, partial denials of the relief sought by the government are captured separately under the heading "Orders Denied in Part." These are dispositions in which the Court granted in part and denied in part the authorizations requested by the government by approving some targets, some facilities, places, premises, property or specific selection terms, and/or some forms of collection, but not others.

### Applications or Certifications Denied

The reported numbers include:

(1) any cases in which the Court denied in its entirety a final, signed application or certification submitted by the government pursuant to Rule 9(b);

(2) any cases in which the government withdrew a final, signed application or certification it had submitted pursuant to Rule 9(b) after being advised that the Court would not grant the application or certification as submitted by the government; and

(3) any cases in which the government decided not to submit a final, signed application or certification pursuant to Rule 9(b) after being advised that the Court, based on its assessment of the corresponding proposed application or certification submitted pursuant to Rule 9(a), would not grant the application or certification as proposed by the government.

**Table 1**

In accordance with the reporting requirements specified in 50 U.S.C. § 1873(a)(1), the statistics in this table are itemized by section of the statute. Some of the statistics reported herein differ from those in comparable reports prepared by the U.S. Department of Justice (DOJ) and the Director of National Intelligence (DNI) because those agencies track and tabulate actions taken only with respect to final applications and certifications filed pursuant to Rule 9(b).

| Section | Applications or Certifications | Orders Granted | Orders Modified | Orders Denied in Part | Applications or Certifications Denied |
|---|---|---|---|---|---|
| 1805 only | 92 | 57 | 28 | 6 | 1 |
| 1824 only | 38 | 32 | 5 | 0 | 1 |
| 1805 and 1824[†] | 1012 | 741 | 212 | 34 | 25 |
| 1842 | 34 | 27 | 5 | 2 | 0 |
| 1861 | 73 | 61 | 9 | 0 | 3 |
| 1881a | [‡] | 0 | [‡] | 0 | 0 |
| 1881b | 0 | 0 | 0 | 0 | 0 |
| 1881c | 69 | 67 | 2 | 0 | 0 |

[†] Requests for combined authority to conduct electronic surveillance and physical searches under 50 U.S.C. § 1805 and § 1824, respectively, are included in this row and are not separately reflected in the rows addressing requests for authority to conduct electronic surveillance (Section 1805) and physical search (Section 1824) above.

[‡] After completing the declassification review specified in 50 U.S.C. § 1873(a)(1), the U.S. Department of Justice has advised the AO that these numbers are currently classified for national security reasons.


**Amicus Curiae**

50 U.S.C. § 1803(i)(2) authorizes the FISA courts to appoint individuals to serve as amicus curiae. Under 50 U.S.C. § 1803(i)(2)(A), a FISA court must appoint an individual to serve as amicus curiae to assist the court in the consideration of any application for an order or review that, in the opinion of the court, presents a novel or significant interpretation of the law, unless the court issues a finding that such appointment is not appropriate. Furthermore, a FISA court may appoint an individual or organization to serve as amicus curiae in any instance as such court deems appropriate or, upon motion, permit an individual or organization leave to file an amicus curiae brief. 50 U.S.C. § 1803(i)(2)(B).

During the reporting period, there were nine appointments of individuals to serve as amicus curiae by the FISA courts. For purposes of this report, each instance of an individual receiving an appointment is counted separately, including when more than one individual was appointed in the same matter, and when the same individual was appointed by the FISC and the FISCR at different stages of the same case. The names of the individuals appointed during the reporting period to serve as amicus curiae are as follows:  Laura Donohue, Amy Jeffress, Jonathan Cedarbaum, John Cella, and Ben Johnson. No findings were made in 2018, pursuant to 50 U.S.C. § 1803(i)(2)(A), that an amicus curiae appointment was not appropriate.

Consistent with the Director's report for 2017, this report specially notes instances in which the Court advised the government that it was considering appointment of an amicus curiae to address a novel or significant question of law raised in a proposed application, but the government ultimately did not proceed with the proposed application or modified the final application such that it did not present a novel or significant question of law, thereby obviating a requirement for consideration as to the appropriateness of appointment of amicus. There was one such instance in 2018, which is reflected in the table above as a partial denial of the application.

# EXHIBIT E
to Twitter's Request for Judicial Notice

UNCLASSIFIED

**Statistical Transparency Report Regarding use of National Security Authorities**

April 22, 2015

**Introduction.**

In June 2013, President Obama directed the Intelligence Community to declassify and make public as much information as possible about certain sensitive U.S. government surveillance programs while protecting sensitive classified intelligence and national security information. Since then, the Director of National Intelligence (DNI) has declassified and authorized the public release of thousands of pages of documents relating to the use of critical national security authorities. In addition to declassifying and publicly releasing these documents, the DNI and the Intelligence Community have published several reports regarding these authorities, including a first-of-its-kind report on June 26, 2014, presenting statistics on how often the government used certain authorities during calendar year 2013.

Today, and consistent with the Intelligence Community's *Principles of Intelligence Transparency*, we are releasing our second annual report presenting statistics on how often the government uses these important authorities. Accordingly, the DNI has declassified and directed the release of the following information covering calendar year 2014.

**Annual Statistics for Calendar Year 2014 regarding Use of Certain National Security Legal Authorities.**

**Titles I, III, IV, and VII of FISA.**

| Legal Authority | Annual Number of Orders | Estimated Number of Targets Affected |
|---|---|---|
| FISA Orders based on probable cause (Title I and III of FISA, Sections 703 and 704 of FISA) | 1519 orders | 1562 |
| Section 702 of FISA | 1 order | 92707 |
| FISA Pen Register/Trap and Trace (Title IV of FISA) | 135 orders | 516 |

UNCLASSIFIED

It is important to provide some additional context to the above statistics.

- **Targets.**  Within the Intelligence Community, the term "target" has multiple meanings.  For example, a "target" could be an individual person, a group, or an entity composed of multiple individuals or a foreign power that possesses or is likely to communicate foreign intelligence information that the U.S. government is authorized to acquire by the above-referenced laws.  Some laws require that the government obtain a court order specifying the communications facilities (e.g., a telephone number, an email address) used by a "target" to be subject to intelligence collection.  Although the government may have legal authority to conduct intelligence collection against multiple communications facilities used by the target, the user of the facilities – the "target" – is only counted once in the above figures.

- **702 Targets.**  In addition to the explanation of target above, in the context of Section 702 the term "target" is generally used to refer to the *act* of intentionally directing intelligence collection at a particular person, a group, or entity.  For example, the statutory provisions of Section 702 state that the Government "may not *intentionally target any person* known at the time of the acquisition to be located in the United States" (emphasis added), among other express limitations.  Under Section 702, the Foreign Intelligence Surveillance Court (FISC) approves Certifications as opposed to individualized orders.   In the Section 702 context, the Intelligence Community targets a particular person, group, or entity by "tasking" selectors, pursuant to targeting procedures approved by the FISC.  Selectors are specific communications facilities assessed to be used by a target (e.g., an email address or telephone number).  Given the restrictions of Section 702, only selectors used by non-U.S. persons reasonably believed to be located outside the United States and who possess, or who are likely to communicate or receive, foreign intelligence information that is covered by an approved certification may be tasked.

   The number of 702 "targets" therefore reflects an estimate of the number of known users of particular selectors.  This estimate is based on the information readily available to the Intelligence Community to identify unique targets – users whose identity may be unknown but who are reasonably believed to use the particular selector from outside the United States and who are reasonably believed to be non-United States persons.  For example, foreign intelligence targets often communicate using several different email accounts.  Each email account is a different selector, so unless the Intelligence Community has information that multiple email accounts are used by the same target, each of those accounts, i.e., selectors, would be counted separately in these figures.  On the other hand, if the Intelligence Community is aware that multiple accounts, i.e. selectors, are all used by the same target, as defined above, they would be counted as one target.  This method of estimating helps ensure that the Intelligence Community does not inadvertently understate the number of discrete persons targeted pursuant to Section 702.

UNCLASSIFIED

- **Relationship of Orders to Targets.**  In some cases, one order can by its terms affect multiple targets (as with Section 702).  Alternatively, a target may be the subject of multiple orders, as noted below.

- **Amendments and Renewals.**  The FISC may amend an order one or more times after it has been issued.  For example, an order may be amended to add a newly discovered account used by the target.  To avoid redundant counting, these statistics do not count such amendments separately.  Moreover, some orders may be renewed multiple times during the calendar year (for example, the FISA statute provides that a Section 704 FISA order against a U.S. person target may last no longer than 90 days but permits the order to be renewed).  Unlike amendments, the statistics count each such renewal as a separate order.

**Title V of FISA (Business Records).**

We are reporting information about the government's use of the FISA Business Records provision (Title V) separately because this authority has been used in two distinct ways – collection of business records to obtain information about a specific subject and collection of business records in bulk.  Accordingly, in the interest of transparency, we have decided to clarify the extent to which individuals are affected by each use.  In addition, instead of reporting on the number of Business Records orders, the government is reporting on the number of approved *applications* submitted to the FISC because the FISC may issue several orders to different recipients based upon a particular application.

UNCLASSIFIED

| Legal Authority | Annual Number of Approved Applications | Estimated Number Affected |
|---|---|---|
| FISA Business Records (Title V of FISA) | 170 | 160: The number of individuals, entities, or foreign powers subject to a business records application to obtain information about a specific subject. |
| | | 161: The number of selectors approved by the FISC to be queried under the NSA telephony metadata program. |
| | | 227: The number of known or presumed U.S. persons who were the subject of queries of information collected in bulk or who were subject to a business records application. |

**National Security Letters.**

Finally, we are reporting information on the government's use of National Security Letters (NSLs). On April 21, 2015, the Department of Justice released its Annual Foreign Intelligence Surveillance Act Report to Congress. That report provides the number of requests made for certain information concerning different United States persons pursuant to NSL authorities during calendar year 2014. In addition to those figures, today we are reporting (1) the total number of NSLs issued for all persons, and (2) the total number of requests for information contained within those NSLs. For example, one NSL seeking subscriber information from one provider may identify three e-mail addresses, all of which are relevant to the same pending investigation and each is considered a "request."

We are reporting the annual number of requests rather than "targets" for multiple reasons. First, the FBI's systems are configured to comply with Congressional reporting requirements, which do not require the FBI to track the number of individuals or organizations that are the subject of an NSL. Second, even if the FBI systems were configured differently, it would still be difficult to identify the number of specific individuals or organizations that are the subjects of NSLs. One reason for this is that the subscriber information returned to the FBI in response to an NSL may identify, for example, one subscriber for three accounts or it may identify different subscribers for each account. In some cases this occurs because the identification information provided by the subscriber to the provider may not be true. For example, a subscriber may use

a fictitious name or alias when creating the account.  Thus, in many instances, the FBI never identifies the actual subscriber of a facility.  In other cases this occurs because individual subscribers may identify themselves differently for each account (e.g., by including a middle name or middle initial) when creating an account.

We also note that the actual number of individuals or organizations that are the subject of an NSL is different than the number of NSL requests.  The FBI often issues NSLs under different legal authorities, e.g., 12 U.S.C. § 3414(a)(5), 15 U.S.C. §§ 1681u(a) and (b), 15 U.S.C. § 1681v, and 18 U.S.C. § 2709, for the same individual or organization.  The FBI may also serve multiple NSLs for an individual for multiple facilities (e.g., multiple e-mail accounts, landline telephone numbers, or cellular phone numbers).  The number of requests, consequently, is significantly larger than the number of individuals or organizations that are the subjects of the NSLs.

| Legal  Authority | Annual  Number of NSLs Issued | Annual Number of Requests for Information |
| --- | --- | --- |
| National Security Letters issued pursuant to 12 U.S.C. § 3414(a)(5), 15 U.S.C. §§ 1681u(a) and (b), 15 U.S.C. § 1681v, and 18 U.S.C. § 2709 | 16,348 | 33,024 |

This information will be available at the website of the Office of the Director of National Intelligence (ODNI); and ODNI's public website dedicated to fostering greater public visibility into the intelligence activities of the government, IContheRecord.tumblr.com.

# EXHIBIT F
to Twitter's Request for Judicial Notice

**Statistical Transparency Report Regarding Use of National Security Authorities**

April 30, 2016

**Annual Statistics for Calendar Year 2015 regarding Use of Certain National Security Legal Authorities.**

In June 2013, President Obama directed the Intelligence Community (IC) to declassify and make public as much information as possible about certain sensitive U.S. government surveillance programs while protecting sensitive classified intelligence and national security information.  Since then, the Director of National Intelligence (DNI) has declassified and authorized the public release of thousands of pages of documents relating to the use of critical national security authorities, including the Foreign Intelligence Surveillance Act (FISA).  In addition to declassifying and publicly releasing these documents, the Intelligence Community has published several reports regarding these authorities, including the *Statistical Transparency Report Regarding use of National Security Authorities* (hereafter the DNI's annual transparency report), presenting metrics related to the use of certain authorities for calendar years 2013 and 2014.

On June 2, 2015, the USA FREEDOM Act was enacted, codifying many of the statistics reported in the DNI's annual transparency reports.  The Act also expanded the scope of the information included in the reports by requiring the DNI to report information concerning United States person search terms and queries of certain unminimized, FISA-acquired information, as well as information concerning unique identifiers used to communicate information collected pursuant to certain FISA orders.[1]  The IC implemented the USA Freedom Act on November 30, 2015.[2]

Today, consistent with the USA FREEDOM Act and the IC's *Principles of Intelligence Transparency*, we are releasing our third annual transparency report presenting statistics on how often the government uses certain national security authorities.  The DNI has declassified and directed the release of the applicable statistics covering calendar year 2015.

This information is available at the website of the Office of the Director of National Intelligence (ODNI); and ODNI's public website dedicated to fostering greater public visibility into the intelligence activities of the United States government, icontheRecord.tumblr.com.

It is important to provide some additional context to the numbers included in this report:

- **Types of Orders.**  There are several different types of orders that the Foreign Intelligence Surveillance Court (FISC) may issue in connection with FISA cases: orders granting or modifying the government's authority to conduct intelligence collection; orders directing electronic communication service providers to provide any technical assistance necessary to implement the authorized intelligence collection; supplemental orders and briefing orders requiring the government to take a particular action or provide the court with specific information; and so on.

  Under Section 702, rather than issuing an individual order authorizing the government to target each non-U.S. person reasonably believed to be located outside the United States who possesses, or who is likely to communicate or receive, foreign intelligence information, the FISC

---

[1] *See* 50 U.S.C. § 1873(b).
[2] Although the USA FREEDOM Act was not implemented until November 30, 2015, the metrics provided in this report represent the full 2015 calendar year except where otherwise stated.

issues a single order[3] approving certifications that describe *categories* of foreign intelligence information to be acquired through the targeting of non-U.S. persons reasonably believed to be located outside the United States.

Unless otherwise indicated, only the orders *granting authority to conduct intelligence collection* under the applicable FISA section are counted in this report; the other types of orders (e.g., modification orders) are not included.

- **Amendments and Renewals.**  The FISC may amend an order one or more times after it has been issued.  For example, an order may be amended to add a newly discovered account used by the target.  This report *does not count such amendments* separately.

  Moreover, some orders may be renewed multiple times during the calendar year (e.g., the FISA statute provides that a Section 704 FISA order against a U.S. person target may last no longer than 90 days but permits the order to be renewed).  Unlike amendments, this report *does count each such renewal* as a separate order.

- **Targets.**  Within the IC, the term "target" has multiple meanings.  With respect to the statistics provided in this report, the term "target" is defined as the individual person, group, entity comprised of multiple individuals, or foreign power that uses the selector, such as a telephone number or email address. If a target were known to use four different selectors, the IC would count one target, not four.  Alternatively, if four targets were known to use a one selector, the IC would count four targets.

  The term "target" can also be used as a verb.  Under Section 702, for example, the IC "targets" a particular non-U.S. person, group, or entity reasonably believed to be located outside the United States and who possesses, or who is likely to communicate or receive, foreign intelligence information, by "*tasking*" selectors that are assessed to be used by such non-U.S. person, group or entity, pursuant to targeting procedures approved by the FISC.

  The number of 702 "targets" reflects an estimate of the number of known users of tasked selectors.  This estimate is based on the information readily available to the IC. Unless and until the IC has information that links multiple selectors to a single foreign intelligence target, each individual selector is counted as being associated with a separate target in this report.  On the other hand, where the IC is aware that multiple selectors are used by the same target, the IC counts the user of those selectors as a single target.  This method of estimating helps ensure that the IC does not inadvertently understate the number of discrete persons *targeted* pursuant to Section 702.

- **Title V of FISA.**  The IC implemented the USA FREEDOM Act's Title V provisions on November 30, 2015, resulting in one additional month's worth of data for calendar year 2015.  Because statistical information tied to a particular FISA authority for a particular month remains

---

[3] Note that, in its own transparency report, which is also required pursuant to Sec. 603 of the USA FREEDOM Act, the Director of the Administrative Office of the United States Courts (AOUSC) counted each Section 702 certification as being associated with its own order.  Because the number of the government's Section 702 certifications remains a classified fact, the government requested that the AOUSC redact the number of certifications and the number of modified orders from its transparency report prior to publicly releasing it.

classified, Title V data specifically associated with December 2015 – i.e., the information required under Section 603 (b)(4)(A) and (B) and 603 (b)(5)(A), (B) and (C) –  is included only in the classified annex to this report that has been provided to Congress.

- **U.S. Persons.**  In calculating the metrics in this report, the IC applied the broader definition of the term "U.S. Person" used in FISA, rather than USA FREEDOM Act's narrower "U.S. Person" definition.  Section 603(e)(4) of the USA FREEDOM Act defines "U.S. Person" as "a citizen of the United States or an alien lawfully admitted for permanent residence (as defined in section 101(a) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)))."  This definition is narrower than FISA's, which defines "U.S. Person" as a citizen of the United States or an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in 50 U.S.C. § 1801(a)(1), (2), or (3). Because the broader FISA definition is the one that governs how U.S. person queries are conducted pursuant to the relevant minimization procedures, it also governs how those queries are counted. It is not possible to isolate U.S. person search terms that only meet the USA FREEDOM Act's narrower definition.

- **"Unique identifiers used to communicate information collected pursuant to such orders."**  This language describes metrics included in the Title IV (PR/TT) portion of the report and in the Title V information covered in the classified annex to the report. The House Report on the USA FREEDOM Act states that "[t]he phrase 'unique identifiers used to communicate information collected pursuant to such orders' means the total number of, for example, email addresses or phone numbers that have been collected as a result of these particular types of FISA orders--not just the number of target email addresses or phone numbers."   H. Rept. 114-109 Part I.

*The remainder of this page is intentionally left blank.*

| Titles I and III and Sections 703 and 704 of FISA | |
|---|---|
| Total number of orders | 1,585 |
| Estimated number of targets of such orders | 1,695 |

*The remainder of this page is intentionally left blank.*

| **Section 702 of FISA** | |
|---|---|
| Total number of orders | 1 |
| Estimated number of targets of such orders | 94,368 |
| Estimated number of search terms concerning a known U.S. person used to retrieve the unminimized contents of communications obtained under Section 702 (excluding search terms used to prevent the return of U.S. person information) [a] | 4,672[b] |
| Estimated number of queries concerning a known U.S. person of unminimized noncontents information obtained under Section 702 (excluding queries containing information used to prevent the return of U.S. person information)[c] | 23,800[d] |

a.  Pursuant to 50 U.S.C. § 1873(d)(2)(A), this metric does not apply to queries conducted by the FBI.

b.  This metric includes some duplicative or recurring queries conducted using the same term.

c.  Pursuant to 50 U.S.C. § 1873(d)(2)(A), this metric does not apply to queries conducted by the FBI.

d.  One IC element is currently not able to provide this information.  See the DNI's certification as to the estimated number of queries concerning a known U.S. person of unminimized noncontents information obtained under Section 702.

*The remainder of this page is intentionally left blank.*

## RESPONSE TO PCLOB RECOMMENDATION 9(5)

In response to Recommendation 9(5) of the Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act, prepared by the Privacy and Civil Liberties Oversight Board, the National Security Agency (NSA) provides the following additional information regarding the dissemination of Section 702 intelligence reports that contain U.S. person information.

Section 702 only permits the targeting of non-U.S. persons reasonably believed to be located outside the United States to acquire foreign intelligence information. Such targets, however, may on occasion communicate information of or about U.S. persons.  Where appropriate, NSA may disseminate such information concerning U.S. persons.  NSA only generates signals intelligence reports in response to a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information.  NSA's minimization procedures expressly prohibit dissemination of information about U.S. persons in any NSA report unless that information is necessary to understand foreign intelligence information or assess its importance, contains evidence of a crime, or indicates a threat of death or serious bodily injury. Even if one of these conditions applies, NSA often will mask the information and will, under any circumstance, include no more than the minimum amount of U.S. person information necessary to understand the foreign intelligence or to describe the crime or threat.  In certain instances, however, NSA makes a determination prior to releasing its original report that the U.S. person's identity is appropriate to disseminate in the first instance using the same standards discussed above.  In 2015, NSA disseminated 4,290 FAA Section 702 intelligence reports that included U.S. person information.  Of those 4,290 reports, the U.S. person information was masked in 3,168 reports and unmasked in 1,122 reports.

Recipients of NSA reporting can request that NSA provide the true identity of a masked U.S. person referenced in an intelligence report, but this information is released only if the recipient has a legitimate need to know the identity and dissemination of the U.S. person's identity has been determined to be necessary to understand foreign intelligence information or assess its importance, contains evidence of a crime, or indicates a threat of death or serious bodily injury.  Under NSA policy, NSA is allowed to unmask the identity for the specific requesting recipient only under certain conditions and where specific additional controls are in place to preclude its further dissemination, and additional approval has been provided by a designated NSA official.  In 2015, NSA released 654 U.S. person identities in response to such requests.

Finally, as part of their regular oversight reviews, the Department of Justice and the Office of the Director of National Intelligence review disseminations of information about U.S. persons that NSA obtained pursuant to Section 702 to ensure that the disseminations were performed in compliance with the minimization procedures.  For additional information, see page 7 of the NSA Director of Civil Liberties and Privacy Office Report, NSA's Implementation of Foreign Intelligence Surveillance Act Section 702.

| **Title IV of FISA** **PR/TT FISA** | |
|---|---|
| Total number of orders | 90 |
| Estimated number of targets of such orders | 456 |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders[a] | 134,987[b] |

a.  Pursuant to Section 1873(d)(2)(B), this metric does not apply to orders resulting in the acquisition of information by the FBI that does not include electronic mail addresses or telephone numbers.

b.  This number represents information the government received from provider(s) electronically for the entire 2015 calendar year.  The government does not have a process for capturing unique identifiers received by other means (such as hard-copy or portable media).

*The remainder of this page is intentionally left blank.*

| Title V of FISA | |
|---|:---:|
| Annual number of approved applications | 142[a] |
| The number of individuals, entities, groups, or foreign powers subject to a business records application to obtain information about a specific subject | 134 |
| The number of selectors approved by the FISC to be queried either under the NSA telephony metadata program or by NSA under Section 501(b)(2)(C) of the USA FREEDOM Act | 56[b] |
| The number of known or presumed U.S. persons who were the subject of queries of information collected in bulk prior to the effective date of the business record provisions of the USA FREEDOM Act, or who were subject to a business records application at any point in 2015 | 183[c] |

a. This metric consists of the total number of approved applications, or orders issued, prior to the effective date of the business records provisions of the USA FREEDOM Act, as well as the approved applications, or orders issued, under Sections 501(b)(2)(B) and  501(b)(2)(C), as required by Section 603(b)(4) and 603(b)(5) of the USA FREEDOM Act.
b. This metric reflects the number of selectors approved by the FISC as meeting the reasonable articulable suspicion standard.
c. This metric includes some duplicative or recurring queries conducted using the same identifier. There may also be some duplication to the extent that some of the U.S. persons who were the subject of queries of information collected in bulk were also subject to a business records application.

*The remainder of this page is intentionally left blank.*

| National Security Letters (NSLs)[a] | |
|---|---|
| Annual number of NSLs issued | 12,870 |
| Annual number of Requests for Information (ROI)[b] | 48,642 |

a. On April 29, 2016, the Department of Justice released its Annual Foreign Intelligence Surveillance Act Report to Congress.  That report is available [here].

b. For example: one NSL seeking subscriber information from one provider may identify three e-mail addresses, all of which are relevant to the same pending investigation; each is considered a separate "request."

*The remainder of this page is intentionally left blank.*

# EXHIBIT G
to Twitter's Request for Judicial Notice

# STATISTICAL TRANSPARENCY REPORT

## REGARDING USE OF NATIONAL SECURITY AUTHORITIES

## FOR CALENDAR YEAR 2016

**April 2017**

## Introduction

In June 2014, the Director of National Intelligence (DNI) began releasing statistics relating to the use of critical national security authorities, including the Foreign Intelligence Surveillance Act (FISA), in an annual report called the *Statistical Transparency Report Regarding Use of National Security Authorities* (hereafter the *Annual Statistical Transparency Report*). Subsequent *Annual Statistical Transparency Reports* were released in 2015 and 2016.

On June 2, 2015, the USA FREEDOM Act was enacted, codifying a requirement to publicly report many of the statistics already reported in the *Annual Statistical Transparency Report.* The Act also expanded the scope of the information included in the reports by requiring the DNI to report information concerning United States person search terms and queries of certain FISA-acquired information, as well as specific statistics concerning information collected pursuant to call detail records. *See* 50 U.S.C. § 1873(b).

Today, consistent with the USA FREEDOM Act requirements to release certain statistics (codified in 50 U.S.C. § 1873(b)) and the Intelligence Community's (IC) *Principles of Intelligence Transparency*, we are releasing our **fourth** *Annual Statistical Transparency Report* presenting statistics on how often the government uses certain national security authorities.

This fourth report has been reformatted to provide a description of the statistics being reported. Related definitions and additional context to the statistics included in this report are provided throughout. The order in which the statistics are presented remains consistent with last year's report and follows the order set forth in 50 U.S.C. § 1873(b).

Additional public information on national security authorities is available at the Office of the Director of National Intelligence's (ODNI) website, www.dni.gov, and ODNI's public tumblr site, IContheRecord.tumblr.com.

## **FISA Title I -- Title III -- Title VII Sections 703 & 704**

→ *All of these authorities require individual court orders based on probable cause.*

→ *Titles I and III apply to FISA activities directed against persons within the United States.*

→ *Sections 703 and 704 apply to FISA activities directed against U.S. persons outside the United States.*

**Both FISA Title I and FISA Title III require a probable cause court order to target individuals within the United States regardless of U.S. person status.** Under FISA, Title I permits electronic surveillance and Title III permits physical search in the United States of foreign powers or agents of a foreign power for the purpose of collecting foreign intelligence information. *See* 50 U.S.C. §§ 1804 and 1823. Title I (electronic surveillance) and Title III (physical search) are commonly referred to as "Traditional FISA." Both require that the Foreign Intelligence Surveillance Court (FISC) make a probable cause finding, based upon a factual statement in the government's application, that (i) the target is a foreign power or an agent of a foreign power, as defined by FISA and (ii) the facility being targeted for electronic surveillance is used by or about to be used, or the premises or property to be searched is or is about to be owned, used, possessed by, or is in transit to or from a foreign power or an agent of a foreign power. In addition to meeting the probable cause standard, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1804(a) and 1823(a).

**FISA Title VII Sections 703 and 704 similarly require a court order based on a finding of probable cause for the government to undertake FISA activities targeting U.S. persons located outside the United States.** Section 703 applies when the government seeks to conduct electronic surveillance or to acquire stored electronic communications or stored electronic data, in a manner that otherwise requires an order pursuant to FISA, of a U.S. person who is reasonably believed to be located outside the United States. Section 704 applies when the government seeks to conduct collection overseas targeting a U.S. person reasonably believed to be located outside the United States under circumstances in which the U.S. person has a reasonable expectation of privacy and a warrant would be required if the acquisition were conducted in the United States. Both Sections 703 and 704 require that the FISC make a probable cause finding, based upon a factual statement in the government's application, that

the target is a U.S. person reasonably believed to be (i) located outside the United States and (ii) a foreign power, agent of a foreign power, or officer or employee of a foreign power; additionally, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1881b(b) and 1881c(b).

> **U.S. Person**. As defined by Title I of FISA, a U.S. person is "a citizen of the United States or an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association with a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in [50 U.S.C. § 1801(a)(1), (2), or (3)]." 50 U.S.C. § 1801(i). Section 602 of the USA FREEDOM Act, however, uses a narrower definition. Since the broader Title I definition governs how U.S. person queries are conducted pursuant to the relevant minimization procedures, it will be used throughout this report.

> **Target.** Within the IC, the term "target" has multiple meanings. With respect to the statistics provided in this report, the term "target" is defined as the individual person, group, entity composed of multiple individuals, or foreign power that uses the selector such as a telephone number or email address.

**The role of the FISC.** If the FISC finds that the government's application meets the requirements of FISA and the Constitution, the FISC must issue an order approving the requested authority.

> **Types of Orders.** There are different types of orders that the FISC may issue in connection with FISA cases, for example: orders granting or modifying the government's authority to conduct intelligence collection; orders directing electronic communication service providers to provide any technical assistance necessary to implement the authorized intelligence collection; and supplemental orders and briefing orders requiring the government to take a particular action or provide the court with specific information.

> **Amendments and Renewals.** The FISC may amend an order one or more times after it has been issued. For example, an order may be amended to add a newly discovered account used by the target. This report *does not count such amendments* separately. The FISC may renew some orders multiple times during the calendar year. Each authority permitted under FISA has specific time limits for the FISA authority to continue (e.g., a Section 704 order against a U.S. person target may last no longer than 90 days

but FISA permits the order to be renewed, *see* 50 U.S.C. § 1881c(c)(4)). Each renewal requires a separate application submitted by the government to the FISC and a finding by the FISC that the application meets the requirements of FISA. Thus, unlike amendments, this report *does count each such renewal* as a separate order. These terms will be used consistently throughout this report.

### FISA "Probable Cause" Court Orders and Targets

| Titles I and III and Sections 703 and 704 of FISA | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Total number of orders | 1,767 | 1,519 | 1,585 | **1,559** |
| Estimated* number of targets of such orders | 1,144 | 1,562 | 1,695 | **1,687** |

*See* 50 U.S.C. § 1873(b)(1).

*Throughout this report, when numbers are *estimated,* the estimate comports with the statutory requirements to provide a "good faith estimate" of a particular number.

**How targets are counted.** If the IC received authorization to conduct electronic surveillance and/or physical search against the same target in four separate applications, the IC would count one target, not four. Alternatively, if the IC received authorization to conduct electronic surveillance and/or physical search against four targets in the same application, the IC would count four targets. Duplicate targets across authorities are not counted.

### FISA "Probable Cause" Targets – U.S. Persons*

| Titles I and III  and Sections 703 and 704 -- Targets | CY2016 |
|---|---|
| Estimated number of targets who are *non*-U.S. persons | **1,351** |
| Estimated number of targets who are U.S. persons | **336** |
| Estimated percentage of targets who are U.S. persons | **19.9%** |

*While not statutorily required to publicly provide these statistics, the IC is providing them consistent with the commitment to its *Principles of Intelligence Transparency*.

## Title VII - FISA Amendment Act (FAA) Section 702

→ *Commonly referred to as "Section 702."*

→ *Requires individual targeting determinations that the target is (1) a non-United States person who (2) is reasonably believed to be located outside the United States and who (3) has or is expected to communicate or receive foreign intelligence information.*

**Section 702.** Title VII of FISA includes Section 702, which permits the Attorney General and the DNI to jointly authorize the targeting of (i) non-U.S. persons reasonably believed to be (ii) located outside the United States to (iii) acquire foreign intelligence information. *See* 50 U.S.C. § 1881a. <u>All three</u> elements must be met. Additionally, Section 702 requires that the Attorney General, in consultation with the DNI, adopt targeting procedures and minimization procedures that they attest satisfy the statutory requirements and are consistent with the Fourth Amendment.

> ➢ **Section 702 Targets and "Tasking."** Under Section 702, the government "targets" a particular non-U.S. person, group, or entity reasonably believed to be located outside the United States and who possesses, or who is likely to communicate or receive, foreign intelligence information, by directing an acquisition at – i.e., "*tasking"* – selectors (e.g., telephone numbers and email addresses) that are assessed to be used by such non-U.S. person, group, or entity, pursuant to targeting procedures approved by the FISC.

Before "tasking" a selector for collection under Section 702, the government must apply its targeting procedures to ensure that the IC appropriately tasks a selector used by a non-U.S. person who is reasonably believed to be located outside the United States and who will likely possess, communicate, or receive foreign intelligence information.

**The FISC's role.** Under Section 702, the FISC determines whether *certifications* provided jointly by the Attorney General and the DNI appropriately meet all the requirements of Section 702. If the FISC determines that the government's certifications and its targeting and minimization procedures meet the statutory requirements of Section 702 and are consistent with the Fourth Amendment, then the FISC issues an order and supporting statement approving the certifications. A recent FISC order and statement approving certifications was publicly released in April 2016 and posted on *IC on the Record*.

➢ **Certifications**. The certifications are jointly executed by the Attorney General and DNI and authorize the government to acquire foreign intelligence information under Section 702. Each annual certification application package must be submitted to the FISC for approval. The package includes the Attorney General and DNI's certifications, affidavits by certain heads of intelligence agencies, targeting procedures, and minimization procedures. A sample of a certification application package was publicly released on *IC on the Record*. The certifications identify categories of information to be collected, which must meet the statutory definition of foreign intelligence information, through the targeting of non-U.S. persons reasonably believed to be located outside the United States. The certifications have included information concerning international terrorism and other topics, such as the acquisition of information concerning weapons of mass destruction.

➢ **Targeting procedures**. The targeting procedures detail the steps that the government must take before tasking a selector, as well as verification steps after tasking, to ensure that the user of the tasked selector is being targeted appropriately – specifically, that the user is a non-U.S. person, located outside the United States, who is being tasked to acquire foreign intelligence information. The IC must make individual determinations that each tasked selector meets the requirements of the targeting procedures. As part of the certification package, the FISC reviews the sufficiency of the IC's targeting procedures, which includes assessing the IC's compliance with the procedures.

➢ **Minimization procedures**. The minimization procedures detail requirements the government must meet to use, retain, and disseminate Section 702 data, which include specific restrictions on how the IC handles non-publicly available U.S. person information acquired from Section 702 collection of non-U.S. person targets, consistent with the needs of the government to obtain, produce, and disseminate foreign intelligence information. As part of the certification package, the FISC reviews the sufficiency of the IC's minimization procedures, which includes assessing the IC's compliance with past procedures. The 2015 minimization procedures have been released on *IC on the Record*.

The IC's adherence to the targeting and minimization procedures is subject to robust internal agency oversight and to rigorous external oversight by the Department of Justice (DOJ), ODNI, Congress, and the FISC. Every identified incidence of non-compliance is reported to the FISC (through individual notices or in reports) and to Congress in semiannual reports. DOJ and ODNI also submit semiannual reports to Congress that assess the IC's overall compliance efforts. Past assessments have been publicly released.

**Section 702 Orders**

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Total number of orders issued | 1 | 1 | 1 | **0** |

*See* 50 U.S.C. § 1873(b)(2).

**Counting Section 702 orders.** As explained above, the FISC may issue a single order to approve more than one Section 702 certification to acquire foreign intelligence information.

Note that, in its own transparency report, which is required pursuant to 50 U.S.C. § 1873(a), the Director of the Administrative Office of the United States Courts (AOUSC) counted each of the Section 702 certifications associated with the FISC's order. Because the number of the government's Section 702 certifications remains a classified fact, the government requested that the AOUSC redact the number of certifications from its transparency report prior to publicly releasing it.

In 2016, the government submitted a certification application to the FISC. Pursuant to 50 U.S.C. § 1881a(j)(2), the FISC extended its review of the 2016 certifications. The FISC may extend its review of the certifications "as necessary for good cause in a manner consistent with national security." *See* 50 U.S.C. § 1881a(j)(2). Thus, because the FISC did not complete its review of the 2016 certifications during calendar year 2016, the FISC did not issue an order concerning those certifications in calendar year 2016. The 2015 order remained in effect during the extension period.

**Section 702 Targets\***

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Estimated number of targets of such orders | 89,138 | 92,707 | 94,368 | **106,469** |

\*While there is no statutory requirement to disclose this number, it is provided in this report to foster public understanding of the IC's use of the Section 702 collection authority. The IC is committed to sharing as much information as possible with the public without jeopardizing mission capabilities.

**Estimating Section 702 targets.** The number of 702 "targets," provided above, reflects an estimate of the number of non-United States persons who are the users of tasked selectors. This estimate is based on information readily available to the IC. Unless and until the IC has information that links multiple selectors to a single foreign intelligence target, each individual

7

selector is counted as a separate target for purposes of this report. On the other hand, where the IC is aware that multiple selectors are used by the same target, the IC counts the user of those selectors as a single target. This counting methodology reduces the risk that the IC might inadvertently understate the number of discrete persons targeted pursuant to Section 702.

### Section 702 Search Terms Used to Query Content

| **Section 702 of FISA** | CY2015 | CY2016 |
|---|---|---|
| Estimated number of search terms concerning a known U.S. person used to retrieve the unminimized contents of communications obtained under Section 702 (excluding search terms used to prevent the return of U.S. person information)* | 4,672 | **5,288** |

*See* 50 U.S.C. § 1873(b)(2)(A).
*Consistent with § 1873(d)(2)(A), this statistic does not include queries that are conducted by the Federal Bureau of Investigation (FBI).

The above is the good faith estimate of the number of *search terms* (e.g., email addresses and telephone numbers,) concerning known U.S. persons that the government used to query unminimized (i.e., raw) lawfully acquired Section 702 *content*.

**Counting U.S. person *search terms* used to query Section 702 *content*.** The National Security Agency (NSA) counts the number of U.S. person identifiers it uses to query the content of unminimized Section 702-acquired information. For example, if the NSA used U.S. person identifier "johndoe@XYXprovider" to query the content of Section 702-acquired information, the NSA would count it as one regardless of how many times the NSA used "johndoe@XYXprovider" to query its 702-acquired information. In calendar year 2016, the Central Intelligence Agency (CIA) adopted this same model for counting search terms. In prior calendar years, however, the CIA counted the total number of actual queries it conducted using U.S. person identifiers. For example, if the CIA used the identifier "johndoe@XYXprovider" 7 times, in prior years the CIA would count this as 7 search terms. Now, CIA the counts this as a single search term.

## Section 702 Queries of Noncontents

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Estimated number of queries concerning a known U.S. person of unminimized noncontents information obtained under Section 702 (excluding queries containing information used to prevent the return of U.S. person information)* | 9500 | 17,500 | 23,800 | **30,355** |

See 50 U.S.C. § 1873(b)(2)(B).

*Consistent with § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

The above is a good faith estimate of the number of *queries* concerning a known U.S. person that the government conducted of unminimized (i.e., raw) lawfully acquired Section 702 *metadata*.

**Counting *queries* using U.S. person identifiers of noncontents collected under Section 702.** This estimate represents the number of times a U.S. person identifier is used to query the noncontents (i.e., metadata) of unminimized Section 702-acquired information.  For example, if the U.S. person identifier telephone number "111-111-2222" was used 15 times to query the noncontents of Section 702-acquired information, the number of queries counted would be 15.

As with last year's transparency report, one IC element remains currently unable to provide the number of queries using U.S. person identifiers of unminimized Section 702 noncontent information. Under 50 U.S.C. § 1873(d)(3)(A), if the DNI concludes that this good-faith estimate cannot be determined accurately because not all of the relevant elements of the IC are able to provide this good faith estimate, then the DNI is required to (i) certify that conclusion in writing to the relevant Congressional committees; (ii) report the good faith estimate for those relevant elements able to provide such good faith estimate; (iii) explain when it is reasonably anticipated that such an estimate will be able to be determined fully and accurately; and (iv) make such certification publicly available on an Internet web site. Because one IC element remains unable to provide such information, the DNI made a certification, pursuant to § 1873(d)(3)(A) to the relevant Congressional committees.

As required by statute, this certification is being made publicly available as an attached appendix to this current report (see Appendix A).

### Required Section 702 Query Reporting to the FISC

| Section 702 of FISA | CY2016 |
|---|:---:|
| Per the FISC Memorandum Opinion and Order dated November 6, 2015: Each instance in which FBI personnel *received and reviewed* Section 702-acquired information that the FBI identified as concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence. | **1** |

On November 6, 2015, the FISC granted the government's application for renewal of the 2015 certifications and, among other things, concluded that the FBI's U.S. person querying provisions in its minimization procedures, "strike a reasonable balance between the privacy interests of the United States persons and persons in the United States, on the one hand, and the government's national security interests, on the other." *Memorandum Opinion and Order* dated November 6, 2015, at 44 (released on *IC on the Record* on April 19, 2016). The FISC further stated that the FBI conducting queries, "designed to return evidence of crimes unrelated to foreign intelligence does not preclude the Court from concluding that taken together, the targeting and minimization procedures submitted with the 2015 Certifications are consistent with the requirements of the Fourth Amendment." *Id*.

Nevertheless, the FISC ordered the government to report in writing, "each instance after December 4, 2015, in which FBI personnel *receive and review* Section 702-acquired information that the FBI identifies as concerning a United States person in response to a query that is not designed to find and extract foreign intelligence information." (Emphasis added). *Id*. at 44 and 78. The FISC directed that the report contain details of the query terms, the basis for conducting the query, the manner in which the query will be or has been used, and other details. *Id*. at 78. In keeping with the IC's *Principles of Transparency*, the DNI declassified the number of each instance such queries occurred in calendar year 2016.

### ADDITIONAL SECTION 702 STATISTICS
### PROVIDED IN
### RESPONSE TO PCLOB RECOMMENDATION 9(5)

In July 2014, the Privacy and Civil Liberties Oversight Board (PCLOB or Board) issued a report on Section 702 entitled, "Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act" (*PCLOB's Section 702 Report*), which contained 10 recommendations. Recommendation 9 focused on "accountability and transparency," noting that the government should implement measures, "to provide insight about the extent to which the NSA acquires and utilizes the communications involving U.S. persons and people located in the United States under the Section 702 program." *PCLOB's Section 702 Report* at 145-146. Specifically, the PCLOB recommended that "the NSA should implement processes to annually count […] (5) the number of instances in which the NSA disseminates non-public information about U.S. persons, specifically distinguishing disseminations that includes names, titles, or other identifiers potentially associated with individuals." *Id.* at 146. This recommendation is commonly referred to as Recommendation 9(5). In response to Recommendation 9(5), NSA previously publicly provided (in the *Annual Statistical Transparency Report* for calendar year 2015) and continues to provide the following additional information regarding the dissemination of Section 702 intelligence reports that contain U.S. person information.

NSA has been providing similar information to Congress per FISA reporting requirements. For example, FISA Section 702(l)(3) requires that NSA annually submit a report to applicable Congressional committees regarding certain numbers pertaining to the acquisition of Section 702-acquired information, including the number of "disseminated intelligence reports containing a reference to a United States person identity." *See* 50 U.S.C. § 1881(l)(3)(A)(i). Additionally, NSA provides this number to Congress as part of Attorney General and Director of National Intelligence's joint assessment of compliance. *See* 50 U.S.C. § 1881(l)(1).

Prior to the PCLOB issuing its *Section 702 Report*, NSA's Director of Civil Liberties and Privacy Office published *NSA's Implementation of Foreign Intelligence Surveillance Act Section 702,"* on April 16, 2014, (hereinafter "NSA DCLPO Report"), in which it explained NSA's dissemination processes. *NSA DCLPO Report* at 7-8. NSA "only generates classified intelligence reports when the information meets a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information." *NSA DCLPO Report* at 7.

➤ **Dissemination.** In the most basic sense, dissemination refers to the sharing of minimized information. As it pertains to FISA (including Section 702), if an agency (in this instance NSA) lawfully collects information pursuant to FISA and wants to share (i.e., disseminate) that information, the agency must first apply its minimization procedures to that information.

Section 702 only permits the targeting of non-U.S. persons reasonably believed to be located outside the United States to acquire foreign intelligence information. Such targets, however, may communicate information to, from, or about U.S. persons. NSA minimization procedures (publicly released on August 11, 2016) permit the NSA to disseminate U.S person information if the NSA masks the information that could identify the U.S. person. The minimization procedures permit NSA to disseminate the U.S. person identity only if doing so meets one of the specified reasons listed in NSA's minimization procedures, including that the U.S. person consented to the dissemination, the U.S. person information was already publicly available, the U.S. person identity was necessary to understand foreign intelligence information, or the communication contained evidence of a crime and is being disseminated to law enforcement authorities. Even if one these conditions applies, as a matter of policy, NSA may still mask the U.S. person information and will include no more than the minimum amount of U.S. person information necessary to understand the foreign intelligence or to describe the crime or threat. *Id.* In certain instances, however, NSA makes a determination prior to releasing its original classified report that the U.S. person's identity is appropriate to disseminate in the first instance using the same standards discussed above.

➤ **Masked U.S. Person Information**. Information about a U.S. person is masked when the identifying information about the person is not included in a report. For example, instead of reporting that Section 702-acquired information revealed that non-U.S. person "Bad Guy" communicated with U.S. person "John Doe" (i.e., the actual name of the U.S. person), the report would mask "John Doe's" identity, and would state that "Bad Guy" communicated with "an identified U.S. person," "a named U.S. person," or "a U.S. person."

Recipients of NSA's classified reports, such as other Federal agencies, may request that NSA provide the true identity of a masked U.S. person referenced in an intelligence report. The requested identity information is released only if the requesting recipient has a legitimate "need to know" the identity of the U.S. person and has the appropriate security clearances, and if the dissemination of the U.S. person's identity would be consistent with NSA's minimization procedures (e.g., the identity is necessary to understand foreign intelligence information or assess its importance). Furthermore, per NSA policy, NSA is allowed to unmask the identity for

the specific requesting recipient only where specific additional controls are in place to preclude its further dissemination and additional approval has been provided by a designated NSA official.

As part of their regular oversight reviews, DOJ and ODNI review disseminations of information about U.S. persons that NSA obtained pursuant to Section 702 to ensure that the disseminations were performed in compliance with the minimization procedures.

| <u>Section 702 – U.S. person (USP) information disseminated by NSA</u> | CY2016 |
|---|---|
| Total number of NSA disseminated §702 Reports containing USP identities | **3,914** |
| Of those NSA disseminated §702 Reports containing USP identities (from the first row in this chart), the USP identity was originally *masked* in this many reports | **2,964*** |
| Of those NSA disseminated §702 Reports containing USP identities (from the first row in this chart), the USP identity was originally *revealed* in this many reports | **1,200*** |
| Of those NSA disseminated §702 Reports containing USP identities where the USP identities was originally masked (from the second row in this chart), the number of USP identities that NSA later released in response to specific requests to unmask a USP identity** | **1,934** |

*A single report may contain both masked and unmasked U.S. person identities.

**For this statistic, last year's Annual Statistical Transparency Report provided the number of approved *requests* (i.e., 654) for unmasking of U.S. person identities, rather than the number of U.S. person identities that were released. A single request may contain multiple U.S. person identities. This year's report provides the number of U.S. person identities referred to by name or title released in response to specific requests to unmask those identities. The number of U.S. person identities that NSA released during calendar year 2015 in response to specific requests to unmask an identity was 2,232, which was the number that should have been reported in last year's report.

## FISA Title IV – USE of PEN REGISTER and TRAP and TRACE (PR/TT) DEVICES

→ *Commonly referred to as the "PR/TT" provision.*

→ *Bulk collection is prohibited.*

→ *Requires individual FISC order to use PR/TT device to capture dialing, routing, addressing, or signaling (DRAS) information.*

→ *Government request to use a PR/TT device on U.S. person target must be based on an investigation to protect against terrorism or clandestine intelligence activities and that investigation must not be based solely on the basis of activities protected by the First Amendment to the Constitution.*

**Pen Register/Trap and Trace Authority.** Title IV of FISA authorizes the use of pen register and trap and trace (PR/TT) devices for foreign intelligence purposes. Title IV authorizes the government to use a PR/TT device to seek and capture dialing, routing, addressing or signaling (DRAS) information. The government may submit an application to the FISC for an order approving use of a PR/TT device (i.e., PR/TT order) for (i) "any investigation to obtain foreign intelligence information not concerning a United States person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a U.S. person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1842(a). If the FISC finds that the government's application sufficiently meets the requirements of FISA, the FISC must issue an order for the installation and use of a PR/TT device.

**PR/TT Statistics**

| Title IV of FISA<br>*PR/TT FISA* | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Total number of orders | 131 | 135 | 90 | **60** |
| Estimated number of targets of such orders | 319 | 516 | 456 | **41** |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders* | - | - | 134,987** | **125,378** |

*See* 50 U.S.C. §§ 1873(b)(3), 1873(b)(3)(A), and 1873(b)(3)(B).

*Pursuant to §1873(d)(2)(B), this statistic does not apply to orders resulting in the acquisition of information by the FBI that does not include electronic mail addresses or telephone numbers.

**This number represents information the government received from provider(s) electronically for the entire 2015 calendar year. The government does not have a process for capturing unique identifiers received by other means (such as hard-copy or portable media).

**Counting orders.** Similar to how orders were counted for Titles I and III and Sections 703 and 704, this report only counts the orders *granting authority to conduct intelligence collection* -- the order for the installation and use of a PR/TT device. Thus, renewal orders are counted as a separate order; modification orders and amendments are not counted.

**Estimating the number of targets.** The government's methodology for counting PR/TT targets is similar to the methodology described above for counting targets of electronic surveillance and/or physical search. If the IC received authorization for the installation and use of a PR/TT device against the same target in four separate applications, the IC would count one target, not four. Alternatively, if the IC received authorization for the installation and use of a PR/TT device against four targets in the same application, the IC would count four targets.

**Estimating the number of unique identifiers.** This statistic counts (1) the targeted identifiers and (2) the non-targeted identifiers (e.g., telephone numbers and e-mail addresses) that were in contact with the targeted identifiers. Specifically, the House Report on the USA FREEDOM Act states that "[t]he phrase 'unique identifiers used to communicate information collected pursuant to such orders' means the total number of, for example, email addresses or phone numbers that have been collected as a result of these particular types of FISA orders--not just

15

the number of target email addresses or phone numbers." [H.R. Rept. 114-109 Part I, p. 26], with certain exceptions noted.

### FISA PR/TT Targets – U.S. Persons*

| PR/TT Targets | CY2016 |
|---|---|
| Estimated number of targets who are *non*-U.S. persons | **23** |
| Estimated number of targets who are U.S. persons | **18** |
| Estimated percentage of targets who are U.S. persons | **43.9%** |

*While not statutorily required to publicly provide these statistics, the IC is providing them consistent with the *Principles of Intelligence Transparency*.

*The remainder of this page is intentionally left blank.*

## FISA Title V – BUSINESS RECORDS

→ *Commonly referred to as "Business Records" provision.*

→ *Bulk collection is prohibited.*

→ *Call Detail Records (CDR) may be obtained from a telephone company if the FISC issues an individual court order for target's records.*

→ *Request for records in an investigation of a U.S. person must be based on an investigation to protect against terrorism or clandestine intelligence activities and provided that the investigation is not conducted solely upon activities protected by the First Amendment to the Constitution.*

**Business Records FISA.** Under FISA, Title V authorizes the government to submit an application for an order requiring the production of any tangible things for (i) "an investigation to obtain foreign intelligence information not concerning a U.S. person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a U.S. person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1861. Title V is commonly referred to as the *"Business Records"* provision of FISA.

In June 2015, the USA FREEDOM Act was signed into law and, among other things, amended Title V, including prohibiting bulk collection. *See* 50 U.S.C. §§ 1861(b), 1861(k)(4). The DNI is required to report various statistics about two Title V provisions – traditional business records and call detail records (discussed further below).

On November 28, 2015, in compliance with amendments enacted by the USA FREEDOM Act, the IC terminated collection of bulk telephony metadata under Title V of the FISA (the "Section 215 Program"). Solely due to legal obligations to preserve records in certain pending civil litigation, including *First Unitarian Church of Los Angeles, et al. v. National Security Agency, et al.*, No. C 13-03287-JSW (N.D. Cal.) and *Jewel, et al. v. National Security Agency, et al.*, No. C 08-04373-JSW (N.D. Cal.), the IC continues to preserve previously collected bulk telephony metadata. Under the terms of a FISC order dated November 24, 2015, the bulk telephony metadata cannot be used or accessed for any purpose other than compliance with preservation obligations. Once the government's preservation obligations are lifted, the government is

required to promptly destroy all bulk metadata produced by telecommunications providers under the Section 215 Program.

As noted in last year's *Annual Statistical Transparency Report*, on November 30, 2015, the IC implemented certain provisions of the USA FREEDOM Act, including the call detail records provision and the requirement to use a specific selection term. Accordingly, only one month's worth of data for calendar year 2015 was available with respect to those provisions. Any statistical information relating to a particular FISA authority for a particular month remains classified. Therefore, the Title V data specifically associated with December 2015 was only released in a classified annex provided to Congress as part of the report for CY2015. For this CY 2016 report, statistical information was collected for an entire year under the USA FREEDOM Act Title V provisions. As a result, those statistics are included in this report.

Statistics related to *traditional business records* under Title V Section 501(b)(2)(B) are provided first pursuant to 50 U.S.C. § 1873(b)(4). Statistics related to *call detail records* under Title V Section 501(b)(2)(C) are provided second pursuant to 50 U.S.C. § 1873(b)(5).

### *"Traditional" Business Records – Section 501(b)(2)(B)*

Business Record (BR) requests for tangible things include books, records, papers, documents, and other items pursuant to 50 U.S.C. §1861(b)(2)(B), also referred to as Section 501(b)(2)(B) . These are commonly referred to as "Traditional" Business Records.

#### *"Traditional" Business Records Statistics*

| Business Records "BR" – Section 501(b)(2)(B) | CY2016 |
|---|---|
| Total number of orders issued pursuant to applications under Section 501(b)(2)(B) | 84 |
| Estimated number of targets of such orders | 88 |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders | 81,035 |

*See* 50 U.S.C. §§ 1873(b)(4), 1873(b)(4)(A), and 1873(b)(4)(B).

**Estimating the number of unique identifiers.** This is an estimate of the number of (1) targeted identifiers (e.g., telephone numbers and email addresses) and (2) non-targeted identifiers that were in contact with the targeted identifiers. This metric represents unique identifiers received

electronically from the provider(s). The government does not have a process for capturing unique identifiers received by other means (i.e., hard-copy or portable media).

**Explaining how we count BR statistics.** As an example of the government's methodology, assume that in 2016, the government submitted a BR request targeting "John Doe" with email addresses john.doe@serviceproviderX, john.doe@serviceproviderY, and john.doe@serviceproviderZ. The FISC found that the application met the requirements of Title V and issued orders granting the application and directing service providers X, Y, and Z to produce business records pursuant to Section 501(b)(2)(B). Provider X returned 10 non-targeted email addresses that were in contact with the target; provider Y returned 10 non-targeted email addresses that were in contact with the target; and provider Z returned 10 non-targeted email addresses that were in contact with the target. Based on this scenario, we would report the following statistics: A) one order by the FISC for the production of tangible things, B) one target of said orders, and C) 33 unique identifiers, representing three targeted email addresses plus 30 non-targeted email addresses.

---

### Call Detail Records – Section 501(b)(2)(C)

---

Call Detail Records (CDR) **–** commonly referred to as "call event metadata" – may be obtained from telecommunications providers pursuant to 50 U.S.C. §1861(b)(2)(C). A CDR is defined as session identifying information (including an originating or terminating telephone number, an International Mobile Subscriber Identity (IMSI) number, or an International Mobile Station Equipment Identity (IMEI) number), a telephone calling card number, or the time or duration of a call. *See* 50 U.S.C. §1861(k)(3)(A). CDRs do <u>not</u> include the content of any communication, the name, address, or financial information of a subscriber or customer, or cell site location or global positioning system information. *See* 50 U.S.C. §1861(k)(3)(B). CDRs are stored and queried by the service providers. *See* 50 U.S.C. §1861(c)(2).

#### Call Detail Record (CDR) Statistics

| Call Detail Records "CDR" – Section 501(b)(2)(C) | CY2016 |
|---|---|
| Total number of orders issued pursuant to applications under Section 501(b)(2)(C) | **40** |
| Estimated number of targets of such orders | **42** |

*See* 50 U.S.C. §§ 1873(b)(5) and 1873(b)(5)(A).

19

**Estimating the number of targets of CDR orders.** A "target" is the person using the selector. For example, if a target uses four selectors that have been approved, the number counted for purposes of this report would be one target, not four. Alternatively, if two targets are using one selector that has been approved, the number counted would be two targets.

**The estimated number of Call Detail Records received from providers.** This metric represents the number of *records received* from the provider(s) and stored in NSA repositories (records that fail at any of a variety of validation steps are not included in this number). CDRs covered by § 501(b)(2)(C) include call detail records created before, on, or after the date of the application relating to an authorized investigation. While the USA FREEDOM Act directs the government to provide a good faith estimate of "the number of unique identifiers used to communicate information collected pursuant to" orders issued in response to CDR applications (*see* § 1873(b)(5)(B)), the statistic below does *not* reflect the number of unique identifiers contained within the call detail records received from the providers. As of the date of this report, the government does not have the technical ability to isolate the number of unique identifiers within records received from the providers. As explained in the 2016 NSA's public report on the USA FREEDOM Act, the metric provided is over-inclusive because the government counts each record *separately even if the government receives the same record multiple times* (whether from one provider or multiple providers). Additionally, this metric includes duplicates of unique identifiers – i.e., because the government lacks the technical ability to isolate unique identifiers, the statistic counts the number of records even if unique identifiers are repeated. This statistic includes records that were received from the providers in CY2016 for all orders active for any portion of the year, which includes orders that the FISC approved in 2015.

### Call Detail Record (CDR) Statistics

| Call Detail Records "CDR" – Section 501(b)(2)(C) | CY2016 |
|---|---|
| Estimated number of call detail records received from providers and stored in NSA repositories | **151,230,968** |

As an example, assume an NSA intelligence analyst learns that phone number (202) 555-1234 is being used by a suspected international terrorist. This is the "specific selection term" or "selector" that will be submitted to the FISC (or the Attorney General in an emergency) for approval using the "reasonable articulable suspicion" (RAS) standard. Assume that one provider (provider X) submits to NSA a record showing (202) 555-1234 had called (301) 555-4321 on May 1, 2016. This is the "first hop" and would count as one record. If the provider submits records showing additional calls between those same telephone numbers, each would count as an

additional record. Thus, if over the course of 2016, (202) 555-1234 was in contact with (301) 555-4321 once each day, then that would count as 365 records obtained from provider X. If another provider (provider Y) also submits records showing direct contact between those two telephone numbers (assume the same number of contacts), then those would add to the count.

In turn, assume that NSA submits the "first-hop" number above – (301) 555-4321- to the providers, and finds that it was used to call (410) 555-5678. This is the "second-hop" result. Each contact between the first-hop and second-hop numbers would count as a separate record, as would each such contact submitted by other providers. More information on how NSA implements this authority can be found in the DCLPO report.

### Call Detail Record (CDR) Statistics

| Call Detail Records "CDR" – Section 501(b)(2)(C) | CY2016 |
|---|---|
| Estimated number of search terms that included information concerning a U.S. person that were used to query any database of call detail records obtained through the use of such orders* | **22,360** |

*See* 50 U.S.C. § 1873(b)(5)(C).

*Consistent with § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

**The number of search terms associated with a U.S. person used to query the CDR data.** Each unique query is counted only once. The same term queried 10 times, still counts as one search term.  Similarly, a single query with 20 terms counts as 20.

*The remainder of this page is intentionally left blank.*

## NATIONAL SECURITY LETTERS (NSLs)

→ _Not_ authorized by FISA but by other statutes.

→ Bulk collection is prohibited, however, by the USA FREEDOM Act.

→ FBI may only use NSLs if the information sought is relevant to international counterterrorism or counterintelligence investigation.

**National Security Letters.** In addition to statistics relating to FISA authorities, we are reporting information on the government's use of National Security Letters (NSLs). The FBI is statutorily authorized to issue NSLs for specific records (as specified below) only if the information being sought is relevant to a national security investigation. NSLs may be issued for four commonly used types of records:

1) telephone subscriber information, toll records, and other electronic communication transactional records, see 18 U.S.C. § 2709;
2) consumer-identifying information possessed by consumer reporting agencies (names, addresses, places of employment, institutions at which a consumer has maintained an account), see 15 U.S.C. § 1681u;
3) full credit reports, see 15 U.S.C. § 1681v (only for counterterrorism, not for counterintelligence investigations); and
4) financial records, see 12 U.S.C. § 3414.

**Counting NSLs.** Today we are reporting (1) the total number of NSLs _issued_ for all persons, and (2) the total number of requests for information (ROI) contained within those NSLs.  When a single NSL contains multiple requests for information, each is considered a "request" and each request must be relevant to the same pending investigation. For example, if the government issued one NSL seeking subscriber information from one provider and that NSL identified three e-mail addresses for the provider to return records, this would count as <u>one</u> NSL issued and <u>three</u> ROIs.

> ➢ **The Department of Justice's Report on NSLs.** In April 2017, the Department of Justice released its _Annual Foreign Intelligence Surveillance Act Report_ to Congress. That report, which is available online, reports on the _number of requests_ made for certain

information concerning different U.S. persons pursuant to NSL authorities during calendar year 2016. The Department of Justice's report provides the number of individuals subject to an NSL whereas the ODNI's report provides the number of NSLs issued. Because one person may be subject to more than one NSL in an annual period, the number of NSLs issued and the number of persons subject to an NSL differs.

**Why we report the number of NSL requests instead of the number of NSL targets.** We are reporting the annual number of requests for multiple reasons. First, the FBI's systems are configured to comply with Congressional reporting requirements, which do not require the FBI to track the number of individuals or organizations that are the subject of an NSL. Even if the FBI systems were configured differently, it would still be difficult to identify the number of specific individuals or organizations that are the subjects of NSLs. One reason for this is that the subscriber information returned to the FBI in response to an NSL may identify, for example, one subscriber for three accounts or it may identify different subscribers for each account.  In some cases this occurs because the identification information provided by the subscriber to the provider may not be true. For example, a subscriber may use a fictitious name or alias when creating the account. Thus, in many instances, the FBI never identifies the actual subscriber of a facility. In other cases, this occurs because individual subscribers may identify themselves differently for each account (e.g., inclusion of middle name, middle initial, etc.) when creating an account.

We also note that the actual number of individuals or organizations that are the subject of an NSL is different than the number of NSL requests. The FBI often issues NSLs under different legal authorities, e.g., 12 U.S.C. § 3414(a)(5), 15 U.S.C. §§ 1681u(a) and (b), 15 U.S.C. § 1681v, and 18 U.S.C. § 2709, for the same individual or organization.  The FBI may also serve multiple NSLs for an individual for multiple facilities (e.g., multiple e-mail accounts, landline telephone numbers and cellular phone numbers). The number of requests, consequently, is significantly larger than the number of individuals or organizations that are the subjects of the NSLs.

### NSL Statistics

| National Security Letters (NSLs) | CY2013 | CY2014 | CY2015 | CY2016 |
|---|---|---|---|---|
| Total number of NSLs issued | 19,212 | 16,348 | 12,870 | **12,150** |
| Number of Requests for Information (ROI) | 38,832 | 33,024 | 48,642 | **24,801** |

*See* 50 U.S.C. § 1873(b)(6).

**APPENDIX A**

DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC 20511

APR 2 8 2017

The Honorable Richard Burr                          The Honorable Chuck Grassley
Chairman                                            Chairman
Select Committee on Intelligence                    Committee on the Judiciary
United States Senate                                United States Senate

The Honorable Devin Nunes                           The Honorable Robert W. Goodlatte
Chairman                                            Chairman
Permanent Select Committee on Intelligence          Committee on the Judiciary
U.S. House of Representatives                        U.S. House of Representatives

Dear Messrs. Chairmen:

Section 603(b)(2)(B) of the *Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015*, (P.L.114-23), 129 Stat. 268 (hereinafter "USA FREEDOM Act"), requires the Director of National Intelligence ("DNI") to make publicly available for the preceding 12-month period a good faith estimate of the number of queries concerning a known United States person of unminimized non-content information relating to electronic communications or wire communications obtained through acquisitions authorized under Section 702 of the Foreign Intelligence Surveillance Act ("FISA"), excluding the number of queries containing information used to prevent the return of information concerning a United States person.

If the DNI concludes that this good faith estimate cannot be determined accurately because some, but not all, of the relevant elements of the Intelligence Community ("IC") are able to provide such good faith estimate, the USA FREEDOM Act requires him to (i) certify that conclusion in writing to the committees identified above; (ii) report the good faith estimate for those relevant elements able to provide such good faith estimate; (iii) explain when it is reasonably anticipated that such an estimate will be able to be determined fully and accurately; and (iv) make such certification publicly available on an Internet website.

I conclude that the good faith estimate required under section 603(b)(2)(B) of the USA FREEDOM Act cannot be determined accurately because some but not all of the relevant elements of the IC are able to provide such good faith estimate. The enclosed report includes the good faith estimate for those relevant IC elements that were able to provide such good faith estimate. Based on the information provided to me by the relevant elements, I reasonably anticipate that such an estimate will be able to be determined fully and accurately by the end of calendar year 2018.

The Honorable Richard Burr
The Honorable Chuck Grassley
The Honorable Devin Nunes
The Honorable Robert W. Goodlatte

      If you have any questions regarding this matter, please contact the Office of DNI Director of Legislative Affairs, Deirdre M. Walsh, at (703) 275-2474.

Sincerely,

Daniel R. Coats

Enclosure:
Statistical Transparency Report

cc:



2

# EXHIBIT H
to Twitter's Request for Judicial Notice

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE

# STATISTICAL TRANSPARENCY REPORT
## Regarding Use of National Security Authorities
~ Calendar Year 2017 ~

LEADING INTELLIGENCE INTEGRATION

Office of Civil Liberties, Privacy, and Transparency

April 2018

# STATISTICAL TRANSPARENCY REPORT

## Regarding Use of National Security Authorities

### ~ Calendar Year 2017 ~

## Table of Contents

Introduction .................................................................................................................. 3

   A.  Background. .......................................................................................... 3

   B.  Areas Covered in this Report. .............................................................. 4

   C.  Context and Clarity. ............................................................................. 5

   D.  Key Terms .............................................................................................. 5

FISA Probable Cause Authorities ................................................................................. 7

   A.  FISA Titles I and III ................................................................................ 7

   B.  FISA Title VII, Sections 703 and 704 .................................................... 7

   C.  Statistics ............................................................................................... 8

FISA Section 702 ........................................................................................................ 10

   A.  Section 702 ......................................................................................... 10

   B.  Statistics—Orders and Targets .......................................................... 12

   C.  Statistics—U.S. Person Queries .......................................................... 14

   D.  Section 702 and FBI Investigations. ................................................... 19

NSA Dissemination of U.S. Person Information under FISA Section 702 .................. 20

   A.  Section 702 ......................................................................................... 20

   B.  Statistics ............................................................................................. 22

FISA Criminal Use and Notice Provisions .................................................................. 25

   A.  FISA Sections 106 and 305 ................................................................. 25

   B.  Statistics ............................................................................................. 25

FISA Title IV – Use of Pen Register and Trap and Trace (PR/TT) Devices ................. 27

   A.  FISA Pen Register/Trap and Trace Authority. .................................... 27

   B.  Statistics ............................................................................................. 27

FISA Title V – BUSINESS RECORDS ............................................................................ 30

   A.  Business Records FISA ........................................................................ 30

   B.  Statistics – "Traditional" Business Records Statistics Orders, Targets & Identifiers ........ 31

   C.  Statistics – Call Detail Record (CDR) Orders, Targets & Identifiers .................... 32

   D.  Statistics – Call Detail Records Queries ............................................. 35

NATIONAL SECURITY LETTERS (NSLs) ........................................................................ 36

   A.  National Security Letters ..................................................................... 36

   B.  Statistics – National Security Letters and Requests of Information ................... 36

APPENDIX A ............................................................................................................... 39

## **Introduction**

Today, consistent with the USA FREEDOM Act and the FISA Amendments Reauthorization Act of 2017 (the reauthorized FAA) requirements to release certain statistics (codified in 50 U.S.C. § 1873(b)) and the Intelligence Community's (IC) Principles of Intelligence Transparency, we are releasing our **fifth** annual *Statistical Transparency Report Regarding Use of National Security Authorities* presenting statistics on how often the government uses certain national security authorities. Providing these statistics allows for an additional way to track the use of Foreign Intelligence Surveillance Act (FISA) authorities and gives further context to the IC's rigorous and multi-layered oversight framework that safeguards the privacy of United States person information acquired pursuant to FISA. The report goes beyond its statutory duty of providing statistics and further provides the public with detailed explanation as to how the IC uses these national security authorities.

Additional public information on national security authorities is available at the Office of the Director of National Intelligence's (ODNI) website, www.dni.gov, and ODNI's public tumblr site, *IC on the Record*. Furthermore, since the release of the previous report, ODNI has created the new website, www.intelligence.gov, that contains additional public information on the IC's activities.

### A.  Background.

In June 2014, the Director of National Intelligence (DNI) began releasing statistics relating to the use of critical national security authorities, including the FISA, in an annual report called the *Statistical Transparency Report Regarding Use of National Security Authorities* (hereafter the *Annual Statistical Transparency Report*). Subsequent *Annual Statistical Transparency Reports* were released in 2015, 2016, and 2017.

On June 2, 2015, the USA FREEDOM Act was enacted, codifying a requirement to publicly report many of the statistics already reported in the *Annual Statistical Transparency Report*. The Act also expanded the scope of the information included in the reports by requiring the DNI to report information concerning United States person (U.S. person or USP) search terms and queries of certain FISA-acquired information, as well as specific statistics concerning call detail records. *See* 50 U.S.C. § 1873(b). On January 19, 2018, the reauthorized FAA was signed. *See* 50 U.S.C. § 1881a. The reauthorized FAA (also referred to as the Section 702 Reauthorization Act of 2017) codified additional statistics that must be publicly released, including many statistics that the government previously reported pursuant to its commitment to transparency.

## B.   Areas Covered in this Report.

This report provides statistics in the following areas (the terms used below are defined and explained later in this report):

- **FISA Probable Cause Authorities.** The number of orders—and the number of targets under those orders—for the use of FISA authorities that require probable cause determinations by the Foreign Intelligence Surveillance Court (FISC), under Titles I and III, and Section 703 and 704, of FISA.

- **FISA Section 702.**
  - The number of orders—and the number of targets under those orders—issued pursuant to Section 702 of FISA.
  - The number of U.S. person queries of Section 702-acquired content and metadata.
  - The number of instances in which the Federal Bureau of Investigation (FBI) personnel received and reviewed Section 702-acquired information that the FBI identified as concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence.
  - The number of instances in which the FBI opened, under the Criminal Investigative Division, an investigation of a U.S. person (who is not considered a threat to national security) based wholly or in part on Section 702-acquired information.
  - The number of National Security Agency (NSA)-disseminated Section 702 reports containing U.S. person identities (various statistics relating to reports where the U.S. person identity was openly named or originally masked and subsequently unmasked).

- **Use in Criminal Proceedings.** The number of criminal proceedings in which the United States or a State or political subdivision provided notice under FISA of the government's intent to enter into evidence or otherwise use or disclose any information derived from electronic surveillance, physical search, or Section 702 acquisition.

- **Pen Register and Trap and Trace Devices.** The number of orders—and the number of targets under those orders—for the use of FISA's pen register/trap and trace devices, and the number of unique identifiers used to communicate information collected pursuant to those orders.

- **Business Records.** The number of orders—and the number of targets under those orders—issued pursuant to FISA's business records authority, and the number of unique identifiers used to communicate information collected pursuant to those orders. In

addition, the number of orders—and the number of targets under those orders—issued pursuant to FISA's business record authority for the production of call detail records, and the number of call detail records received from providers and stored in NSA repositories.

- **National Security Letters**. The number of national security letters issued, and the number of requests for information within those national security letters.

## C.  Context and Clarity.

Consistent with the IC's *Principles of Intelligence Transparency,* this report seeks to enhance public understanding by including explanations and charts for context and clarity. For example, the report provides charts that place the statistics in this report in context with the statistics in prior reports. While these statistics provide an important point of reference for understanding the use of these authorities, it is important to keep in mind the statistics' limitations. The statistics fluctuate from year to year for a variety of reasons (e.g., operational priorities, world events, technical capabilities), some of which cannot be explored in an unclassified setting. Moreover, there may be no relationship between a decrease in the use of one authority and an increase in another. Nonetheless, we believe this report provides helpful information about how the IC uses these vital national security authorities.

## D.  Key Terms.

Certain terms used throughout this report are described below. Other terms are described in the sections in which they are most directly relevant.

- **U.S. Person**. As defined by Title I of FISA, a U.S. person is "a citizen of the United States , an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in [50 U.S.C. § 1801(a)(1), (2), or (3)]." 50 U.S.C. § 1801(i). Section 602 of the USA FREEDOM Act, however, uses a narrower definition. Since the broader Title I definition governs how U.S. person queries are conducted pursuant to the relevant minimization procedures, it will be used throughout this report.

- **Target.** Within the IC, the term "target" has multiple meanings. With respect to the statistics provided in this report, the term "target" is defined as the individual person, group, entity composed of multiple individuals, or foreign power that uses the selector such as a telephone number or email address.

- **Orders.** There are different types of orders that the FISC may issue in connection with FISA cases, for example: orders granting or modifying the government's authority to conduct foreign intelligence collection; orders directing electronic communication service providers to provide any technical assistance necessary to implement the authorized foreign intelligence collection; and supplemental orders and briefing orders requiring the government to take a particular action or provide the court with specific information. The FISC may amend an order one or more times after it has been issued. For example, an order may be amended to add a newly discovered account used by the target. This report *does not count such amendments* separately. The FISC may renew some orders multiple times during the calendar year. Each authority permitted under FISA has specific time limits for the FISA authority to continue (e.g., a Section 704 order against a U.S. person target outside of the United States may last no longer than 90 days but FISA permits the order to be renewed, *see* 50 U.S.C. § 1881c(c)(4)). Each renewal requires a separate application submitted by the government to the FISC and a finding by the FISC that the application meets the requirements of FISA. Thus, unlike amendments, this report *does count each such renewal* as a separate order. These terms will be used consistently throughout this report.

- **"Estimated Number."** Throughout this report, when numbers are *estimated,* the estimate comports with the statutory requirements to provide a "good faith estimate" of a particular number.

- **Dissemination.** In the most basic sense, dissemination refers to the sharing of minimized information. As it pertains to FISA (including Section 702), if an agency (in this instance NSA) lawfully collects information pursuant to FISA and wants to disseminate that information, the agency must first apply its minimization procedures to that information.

## FISA Probable Cause Authorities

### A. FISA Titles I and III

**To conduct electronic surveillance or physical search under FISA Title I or FISA Title III, a probable cause court order is required regardless of U.S. person status.** Under FISA, Title I permits electronic surveillance and Title III permits physical search in the United States of foreign powers or agents of a foreign power for the purpose of collecting foreign intelligence information. *See* 50 U.S.C. §§ 1804 and 1823. Title I (electronic surveillance) and Title III (physical search)

> **FISA Title I, Title III, and Title VII Section 703 and 704**
>
> → *All of these authorities require individual court orders based on probable cause.*
>
> → *Titles I and III apply to FISA activities directed against persons within the United States.*
>
> → *Sections 703 and 704 apply to FISA activities directed against U.S. persons outside the United States.*

are commonly referred to as "Traditional FISA." Both require that the FISC make a probable cause finding, based upon a factual statement in the government's application, that (i) the target is a foreign power or an agent of a foreign power, as defined by FISA and (ii) the facility being targeted for electronic surveillance is used by or about to be used, or the premises or property to be searched is or is about to be owned, used, possessed by, or is in transit to or from a foreign power or an agent of a foreign power. In addition to meeting the probable cause standard, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1804(a) and 1823(a).

### B. FISA Title VII, Sections 703 and 704

**FISA Title VII Sections 703 and 704 similarly require a court order based on a finding of probable cause for the government to undertake FISA activities targeting U.S. persons located outside the United States.** Section 703 applies when the government seeks to conduct electronic surveillance or to acquire stored electronic communications or stored electronic data, in a manner that otherwise requires an order pursuant to FISA, of a U.S. person who is reasonably believed to be located outside the United States. Section 704 applies when the government seeks to conduct collection overseas targeting a U.S. person reasonably believed to be located outside the United States under circumstances in which the U.S. person has a reasonable expectation of privacy and a warrant would be required if the acquisition were conducted in the United States. Both Sections 703 and 704 require that the FISC make a

probable cause finding, based upon a factual statement in the government's application, that the target is a U.S. person reasonably believed to be (i) located outside the United States and (ii) a foreign power, agent of a foreign power, or officer or employee of a foreign power. Additionally, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1881b(b) and 1881c(b).

## C. Statistics

**How targets are counted.** If the IC received authorization to conduct electronic surveillance and/or physical search against the same target in four separate applications, the IC would count one target, not four. Alternatively, if the IC received authorization to conduct electronic surveillance and/or physical search against four targets in the same application, the IC would count four targets. Duplicate targets across authorities are not counted.

**Figure 1a: Table of FISA "Probable Cause" Court Orders and Targets**

| Titles I and III and Sections 703 and 704 of FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Total number of orders | 1,767 | 1,519 | 1,585 | 1,559 | **1,437** |
| Estimated number of targets of such orders* | 1,144 | 1,562 | 1,695 | 1,687 | **1,337** |

*See* 50 U.S.C. §§ 1873(b)(1) and 1873(b)(1)(A).

* Although providing this statistic was first required by the USA FREEDOM Act, the reauthorized FAA of 2017 enumerated this requirement at 50 U.S.C. § 1873(b)(1)(A).

**Figure 1b: Chart of FISA "Probable Cause" Court Orders and Targets**



**Figure 2: Table of FISA "Probable Cause" Targets – U.S. Persons**

| Titles I and III  and Sections 703 and 704 -- Targets | CY2016 | CY2017 |
|---|---|---|
| Estimated number of targets who are *non*-U.S. persons* | 1,351 | **1,038** |
| Estimated number of targets who are U.S. persons* | 336 | **299** |
| Estimated percentage of targets who are U.S. persons | 19.9% | **22.4%** |

*See* 50 U.S.C. §§1873(b)(1)(B) and 1873(b)(1)(C) for rows one and two, respectively.

* Previously the IC was not statutorily required to publicly provide these statistics but provided them consistent with transparency principles. The reauthorized FAA of 2017 codified this requirement at 50 U.S.C. §§ 1873(b)(1)(B) and 1873(b)(1)(C).

# FISA Section 702

## A.  Section 702

Title VII of FISA includes Section 702, which permits the Attorney General and the DNI to jointly authorize the targeting of (i) non-U.S. persons (ii) reasonably believed to be located outside the United States (iii) to acquire foreign intelligence information. *See* 50 U.S.C. § 1881a. <u>All three</u> elements must be met. Additionally, Section 702 requires that the Attorney General, in consultation with the DNI, adopt targeting procedures, minimization procedures, and querying

> **Title VII - FISA Amendments Act (FAA) Section 702**
>
> →*Commonly referred to as "Section 702."*
>
> →*Requires individual targeting determinations that the target (1) is a non-U.S. person (2) who is reasonably believed to be located outside the United States and (3) who has or is expected to communicate or receive foreign intelligence information.*

procedures that they attest satisfy the statutory requirements and are consistent with the Fourth Amendment. Additional information on how the government uses Section 702 is posted on *IC on the Record*.

**Section 702 Targets and "Tasking."** Under Section 702, the government "targets" a particular non-U.S. person, group, or entity reasonably believed to be located outside the United States and who possesses, or who is likely to communicate or receive, foreign intelligence information, by directing an acquisition at – i.e., "*tasking*" – selectors (e.g., telephone numbers and email addresses) that are assessed to be used by such non-U.S. person, group, or entity, pursuant to targeting procedures approved by the FISC. Before "tasking" a selector for collection under Section 702, the government must apply its targeting procedures to ensure that the IC appropriately tasks a selector used by a non-U.S. person who is reasonably believed to be located outside the United States and who will likely possess, communicate, or receive foreign intelligence information.

NSA and FBI task selectors pursuant to their respective Section 702 targeting procedures, which are discussed below. All agencies that receive unminimized (i.e., "raw") Section 702 data – NSA, FBI, Central Intelligence Agency (CIA), and National Counterterrorism Center (NCTC) – handle the Section 702-acquired data in accordance with minimization procedures, which are explained below.

**The FISC's role.** Under Section 702, the FISC determines whether *certifications* provided jointly by the Attorney General and the DNI meet all the requirements of Section 702. If the FISC determines that the government's certifications its targeting, minimization, and, as described below, querying procedures meet the statutory requirements of Section 702 and are consistent with the Fourth Amendment, then the FISC issues an order and supporting statement approving the certifications. The 2016 FISC order and statement approving certifications was publicly released in May 2017 and posted on *IC on the Record*.

**Certifications**. The certifications are jointly executed by the Attorney General and DNI and authorize the government to acquire foreign intelligence information under Section 702. Each annual certification application package must be submitted to the FISC for approval. The package includes the Attorney General and DNI's certifications, affidavits by certain heads of intelligence agencies, targeting procedures, minimization procedures, and, as described below, querying procedures. Samples of certification application packages have been publicly released on *IC on the Record*, most recently in May 2017. The certifications identify categories of information to be collected, which must meet the statutory definition of foreign intelligence information, through the targeting of non-U.S. persons reasonably believed to be located outside the United States. The certifications have included information concerning international terrorism and other topics, such as the acquisition of information concerning weapons of mass destruction.

**Targeting procedures**. The targeting procedures detail the steps that the government must take before tasking a selector, as well as verification steps after tasking, to ensure that the user of the tasked selector is being targeted appropriately – specifically, that the user is a non-U.S. person, located outside the United States, who is being tasked to acquire foreign intelligence information. The IC must make individual determinations that each tasked selector meets the requirements of the targeting procedures. Each agency's Section 702 targeting procedures are approved by the Attorney General and then reviewed, as part of the certification package, by the FISC, which reviews the sufficiency of each agency's targeting procedures including assessing the IC's compliance with the procedures. NSA's targeting procedures (signed in 2017) for the 2016 certification package have been publicly released *IC on the Record*.

**Minimization procedures**. The minimization procedures detail requirements the government must meet to use, retain, and disseminate Section 702 data, which include specific restrictions on how the IC handles non-publicly available U.S. person information acquired from Section 702 collection of non-U.S. person targets, consistent with the needs of the government to obtain, produce, and disseminate foreign intelligence information. Each agency's Section 702 minimization procedures are approved by the Attorney General and then reviewed, as part of the certification package, by the FISC, which reviews the sufficiency of each agency's

minimization procedures, including assessing the IC's compliance with past procedures. The 2016 certification minimization procedures have been released on *IC on the Record*.

**Querying procedures**. With the reauthorized FAA of 2017, Congress amended Section 702 to require that querying procedures be adopted by the Attorney General, in consultation with the DNI. Section 702(f) requires that a record of each U.S. person query term be kept. Similar to the other procedures, the querying procedures are required to be reviewed by the FISC as part of the certification package for consistency with the statute and the Fourth Amendment. Congress added other requirements in 702(f), which pertain to the access of certain results of queries conducted by FBI; those requirements will be discussed later in this report.

To date, each agency's court-approved minimization procedures have provided the rules under which the agency may query their databases containing previously acquired Section 702 data (content and metadata) using a U.S. person query term. As described above, with the reauthorized FAA of 2017, Congress amended Section 702 to require that, going forward, querying procedures must be adopted by the Attorney General. Query terms may be date-bound, and may include alphanumeric strings, such as telephone numbers, email addresses, or terms, such as a name, that can be used individually or in combination with one another. Pursuant to court-approved procedures, an agency can only query Section 702 information if the query is reasonably likely to return foreign intelligence information or, in the case of the FBI, evidence of a crime. Additional information about U.S. person queries is posted on *IC on the Record*.

**Compliance.** The IC's adherence to the targeting and minimization procedures, including query requirements, is subject to robust internal agency oversight and to rigorous external oversight by the Department of Justice (DOJ), ODNI, Congress, and the FISC. Every identified incidence of non-compliance is reported to the FISC (through individual notices or in reports) and to Congress in semiannual reports. DOJ and ODNI also submit semiannual reports to Congress that assess the IC's overall compliance efforts. Past assessments have been publicly released.

## B.  Statistics—Orders and Targets

**Counting Section 702 orders.** As explained above, the FISC may issue a single order to approve more than one Section 702 certification to acquire foreign intelligence information. Note that, in its own transparency report, which is required pursuant to 50 U.S.C. § 1873(a), the Director of the Administrative Office of the United States Courts (AOUSC) counted each of the Section 702 certifications associated with the FISC's order. Because the number of the government's Section 702 certifications remains a classified fact, the government requested that the AOUSC redact the number of certifications from its transparency report prior to publicly releasing it.

In 2016, the government submitted a certification application package to the FISC. Pursuant to 50 U.S.C. § 1881a(j)(2), the FISC extended its review of the 2016 certification package. The FISC may extend its review of the certifications "as necessary for good cause in a manner consistent with national security." *See* 50 U.S.C. § 1881a(j)(2) (note that with the reauthorized FAA of 2017, this section has been updated to § 1881a(k)(2)). Thus, because the FISC did not complete its review of the 2016 certifications during calendar year 2016, the FISC did not issue an order concerning those certifications in calendar year 2016. The 2015 order remained in effect during the extension period. On April 26, 2017, the FISC issued an order authorizing the 2016 certifications.

**Figure 3: Table of Section 702 Orders**

| **Section 702 of FISA** | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Total number of orders issued | 1 | 1 | 1 | 0 | **1** |

*See* 50 U.S.C. § 1873(b)(2).

**Estimating Section 702 targets.** The number of 702 "targets," provided below, reflects an estimate of the number of non-U.S. persons who are the users of tasked selectors. This estimate is based on information readily available to the IC. Unless and until the IC has information that links multiple selectors to a single foreign intelligence target, each individual selector is counted as a separate target for purposes of this report. On the other hand, where the IC is aware that multiple selectors are used by the same target, the IC counts the user of those selectors as a single target. This counting methodology reduces the risk that the IC might inadvertently understate the number of discrete persons targeted pursuant to Section 702.

**Figure 4: Table of Section 702 Targets (recall that only <u>non</u>-USPs are targeted)**

| **<u>Section 702 of FISA</u>** | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Estimated number of targets of such orders* | 89,138 | 92,707 | 94,368 | 106,469 | **129,080** |

*See* 50 U.S.C. § 1873(b)(2)(A).

* Previously the IC was not statutorily required to publicly provide this statistic, but provided it consistent with transparency principles. The reauthorized FAA of 2017 codified this requirement at 50 U.S.C. § 1873(b)(2)(A).

## C. Statistics—U.S. Person Queries

In July 2014, the Privacy and Civil Liberties Oversight Board (PCLOB or Board) issued a report on Section 702 entitled, "*Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*" (*PCLOB's Section 702 Report*), which reported U.S. person query statistics for calendar year 2013. *See PCLOB's Section 702 Report,* at 57-58*.* The USA FREEDOM Act, enacted in 2015, required the public reporting of statistics regarding the number of U.S. person queries of Section 702. Specifically, the Act required the "number of search terms concerning a known United States person used to retrieve the unminimized contents […]" – referred as *query terms of content* – and "the number of queries concerning a known United States person of unminimized noncontents information […]" – referred as *queries of metadata*. *See* 50 U.S.C. § 1873(b)(2)(B) and (b)(2)(C), respectively. Thus, ODNI began reporting on these statistics in the *Annual Statistical Transparency Report* covering calendar year 2015.

Below are statistics for U.S. person queries of raw, unminimized Section 702-acquired data.[1] The U.S. person statistics are based on (a) approved U.S. person *query terms* used to query

---

[1] With the reauthorization of FAA in 2017, Congress codified new requirements regarding the access of results of certain queries conducted by the FBI. Specifically under Section 702(f)(2)(A), an order from the FISC is now required before the FBI can review the contents of a query using a U.S. person query term when the query was not designed to find and extract foreign intelligence information and was performed in connection with a predicated criminal investigation that does not relate to national security. Before the FISC may issue such an order based on a finding of probable cause, an FBI officer must apply in writing, to include the officer's justification that the query results would provide evidence of criminal activity, and the application must be approved by the Attorney General.

Section 702 *content* and (b) U.S. person *queries* conducted of Section 702 *noncontents* (i.e., metadata). It is important to understand that these two very different numbers cannot be combined because they use *different counting methodologies* (approved query terms versus queries conducted) and *different data types* (content versus noncontents).

**Counting approved U.S. person *query terms* used to query Section 702 *content*.** The NSA counts the number of U.S. person identifiers it approved to query the content of unminimized Section 702-acquired information. For example, if the NSA used U.S. person identifier "johndoe@XYZprovider" to query the content of Section 702-acquired information, the NSA would count it as one regardless of how many times the NSA used "johndoe@XYZprovider" to query its 702-acquired information. The CIA started using this model in 2016 for counting query terms and those statistics were included in the *Annual Statistical Transparency Report* covering CY2016. When the NCTC began receiving raw Section 702 information, NCTC followed a similar approach of counting U.S. person query terms that were used to query Section 702 content.

**Figure 5: Illustration of how the IC counts approved U.S. person query terms used to query Section 702 content**



---

50 U.S.C. Section 1873(b)(2)(A) requires annual reporting of the number of times the FBI received an order pursuant to 702(f)(2)(A); this statistic will be provided in future transparency reports.

**Figure 6a: Table of U.S. Person Query Terms Used to Query Section 702 Content**

| Section 702 of FISA | CY2015 | CY2016 | CY2017 |
|---|---|---|---|
| Estimated number of search terms concerning a known U.S. person used to retrieve the unminimized contents of communications obtained under Section 702 (excluding search terms used to prevent the return of U.S. person information)* | 4,672 | 5,288 | **7,512** |

*See* 50 U.S.C. § 1873(b)(2)(B).

* Consistent with 50 U.S.C. § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI. However, the reauthorized FAA of 2017 codified a new reporting requirement for the FBI under 50 U.S.C. § 1873(b)(2)(D), which is addressed later in this report.

**Figure 6b: Chart of U.S. Person Query Terms Used to Query Section 702 Content**



**Counting** *queries* **using U.S. person identifiers of noncontents collected under Section 702.**
This estimate represents the number of times a U.S. person identifier is used to query the noncontents (i.e., metadata) of unminimized Section 702-acquired information. For example, if the U.S. person identifier telephone number "111-111-2222" was used 15 times to query the noncontents of Section 702-acquired information, the number of queries counted would be 15.

**Figure 7: Illustration of how the IC counts U.S. person queries of Section 702 noncontents**



As with last year's transparency report, one IC element, the CIA, remains currently unable to provide the number of queries using U.S. person identifiers of unminimized Section 702 noncontents information for CY2017. Under 50 U.S.C. § 1873(d)(3)(A), if the DNI concludes that this good-faith estimate cannot be determined accurately because not all of the relevant elements of the IC are able to provide this good faith estimate, then the DNI is required to (i) certify that conclusion in writing to the relevant Congressional committees; (ii) report the good faith estimate for those relevant elements able to provide such good faith estimate; (iii) explain when it is reasonably anticipated that such an estimate will be able to be determined fully and accurately; and (iv) make such certification publicly available on an Internet web site. Because the CIA remained unable to provide such information for calendar year 2017, the DNI made a certification, pursuant to 50 U.S.C. § 1873(d)(3)(A) to the relevant Congressional committees. As required by statute, this certification is being made publicly available as an attached appendix to this current report (see Appendix A). As described in Appendix A, CIA will be able to provide a good faith estimate of these queries for calendar year 2018; such information will be included in the 2019 annual transparency report.

**Figure 8: Table of U.S. Person Queries of Noncontents of Section 702**

| __Section 702 of FISA__ | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Estimated number of queries concerning a known U.S. person of unminimized noncontents information obtained under Section 702 (excluding queries containing information used to prevent the return of U.S. person information)* | 9,500 | 17,500 | 23,800 | 30,355 | **16,924** |

*See* 50 U.S.C. § 1873(b)(2)(C).

* Consistent with 50 U.S.C. § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI. However, the reauthorized FAA of 2017 codified a new reporting requirement for the FBI under 50 U.S.C. § 1873(b)(2)(D), which was addressed earlier in this report.

**FISC Order Requiring Certain Section 702 Query Reporting by FBI.** On November 6, 2015, the FISC granted the government's application for renewal of the 2015 certifications and, among other things, concluded that the FBI's U.S. person querying provisions in its minimization procedures, "strike a reasonable balance between the privacy interests of the United States persons and persons in the United States, on the one hand, and the government's national security interests, on the other." *Memorandum Opinion and Order* dated November 6, 2015, at 44 (released on *IC on the Record* on April 19, 2016). The FISC further stated that the FBI conducting queries, "designed to return evidence of crimes unrelated to foreign intelligence does not preclude the Court from concluding that taken together, the targeting and minimization procedures submitted with the 2015 Certifications are consistent with the requirements of the Fourth Amendment." *Id*.

Nevertheless, the FISC ordered the government to report in writing, "each instance after December 4, 2015, in which FBI personnel *receive and review* Section 702-acquired information that the FBI identifies as concerning a United States person in response to a query that is not designed to find and extract foreign intelligence information." (Emphasis added). *Id*. at 44 and 78. The FISC directed that the report contain details of the query terms, the basis for conducting the query, the manner in which the query will be or has been used, and other details. *Id*. at 78. In keeping with the IC's *Principles of Transparency*, the DNI declassified the number of each such query reported to the FISC in calendar year 2016. This year, the DNI has again declassified the number reported for calendar year 2017, as noted in Figure 10.

**Figure 9: Table Regarding Required Section 702 Query Reporting to the FISC**

| **Section 702 of FISA** | CY2016 | CY2017 |
|---|---|---|
| Per the FISC Memorandum Opinion and Order dated November 6, 2015:  Each reported instance in which FBI personnel *received and reviewed* Section 702-acquired information that the FBI identified as concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence. | 1 | **0** |

## D.  Section 702 and FBI Investigations.

The reauthorized FAA of 2017 now requires that the FBI report on the number of instances in which the FBI opened a criminal investigation of a U.S. person, who is not considered a threat to national security, based wholly or in part on Section 702-acquired information. *See* 50 U.S.C. § 1873(b)(2)(D). This statistic will provide transparency with regard to how often Section 702 collection is used for non-national security investigations conducted by the FBI. Figure 10 provides the required statistic.

**Figure 10: Table Regarding Number of FBI Investigations Opened on USPs Based on Section 702 Acquisition**

| **Section 702 of FISA** | CY2017 |
|---|---|
| The number of instances in which the FBI opened, under the Criminal Investigative Division or any successor division, an investigation of a U.S. person (who is not considered a threat to national security) based wholly or in part on an acquisition authorized under Section 702. | **0** |

*See* 50 U.S.C. § 1873(b)(2)(D).

## NSA Dissemination of U.S. Person Information under FISA Section 702

### A. Section 702

In July 2014, the *PCLOB's Section 702 Report* contained 10 recommendations. Recommendation 9 focused on "accountability and transparency," noting that the government should implement measures, "to provide insight about the extent to which the NSA acquires and utilizes the communications involving U.S. persons and people located in the United States under the Section 702 program." *PCLOB's Section 702 Report* at 145-146. Specifically, the PCLOB recommended that "the NSA should implement processes to annually count […] (5) the number of instances in which the NSA disseminates non-public information about U.S. persons, specifically distinguishing disseminations that includes names, titles, or other identifiers, such as telephone numbers or e-mail addresses, potentially associated with individuals." *Id.* at 146. This recommendation is commonly referred to as Recommendation 9(5). In response to the PCLOB's July 2014 Recommendation 9(5), NSA previously publicly provided (in the *Annual Statistical Transparency Report* for calendar year 2015) and continues to provide the following additional information regarding the dissemination of Section 702 intelligence reports that contain U.S. person information. Because the PCLOB issued its recommendation in 2014, these statistics were not included in *Annual Statistical Transparency Report* for calendar years 2013 or 2014.

NSA has been providing similar information to Congress since 2009, in classified form, per FISA reporting requirements. For example, FISA Section 702(m)(3) requires that NSA annually submit a report to applicable Congressional committees regarding certain numbers pertaining to the acquisition of Section 702-acquired information, including the number of "disseminated intelligence reports containing a reference to a United States person identity." *See* 50 U.S.C. § 1881a(m)(A)(3)(i) (prior to the reauthorized FAA of 2017under § 1881a(l)(3)(A)(i)). Section 702a(m)(A)(3) also requires that the number of "United States-person identities subsequently disseminated by [NSA] in response to request for identities that were not referred to by name or title in the original reporting." *See* 50 U.S.C. § 1881a(m)(3)(A)(ii). This second requirement refers to NSA providing the number of approved unmasking requests, which is explained below. Additionally, NSA provides the number of NSA's disseminated intelligence reports containing a U.S. person reference to Congress as part of the Attorney General and the DNI's joint assessment of compliance. *See* 50 U.S.C. § 1881a(m)(1) (prior to the reauthorized FAA of 2017under § 1881a(l)(1)).

Prior to the PCLOB issuing its *Section 702 Report*, NSA's Director of the Civil Liberties, Privacy, and Transparency Office published "*NSA's Implementation of Foreign Intelligence Surveillance Act Section 702,*" on April 16, 2014, (hereinafter "NSA DCLPO Report"), in which it explained

NSA's dissemination processes. *NSA DCLPO Report* at 7-8. NSA "only generates classified intelligence reports when the information meets a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information." *NSA DCLPO Report* at 7.

Section 702 only permits the targeting of non-U.S. persons reasonably believed to be located outside the United States to acquire foreign intelligence information. Such targets, however, may communicate information to, from, or about U.S. persons. NSA minimization procedures (publicly released on May 11, 2017) permit the NSA to disseminate U.S person information if the NSA masks the information that could identify the U.S. person. The minimization procedures also permit NSA to disseminate the U.S. person identity only if doing so meets one of the specified reasons listed in NSA's minimization procedures, including that the U.S. person consented to the dissemination, the U.S. person information was already publicly available, the U.S. person identity was necessary to understand foreign intelligence information, or the communication contained evidence of a crime and is being disseminated to law enforcement authorities. Even if one these conditions applies, as a matter of policy, NSA may still mask the U.S. person information and will include no more than the minimum amount of U.S. person information necessary to understand the foreign intelligence or to describe the crime or threat. *Id.* In certain instances, however, NSA makes a determination prior to releasing its original classified report that the U.S. person's identity is appropriate to disseminate in the first instance using the same standards discussed above.

**Masked U.S. Person Information**. Agency minimization procedures generally provide for the substitution of a U.S. person identity with a generic phrase or term if the identity otherwise does not meet the dissemination criteria; this is informally referred to as "masking" the identity of the U.S. person. Information about a U.S. person is masked when the identifying information about the person is not included in a report. For example, instead of reporting that Section 702-acquired information revealed that non-U.S. person "Bad Guy" communicated with U.S. person "John Doe" (i.e., the actual name of the U.S. person), the report would mask "John Doe's" identity, and would state that "Bad Guy" communicated with "an identified U.S. person," "a named U.S. person," or "a U.S. person."

**Unmasking U.S. Person Information.** Recipients of NSA's classified reports, such as other federal agencies, may request that NSA provide the U.S. person identity that was masked in an intelligence report. The requested identity information is released only if the requesting recipient has a "need to know" the identity of the U.S. person and if the dissemination of the U.S. person's identity would be consistent with NSA's minimization procedures (e.g., the identity is necessary to understand foreign intelligence information or assess its importance), and additional approval has been provided by a designated NSA official.

As part of their regular oversight reviews, DOJ and ODNI review disseminations of information about U.S. persons that NSA obtained pursuant to Section 702 to ensure that the disseminations were performed in compliance with the minimization procedures.

Additional information describing how the IC protects U.S. person information obtained pursuant to FISA provisions is provided in recent reports by the civil liberties and privacy officers for the ODNI (including NCTC), NSA, FBI, and CIA. The reports collectively documented the rigorous and multi-layered framework that safeguards the privacy of U.S. person information in FISA disseminations. *See ODNI Report on Protecting U.S. Person Identities in Disseminations under FISA* and annexes containing agency specific reports.

## B. Statistics

Below are statistics and charts to further explain how NSA disseminates U.S. person information incidentally acquired from Section 702 in classified intelligence reports. NSA may:

   i.    openly name (i.e., originally reveal) the U.S. person in the report,
  ii.    initially mask (i.e., not reveal) the U.S. person identity in the report, or
 iii.    in the instances where the U.S. person identity was initially masked, upon a specific request, later reveal and unmask the U.S. person identity but only to the requestor.

This year's report presents the dissemination numbers in a different format from the previous report to facilitate understanding and to provide consistency with NSA's classified FISA Section 702(m)(3) reports to Congress. This report separates the number of reports (in Figure 11) from the statistics relating to the U.S. person identities later disseminated (in Figure 12).

NSA applies its minimization procedures in preparing its classified intelligence reports, and then disseminates the reports to authorized recipients with a need to know the information in order to perform their official duties. Very few of NSA's intelligence reports from Section 702 collection contain references to U.S. person identities (whether masked or openly named).

The first row of Figure 11 provides "an accounting of the number of disseminated intelligence reports containing a reference to a United States-person identity." *See* 50 U.S.C. § 1881a(m)(3)(A)(i). Note that a single report could contain multiple U.S. person identities, masked and/or openly named. NSA's counting methodology is to include any disseminated intelligence report that contains a reference to one or more U.S. person identities, whether masked or openly named, even if the report includes information from other sources. NSA does not maintain records that allow it to readily determine, in the case of an intelligence report that includes information from several sources, from which source a reference to a U.S. person identity was derived. Accordingly, the references to U.S. person identities may have resulted

from Section 702 authorized collection or from other authorized signals intelligence activity conducted by NSA. This counting methodology was used in the previous report and is used in NSA's FISA Section 702(m)(3) report. As noted above, a U.S. person is "a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in [50 U.S.C. § 1801(a)(1), (2), or (3)]." *See* 50 U.S.C. 1801(i).

The second row of Figure 11 provides the *number of reports* containing U.S. person identities *where the U.S. person identity was masked* in the report. The third row provides the *number of reports* containing U.S. person *identities where the U.S. person was openly named* in the report.

**Figure 11: Table of Section 702 *Reports* Containing USP information unmasked by NSA**

| Section 702 Reports Containing U.S. person (USP) information disseminated by NSA | CY2016 | CY2017 |
|---|---|---|
| **Reports** – Total number of NSA disseminated §702 reports containing USP identities *regardless of whether the identity was openly named or masked*. | 3,914 | **4,065** |
| **Reports** – Total number of NSA disseminated §702 reports containing USP identities *where the USP identity was masked.* | 2,964 | **3,034** |
| **Reports** – Total number of NSA disseminated §702 reports containing USP identities *where the USP was openly named*. | 1,200 | **1,341** |

*As explained above, rows 2 and 3 will not total row 1 because one report may contain both masked and openly namely identities.*

Figure 12 provides statistics relating to the numbers of U.S. person <u>identities</u> that were originally masked in those reports counted in Figure 11 but which NSA later provided to authorized requestors (i.e., unmasked) during CY2017. This statistic is the number required to be reported to Congress in NSA's FISA Section 702(m)(3) report. In other words, Figure 12 provides "an accounting of the number of United States-person identities subsequently disseminated by [NSA] in response to requests for identities that were not referred to by name or title in the original reporting." *See* 50 U.S.C. § 1881a(m)(3)(A)(ii). This number is different than numbers provided in either CY2015 or the CY2016 *Annual Statistical Transparency Report*. NSA has decided to declassify the total number of U.S. person identities unmasked in response to a request. The U.S. person identities include individuals as well as non-individual entities

whose identities NSA masks pursuant to law or policy. These non-individual entities, include, for example, U.S. IP addresses and artificial "persons" such as corporations.

Previously, the *Annual Statistical Transparency Report* focused on responding to the PCLOB's report recommendation 9(5) by counting only those U.S. person identities where the proper name or title of an individual was unmasked; it did not count any other unmasking such as email addresses or telephone numbers or U.S. IP addresses or U.S. corporations. Rather than distinguishing between the different ways a U.S. person might be named in an intelligence report, NSA will provide the total number of U.S. person identities unmasked in response to a specific request from another agency whether it is a title of an individual, an identifier such as an email address, an IP address or a corporation. Thus, this current *Annual Statistical Transparency Report*, in Figure 12, reports that same metric that is reported in NSA's FISA Section 702(m)(3). However, because NSA's FISA Section 702(m)(3) reports have a time period of September through August, comparing the two reporting years is not an exact comparison.

**Figure 12: Table of Section 702 USP Identities disseminated by NSA**

| Section 702 – U.S. person (USP) identities unmasked by NSA | 12 month period Sep 2015-Aug 2016 | CY2017 |
|---|---|---|
| The number of U.S. person identities that NSA unmasked in response to a specific request from another agency. | 9,217 | **9,529** |

Beginning with next year's transparency report (due April 2019), ODNI will report statistics pertaining to how the IC disseminates U.S. person information regardless of the legal authority under which the information was collected (not only FISA Section 702). *See ICPG 107.1* Specifically, ODNI will report (1) the total number of requests to identify U.S. persons, whose identity was originally omitted, in disseminated intelligence reports, (2) the total number of those requests approved, and (3) the total number of those requests denied.

## FISA Criminal Use and Notice Provisions

### A.  FISA Sections 106 and 305

FISA Section 106 requires <u>advance</u> authorization from the Attorney General <u>before</u> any information acquired through Title I electronic surveillance may be used in a criminal proceeding. This authorization from the Attorney General is defined to include authorization by the Acting Attorney General, Deputy Attorney General, or, upon designation by the Attorney General, the Assistant Attorney General for National Security. Section 106 also requires that if a government entity intends to introduce into evidence in any trial, hearing, or other proceeding, against an aggrieved person, information obtained or derived from electronic surveillance, it must notify the aggrieved person and the court. The aggrieved person is then entitled to seek suppression of the information. FISA Section 706 requires that any information acquired pursuant to Section 702 be treated as electronic surveillance under Title I, including for purposes of the use, notice, and suppression requirements under Section 106.

> **FISA Sections 106 and 305**
> **– Criminal Use and Notice Provisions –**
>
> → *Commonly referred to as the "criminal use provision."*
>
> → *Section 106 applies to information acquired from Title I electronic surveillance; Section 305 applies to information acquired from Title III physical search.*
>
> → *Attorney General advance authorization is required before such information may be used in a criminal proceeding; if such information is used or intended to be used against an aggrieved person, that person must be given notice of the information and have a chance to suppress the information.*
>
> → *The reauthorized FAA of 2017 codified that statistics must be provided to the public as it pertained to Section 106, Section 305, as well as Section 702 acquired information.*

FISA Section 305 provides the same requirements for information acquired through Title III physical search (i.e., advance authorization, notice, and opportunity to suppress).

### B.  Statistics

The reauthorized FAA of 2017codified that certain statistics concerning criminal proceedings must be provided to the public pertaining to Sections 106 and 305, including Section 702-acquired information. Specifically, figure 13 provides that, in 2017, the Government filed notice of intent to use FISA-acquired information, pursuant to Section 106 or 305, in seven (7) separate criminal proceedings.

**Figure 13: Table Regarding Number of Criminal Proceedings in which the Government Provided Notice of Its Intent to Use Cert FISA Information**

| FISA Sections 106 and 305 | CY2017 |
|---|---|
| The number of criminal proceedings in which the United States or a State or political subdivision thereof provided notice pursuant to Section 106 (including with respect to Section 702-acquired information) or Section 305 of the government's intent to enter into evidence or otherwise use or disclose any information obtained or derived from electronic surveillance, physical search, or Section 702 acquisition. | **7** |

### FISA Title IV – Use of Pen Register and Trap and Trace (PR/TT) Devices

#### A.  FISA PR/TT Authority

Title IV of FISA authorizes the use of pen register and trap and trace (PR/TT) devices for foreign intelligence purposes. Title IV authorizes the government to use a PR/TT device to seek and capture dialing, routing, addressing or signaling (DRAS) information. The government may submit an application to the FISC for an order approving the use of a PR/TT device (i.e., PR/TT order) for (i) "any investigation to obtain foreign intelligence information not concerning a United States person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1842(a). If the FISC finds that the government's application sufficiently meets the requirements of FISA, the FISC must issue an order for the installation and use of a PR/TT device.

> **FISA Title IV**
>
> → *Commonly referred to as the "PR/TT" provision.*
>
> → *Bulk collection is prohibited.*
>
> → *Requires individual FISC order to use PR/TT device to capture dialing, routing, addressing, or signaling (DRAS) information.*
>
> → *Government request to use a PR/TT device on U.S. person target must be based on an investigation to protect against terrorism or clandestine intelligence activities and that investigation must not be based solely on the basis of activities protected by the First Amendment to the Constitution.*

#### B.  Statistics

**Counting orders.** Similar to how orders were counted for Titles I and III and Sections 703 and 704, this report only counts the orders *granting authority to conduct intelligence collection* -- the order for the installation and use of a PR/TT device. Thus, renewal orders are counted as a separate order; modification orders and amendments are not counted.

**Estimating the number of targets.** The government's methodology for counting PR/TT targets is similar to the methodology described above for counting targets of electronic surveillance and/or physical search. If the IC received authorization for the installation and use of a PR/TT device against the same target in four separate applications, the IC would count one target, not

four. Alternatively, if the IC received authorization for the installation and use of a PR/TT device against four targets in the same application, the IC would count four targets.

**Estimating the number of unique identifiers.** This statistic counts (1) the targeted identifiers and (2) the non-targeted identifiers (e.g., telephone numbers and e-mail addresses) that were in contact with the targeted identifiers. Specifically, the House Report on the USA FREEDOM Act states that "[t]he phrase 'unique identifiers used to communicate information collected pursuant to such orders' means the total number of, for example, email addresses or phone numbers that have been collected as a result of these particular types of FISA orders--not just the number of target email addresses or phone numbers." [H.R. Rept. 114-109 Part I, p. 26], with certain exceptions noted.

**Figure 14: Table of PR/TT Orders, Targets, and Unique Identifiers Collected**

| **Title IV of FISA** <br> *PR/TT FISA* | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Total number of orders | 131 | 135 | 90 | 60 | **33** |
| Estimated number of targets of such orders | 319 | 516 | 456 | 41 | **27** |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders* | - | - | 134,987[#] | 81,035[#†] | **56,064[#]** |

*See* 50 U.S.C. §§ 1873(b)(3), 1873(b)(3)(A), and 1873(b)(3)(B).

* Pursuant to §1873(d)(2)(B), this statistic does not apply to orders resulting in the acquisition of information by the FBI that does not include electronic mail addresses or telephone numbers.

[#] This number represents information the government received from provider(s) electronically for the entire calendar year. The government does not have a process for capturing unique identifiers received by other means (such as hard-copy or portable media).

[†] Last year, the FBI mistakenly interchanged the number of unique identifiers for business records and PR/TT orders, reporting the number of business records unique identifiers as PR/TT unique identifiers and vice versa. This report corrects the error and accurately identifies the legal authority under which the FBI obtained the unique identifiers.

**Figure 15: Table of FISA PR/TT Targets – U.S. Persons and Non-U.S. Persons***

| PR/TT Targets | CY2016 | CY2017 |
|---|---|---|
| Estimated number of targets who are *non*-U.S. persons | 23 | **16** |
| Estimated number of targets who are U.S. persons | 18 | **11** |
| Estimated percentage of targets who are U.S. persons | 43.9% | **40.7%** |

*See* 50 U.S.C. §§1873(b)(3)(A)(i) and 1873(b)(3)(A)(ii) for rows one and two, respectively.

* Previously the IC was not statutorily required to publicly provide these statistics, but provided them consistent with transparency principles. The reauthorized FAA of 2017 codified this requirement at 50 U.S.C. §§ 1873(b)(3)(A)(i) and 1873(b)(3)(A)(ii).

## FISA Title V – Business Records

### A.  Business Records FISA

Under FISA, Title V authorizes the government to submit an application for an order requiring the production of any tangible things for (i) "an investigation to obtain foreign intelligence information not concerning a United States person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1861. Title V is commonly referred to as the *"Business Records"* provision of FISA.

> **FISA Title V**
>
> → *Commonly referred to as "Business Records" provision.*
>
> → *Bulk collection is prohibited.*
>
> → *Call Detail Records (CDRs) may be obtained from a telephone company if the FISC issues an individual court order for target's records.*
>
> → *Request for records in an investigation of a U.S. person must be based on an investigation to protect against terrorism or clandestine intelligence activities and provided that the investigation is not conducted solely upon activities protected by the First Amendment to the Constitution.*

In June 2015, the USA FREEDOM Act was signed into law and, among other things, it amended Title V, including by prohibiting bulk collection. *See* 50 U.S.C. §§ 1861(b), 1861(k)(4). The DNI is required to report various statistics about two Title V provisions – traditional business records and call detail records (discussed further below).  On November 28, 2015, in compliance with amendments enacted by the USA FREEDOM Act, the IC terminated collection of bulk telephony metadata under Title V of the FISA (the "Section 215 Program"). Solely due to legal obligations to preserve records in certain pending civil litigation, including *First Unitarian Church of Los Angeles, et al. v. National Security Agency, et al.*, No. C 13-03287-JSW (N.D. Cal.) and *Jewel, et al. v. National Security Agency, et al.*, No. C 08-04373-JSW (N.D. Cal.), the IC continues to preserve previously collected bulk telephony metadata. Under the terms of a FISC order dated November 24, 2015, the bulk telephony metadata cannot be used or accessed for any purpose other than compliance with preservation obligations. Once the government's preservation obligations are lifted, the government is required to promptly destroy all bulk metadata produced by telecommunications providers under the Section 215 Program.

As noted in last year's *Annual Statistical Transparency Report*, on November 30, 2015, the IC implemented certain provisions of the USA FREEDOM Act, including the call detail records provision and the requirement to use a specific selection term. Accordingly, only one month's worth of data for calendar year 2015 was available with respect to those provisions. Any statistical information relating to a particular FISA authority for a particular month remains classified. Therefore, the Title V data specifically associated with December 2015 was only released in a classified annex provided to Congress as part of the report for CY2015. For the CY 2016 report, statistical information was collected for an entire year under the USA FREEDOM Act Title V provisions. As a result, those statistics were included in that report. For the CY 2017 report, statistical information was collected for an entire year under the USA FREEDOM Act Title V provisions. As a result, those statistics are included in this report.

Statistics related to *traditional business records* under Title V Section 501(b)(2)(B) are provided first pursuant to 50 U.S.C. § 1873(b)(5). Statistics related to *call detail records* under Title V Section 501(b)(2)(C) are provided second pursuant to 50 U.S.C. § 1873(b)(6).

## B. Statistics – "Traditional" Business Records Statistics Orders, Targets & Identifiers

Business Record (BR) requests for tangible things include books, records, papers, documents, and other items pursuant to 50 U.S.C. §1861(b)(2)(B), also referred to as Section 501(b)(2)(B) . These are commonly referred to as "Traditional" Business Records.

**Estimating the number of unique identifiers.** This is an estimate of the number of (1) targeted identifiers (e.g., telephone numbers and email addresses) and (2) non-targeted identifiers that were in contact with the targeted identifiers. This metric represents unique identifiers received electronically from the provider(s). The government does not have a process for capturing unique identifiers received by other means (i.e., hard-copy or portable media).

**Explaining how we count BR statistics.** As an example of the government's methodology, assume that in 2017, the government submitted a BR request targeting "John Doe" with email addresses john.doe@serviceproviderX, john.doe@serviceproviderY, and john.doe@serviceproviderZ. The FISC found that the application met the requirements of Title V and issued orders granting the application and directing service providers X, Y, and Z to produce business records pursuant to Section 501(b)(2)(B). Provider X returned 10 non-targeted email addresses that were in contact with the target; provider Y returned 10 non-targeted email addresses that were in contact with the target; and provider Z returned 10 non-targeted email addresses that were in contact with the target. Based on this scenario, we would report the following statistics: A) one order by the FISC for the production of tangible things, B)

one target of said orders, and C) 33 unique identifiers, representing three targeted email addresses plus 30 non-targeted email addresses.

**Figure 16: Table of "Traditional" Business Records Orders, Targets, and Unique Identifiers Collected**

| Business Records "BR" – Section 501(b)(2)(B) | CY2016 | CY2017 |
|---|---|---|
| Total number of orders issued pursuant to applications under Section 501(b)(2)(B) | 84 | **77** |
| Estimated number of targets of such orders | 88 | **74** |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders | 125,354† | **87,834** |

See 50 U.S.C. §§ 1873(b)(5), 1873(b)(5)(A), and 1873(b)(5)(B).

† Last year, the FBI mistakenly interchanged the number of unique identifiers for business records and PR/TT orders, reporting the number of business records unique identifiers as PR/TT unique identifiers and vice versa. This report corrects the error and accurately identifies the legal authority under which the FBI obtained the unique identifiers.

## C. Statistics – Call Detail Record (CDR) Orders, Targets & Identifiers

Call Detail Records (CDRs) **–** commonly referred to as "call event metadata" – may be obtained from traditional telecommunications providers pursuant to 50 U.S.C. §1861(b)(2)(C). A CDR is defined as session identifying information (such as originating or terminating telephone number, an International Mobile Subscriber Identity (IMSI) number, or an International Mobile Station Equipment Identity (IMEI) number), a telephone calling card number, or the time or duration of a call. *See* 50 U.S.C. §1861(k)(3)(A). CDRs provided to the government do <u>not</u> include the content of any communication, the name, address, or financial information of a subscriber or customer, or cell site location or global positioning system information. *See* 50 U.S.C. §1861(k)(3)(B). CDRs are stored and queried by the service providers. *See* 50 U.S.C. §1861(c)(2).

**Estimating the number of targets of CDR orders.** A "target" is the person using the selector. For example, if a target uses four selectors that have been approved, the number counted for purposes of this report would be one target, not four. Alternatively, if two targets are using one selector that has been approved, the number counted would be two targets.

**Figure 17: Table of CDR Orders and Targets**

| Call Detail Records "CDRs" – Section 501(b)(2)(C) | CY2016 | CY2017 |
|---|---|---|
| Total number of orders issued pursuant to applications under Section 501(b)(2)(C) | 40 | **40** |
| Estimated number of targets of such orders | 42 | **40** |

*See* 50 U.S.C. §§ 1873(b)(6) and 1873(b)(6)(A).

**The estimated number of Call Detail Records received from providers.** This metric represents the number of *records received* from the provider(s) and stored in NSA repositories (records that fail at any of a variety of validation steps are not included in this number). CDRs covered by § 501(b)(2)(C) include call detail records created before, on, or after the date of the application relating to an authorized investigation. While the USA FREEDOM Act directs the government to provide a good faith estimate of "the number of unique identifiers used to communicate information collected pursuant to" orders issued in response to CDR applications (*see* 50 U.S.C. § 1873(b)(5)(B)), the statistic below does *not* reflect the number of unique identifiers contained within the call detail records received from the providers. As of the date of this report, the government does not have the technical ability to isolate the number of unique identifiers within records received from the providers. As explained in the 2016 NSA public report on the USA FREEDOM Act, the metric provided is over-inclusive because the government counts each record *separately even if the government receives the same record multiple times* (whether from one provider or multiple providers). Additionally, this metric includes duplicates of unique identifiers – i.e., because the government lacks the technical ability to isolate unique identifiers, the statistic counts the number of records even if unique identifiers are repeated. For example, if one unique identifier is associated with multiple calls to a second unique identifier, it will be counted multiple times. Similarly, if two different providers submit records showing the same two unique identifiers in contact, then those would also be counted. This statistic includes records that were received from the providers in CY2017 for all orders active for any portion of the year, which includes orders that the FISC approved in 2016. Furthermore, while the records are received from domestic communications service providers, the records received are for domestic and foreign numbers. More information on how NSA implements this authority can be found in the DCLPO report, in particular *see* page 5 for a description and illustration of the USA FREEDOM Implementation Architecture.

**Figure 18:  Illustration of a hop scenario and counting**



Target uses Phone A which is the FISC-approved selector in the FISC order.  This would count as **1 order, 1 target**, **7 unique identifiers** (phones A, B, C, D, E, F, G) and, assuming 500 calls between parties, **6000 CDRs** (*produced for both sides of a call event).

Assume an NSA intelligence analyst learns that phone number (**Phone A**) is being used by a suspected international terrorist (target). **Phone A** is the "specific selection term" or "selector" that will be submitted to the FISC (or the Attorney General in an emergency) for approval using the "reasonable articulable suspicion" (RAS) standard. Assume that one provider (provider X) submits a record showing **Phone A** called unique identifier **Phone B** – what is referred to as a "call event." This is the **"first hop."** In turn, assume that NSA submits the "first-hop" Phone B to the provider X, and finds that unique identifier was used to call another unique identifier **Phone D**. This is the **"second-hop."** If the unique identifiers call one another multiple times, then multiple CDRs are produced and duplication occurs. Additionally, the government may receive multiple CDRs for a single call event. NSA may also submit the specific selection Phone A number to another provider (provider Y) who may have CDRs of the same call events.

Not all CDRs provided to the government will be domestic numbers. The targeted "specific selection term" could be a foreign number, could have called a foreign number or the "first-

hop" number could have called a foreign number; thus, these CDRs statistics contain both domestic and foreign number results.

**Figure 19: Table of CDRs Received Arising from Such Targets**

| Call Detail Records "CDRs" – Section 501(b)(2)(C) | CY2016 | CY2017 |
|---|---|---|
| Estimated number of call detail records arising from such targets that NSA received from providers pursuant to Section 501(b)(2)(C) and stored in its  repositories* | 151,230,968 | **534,396,285** |

* While the statute directs the government to count the unique identifiers, the government is not technically able to isolate the number of unique identifiers; thus, this number includes duplicate records. Additionally, the number of records contains both domestic and foreign numbers.


## D.  Statistics – Call Detail Record Queries

**The number of search terms associated with a U.S. person used to query the CDR data.** Each unique query is counted only once. The same term queried 10 times counts as one query term. A single query with 20 terms counts as 20 query terms.

**Figure 20: Table of CDRs -- U.S. person query terms**

| Call Detail Records "CDRs" – Section 501(b)(2)(C) | CY2016 | CY2017 |
|---|---|---|
| Estimated number of search terms that included information concerning a U.S. person that were used to query any database of call detail records obtained through the use of such orders* | 22,360 | **31,196** |

*See* 50 U.S.C. § 1873(b)(6)(C).

* Consistent with § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

## National Security Letters (NSLs)

### A. National Security Letters

In addition to statistics relating to FISA authorities, we are reporting information on the government's use of National Security Letters (NSLs). The FBI is statutorily authorized to issue NSLs for specific records (as specified below) only if the information being sought is relevant to a national security investigation. NSLs may be issued for four commonly used types of records:

> **National Security Letters**
>
> → _Not_ authorized by FISA but by other statutes.
>
> → Bulk collection is prohibited, however, by the USA FREEDOM Act.
>
> → FBI may only use NSLs if the information sought is relevant to international counterterrorism or counterintelligence investigation.

1) telephone subscriber information, toll records, and other electronic communication transactional records, see 18 U.S.C. § 2709;
2) consumer-identifying information possessed by consumer reporting agencies (names, addresses, places of employment, institutions at which a consumer has maintained an account), see 15 U.S.C. § 1681u;
3) full credit reports, see 15 U.S.C. § 1681v (only for counterterrorism, not for counterintelligence investigations); and
4) financial records, see 12 U.S.C. § 3414.

### B. Statistics – National Security Letters and Requests of Information

**Counting NSLs.** Today we are reporting (1) the total number of NSLs _issued_ for all persons, and (2) the total number of requests for information (ROI) contained within those NSLs.  When a single NSL contains multiple ROIs, each is considered a "request" and each request must be relevant to the same pending investigation. For example, if the government issued one NSL seeking subscriber information from one provider and that NSL identified three e-mail addresses for the provider to return records, this would count as <u>one</u> NSL issued and <u>three</u> ROIs.

- **The Department of Justice's Report on NSLs.** In May 2018, the Department of Justice released its *Annual Foreign Intelligence Surveillance Act Report* to Congress. That report, which is available online, provides the *number of requests* made for certain information concerning different U.S. persons pursuant to NSL authorities during calendar year 2017. The Department of Justice's report provides the number of individuals subject to an NSL whereas the ODNI's report provides the number of NSLs issued. Because one person may be subject to more than one NSL in an annual period, the number of NSLs issued and the number of persons subject to an NSL differs.

**Why we report the number of NSL requests instead of the number of NSL targets.** We are reporting the annual number of requests for multiple reasons. First, the FBI's systems are configured to comply with Congressional reporting requirements, which do not require the FBI to track the number of individuals or organizations that are the subject of an NSL. Even if the FBI systems were configured differently, it would still be difficult to identify the number of specific individuals or organizations that are the subjects of NSLs. One reason for this is that the subscriber information returned to the FBI in response to an NSL may identify, for example, one subscriber for three accounts or it may identify different subscribers for each account.  In some cases this occurs because the identification information provided by the subscriber to the provider may not be true. For example, a subscriber may use a fictitious name or alias when creating the account. Thus, in many instances, the FBI never identifies the actual subscriber of a facility. In other cases, this occurs because individual subscribers may identify themselves differently for each account (e.g., inclusion of middle name, middle initial, etc.) when creating an account.

We also note that the actual number of individuals or organizations that are the subject of an NSL is different than the number of NSL requests. The FBI often issues NSLs under different legal authorities, e.g., 12 U.S.C. § 3414(a)(5), 15 U.S.C. §§ 1681u(a) and (b), 15 U.S.C. § 1681v, and 18 U.S.C. § 2709, for the same individual or organization. The FBI may also serve multiple NSLs for an individual for multiple facilities (e.g., multiple e-mail accounts, landline telephone numbers and cellular phone numbers). The number of requests, consequently, is significantly larger than the number of individuals or organizations that are the subjects of the NSLs.

**Figure 21a: Table of NSLs Issued and Requests for Information**

| National Security Letters (NSLs) | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 |
|---|---|---|---|---|---|
| Total number of NSLs issued | 19,212 | 16,348 | 12,870 | 12,150 | **12,762** |
| Number of Requests for Information (ROI) | 38,832 | 33,024 | 48,642 | 24,801 | **41,579** |

*See* 50 U.S.C. § 1873(b)(6).

**Figure 21b: Chart of NSLs Issued and Requests for Information**



**APPENDIX**

UNCLASSIFIED

DIRECTOR OF NATIONAL INTELLIGENCE
WASHINGTON, DC 20511

**MAY 0 4 2018**

The Honorable Richard Burr
Chairman
Select Committee on Intelligence
United States Senate

The Honorable Chuck Grassley
Chairman
Committee on the Judiciary
United States Senate

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives

The Honorable Robert W. Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives

Dear Messrs. Chairmen:

Section 603(b)(2)(B) of the Foreign Intelligence Surveillance Act (FISA), as amended by the *Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015*, (P.L.114-23), 129 Stat. 268 (hereinafter USA FREEDOM Act), requires the Director of National Intelligence (DNI) to make publicly available for the preceding 12-month period a good faith estimate of the number of queries concerning a known United States person of unminimized non-content information relating to electronic communications or wire communications obtained through acquisitions authorized under Section 702 of FISA, excluding the number of queries containing information used to prevent the return of information concerning a United States person.

If the DNI concludes that this good faith estimate cannot be determined accurately because not all of the relevant elements of the Intelligence Community (IC) are able to provide this good faith estimate, then FISA requires him to (i) certify that conclusion in writing to the committees identified above; (ii) report the good faith estimate for those relevant elements able to provide such good faith estimate; (iii) explain when it is reasonably anticipated that such an estimate will be able to be determined fully and accurately; and (iv) make such certification publicly available on an Internet website.

I conclude that the good faith estimate required under section 603(b)(2)(B) of FISA cannot be determined accurately because not all of the relevant elements of the IC are able to provide this good faith estimate. Specifically, the Central Intelligence Agency (CIA) remained unable to provide such information for calendar year 2017. The enclosed report includes the good faith estimate for those relevant IC elements that were able to provide such good faith estimate. Based on the information provided to me by the CIA, I reasonably anticipate that such an estimate will be able to be determined fully and accurately by the end of calendar year 2018 so as to be included in the 2019 report.

UNCLASSIFIED

UNCLASSIFIED

The Honorable Richard Burr
The Honorable Chuck Grassley
The Honorable Devin Nunes
The Honorable Robert W. Goodlatte


If you have any questions regarding this matter, please contact the Office of the Director of National Intelligence Office of Legislative Affairs at (703) 275-2474.

Sincerely,

Daniel R. Coats


Enclosure:
Statistical Transparency Report

cc:   Executive Secretary, National Security Staff
      Director, Central Intelligence Agency
      Under Secretary of Defense for Intelligence
      Under Secretary for Intelligence and Analysis, Department of Homeland Security
      Director, National Security Agency
      Director, National Reconnaissance Office
      Director, Defense Intelligence Agency
      Director, National Geospatial-Intelligence Agency
      Assistant Secretary for Intelligence and Research, Department of State
      Assistant Secretary for Intelligence and Analysis, Department of the Treasury
      Executive Assistance Director, Intelligence Branch, Federal Bureau of Investigation
      Chief of Intelligence, Senior Officer, Drug Enforcement Administration
      Director, Office of Intelligence and Counterintelligence, Department of Energy
      Deputy Chief of Staff, G2, U.S. Army
      Director of Intelligence, U.S. Marine Corps
      Director of Naval Intelligence, N2 U.S. Navy
      Deputy Chief of Staff for Intelligence, Surveillance and Reconnaissance, A2, U.S. Air
        Force
      Deputy Chief of Staff for Intelligence and Criminal Investigations, U.S. Coast Guard
      Assistant Attorney General for National Security, Department of Justice

2

UNCLASSIFIED

# EXHIBIT I
to Twitter's Request for Judicial Notice



*Office of the Director of National Intelligence*

# Statistical Transparency Report

## Regarding the Use of National Security Authorities

— Calendar Year 2018 —

Office of Civil Liberties, Privacy, and Transparency

April 2019



ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES

CALENDAR YEAR **2018**

# Table of Contents

**Introduction** ................................................................................................................................. **4**

    *A. Background* ........................................................................................................................... 4

    *B. Areas Covered in this Report* ............................................................................................ 4

    *C. Context and Clarity* ........................................................................................................... 5

    *D. Key Terms* ........................................................................................................................... 6

**FISA Probable Cause Authorities** ........................................................................................ **8**

    *A. FISA Titles I and III* ........................................................................................................ 8

    *B. FISA Title VII, Sections 703 and 704* ........................................................................... 8

    *C. Statistics* ............................................................................................................................. 8

**FISA Section 702** ..................................................................................................................... **10**

    *A. Section 702* ...................................................................................................................... 10

    *B. Statistics—Orders and Targets* ....................................................................................... 12

    *C. Statistics—U.S. Person Queries* ..................................................................................... 13

    *D. Section 702 and FBI Investigations* ............................................................................... 16

    *E. NSA Dissemination of U.S. Person Information under FISA Section 702* ................. 17

**FISA Criminal Use and Notice Provisions** ...................................................................... **22**

    *A. FISA Sections 106 and 305* ........................................................................................... 22

**FISA Title IV—Use of Pen Register and Trap and Trace (PR/TT) Devices** ............. **23**

    *A. FISA PR/TT Authority* ................................................................................................... 23

    *B. Statistics* ........................................................................................................................... 23

**FISA Title V—Business Records** ........................................................................................ **25**

    *A. Business Records FISA* ................................................................................................... 25

    *B. Statistics—Title V "Traditional" Business Records Statistics Orders, Targets & Identifiers* ......................... 26

    *C. Statistics—Call Detail Record (CDR) Orders, Targets & Identifiers* .......................... 27

    *D. Statistics—Call Detail Record Queries* ........................................................................ 31

**National Security Letters (NSLs)** ......................................................................................... **32**

    *A. National Security Letters* ............................................................................................... 32

    *B. Statistics—National Security Letters and Requests for Information* ........................... 32

CONTENTS
FIGURES
INTRODUCTION
FISA PROBABLE CAUSE AUTHORITIES
FISA SECTION 702
FISA CRIMINAL USE
FISA TITLE IV
FISA TITLE V
NATIONAL SECURITY LETTERS

ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES

**CALENDAR YEAR 2018**

# Table of Figures

*Figures 1a and 1b:* FISA "Probable Cause" Court Orders and Targets ..................................................... 9

*Figures 2a and 2b:* FISA "Probable Cause" Targets Broken Down by U.S. Person Status ..................... 9

*Figure 3:* Section 702 Orders ................................................................................................................. 13

*Figure 4:* Section 702 Targets ............................................................................................................... 13

*Figure 5:* How the IC Counts U.S. Person Query Terms Used To Query Section 702 Content ............... 14

*Figure 6:* U.S. Person Query Terms Used To Query Section 702 Content .............................................. 14

*Figure 7:* How the IC Counts U.S. Person Query Terms Used To Query Section 702 Noncontents ....... 15

*Figure 8:* U.S. Person Queries of Noncontents of Section 702 .............................................................. 15

*Figure 9:* Required Section 702 Query Reporting to the FISC ............................................................... 16

*Figure 10:* Number of FBI Investigations Opened on USPs Based on Section 702 Acquisition ............. 16

*Figure 11:* Section 702 Reports Containing USP Information Unmasked by NSA ................................... 20

*Figure 12:* Section 702 USP Identities Disseminated by NSA ............................................................... 20

*Figure 13:* Number of Criminal Proceedings in Which the Government Provided Notice of Its Intent
To Use Certain FISA Information ............................................................................................................. 22

*Figures 14a and 14b:* Number of PR/TT Orders, Targets and Unique Identifiers Collected ................. 24

*Figure 15:* FISA PR/TT Targets—U.S. Persons and Non-U.S. Persons ................................................. 24

*Figure 16a:* Title V "Traditional" Business Records Orders, Targets, and Unique Identifiers Collected .... 26

*Figure 16b:* "Traditional" Business Records Orders and Targets ........................................................... 27

*Figure 16c:* "Traditional" Business Records Unique Identifiers ............................................................ 27

*Figures 17a and 17b:* CDR Orders and Targets .................................................................................... 28

*Figure 18:* Call Event Hop Scenario and Method of Counting ............................................................... 29

*Figure 19:* CDRs Received Arising from Such Targets .......................................................................... 30

*Figure 20:* Unique Identifiers in the CDRs Received ............................................................................ 31

*Figure 21:* CDRs—U.S. Person Query Terms ...................................................................................... 31

*Figure 22a:* NSLs Issued and Requests for Information ....................................................................... 33

*Figure 22b:* Total NSLs Issued and Total ROIs Within Those NSLs ..................................................... 33

CONTENTS
FIGURES
INTRODUCTION
FISA PROBABLE CAUSE AUTHORITIES
FISA SECTION 702
FISA CRIMINAL USE
FISA TITLE IV
FISA TITLE V
NATIONAL SECURITY LETTERS

CALENDAR YEAR **2018**

# Introduction

Today, consistent with the Foreign Intelligence Surveillance Act of 1978 (FISA), as amended (codified in 50 U.S.C. § 1873(b)), and the Intelligence Community's (IC) *Principles of Intelligence Transparency,* we are releasing our sixth annual *Statistical Transparency Report Regarding Use of National Security Authorities* presenting statistics on how often the government uses certain national security authorities. Providing these statistics allows for an additional way to track the use of FISA authorities and National Security Letters (NSLs). The statistics also add further context regarding the IC's rigorous and multi-layered oversight framework that safeguards the privacy of United States person (U.S. person or USP) information and non-U.S. persons' information acquired pursuant to these national security authorities. This report goes beyond the government's statutory duty of providing statistics by further providing the public with detailed explanations as to how the IC uses its national security authorities. This document should be read in conjunction with the national security-related materials that the government has already released publicly, especially the documents that have been highlighted through the hyperlinks embedded in this report, as well as the statistical report provided by the Director of the Administrative Office of the U.S. Courts (50 U.S.C. § 1873(a), available on the AOUSC website).

Additional public information on national security authorities is available at the Office of the Director of National Intelligence's (ODNI) website, www.dni.gov, the Intelligence Community's public website, www.intel.gov, and ODNI's public Tumblr site, *IC on the Record* at IContheRecord.tumblr.com.

## A. Background

In June 2014, the Director of National Intelligence (DNI) began releasing statistics relating to the use of critical national security authorities, including FISA, in an annual report called the *Statistical Transparency Report Regarding Use of National Security Authorities* (hereafter the *Annual Statistical Transparency Report*). Subsequent *Annual Statistical Transparency Reports* were released in 2015, 2016, 2017, and 2018.

On June 2, 2015, the Uniting and Strengthening America by Fulfilling Rights and Ensuring Effective Discipline Over Monitoring Act of 2015 (USA FREEDOM Act) was enacted, amending FISA by requiring the government to publicly report many of the statistics already reported in the *Annual Statistical Transparency Report*. The USA FREEDOM Act also expanded the scope of the information included in the reports by requiring the DNI to report information concerning USP search terms and queries of certain FISA-acquired information, as well as specific statistics concerning call detail records. *See* 50 U.S.C. § 1873(b). On January 19, 2018, the FISA Amendments Reauthorization Act of 2017 was signed, further codifying that additional statistics must be publicly released, including many statistics that the government previously reported pursuant to its commitment to transparency.

## B. Areas Covered in this Report

This report provides statistics in the following areas (the terms used below are defined and explained later in this report):

- **FISA PROBABLE CAUSE AUTHORITIES.** The number of orders—and the number of targets under those orders—for the use of FISA authorities that require probable cause determinations by the Foreign Intelligence Surveillance Court (FISC), under Titles I and III, and Section 703 and 704, of FISA.

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

- **FISA SECTION 702.**
  - The number of orders—and the number of targets under those orders—issued pursuant to Section 702 of FISA.
  - The number of U.S. person queries of Section 702-acquired content.
  - The number of U.S. person queries of Section 702-acquired metadata.
  - The number of instances in which Federal Bureau of Investigation (FBI) personnel received and reviewed Section 702-acquired information that the FBI identified as concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence and conducted in connection with a predicated criminal investigation.
  - The number of instances in which the FBI opened, under the Criminal Investigative Division, an investigation of a U.S. person who is not considered a threat to national security based wholly or in part on Section 702-acquired information.
  - The number of National Security Agency (NSA)-disseminated Section 702 reports containing U.S. person identities (various statistics relating to reports where the U.S. person identity was openly named or originally masked and subsequently unmasked).
- **USE IN CRIMINAL PROCEEDINGS.** The number of criminal proceedings in which the United States or a State or political subdivision provided notice under FISA of the government's intent to enter into evidence or otherwise use or disclose any information derived from electronic surveillance, physical search, or Section 702 acquisition.
- **PEN REGISTER AND TRAP AND TRACE DEVICES.** The number of orders—and the number of targets under those orders—for the use of FISA's pen register/trap and trace devices, and the number

of unique identifiers used to communicate information collected pursuant to those orders.

- **BUSINESS RECORDS.** The number of business records are reported with distinction made between records obtained under Section 501(b)(2)(B)—commonly referred to as "traditional" business records—and call detail records obtained under Section 501(b)(2)(C). Specifically:
  - The number of traditional business record orders—and the number of targets under those orders—issued pursuant to FISA's traditional business records authority, and the number of unique identifiers used to communicate information collected pursuant to those orders.
  - The number of call detail record orders—and the number of targets under those orders—issued pursuant to FISA's call detail records authority for the ongoing production of call detail records, the number of call detail records received from providers and stored in NSA repositories, and the number of unique identifiers used to communicate information collected.
- **NATIONAL SECURITY LETTERS.** The number of National Security Letters (NSLs) issued, and the number of requests for information within those NSLs.

## C. Context and Clarity

Consistent with the IC's *Principles of Intelligence Transparency*, and in addition to the mandatory reporting required by FISA, this report provides transparency to enhance public understanding about certain activities the IC undertakes to accomplish its national security mission. Specifically, this report provides context concerning how the IC implements FISA, including the circumstances under which such activities are conducted and the rules that are designed to ensure compliance with the Constitution and laws of the United States. While the statistics contained herein provide an important point for understanding the use of these authori-

CONTENTS
FIGURES
INTRODUCTION
FISA PROBABLE CAUSE AUTHORITIES
FISA SECTION 702
FISA CRIMINAL USE
FISA TITLE IV
FISA TITLE V
NATIONAL SECURITY LETTERS

ties, the statistics have limitations in explaining the complexities of how the IC implements FISA; thus, this report is intended to be read in conjunction with other related publicly released information for a more comprehensive understanding. The statistics fluctuate from year to year for a variety of reasons. These include changes in operational priorities, world events, technical capabilities, target behavior, the dynamics of the ever-changing telecommunications sector, and the use of technology to automate the delivery of marketing and other communications. These reasons often cannot be explored in detail in an unclassified setting without divulging information necessary to protect national security. Moreover, there may be no relationship between a decrease in the use of one authority and an increase in another.

## D. Key Terms

Certain terms used throughout this report are described below. Other terms are described in the sections in which they are most directly relevant. These terms will be used consistently throughout this report.

- **U.S. PERSON.** As defined by Title I of FISA, a U.S. person is "a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in [50 U.S.C. § 1801(a)(1), (2), or (3)]." 50 U.S.C. § 1801(i). Section 602 of the USA FREEDOM Act, however, uses a narrower definition. Since the broader Title I definition governs how U.S. person queries are conducted pursuant to the relevant minimization procedures, it will be used throughout this report.

- **TARGET.** Within the IC, the term "target" has multiple meanings. With respect to the statistics provided in this report, the term "target" is used as a noun and defined as the individual person, group, entity composed of multiple individuals, or foreign power that uses the selector such as a telephone number or email address.

The IC also uses the term "target" as a verb, especially as it relates to Section 702. Specifically, Section 702 authorizes the targeting of (i) non-United States persons (ii) reasonably believed to be located outside the United States (iii) to acquire foreign intelligence information. To ensure that all three requirements are appropriately met, Section 702 requires targeting procedures. Additional information on targeting is detailed below in the Section 702 discussion.

Targeting for intelligence purposes must be informed by the *National Intelligence Priorities Framework (NIPF)*. The NIPF is the high-level mechanism to manage and communicate national intelligence priorities, facilitating the IC's ability to allocate finite resources to address the most pressing intelligence questions and mission requirements. Guidance from the President and the National Security Advisor, with formal input from cabinet-level heads of departments and agencies, determine the overall priorities of the top-level NIPF issues. Once the IC determines that a particular target meets an intelligence need under the NIPF, the IC must then apply applicable legal authorities (e.g., certain acquisitions authorized under FISA, Executive Order 12333) to begin targeting.

- **ORDERS.** There are different types of orders that the FISC may issue in connection with FISA cases, including orders granting or modifying the government's applications to conduct foreign intelligence collection including orders granting or modifying the government's applications to conduct foreign intelligence collection pursuant to FISA; orders directing electronic

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES

CALENDAR YEAR **2018**

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

communication service providers to provide any technical assistance necessary to implement the authorized foreign intelligence collection; and supplemental orders and briefing orders requiring the government to take a particular action or provide the court with specific information. As with past years, this report only counts orders granting the government's applications.

The FISC may *amend* an order one or more times after it has been granted. For example, an order may be amended to add a newly discovered account used by the target. *This report does not count such amendments separately.*

The FISC may *renew* some orders multiple times during the calendar year. Each authority permitted under FISA has specific time limits for the FISA authority to continue (e.g., a Section 704 order against a U.S. person target outside of the United States may last no longer than 90 days, but FISA permits the order to be renewed, *see* 50 U.S.C. § 1881c(c)(4)). Each renewal requires a separate application submitted by the government to the FISC and a finding by the FISC that the application meets the requirements of FISA. Thus, unlike amendments, *this report counts each such renewal as a separate order granting the requested FISA authority.*

▪ **"ESTIMATED NUMBER."** Throughout this report, when numbers are *estimated*, the estimate comports with the statutory requirements to provide a "good faith estimate" of a particular number.

▪ **DISSEMINATION.** Dissemination refers to the sharing of minimized information. As it pertains to FISA (including Section 702), if an agency (such as NSA) lawfully collects information pursuant to

FISA and wants to disseminate that information, the agency must first apply its minimization procedures to that information.

▪ **FISC.** The FISC was established in 1978 when Congress enacted FISA (*see* 50 U.S.C. §§ 1801-1885c). The Court is composed of eleven federal district court judges who are designated by the Chief Justice of the United States. Pursuant to FISA, the Court entertains applications submitted by the United States Government for approval of electronic surveillance, physical search, and other investigative actions for foreign intelligence purposes.

▪ **AMICUS CURIAE.** In 2015, the USA FREEDOM Act established a framework under which qualified individuals are appointed as amicus curiae to assist the FISC and the Foreign Intelligence Surveillance Court of Review (FISC-R) in the consideration of matters (including matters that present a novel or significant interpretation of the law or matters dealing with technical expertise) before those courts. *See* 50 U.S.C. § 1803. Individuals designated as amici must have expertise in privacy and civil liberties, intelligence collection, communications technology, or other areas that may lend legal or technical expertise to the FISC and FISC-R and must also be eligible for access to classified information. When appointed, amicus curiae provide those courts, as appropriate, with legal arguments that advance the protection of individual privacy and civil liberties; information related to intelligence collection or communications technology; or legal arguments or information regarding any other area relevant to the issue presented to the court.

CALENDAR YEAR 2018

# FISA Probable Cause Authorities

## A. FISA Titles I and III

With limited exceptions (e.g., in the event of an emergency), to conduct electronic surveillance or physical search of an individual under FISA Title I or FISA Title III, a probable cause court order is required regardless of U.S. person status. Under FISA, Title I permits electronic surveillance and Title III permits physical search in the United States of foreign powers or agents of a foreign power when the government has a significant purpose to obtain foreign intelligence information. *See* 50 U.S.C. §§ 1804 and 1823. Title I (electronic surveillance) and Title III (physical search) are commonly referred to as "Traditional FISA." Both require that, following submission of a government application, the FISC make a probable cause finding, based upon a factual statement in the government's application, that (i) the target is a foreign power or an agent of a foreign power, as defined by FISA and (ii) the facility being targeted for electronic surveillance is used by or about to be used, or the premises or property to be searched is or is about to be owned, used, possessed by, or is in transit to or from a foreign power or an agent of a foreign power. In addition to meeting the probable cause standard, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1804(a) and 1823(a).

## B. FISA Title VII, Sections 703 and 704

*FISA Title VII Sections 703 and 704 similarly require a court order based on a finding of probable cause for the government to undertake FISA collection targeting U.S. persons located outside the United States.* Section 703 applies when the government seeks to conduct electronic surveillance or to acquire stored electronic communications or stored electronic data inside the U.S., in a manner that otherwise requires an order pursuant to FISA, of a U.S. person who is reasonably believed to be located outside the United States. Section 704 applies when the government

> ### FISA Title I, Title III, and Title VII Section 703 and 704
>
> - All of these authorities require individual court orders based on probable cause.
> - Titles I and III apply to FISA collection targeting persons within the United States.
> - Sections 703 and 704 apply to FISA collection targeting U.S. persons outside the United States.

seeks to conduct collection overseas targeting a U.S. person reasonably believed to be located outside the United States under circumstances in which the U.S. person has a reasonable expectation of privacy and a warrant would be required if the acquisition were conducted in the United States. Both Sections 703 and 704 require that the FISC make a probable cause finding, based upon a factual statement in the government's application, that the target is a U.S. person reasonably believed to be (i) located outside the United States and (ii) a foreign power, agent of a foreign power, or officer or employee of a foreign power. Additionally, the government's application must meet the other requirements of FISA. *See* 50 U.S.C. §§ 1881b(b) and 1881c(b).

## C. Statistics

HOW TARGETS ARE COUNTED. If the IC received authorization to conduct electronic surveillance and/or physical search against the same target in four separate applications, the IC would count one target, not four. Alternatively, if the IC received authorization to conduct electronic surveillance and/or physical search against four targets in the same application, the IC would count four targets. Duplicate targets across authorities are not counted.

CONTENTS | FIGURES | INTRODUCTION | FISA PROBABLE CAUSE AUTHORITIES | FISA SECTION 702 | FISA CRIMINAL USE | FISA TITLE IV | FISA TITLE V | NATIONAL SECURITY LETTERS

## Figures 1a and 1b: FISA "Probable Cause" Court Orders and Targets

| Titles I and III and Sections 703 and 704 of FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|---|---|---|
| Total number of orders | 1,767 | 1,519 | 1,585 | 1,559 | 1,437 | **1,184** |
| Estimated number of targets of such orders* | 1,144 | 1,562 | 1,695 | 1,687 | 1,337 | **1,833** |



See 50 U.S.C. §§ 1873(b)(1) and 1873(b)(1)(A).

*Although providing this statistic was first required by the USA FREEDOM Act, the FISA Amendments Reauthorization Act of 2017 enumerated this requirement at 50 U.S.C. § 1873(b)(1)(A).

## Figures 2a and 2b: FISA "Probable Cause" Targets Broken Down by U.S. Person Status

| Titles I and III and Sections 703 and 704—Targets | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Estimated number of targets who are *non*-U.S. persons* | 1,351 | 1,038 | **1,601** |
| Estimated number of targets who are U.S. persons* | 336 | 299 | **232** |
| Percentage of targets who are estimated to be U.S. persons | 19.9% | 22.4% | **12.7%** |



See 50 U.S.C. §§ 1873(b)(1)(B) and 1873(b)(1)(C) for rows one and two, respectively.

*Previously the IC was not statutorily required to publicly provide these statistics but provided them consistent with transparency principles. The FISA Amendments Reauthorization Act of 2017 codified this requirement at 50 U.S.C. §§ 1873(b)(1)(B) and 1873(b)(1)(C).

**CALENDAR YEAR 2018**

# FISA Section 702

## A. Section 702

Title VII of FISA includes Section 702, which permits the Attorney General and the DNI to jointly authorize the targeting of (i) non-U.S. persons (ii) who are reasonably believed to be located outside the United States (iii) to acquire foreign intelligence information. *See* 50 U.S.C. § 1881a. *All three* elements must be met. Additionally, Section 702 requires that the Attorney General, in consultation with the DNI, adopt targeting procedures, minimization procedures, and querying procedures that they attest satisfy the statutory requirements of Section 702 and are consistent with the Fourth Amendment. Additional information on how the government uses Section 702 is posted on *IC on the Record* including a *Section 702 Overview*.

**SECTION 702 TARGETS AND "TASKING."** Under Section 702, the government "targets" a particular non-U.S. person, including non-U.S. person groups or entities, reasonably believed to be located outside the United States to acquire foreign intelligence information by "tasking" selectors (e.g., telephone numbers and email addresses). Before tasking a selector for collection under Section 702, the government must apply its targeting procedures to ensure that the selector is used by a non-U.S. person who is reasonably believed to be located outside the United States and who is expected to possess, receive, and/or is likely to communicate foreign intelligence information. The foreign intelligence information must fall within a specific category of foreign intelligence information that has been authorized for acquisition by the Attorney General and the DNI as part of a Section 702 certification.

In addition to the requirement that the type of foreign intelligence information sought must be authorized as part of a certification approved by the FISC, agencies must also apply protections

> **FISA Title VII— Section 702**
>
> - Commonly referred to as "Section 702."
>
> - Requires individual targeting determinations that the target (1) is a non-U.S. person (2) who is reasonably believed to be located outside the United States and (3) who has or is expected to communicate or receive foreign intelligence information.

required by *Presidential Policy Directive 28 (PPD-28)*, Signals Intelligence Activities, to Section 702-acquired information. PPD-28 reinforces longstanding intelligence practices that protect privacy and civil liberties, while requiring agencies to implement new procedures to ensure that U.S. signals intelligence activities continue to include appropriate safeguards for the personal information of all individuals, regardless of the nationality of the individual to whom the information pertains or where that individual resides.

NSA and FBI task selectors pursuant to their respective Section 702 targeting procedures, which are discussed below. All agencies that receive unminimized (i.e., "raw") Section 702 data—NSA, FBI, Central Intelligence Agency (CIA), and National Counterterrorism Center (NCTC)—handle the Section 702-acquired data in accordance with minimization procedures, which are explained below.

**THE FISC'S ROLE.** Under Section 702, the FISC determines whether certifications executed jointly by the Attorney General and the DNI meet all the requirements of Section 702. In deciding whether to approve a certification application package, the FISC reviews the certifications and the minimization, targeting, and querying procedures to ensure compliance with both FISA and the Fourth Amendment.

CONTENTS | FIGURES | INTRODUCTION | FISA PROBABLE CAUSE AUTHORITIES | FISA SECTION 702 | FISA CRIMINAL USE | FISA TITLE IV | FISA TITLE V | NATIONAL SECURITY LETTERS

The Court's review is not limited to the procedures as written, but also includes an examination of how the procedures have been and will be implemented. Accordingly, as part of its review, the FISC considers the compliance incidents reported to it by the government through notices and reports.

If the FISC determines that the government's certification application package meets the statutory requirements of Section 702 and are consistent with the Fourth Amendment, then the FISC issues an order and supporting statement approving the certifications. The 2016 FISC order and statement approving the certifications was publicly released, in redacted form, in May 2017 and posted on *IC on the Record*.

**CERTIFICATIONS.** Under Section 702, the Attorney General and DNI jointly execute certifications under which the Intelligence Community intends to acquire specified foreign intelligence information. The certifications identify categories of foreign intelligence information to be collected, which must meet the statutory definition of foreign intelligence information, through the targeting of non-U.S. persons reasonably believed to be located outside the United States. The certifications have included information concerning international terrorism and other topics, such as the acquisition of information concerning weapons of mass destruction. Each annual certification must be submitted to the FISC for approval in a certification application package that includes the Attorney General and DNI's certifications, affidavits by certain heads of intelligence agencies, targeting procedures, minimization procedures, and, as described below, querying procedures. Samples of certification application packages have been publicly released on *IC on the Record*, most recently in May 2017.

**TARGETING PROCEDURES.** Each set of targeting procedures are adopted by the Attorney General and then reviewed, as part of the certification package, by the FISC, which reviews the sufficiency of each agency's targeting procedures including assessing the IC's compliance with the procedures. Only

agencies that have Attorney General-adopted targeting procedures that the FISC finds sufficient as part of a certification package may task selectors pursuant to Section 702; only two agencies, NSA and FBI, have targeting procedures and thus are permitted to task selectors.

NSA includes the targeting rationale (TAR) in the tasking record, which requires the targeting analyst to briefly state why targeting for a particular selector was requested. The intent of the TAR is to memorialize why the analyst is requesting targeting and provide a linkage between the user of the selector and the foreign intelligence purpose covered by the certification under which it is being tasked. The TAR is reviewed by the ODNI and Department of Justice oversight teams as part of their routine review of the tasking records. More information about these oversight reviews is provided in the Attorney General and DNI's joint *Semiannual Assessment of Compliance with Procedures and Guidelines Issued Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (commonly referred to as the *Joint Assessment of 702 Compliance* or *Joint Assessment*), most recently released in February 2019 on *IC on the Record*. NSA's 2016 targeting procedures and FBI's 2016 targeting procedures have been publicly released on *IC on the Record*.

**MINIMIZATION PROCEDURES.** The minimization procedures detail requirements the government must meet to use, retain, and disseminate Section 702 data, including specific restrictions regarding non-publicly available U.S. person information acquired from Section 702 collection of non-U.S. person targets, consistent with the needs of each agency to obtain, produce, and disseminate foreign intelligence information. Each agency's Section 702 minimization procedures are adopted by the Attorney General. The FISC reviews the sufficiency of each agency's minimization procedures as part of the certification application package. Such reviews include assessing the IC's compliance with past procedures. The 2016 minimization procedures have been released on *IC on the Record*.

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

CALENDAR YEAR **2018**

Non-U.S. persons also benefit from many of the protective rules prescribed by the targeting and minimization procedures. Under Section 702, collection is targeted (not bulk), and must be limited to non-U.S. person targets located outside the United States who are likely to possess, receive, and/or are expected to communicate foreign intelligence information that is linked to one of the FISC-approved certifications. *See Status of Implementation of PPD-28: Response to the PCLOB's Report, October 2018* at 9. Additionally, "as a practical matter, non-U.S. persons also benefit from the access and retention restrictions required by the different agencies' minimization and/or targeting procedures." *See Privacy and Civil Liberties Oversight Board Report on the Surveillance Program Operated Pursuant to Section 702 of FISA* (July 2, 2014) at 100.

**QUERYING PROCEDURES.** With passage of the FISA Amendments Reauthorization Act of 2017, Congress amended Section 702 to require that querying procedures be adopted by the Attorney General, in consultation with the DNI. Section 702(f)(1) requires that the querying procedures be consistent with the Fourth Amendment and that they include a technical procedure whereby a record is kept of each U.S. person term used for a query. Similar to the Section 702 targeting and minimization procedures, the querying procedures are required to be reviewed by the FISC as part of the certification package for consistency with the statute and the Fourth Amendment. Congress added other requirements in Section 702(f), which pertain to accessing certain results of queries conducted by FBI; those requirements will be discussed later in this report.

Query terms may be date-bound, and may include alphanumeric strings, such as telephone numbers, email addresses, or terms, such as a name, that can be used individually or in combination with one another. Pursuant to court-approved procedures, an agency can only query Section 702 information if the query is reasonably likely to return foreign intelligence information or, in the case of the FBI, evidence of a crime. This standard applies to all Section 702 queries, regardless of whether the term includes U.S. person or non-U.S. person identifiers. As explained in the March 2019-released *Joint Assessment of Section 702 Compliance*, NSA personnel are required to obtain Office of General Counsel approval before any use of United States person identifiers as terms to query the content of Section 702 information. Additional information about U.S. person queries is posted on *IC on the Record.*

**COMPLIANCE.** The IC's application of the targeting, minimization, and querying procedures is subject to robust internal agency oversight and to rigorous external oversight by DOJ, ODNI, Congress, and the FISC. Every identified incident of non-compliance, regardless of the U.S. person status of individuals affected by the incident, is reported to the FISC (through notices or in reports) and to Congress in semiannual reports. Depending on the nature of the incident, the FISC may order remedial actions, which could include deleting improperly collected information, recalling improperly disseminated information, and re-training IC employees. DOJ and ODNI also jointly submit semiannual reports to Congress that assess the IC's overall compliance efforts. Past Joint Assessments of Section 702 Compliance have been publicly released.

## B. Statistics—Orders and Targets

**COUNTING SECTION 702 ORDERS.** As explained above, the FISC may issue a single order to approve more than one Section 702 certification to acquire foreign intelligence information. Note that, in its own transparency report, which is required pursuant to 50 U.S.C. § 1873(a), the Director of the Administrative Office of the United States Courts (AOUSC) counted each of the Section 702 certifications associated with the FISC's order. Because the number of the government's Section 702 certifications remains a classified fact, the government requested that the AOUSC redact the number of certifications from its transparency report prior to publicly releasing it.

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

**Figure 3:** **Section 702 Orders**

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | CY2018 |
|---|---|---|---|---|---|---|
| Total number of orders issued | 1 | 1 | 1 | 0* | 1 | 1 |

*See* 50 U.S.C. § 1873(b)(2).

\* In 2016, the government submitted a certification application package to the FISC. Pursuant to 50 U.S.C. § 1881a(j)(2), the FISC extended its review of the 2016 certification package. The FISC may extend its review of the certifications "as necessary for good cause in a manner consistent with national security." See 50 U.S.C. § 1881a(j)(2), subsequently codified under § 1881a(k)(2) with the FISA Amendments Reauthorization Act of 2017. Thus, because the FISC did not complete its review of the 2016 certifications during calendar year 2016, the FISC did not issue an order concerning those certifications in calendar year 2016. The 2015 order remained in effect during the extension period. On April 26, 2017, the FISC issued an order authorizing the 2016 certifications.

**ESTIMATING SECTION 702 TARGETS.** The number of 702 targets, provided below, reflects an estimate of the number of non-U.S. persons who are the users of tasked selectors. This estimate is based on information readily available to the IC. Unless and until the IC has information that links multiple selectors to a single foreign intelligence target, each individual selector is counted as a separate target for purposes of this report. On the other hand, where the IC is aware that multiple selectors are used by the same target, the IC counts the user of those selectors as a single target. This counting methodology reduces the risk that the IC might inadvertently understate the number of discrete persons targeted pursuant to Section 702.

**Figure 4:** **Section 702 Targets***

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | CY2018 |
|---|---|---|---|---|---|---|
| Estimated number of targets of such orders** | 89,138 | 92,707 | 94,368 | 106,469 | 129,080 | 164,770 |

*See* 50 U.S.C. § 1873(b)(2)(A).

\*Recall that only non-USPs are targeted

\*\*Previously the IC was not statutorily required to publicly provide this statistic but provided it consistent with transparency principles. The FISA Amendments Reauthorization Act of 2017 codified this requirement at 50 U.S.C. § 1873(b)(2)(A).

## C. Statistics—U.S. Person Queries

In July 2014, the Privacy and Civil Liberties Oversight Board (PCLOB or Board) issued a report on Section 702 entitled, *"Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act" (PCLOB's Section 702 Report)*, which reported U.S. person query statistics for calendar year 2013. *See PCLOB's Section 702 Report* at 57-58. The USA FREEDOM Act, enacted in 2015, added a requirement to report publicly certain statistics regarding the number of U.S. person queries of Section 702. Specifically, the Act requires reporting of the "number of search terms concerning a known United States person used to retrieve the unminimized contents [ … ]"—referred to as "query terms of content"—and the "number of queries concerning a known United States person of unminimized noncontents information [ … ]"—referred to as "queries of metadata." See 50 U.S.C. § 1873(b)(2)(B) and (b)(2)(C), respectively. Thus, ODNI began reporting on these statistics in the *Annual Statistical Transparency Report* covering CY2015.

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

Below are statistics for U.S. person queries of raw, Section 702-acquired data.[1] The U.S. person statistics are based on (a) U.S. person *query terms* used to query Section 702 *content* and (b) U.S. person *queries* conducted of Section 702 *noncontents* (i.e., metadata). It is important to understand that these two very different numbers cannot be combined because they use *different counting methodologies* (query terms versus queries conducted) and *different data types* (content versus noncontents).

**COUNTING U.S. PERSON *QUERY TERMS* USED TO QUERY SECTION 702 *CONTENT*.** The NSA counts the number of U.S. person identifiers it approved to query the content of unminimized Section 702-acquired information. For example, if the NSA used U.S. person identifier "johndoe@XYZprovider" to query the content of Section 702-acquired information, the NSA would count it as one regardless of how many times the NSA used "johndoe@XYZprovider" to query its 702-acquired information. The CIA started using this model in 2016 for counting query terms and those statistics were included in the *Annual Statistical Transparency Report* covering CY2016. When the NCTC began receiving raw Section 702 information, NCTC followed a similar approach of counting U.S. person query terms that were used to query Section 702 content.

### Figure 5: How the IC Counts U.S. Person Query Terms Used To Query Section 702 Content



Counted as **3 USPER query terms**, not the 6 instances that the query terms queried the content.

### Figure 6: U.S. Person Query Terms Used To Query Section 702 Content

| Section 702 of FISA | CY2015 | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|---|
| Estimated number of search terms concerning a known U.S. person used to retrieve the unminimized contents of communications obtained under Section 702 (excluding search terms used to prevent the return of U.S. person information)* | 4,672 | 5,288 | 7,512 | **9,637** |

*See* 50 U.S.C. § 1873(b)(2)(B).

*Consistent with 50 U.S.C. § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

[1] With the FISA Amendments Reauthorization Act in 2017, Congress codified new requirements regarding the access to results of certain queries conducted by the FBI. Specifically under Section 702(f)(2)(A), an order from the FISC is now required before the FBI can review the contents of a query using a U.S. person query term when the query was not designed to find and extract foreign intelligence information and was performed in connection with a predicated criminal investigation that does not relate to national security. Before the FISC may issue such an order based on a finding of probable cause, an FBI agent must apply in writing, to include the agent's justification that the query results would provide evidence of criminal activity, and the application must be approved by the Attorney General. 50 U.S.C. Section 1873(b)(2)(A) requires annual reporting of the number of times the FBI received an order pursuant to 702(f)(2)(A).

CALENDAR YEAR 2018

**COUNTING** *QUERIES* **USING U.S. PERSON IDENTIFIERS OF** *NONCONTENTS* **COLLECTED UNDER SECTION 702.** This estimate represents the number of times a U.S. person identifier is used to query the noncontents (i.e., metadata) of unminimized Section 702-ac-quired information. For example, if the U.S. person identifier telephone number "111-111-2222" was used 15 times to query the noncontents of Section 702-acquired information, the number of queries counted would be 15.

Figure 7: **How the IC Counts U.S. Person Query Terms Used To Query Section 702 Noncontents**



Counted as **6 USPER queries** (each individual query event is counted).

The CIA, had been previously unable to provide the number of queries using U.S. person identifiers of unminimized Section 702 noncontents information. Beginning in 2018, CIA was able to estimate the number of these queries and, as such, this new information is included in the CY2018 statistic below.

Figure 8: **U.S. Person Queries of Noncontents of Section 702**

| Section 702 of FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | **CY2018**\*\* |
|---|---|---|---|---|---|---|
| Estimated number of queries concerning a known U.S. person of unminimized noncontent information obtained under Section 702 (excluding queries containing information used to prevent the return of U.S. person information)* | 9,500 | 17,500 | 23,800 | 30,355 | 16,924 | **14,374** |

*See* 50 U.S.C. § 1873(b)(2)(C).

*Consistent with 50 U.S.C. § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

**Beginning with CY2018, this statistic includes all elements that are required to report this number. As explained above, prior to CY2018, CIA had been unable to provide this number.

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

**FISC ORDER REQUIRING CERTAIN SECTION 702 QUERY RE-PORTING BY FBI.** On November 6, 2015, the FISC granted the government's application for renewal of the 2015 certifications and, among other things, concluded that the FBI's U.S. person querying provisions in its minimization procedures, "strike a reasonable balance between the privacy interests of the United States persons and persons in the United States, on the one hand, and the government's national security interests, on the other." *Memorandum Opinion and Order* dated November 6, 2015, at 44 (released on *IC on the Record* on April 19, 2016). The FISC further stated that the FBI conducting queries, "designed to return evidence of crimes unrelated to foreign intelligence does not preclude the Court from concluding that taken together, the targeting and minimization procedures submitted with the 2015 Certifications are consistent with the requirements of the Fourth Amendment." *Id.*

Nevertheless, the FISC ordered the government to report in writing, "each instance after December 4, 2015, in which FBI personnel *receive and review* Section 702-acquired information that the FBI identifies as concerning a United States person in response to a query that is not designed to find and extract foreign intelligence information." (Emphasis added). *Id.* at 44 and 78. The FISC directed that the report contain details of the query terms, the basis for conducting the query, the manner in which the query will be or has been used, and other details. *Id.* at 78. In keeping with the IC's Principles of Intelligence Transparency, the DNI declassified the number of each such query reported to the FISC in calendar year 2016 and for applicable calendar years thereafter. These numbers are reported in Figure 9.

### Figure 9: Required Section 702 Query Reporting to the FISC

| Section 702 of FISA | CY2016 | CY2017 | CY2018 |
|---|---|---|---|
| Per the FISC Memorandum Opinion and Order dated November 6, 2015: Each reported instance in which FBI personnel *received and reviewed* Section 702-acquired information that the FBI identified as concerning a U.S. person in response to a query that was designed to return evidence of a crime unrelated to foreign intelligence. | 1 | 0 | **0** |

*See* FISC Memorandum Opinion and Order dated November 6, 2015.

## D. Section 702 and FBI Investigations

With the enactment of the FISA Amendments Reauthorization Act of 2017, FISA now requires that the FBI report on the number of instances in which the FBI opened, under the Criminal Investigative Division, a criminal investigation of a U.S. person, who is not considered a threat to national security, based wholly or in part on Section 702-acquired information. *See* 50 U.S.C. § 1873(b)(2)(D). This statistic will provide transparency with regard to how often Section 702 collection is used for non-national security investigations conducted by the FBI. Figure 10 provides the required statistic.

### Figure 10: Number of FBI Investigations Opened on USPs Based on Section 702 Acquisition

| Section 702 of FISA | CY2017 | CY2018 |
|---|---|---|
| The number of instances in which the FBI opened, under the Criminal Investigative Division or any successor division, an investigation of a U.S. person (who is not considered a threat to national security) based wholly or in part on an acquisition authorized under Section 702. | 0 | **0** |

*See* 50 U.S.C. § 1873(b)(2)(D).

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

## E. NSA Dissemination of U.S. Person Information under FISA Section 702

**BACKGROUND ON NSA DISSEMINATING U.S. PERSON INFORMATION UNDER SECTION 702.** In July 2014, the *PCLOB's Section 702 Report* contained 10 recommendations. Recommendation 9 focused on "accountability and transparency," noting that the government should implement measures, "to provide insight about the extent to which the NSA acquires and utilizes the communications involving U.S. persons and people located in the United States under the Section 702 program." *PCLOB's Section 702 Report* at 145-146. Specifically, the PCLOB recommended that "the NSA should implement processes to annually count [ … ] (5) the number of instances in which the NSA disseminates non-public information about U.S. persons, specifically distinguishing disseminations that includes names, titles, or other identifiers, such as telephone numbers or e-mail addresses, potentially associated with individuals." *Id.* at 146. This recommendation is commonly referred to as Recommendation 9(5). In response to the PCLOB's July 2014 Recommendation 9(5), NSA previously publicly provided (in the *Annual Statistical Transparency Report* for calendar year 2015) and continues to provide the following additional information regarding the dissemination of Section 702 intelligence reports that contain U.S. person information. Because the PCLOB issued its recommendation in 2014, these statistics were not included in *Annual Statistical Transparency Report* for calendar years 2013 or 2014.

NSA has been providing similar information to Congress since 2009, in classified form, per FISA reporting requirements. For example, FISA Section 702(m)(3) requires that NSA annually submit a report to applicable Congressional committees regarding certain numbers pertaining to the acquisition of Section 702-acquired information, including the number of "disseminated intelligence reports containing a reference to a United States person identity." *See* 50 U.S.C. § 1881a(m)(3)(A)

(i) (prior to the FISA Amendments Reauthorization Act of 2017 under § 1881a(l)(3)(A)(i)). Section 702(m)(3)(A) also requires that the number of "United States-person identities subsequently disseminated by [NSA] in response to request for identities that were not referred to by name or title in the original reporting." *See* 50 U.S.C. § 1881a(m)(3)(A)(ii). This second requirement refers to NSA providing the number of approved unmasking requests, which is explained below. Additionally, the Attorney General and the DNI provide to Congress the number of NSA's disseminated intelligence reports containing a U.S. person reference as part of the Attorney General and the DNI's Joint Assessment of Compliance. *See* 50 U.S.C. § 1881a(m)(1) (prior to the FISA Amendments Reauthorization Act of 2017 under § 1881a(l)(1)).

Prior to the PCLOB issuing its *Section 702 Report*, NSA's Director of the Civil Liberties, Privacy, and Transparency Office published "*NSA's Implementation of Foreign Intelligence Surveillance Act Section 702,*" on April 16, 2014, (hereinafter "NSA DCLPO Report"), in which it explained NSA's dissemination processes. *NSA DCLPO Report* at 7-8. NSA "only generates classified intelligence reports when the information meets a specific intelligence requirement, regardless of whether the proposed report contains U.S. person information." *NSA DCLPO Report* at 7.

Section 702 only permits the targeting of non-U.S. persons reasonably believed to be located outside the United States to acquire foreign intelligence information. Such targets, however, may communicate information to, from, or about U.S. persons. NSA's minimization procedures (publicly released on August 11, 2016) permit the NSA to disseminate U.S person information if the information is necessary to understand the foreign intelligence. By policy, generally, the NSA masks the information that could identify the U.S. person. NSA's minimization procedures define U.S. person identi-

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

CALENDAR YEAR **2018**

fying information as "(1) the name, unique title, or address of a United States person; or (2) other personal identifiers of a United States person [. . . ]". See NSA's Minimization Procedures 2(f).

The minimization procedures also permit NSA to disseminate U.S. person identities only if doing so meets one of the specified reasons listed in NSA's minimization procedures, including that the U.S. person consented to the dissemination, the U.S. person information was already publicly available, the U.S. person information was necessary to understand foreign intelligence information, or the communication contained evidence of a crime and is being disseminated to law enforcement authorities. For example, a Section 702 target may communicate information about a U.S. person that the target intends to victimize in some way; NSA may need to disseminate the identity of affected U.S. persons to appropriate authorities so that they can take appropriate protective, preventive, or investigative action.

Even if one these conditions applies, as a matter of policy, NSA may still mask the U.S. person identity and will include no more than the minimum amount of U.S. person information necessary to understand the foreign intelligence or to describe the crime or threat. *Id.* In certain instances, however, NSA makes a determination that it is appropriate to include in the original report the U.S. person's identity, using the same standards discussed above.

▪ **MASKED U.S. PERSON INFORMATION.** Agency minimization procedures generally provide for the substitution of a U.S. person identity with a generic phrase or term if the identity otherwise does not meet the dissemination criteria; this is often referred to as "masking" the identity of the U.S. person. Information about a U.S. person is masked when the identifying information about the person is not included in a report. For example, instead of reporting that Section 702-acquired information revealed that non-U.S. person "Bad Guy" communicated with

U.S. person "John Doe" (i.e., the actual name of the U.S. person), the report would mask "John Doe's" name, and would state that "Bad Guy" communicated with "an identified U.S. person," "a named U.S. person," or "a U.S. person." Other examples of masked U.S. person identities would be "a named U.S. entity," "a U.S. person email address," or "a U.S. IP address."

▪ **UNMASKING U.S. PERSON INFORMATION.** Recipients of NSA's classified reports, such as other federal agencies, may request that NSA provide the U.S. person identifying information that was masked in an intelligence report. The requested identity information is released only if the requesting recipient has a "need to know" the identity of the U.S. person and if the dissemination of the U.S. person's identity would be consistent with NSA's minimization procedures (e.g., the identity is necessary to understand foreign intelligence information or assess its importance), and additional approval has been provided by a designated NSA official.

As part of their regular oversight reviews, DOJ and ODNI review disseminations of information about U.S. persons that NSA obtained pursuant to Section 702 to ensure that the disseminations were consistent with the minimization procedures.

Additional information describing how the IC protects U.S. person information obtained pursuant to FISA provisions is provided in recent reports by the civil liberties and privacy officers for the ODNI (including NCTC), NSA, FBI, and CIA. The reports collectively documented the rigorous and multi-layered framework that safeguards the privacy of U.S. person information in FISA disseminations. *See* ODNI Report on Protecting U.S. Person Identities in Disseminations under FISA and annexes containing agency specific reports.

**STATISTICS OF NSA'S U.S. PERSON DISSEMINATING INFORMATION.** Below are statistics and charts to further explain how NSA disseminates U.S. person infor-

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

mation incidentally acquired from Section 702 in classified intelligence reports. NSA may:

i. openly name (i.e., originally reveal) the U.S. person identity in the report,

ii. initially mask (i.e., not reveal) the U.S. person identity in the report, or

iii. in the instances where the U.S. person identity was initially masked, upon a specific request, later reveal and unmask the U.S. person identity but only to the requestor.

Consistent with the CY2017 *Annual Statistical Transparency Report*, this year's report presents the dissemination numbers in a different format from the CY2016 and prior year reports to facilitate understanding and to provide consistency with NSA's classified FISA Section 702(m)(3) reports to Congress. This report separates the number of *reports* (in Figure 11) from the statistics relating to the U.S. person identities later disseminated (in Figure 12).

NSA applies its minimization procedures in preparing its classified intelligence reports, and then disseminates the reports to authorized recipients with a need to know the information in order to perform their official duties. Very few of NSA's intelligence reports from Section 702 collection contain references to U.S. person identities (whether masked or openly named).

The first row of Figure 11 provides "an accounting of the number of disseminated intelligence reports containing a reference to a United States-person identity." *See* 50 U.S.C. § 1881a(m)(3)(A)(i). NSA's counting methodology is to include any disseminated intelligence report that contains a reference to one or more U.S. person identities, whether masked or openly named, even if the report includes information from other sources. NSA does not maintain

records that allow it to readily determine, in the case of an intelligence report that includes information from several sources, from which source a reference to a U.S. person identity was derived. Accordingly, the references to U.S. person identities may have resulted from Section 702 authorized collection or from other authorized signals intelligence activity conducted by NSA. This counting methodology was used in the previous report and is used in NSA's FISA Section 702(m)(3) report.

Note that a single report could contain multiple U.S. person identities, masked and/or openly named. For example, a single report could include of a large number of U.S. identities that a foreign intelligence target is seeking to victimize; each of those identifiers would be counted.

As noted above, a U.S. person is "a citizen of the United States, an alien lawfully admitted for permanent residence (as defined in section 101(a)(20) of the Immigration and Nationality Act), an unincorporated association a substantial number of members of which are citizens of the United States or aliens lawfully admitted for permanent residence, or a corporation which is incorporated in the United States, but does not include a corporation or an association which is a foreign power, as defined in [50 U.S.C. § 1801(a)(1), (2), or (3)]." *See* 50 U.S.C. § 1801(i). Thus the numbers below include U.S. person identities not only of U.S. persons who are individuals, but also of U.S. persons that are corporations or unincorporated associations.

The second row of Figure 11 provides the *number of reports* containing U.S. person identities *where the U.S. person identity was masked* in the report. The third row provides the *number of reports* containing U.S. person identities *where the U.S. person identity was openly included* in the report.

CONTENTS

FIGURES

INTRODUCTION

FISA PROBABLE CAUSE AUTHORITIES

FISA SECTION 702

FISA CRIMINAL USE

FISA TITLE IV

FISA TITLE V

NATIONAL SECURITY LETTERS

**Figure 11:** Section 702 Reports Containing USP Information Unmasked by NSA

| Section 702 Reports Containing U.S. Person (USP) Information Disseminated by NSA | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| **REPORTS**—Total number of NSA disseminated § 702 reports containing USP identities *regardless of whether or not the identity was openly included or masked.* | 3,914 | 4,065 | **4,495** |
| **REPORTS**—Total number of NSA disseminated § 702 reports containing USP identities *where the USP identity was masked.* | 2,964 | 3,034 | **3,442** |
| **REPORTS**—Total number of NSA disseminated § 702 reports containing USP identities *where the USP identity was openly included.* | 1,200 | 1,341 | **1,379** |

Rows 2 and 3 will not total row 1 because one report may contain both masked and openly named identities

Figure 12 provides statistics relating to the numbers of U.S. person *identities* that were originally masked in those reports counted in Figure 11 but which NSA later provided to authorized requestors (i.e., unmasked). This statistic is the number required to be reported to Congress in NSA's FISA Section 702(m)(3) report. In other words, Figure 12 provides "an accounting of the number of United States-person identities subsequently disseminated by [NSA] in response to requests for identities that were not referred to by name or title in the original reporting." *See* 50 U.S.C. § 1881a(m)(3)(A)(ii). This number is different than numbers provided in either CY2015 or the CY2016 *Annual Statistical Transparency Report*. NSA has decided to declassify the total number of U.S. person identities unmasked in response to a request.

The CY2015 and CY2016 *Annual Statistical Transparency Reports* focused on responding to the PCLOB's report recommendation 9(5) by counting only those U.S. person identities where the proper name or title of an individual was unmasked; it did not count other identifiers such as email addresses, telephone numbers or U.S. IP addresses; nor did it count identifiers pertaining to U.S. corporations or associations. Rather than distinguishing between the different ways a U.S. person might be named in an intelligence report, NSA now provides the total number of U.S. person identities unmasked in response to a specific request from another agency. This is the same metric that NSA reports to Congress pursuant to FISA Section 702(m)(3) reporting requirements. Prior to CY2017, NSA's FISA Section 702(m)(3) reports covered the time period of September through August. For CY2017 and going forward, both reports now cover the same timeframe and follow the same reporting methodology.

**Figure 12:** Section 702 USP Identities Disseminated by NSA

| Section 702—U.S. Person (USP) Identities Unmasked by NSA | 12-month period Sep 2015–Aug 2016 | CY2017 | **CY2018** |
|---|---|---|---|
| The number of U.S. person identities that NSA unmasked in response to a specific request from another agency | 9,217 | 9,529 | **16,721** |

ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES

CALENDAR YEAR 2018

Intelligence Community Policy Guidance (ICPG) 107.1, *Requests for Identities of U.S. Persons in Disseminated Intelligence Reports*, requires all IC elements to have procedures to respond to requests for the identities of U.S. persons whose identities were originally masked in a disseminated intelligence report. ICPG 107.1 applies to information regardless of the legal authority under which the information was collected (i.e., including, but not limited to, FISA Section 702). The ICPG further requires the DNI to report, on an annual basis, certain statistics to track requests made pursuant to ICPG 107.1.

Since issuance of ICPG 107.1, all IC elements have finalized their procedures. As of January 1, 2019, all IC elements began tracking the applicable requests. Accordingly, ODNI will be able to provide these numbers for CY2019 in next year's *Annual Statistical Transparency Report*.

**CALENDAR YEAR 2018**

# FISA Criminal Use and Notice Provisions

## A. FISA Sections 106 and 305

FISA Section 106 requires *advance* authorization from the Attorney General *before* any information acquired through Title I electronic surveillance may be used in a criminal proceeding. This authorization from the Attorney General is defined to include authorization by the Acting Attorney General, Deputy Attorney General, or, upon designation by the Attorney General, the Assistant Attorney General for National Security. Section 106 also requires that if a government entity intends to introduce into evidence in any trial, hearing, or other proceeding, against an "aggrieved person," information obtained or derived from electronic surveillance, it must notify the aggrieved person and the court. The aggrieved person is then entitled to seek suppression of the information. FISA Section 706 requires that any information acquired pursuant to Section 702 be treated as electronic surveillance under Section 106, including for purposes of the use, notice, and suppression requirements.

FISA Section 305 provides comparable requirements for use of information acquired through Title III physical search (i.e., advance authorization, notice, and opportunity to suppress) in a legal proceeding.

## B. Statistics

The FISA Amendments Reauthorization Act of 2017 codified a requirement that certain statistics concerning criminal proceedings must be provided to the public pertaining to Sections 106 and 305,

### FISA Sections 106 and 305—Criminal Use and Notice Provisions

- Commonly referred to as the "criminal use provision."

- Section 106 applies to information acquired from Title I electronic surveillance and Section 702; Section 305 applies to information acquired from Title III physical search.

- Attorney General advance authorization is required before such information may be used in a criminal proceeding; if such information is used or intended to be used against an aggrieved person, that person must be given notice of the information and have a chance to suppress the information.

- The FISA Amendments Reauthorization Act of 2017 codified that statistics must be provided to the public as it pertained to Section 106, Section 305, as well as Section 702 acquired information.

including Section 702-acquired information. Specifically, Figure 13 provides that the government filed notice of intent to use FISA-acquired information, pursuant to Section 106 or 305, in seven (7) separate proceedings in 2017 and in fourteen (14) separate criminal proceedings in 2018.

**Figure 13: Number of Criminal Proceedings in Which the Government Provided Notice of Its Intent To Use Certain FISA Information**

| | CY2017 | CY2018 |
|---|---|---|
| The number of criminal proceedings in which the United States or a State or political subdivision thereof provided notice pursuant to Section 106 (including with respect to Section 702-acquired information) or Section 305 of the government's intent to enter into evidence or otherwise use or disclose any information obtained or derived from electronic surveillance, physical search, or Section 702 acquisition. | 7 | 14 |

*See* 50 U.S.C. § 1873(b)(4).

**CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS**

CALENDAR YEAR **2018**

# FISA Title IV—Use of Pen Register and Trap and Trace (PR/TT) Devices

## A. FISA PR/TT Authority

Title IV of FISA authorizes the use of pen register and trap and trace (PR/TT) devices for foreign intelligence purposes. Title IV authorizes the government to use a PR/TT device to capture dialing, routing, addressing or signaling (DRAS) information. The government may submit an application to the FISC for an order approving the use of a PR/TT device (i.e., PR/TT order) for (i) "any investigation to obtain foreign intelligence information not concerning a United States person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1842(a). If the FISC finds that the government's application meets the requirements of FISA, the FISC must issue an order for the installation and use of a PR/TT device.

## B. Statistics

**COUNTING ORDERS.** Similar to how orders were counted for Titles I and III and Sections 703 and 704, this report only counts the orders granting authority to conduct intelligence collection—the order for the installation and use of a PR/TT device. Thus, renewal orders are counted as a separate order; modification orders and amendments are not counted.

**ESTIMATING THE NUMBER OF TARGETS.** The government's methodology for counting PR/TT targets is similar to the methodology described above for counting targets of electronic surveillance and/or physical search. If the IC received authorization for the installation and use of a PR/TT device against the same target in four separate applications, the IC would count one target, not four. Alternatively, if

**FISA Title IV**

- Commonly referred to as the "PR/TT" provision.

- Bulk collection is prohibited.

- Requires individual FISC order to use PR/TT device to capture dialing, routing, addressing, or signaling (DRAS) information.

- Government request to use a PR/TT device on U.S. person target must be based on an investigation to protect against terrorism or clandestine intelligence activities and that investigation must not be based solely on the basis of activities protected by the First Amendment to the Constitution.

the IC received authorization for the installation and use of a PR/TT device against four targets in the same application, the IC would count four targets.

**ESTIMATING THE NUMBER OF UNIQUE IDENTIFIERS.** This statistic counts (1) the targeted identifiers and (2) the non-targeted identifiers (e.g., telephone numbers and email addresses) that were in contact with the targeted identifiers. Specifically, the House Report on the USA FREEDOM Act states that "[t]he phrase 'unique identifiers used to communicate information collected pursuant to such orders' means the total number of, for example, email addresses or phone numbers that have been collected as a result of these particular types of FISA orders—not just the number of target email addresses or phone numbers." [H.R. Rept. 114-109 Part I, p. 26], with certain exceptions noted.

CONTENTS
FIGURES
INTRODUCTION
FISA PROBABLE CAUSE AUTHORITIES
FISA SECTION 702
FISA CRIMINAL USE
FISA TITLE IV
FISA TITLE V
NATIONAL SECURITY LETTERS

CALENDAR YEAR **2018**

ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES

### Figures 14a and 14b: Number of PR/TT Orders, Targets and Unique Identifiers Collected

| Titles IV of FISA PR/TT FISA | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|---|---|---|
| Total number of orders | 131 | 135 | 90 | 60 | 33 | **34** |
| Estimated number of targets of such orders | 319 | 516 | 456 | 41 | 27 | **29** |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders* | | | 134,987• | 81,035•‡ | 56,064• | **132,690** |



*See* 50 U.S.C. §§ 1873(b)(3), 1873(b)(3)(A), and 1873(b)(3)(B).

*Pursuant to § 1873(d)(2)(B), this statistic does not apply to orders resulting in the acquisition of information by the FBI that does not include email addresses or telephone numbers.

•This number represents information the government received from provider(s) electronically for the entire calendar year. The government does not have a process for capturing unique identifiers received by other means (such as hard-copy or portable media).

‡For the CY2016 report, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for *business records* instead of the number of the unique identifiers collected pursuant PR/TT orders. As noted below, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for PR/TT orders under the statistics for business records.

### Figure 15: FISA PR/TT Targets—U.S. Persons and Non-U.S. Persons*

| PR/TT Targets | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Estimated number of targets who are *non*-U.S. persons* | 23 | 16 | **15** |
| Estimated number of targets who are U.S. persons | 18 | 11 | **14** |
| Estimated percentage of targets who are U.S. persons | 43.9% | 40.7% | **48.3%** |

*See* 50 U.S.C. §§1873(b)(3)(A)(i) and 1873(b)(3)(A)(ii) for rows one and two, respectively.

*Previously the IC was not statutorily required to publicly provide these statistics, but provided them consistent with transparency principles. The FISA Amendments Reauthorization Act of 2017 codified this requirement at 50 U.S.C. §§ 1873(b)(3)(A)(i) and 1873(b)(3)(A)(ii).

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

# FISA Title V—Business Records

## A. Business Records FISA

Title V of FISA authorizes the government to submit an application for an order requiring the production of any tangible things for (i) "an investigation to obtain foreign intelligence information not concerning a United States person or" (ii) "to protect against international terrorism or clandestine intelligence activities, provided that such investigation of a United States person is not conducted solely upon the basis of activities protected by the First Amendment to the Constitution." 50 U.S.C. § 1861. Title V is commonly referred to as the *"Business Records"* provision of FISA.

In June 2015, the USA FREEDOM Act was signed into law and, among other things, it amended Title V, including by prohibiting bulk collection. *See* 50 U.S.C. §§ 1861(b), 1861(k)(4). The DNI is required to report various statistics about two Title V provisions—traditional business records under Section 501(b)(2)(B) and call detail records under Section 501(b)(2)(C). On November 28, 2015, in compliance with amendments enacted by the USA FREEDOM Act, the IC terminated collection of bulk telephony metadata under Title V of FISA (the "Section 215 Program"). Solely due to legal obligations to preserve records in certain pending civil litigation, the IC continues to preserve previously collected bulk telephony metadata. Under the terms of a FISC order dated November 24, 2015, the bulk telephony metadata cannot be used or accessed for any purpose other than compliance with preservation obligations. Once the government's preservation obligations are lifted, the government is required to promptly destroy all bulk metadata produced by telecommunications providers under the Section 215 Program.

On November 30, 2015, the IC implemented certain provisions of the USA FREEDOM Act,

### FISA Title V

- Title V has two key provisions: (1) traditional business records and (2) Call Detail Records (CDRs).

- Request for records in an investigation of a U.S. person must be based on an investigation to protect against terrorism or clandestine intelligence activities and provided that the investigation is not conducted solely upon activities protected by the First Amendment to the Constitution.

- CDRs may be obtained from a telephone company if the FISC issues an individual court order for the target's records.

- Bulk collection of CDRs is prohibited.

including the call detail records provision and the requirement to use a specific selection term. Accordingly, only one month's worth of data for calendar year 2015 was available with respect to those provisions. Any statistical information relating to a particular FISA authority for a particular month remains classified. Therefore, the Title V data specifically associated with December 2015 was only released in a classified annex provided to Congress as part of the report for CY2015. After CY2015, statistical information was collected for an entire year and those statistics were included in subsequent reports.

Statistics related to traditional business records obtained under Title V Section 501(b)(2)(B) are provided first pursuant to 50 U.S.C. § 1873(b)(5). Statistics related to call detail records obtained under Title V Section 501(b)(2)(C) are provided second pursuant to 50 U.S.C. § 1873(b)(6).

CALENDAR YEAR **2018**

## B. Statistics—Title V "Traditional" Business Records Statistics Orders, Targets & Identifiers

Business Record (BR) requests for tangible things may include books, records, (e.g. electronic communications transactions records), papers, documents, and other items pursuant to 50 U.S.C. § 1861(b)(2)(B), also referred to as Section 501(b)(2)(B). These are commonly referred to as traditional business records.

**ESTIMATING THE NUMBER OF UNIQUE IDENTIFIERS.** This is an estimate of the number of (1) targeted identifiers (e.g., telephone numbers and email addresses) and (2) non-targeted identifiers that were in contact with the targeted identifiers. The number of identifiers used by targets to communicate can vary significantly from year to year, which in turn will impact the number of non-targeted identifiers in contact with the targeted identifiers. Furthermore, this metric represents unique identifiers received electronically from the provider(s). The government does not have a process for capturing unique identifiers received by other means (i.e., hard-copy or portable media). For example, the FBI could obtain, under this authority, a hard-copy of a purchase receipt from a company. That purchase receipt could contain a unique identifier such as a telephone number, which would not be counted.

**EXPLAINING HOW WE COUNT BR STATISTICS.** As an example of the government's methodology, assume that in 2017, the government submitted a BR request targeting "John Doe" with email addresses john.doe@serviceproviderX, john.doe@serviceproviderY, and john.doe@serviceproviderZ. The FISC found that the application met the requirements of Title V and issued orders granting the application and directing service providers X, Y, and Z to produce business records pursuant to Section 501(b)(2)(B). Provider X returned 10 non-targeted email addresses that were in contact with the target; provider Y returned 10 non-targeted email addresses that were in contact with the target; and provider Z returned 10 non-targeted email addresses that were in contact with the target. Based on this scenario, we would report the following statistics: A) one order by the FISC for the production of tangible things, B) one target of said orders, and C) 33 unique identifiers, representing three targeted email addresses plus 30 non-targeted email addresses.

**Figure 16a: Title V "Traditional" Business Records Orders, Targets, and Unique Identifiers Collected**

| Business Records "BR" - Section 501(b)(2)(B) | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Total number of orders issues pursuant to applications under Section 501(b)(2)(B) | 84 | 77 | **56** |
| Estimated number of targets of such orders | 88 | 74 | **60** |
| Estimated number of unique identifiers used to communicate information collected pursuant to such orders | 125,354* | 87,834 | **214,860** |

*See* 50 U.S.C. §§ 1873(b)(5), 1873(b)(5)(A), and 1873(b)(5)(B).

*For the CY2016 report, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for *PR/TT devices* instead of the number of the unique identifiers collected pursuant business records orders. As noted above, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for business records orders under the statistics for PR/TT devices.

CONTENTS · FIGURES · INTRODUCTION · FISA PROBABLE CAUSE AUTHORITIES · FISA SECTION 702 · FISA CRIMINAL USE · FISA TITLE IV · FISA TITLE V · NATIONAL SECURITY LETTERS

ODNI STATISTICAL TRANSPARENCY REPORT REGARDING USE OF NATIONAL SECURITY AUTHORITIES



Figure 16b: "Traditional" Business Records Orders and Targets



Figure 16c: "Traditional" Business Records Unique Identifiers

*See* 50 U.S.C. §§ 1873(b)(5), 1873(b)(5)(A), and 1873(b)(5)(B).

*For the CY2016 report, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for *PR/TT devices* instead of the number of the unique identifiers collected pursuant business records orders. As noted above, FBI erroneously provided the estimated number of unique identifiers used to communicate information collected pursuant to orders for business records orders under the statistics for PR/TT devices.

## C. Statistics—Call Detail Record (CDR) Orders, Targets & Identifiers

Call Detail Records (CDRs)—commonly referred to as "call event metadata"—may be obtained from telecommunications providers on an ongoing basis pursuant to 50 U.S.C. § 1861(b)(2)(C). Title V of FISA defines a CDR as session identifying information (such as an originating or terminating telephone number, an International Mobile Subscriber Identity (IMSI) number, or an International Mobile Station Equipment Identity (IMEI) number), a telephone calling card number, or the time or duration of a call. *See* 50 U.S.C. § 1861(k)(3)(A). By statute, CDRs provided to the government may *not* include the content of any communication, the name, address, or financial information of a subscriber or customer, or cell site location or global positioning system information. *See* 50 U.S.C. § 1861(k)(3)(B). CDRs are stored and queried by the service providers. *See* 50 U.S.C. § 1861(c)(2). After NSA receives the CDRs from the providers pursuant to a FISC order, NSA stores and queries those lawfully obtained CDRs.

Figures 17a and 17b: **CDR Orders and Targets**

| Business Records (BRs)—Section 501(b)(2)(B) | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Total number of orders issues pursuant to applications under Section 501(b)(2)(C) | 40 | 40 | **14** |
| Estimated number of targets of such orders | 42 | 40 | **11** |



See 50 U.S.C. §§ 1873(b)(6) and 1873(b)(6)(A).

**CHANGES IN TECHNICAL CAPABILITIES TO COUNT UNIQUE IDENTIFIERS.** While the USA FREEDOM Act directs the government to provide a good faith estimate of "the number of unique identifiers used to communicate information collected pursuant to" orders issued in response to CDR applications (see 50 U.S.C. § 1873(b)(5)(B)), in the past, the government did not have the technical ability to isolate the number of unique identifiers within records received from the providers. Since the previous *Annual Statistical Transparency Report,* NSA developed a new technical solution to allow NSA to produce a good faith estimate of the number of unique identifiers. This new technical solution was put into place after the deletion of records in May 2018, so NSA will provide this partial-year count. The deletion of records was publicly discussed in a June 28, 2018 public notice by NSA and is also discussed below.

In previous years, this report has included an alternate metric that represents the number of records received from the provider(s) and stored in NSA repositories (records that fail at any of a variety of validation steps are not included in this number). CDRs covered by § 501(b)(2)(C) in-clude call detail records created before, on, or after the date of the application relating to an authorized investigation.

Both metrics are included in this report. NSA counting for CY2018 includes (1) the total number of CDRs received for the year as we have reported in previous years, as illustrated in Figure 19 and (2) the unique identifiers within the CDRs received for the portion of the year NSA was able to count them, as illustrated in Figure 20.

**THE ESTIMATED NUMBER OF CDRS RECEIVED FROM PROVIDERS.** As explained in the 2016 NSA public report on the USA FREEDOM Act, the metric provided is over-inclusive because the government counts each record separately *even if the government receives the same record multiple times* (whether from one provider or multiple providers). Additionally, this metric includes duplicates of unique identifiers – i.e., because the government lacked the technical ability to isolate unique identifiers, the statistic counts the number of records even if unique identifiers are repeated. For example, if one unique identifier is associated with multiple calls to a second unique identifier, it will be counted multiple times. Similarly, if two different provid-

ers submit records showing the same two unique identifiers in contact, then those would also be counted separately. This statistic includes records that were received from the providers in CY2018 for all orders active for any portion of the calendar year, which includes orders that the FISC approved in CY2017. Furthermore, while the records are received from domestic communications service providers, the records received are for domestic and foreign numbers. More information on how NSA implements this authority can be found in the DCLPO report, in particular see page 5 for a description and illustration of the USA FREEDOM Implementation Architecture.

**Figure 18: Call Event Hop Scenario and Method of Counting**



*Target uses **Phone Number A** which is the FISC-approved selector in the FISC order. This would be counted as **1 order, 1 target, 7 unique identifiers (phone numbers A, B, C, D, E, F, G)** and, assuming 500 calls between each party (1,000 records), **6000 CDRs.** CDRs may include records for both sides of a call (for example, one call from **Phone Number A** to **Phone Number B** could result in 2 records).*

Assume an NSA intelligence analyst learns that phone number (**Phone Number A**) is being used by a suspected international terrorist (target). **Phone Number A** is the "specific selection term" or "selector" that will be submitted to the FISC (or the Attorney General in an emergency) for approval using the "reasonable articulable suspicion" (RAS) standard. Assume that one provider (provider X) submits a record showing **Phone Number A** called unique identifier **Phone Number B**—what is referred to as a "call event." This is the "**first hop.**" In turn, assume that NSA submits the "first-hop" **Phone Number B** to the provider X, and finds that unique identifier was used to call another unique identifier **Phone Number D**. This is the "**second-hop.**" If the unique identifiers call one another multiple times, then multiple CDRs are produced and duplication occurs. Additionally, the government may receive multiple

CDRs for a single call event. NSA may also submit the specific selection **Phone Number A** to another provider (provider Y) who may have CDRs of the same call events.

Not all CDRs provided to the government will be for domestic numbers. The targeted "specific selection term" could be a foreign number, could have called a foreign number or the "first-hop" number could have called a foreign number; thus, these CDRs statistics contain both domestic and foreign number results. Furthermore, CDRs provided to the government include call events with business entities, such as calls for marketing purposes.

**Figure 19: CDRs Received Arising from Such Targets**

| Call Detail Records (CDRs)—Section 501(b)(2)(C) | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Estimated number of call detail records arising from such targets that NSA received from providers pursuant to Section 501(b)(2)(C) and stored in its repositories* | 151,230,968 | 534,396,285 | **434,238,543** |

*While the statute directs the government to count the unique identifiers, until May of 2018, the government was not technically able to isolate the number of unique identifiers; thus, the number reported above counts total CDRs received for the year and includes duplicate records. Additionally, the number of records contains both domestic and foreign numbers, including numbers used by business entities for marketing purposes.

**THE ESTIMATED NUMBER OF UNIQUE IDENTIFIERS IN THE CDRS RECEIVED.** On June 28, 2018, NSA issued a public notice stating that on May 23, 2018, NSA began deleting all CDRs acquired since 2015 under Section 501(b)(2)(C) of FISA. NSA deleted the CDRs because earlier in 2018 NSA analysts noted technical irregularities in some data received from telecommunications service providers. These irregularities also resulted in the production to NSA of some CDRs that NSA was not authorized to receive. Because it was infeasible to identify and isolate properly produced data, NSA concluded that it should not use any of the CDRs. Consequently, NSA, in consultation with the Department of Justice and the ODNI, decided that the appropriate course of action was to delete all CDRs. NSA notified the Congressional oversight committees, the Privacy and Civil Liberties Oversight Board, and the Department of Justice of this decision. The Department of Justice, in turn, notified the Foreign Intelligence Surveillance Court. The root cause of the specific problem that led to the deletion was addressed at that time. Additionally, NSA reviewed and revalidated its intelligence reporting to ensure that the reports were based on properly received CDRs.

During the reporting period, NSA subsequently re-submitted the already FISC-approved selectors to the providers and also submitted new selectors that were approved by the FISC. NSA ingested and stored CDRs produced by the providers in response to these submissions during CY2018. Additionally, during this time, NSA implemented a new technical means of counting the unique identifiers as opposed to counting all records stored in NSA's repositories. The new counting process was applied as the records were delivered by the providers beginning on May 23, 2018, when the process was initiated.

The new process counts each type of identifier separately, and includes counts for phone numbers, International Mobile Subscriber Identities (IMSIs), and International Mobile Equipment Identities (IMEIs). An IMSI is a 15-digit number associated with the SIM card in a mobile phone. An IMEI identifies the specific physical device, much like a serial number. In the CDRs NSA receives under UFA, IMSIs and IMEIs are associated with a phone number, so the phone number count below represents the number of unique phones associated with UFA CDRs.

Figure 20: **Unique Identifiers in the CDRs Received**

| Call Detail Records (CDRs)—Section 501(b)(c)(C) | 23 May to 31 December 2018 |
|---|---|
| The number of unique identifiers used to communicate information collected pursuant to such orders under Section 501(b)(2)(C)* | 19,372,544 Phone Numbers, which are associated with 7,285,362 IMSIs and 5,305,578 IMEIs |

*Identifiers include both domestic and foreign numbers, including numbers used by business entities for marketing purposes.

## D. Statistics—Call Detail Record Queries

THE NUMBER OF SEARCH TERMS ASSOCIATED WITH A U.S. PERSON USED TO QUERY THE CDR DATA. In 2018, NSA streamlined and upgraded its analytic tools to improve performance and compliance capabilities. This gave NSA analysts an increased ability to group related query terms together and run those query terms against multiple repositories that the analyst is authorized to query. NSA analysts must still comply with all applicable restrictions, controls, and training that apply to each query term and each repository.

Due to the technical parameters of the tool, in order to generate a count of CDR queries, NSA must count all query terms, even if query terms would never return CDR results (e.g. using an email address as a query term will never return a hit from CDR data). Additionally, the parameters of the tool do not allow NSA to distinguish which specific query terms are U.S. persons and which are not when multiple query terms are used. For example, a single query using 20 query terms counts as 20, even if only one of those terms is a U.S. person phone number, and the remaining 19 are either not associated with a U.S. person or are email addresses.

Figure 21: **CDRs—U.S. Person Query Terms**

| Call Detail Records (CDRs)—Section 501(b)(2)(C) | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|
| Estimated number of search terms that included information concerning a U.S. person that were used to query any database of call detail records obtained through the use of such orders.* | 22,360 | 31,196 | **164,682** |

*See* 50 U.S.C. § 1873(b)(6)(C).

* Consistent with § 1873(d)(2)(A), this statistic does not include queries that are conducted by the FBI.

CALENDAR YEAR **2018**

# National Security Letters (NSLs)

## A. National Security Letters

In addition to statistics relating to FISA authorities, we are reporting information on the government's use of National Security Letters (NSLs). The FBI is statutorily authorized to issue NSLs for specific records (as specified below) only if the information being sought is relevant to a national security investigation. NSLs may be issued for four commonly used types of records:

i.  telephone subscriber information, toll records, and other electronic communication transactional records, *see* 18 U.S.C. § 2709;

ii. consumer-identifying information possessed by consumer reporting agencies (names, addresses, places of employment, institutions at which a consumer has maintained an account), *see* 15 U.S.C. § 1681u;

iii. full credit reports, *see* 15 U.S.C. § 1681v (only for counterterrorism, not for counterintelligence investigations); and

iv. financial records, *see* 12 U.S.C. § 3414.

## B. Statistics—National Security Letters and Requests for Information

COUNTING NSLs. Today we are reporting (1) the total number of NSLs *issued* for all persons, and (2) the total number of requests for information (ROI) contained within those NSLs. When a single NSL contains multiple ROIs, each is considered a "request" and each request must be relevant to the same pending investigation. For example, if the government issued one NSL seeking subscriber information from one provider and that NSL identified three e-mail addresses for the provider to return records, this would count as *one* NSL issued and *three* ROIs.

> **National Security Letters**
>
> - *Not* authorized by FISA but by other statutes.
>
> - Bulk collection is prohibited, however, by the USA FREEDOM Act.
>
> - FBI may only use NSLs if the information sought is relevant to international counterterrorism or counterintelligence investigation.

■ **THE DEPARTMENT OF JUSTICE'S REPORT ON NSLs.** In April 2019, the Department of Justice released its *Annual Foreign Intelligence Surveillance Act Report* to Congress. That report, which is available online, provides the number of requests made for certain information concerning different U.S. persons pursuant to NSL authorities during calendar year 2018. The Department of Justice's report provides the number of individuals subject to an NSL whereas the ODNI's report provides the number of NSLs issued. Because one person may be subject to more than one NSL in an annual period, the number of NSLs issued and the number of persons subject to an NSL differs.

**WHY WE REPORT THE NUMBER OF NSL REQUESTS INSTEAD OF THE NUMBER OF NSL TARGETS.** We are reporting the annual number of requests for multiple reasons. First, the FBI's systems are configured to comply with Congressional reporting requirements, which do not require the FBI to track the number of individuals or organizations that are the subject of an NSL. Even if the FBI systems were configured differently, it would still be difficult to identify the number of specific individuals or organizations that are the subjects of NSLs. One reason for this

is that the subscriber information returned to the FBI in response to an NSL may identify, for example, one subscriber for three accounts or it may identify different subscribers for each account. In some cases this occurs because the identification information provided by the subscriber to the provider may not be true. For example, a subscriber may use a fictitious name or alias when creating the account. Thus, in many instances, the FBI never identifies the actual subscriber of an account. In other cases, this occurs because individual subscribers may identify themselves differently for each account (e.g., inclusion of middle name, middle initial, etc.) when creating an account.

We also note that the actual number of individuals or organizations that are the subject of an NSL is different than the number of NSL requests. The

FBI often issues NSLs under different legal authorities, e.g., 12 U.S.C. § 3414(a)(5), 15 U.S.C. §§ 1681u(a) and (b), 15 U.S.C. § 1681v, and 18 U.S.C. § 2709, for the same individual or organization. The FBI may also serve multiple NSLs for an individual for multiple facilities (e.g., multiple e-mail accounts, landline telephone numbers and cellular phone numbers). The number of requests, consequently, is significantly larger than the number of individuals or organizations that are the subjects of the NSLs.

As is the case with other statistics in this report, statistics often fluctuate from year to year for a variety of reasons. The IC is committed to sharing statistical data and engaging the public about how the IC uses its national security authorities and for what purposes.

Figure 22a: **NSLs Issued and Requests for Information**

| National Security Letters (NSLs) | CY2013 | CY2014 | CY2015 | CY2016 | CY2017 | **CY2018** |
|---|---|---|---|---|---|---|
| Total number NSLs issued | 19,212 | 16,348 | 12,870 | 12,150 | 12,762 | **10,235** |
| Number of Requests for Information (ROI) | 38,832 | 33,024 | 48,642 | 24,801 | 41,579 | **38,872** |

*See* 50 U.S.C. § 1873(b)(6).

Figure 22b: **Total NSLs Issued and Total ROIs Within Those NSLs**







034609 4-19

# EXHIBIT J
to Twitter's Request for Judicial Notice



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, DC*

**APR 2 0 2015**

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Richard Burr
Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C. 20510

The Honorable Bob Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, D.C. 20515

Dear Messrs. Chairmen:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence
Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In
accordance with those provisions, this report provides information regarding all applications
made by the Government during calendar year 2014 for authority to conduct electronic
surveillance for foreign intelligence purposes under the Act, all applications made by the
Government during calendar year 2014 for access to certain business records (including the
production of tangible things) for foreign intelligence purposes, and certain requests made by the
Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while
not required to do so by statute, the Government is providing information concerning the number
of applications made during calendar year 2014 for authority to conduct physical searches for
foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications
include applications made solely for electronic surveillance, applications made solely for

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Bob Goodlatte
The Honorable Devin Nunes
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications to the proposed orders in 19 applications.[1] Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014. The FISC made modifications to four proposed orders in applications for access to business records.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C.§ 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization. The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Bob Goodlatte
The Honorable Devin Nunes
Page Three

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 4,699 different United States persons.[2]

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

cc:     The Honorable Patrick J. Leahy
        Ranking Member
        Senate Committee on the Judiciary

        The Honorable Diane Feinstein
        Vice Chairman
        Senate Select Committee on Intelligence

        The Honorable John Conyers, Jr.
        Ranking Member
        House Committee on the Judiciary

        The Honorable Adam Schiff
        Ranking Member
        House Permanent Select Committee on Intelligence

---

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**APR 2 0 2015**

The Honorable John Boehner
Speaker
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Speaker:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2014 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2014 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government.  The FISC did not deny any applications in whole, or in part.  The FISC made modifications to the proposed orders

The Honorable John Boehner
Page Two

in 19 applications.[1] Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

> **Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014. The FISC made modifications to four proposed orders in applications for access to business records.

> **Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization. The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Kevin McCarthy
Majority Leader
U.S. House of Representatives                    **APR 2 0 2015**
Washington, DC  20515

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2014 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2014 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government.  The FISC did not deny any applications in whole, or in part.  The FISC made modifications to the proposed orders

The Honorable Kevin McCarthy
Page Two

in 19 applications.[1]  Thus, the FISC approved collection activity in a total of 1,379 of the
applications that included requests for authority to conduct electronic surveillance.

> **Applications for Access to Certain Business Records (Including the Production of
> Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50
> U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access
to certain business records (including the production of tangible things) for foreign intelligence
purposes.  The FISC did not deny, in whole or in part, any such application filed by the
Government during calendar year 2014.  The FISC made modifications to four proposed orders
in applications for access to business records.

> **Requests Made for Certain Information Concerning Different United States Persons
> Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA
> PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization
Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual
reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to
the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C.
§ 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber
information only) for information concerning United States persons.  These sought information
pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful.  Please do not hesitate to contact this office if
we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two
orders for applications after first granting authorization.  The FISC also modified two orders for applications made in a prior
reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States
persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning
the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S.
persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as
two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                              *Washington, D.C. 20530*

The Honorable Nancy Pelosi
Minority Leader                                              **APR 2 0 2015**
U.S. House of Representatives
Washington, DC  20515

Dear Madam Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2014 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2014 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government.  The FISC did not deny any applications in whole, or in part.  The FISC made modifications to the proposed orders

The Honorable Nancy Pelosi
Page Two

in 19 applications.[1]  Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

> **Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014.  The FISC made modifications to four proposed orders in applications for access to business records.

> **Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization.  The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                     *Washington, D.C. 20530*

The Honorable Joseph R. Biden, Jr.                     **APR 2 0 2015**
President
United States Senate
Washington, DC 20510

Dear Mr. President:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006). In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2014 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities. In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2014 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications to the proposed orders

The Honorable Joseph R. Biden, Jr.
Page Two

in 19 applications.[1]  Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014.  The FISC made modifications to four proposed orders in applications for access to business records.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization.  The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                              *Washington, D.C. 20530*

APR 2 0 2015

The Honorable Mitch McConnell
Majority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence
Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In
accordance with those provisions, this report provides information regarding all applications
made by the Government during calendar year 2014 for authority to conduct electronic
surveillance for foreign intelligence purposes under the Act, all applications made by the
Government during calendar year 2014 for access to certain business records (including the
production of tangible things) for foreign intelligence purposes, and certain requests made by the
Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while
not required to do so by statute, the Government is providing information concerning the number
of applications made during calendar year 2014 for authority to conduct physical searches for
foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications
include applications made solely for electronic surveillance, applications made solely for
physical search, and combined applications requesting authority for electronic surveillance and
physical search.  Of these, 1,379 applications included requests for authority to conduct
electronic surveillance.

None of these 1,379 applications were withdrawn by the Government.  The FISC did not
deny any applications in whole, or in part.  The FISC made modifications to the proposed orders

The Honorable Mitch McConnell
Page Two

in 19 applications.[1]  Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014.  The FISC made modifications to four proposed orders in applications for access to business records.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization.  The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 0 2015

The Honorable Harry Reid
Minority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2014 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2014 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2014** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government.  The FISC did not deny any applications in whole, or in part.  The FISC made modifications to the proposed orders

The Honorable Harry Reid
Page Two

in 19 applications.[1]  Thus, the FISC approved collection activity in a total of 1,379 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2014** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2014, the Government made 170 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2014.  The FISC made modifications to four proposed orders in applications for access to business records.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2014** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2014, the FBI made 12,452 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 4,699 different United States persons.[2]

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization.  The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

[2] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable James C. Duff                                 **APR 2 0 2015**
Director
Administrative Office of the United States Courts
Washington, D.C. 20544

Dear Mr. Duff:

Pursuant to section 107 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, this report provides information regarding applications made by the Government during calendar year 2014 for authority to conduct electronic surveillance and physical search for foreign intelligence purposes.

During calendar year 2014, the Government made 1,416 applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,416 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,379 applications included requests for authority to conduct electronic surveillance.

None of these 1,379 applications were withdrawn by the Government. The FISC did not deny any application in whole, or in part. The FISC made modifications to the proposed orders in 19 applications.[1] Thus, the FISC approved collection activity in a total of 1,416 of the applications that included requests for authority to conduct electronic surveillance.

---

[1] In addition to the 19 orders modified with respect to applications made during the reporting period, the FISC modified two orders for applications after first granting authorization. The FISC also modified two orders for applications made in a prior reporting period during the current reporting period.

The Honorable James C. Duff
Page Two


    We hope that this information is helpful.  Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.


                Sincerely,

                Peter J. Kadzik
                Assistant Attorney General

# EXHIBIT K
to Twitter's Request for Judicial Notice



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                   *Washington, D.C. 20530*

**APR 2 8 2016**

The Honorable Charles E. Grassley                The Honorable Richard Burr
Chairman                                          Chairman
Committee on the Judiciary                        Select Committee on Intelligence
United States Senate                              United States Senate
Washington, D.C. 20510                            Washington, D.C. 20510

The Honorable Robert W. Goodlatte                The Honorable Devin Nunes
Chairman                                          Chairman
Committee on the Judiciary                        Permanent Select Committee on Intelligence
U.S. House of Representatives                      U.S. House of Representatives
Washington, D.C. 20515                            Washington, D.C. 20515

Dear Messrs. Chairmen:

    This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2015 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2015 for authority to conduct physical searches for foreign intelligence purposes.

    **Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

    During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure.  A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Three

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Four


      We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.


                Sincerely,

                Peter J. Kadzik
                Assistant Attorney General


cc:      The Honorable Patrick J. Leahy
         Ranking Minority Member
         Senate Committee on the Judiciary

         The Honorable Dianne Feinstein
         Vice Chairman
         Senate Select Committee on Intelligence

         The Honorable John Conyers, Jr.
         Ranking Minority Member
         House Committee on the Judiciary

         The Honorable Adam Schiff
         Ranking Minority Member
         House Permanent Select Committee on Intelligence



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 8 2016

The Honorable Joseph R. Biden, Jr.
President
United States Senate
Washington, DC  20510

Dear Mr. President:

        This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence
Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA
PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most
recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).  In
accordance with those provisions, this report provides information regarding all applications
made by the Government during calendar year 2015 for authority to conduct electronic
surveillance for foreign intelligence purposes under the Act, all applications made by the
Government during calendar year 2015 for access to certain business records (including the
production of tangible things) for foreign intelligence purposes, and certain requests made by the
Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while
not required to do so by statute, the Government is providing information concerning the number
of applications made during calendar year 2015 for authority to conduct physical searches for
foreign intelligence purposes.

        **Applications Made to the Foreign Intelligence Surveillance Court During Calendar
        Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

        During calendar year 2015, the Government made 1,499 applications[1] to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes.  The 1,499 applications
include applications made solely for electronic surveillance, applications made solely for
physical search, and combined applications requesting authority for electronic surveillance and
physical search.  Of these, 1,457 applications included requests for authority to conduct
electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to
applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of
Procedure.  A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application
submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government
did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Joseph R. Biden, Jr.
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Joseph R. Biden, Jr.
Page Three

     In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

     In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

     In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

     We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                          *Washington, D.C. 20530*

APR 2 8 2016

The Honorable Mitch McConnell
Majority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2015 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2015 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure.  A "denial" refers to a judge's formal denial of any such application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Mitch McConnell
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Mitch McConnell
Page Three

In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. See Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 8 2016

The Honorable Harry Reid
Minority Leader
United States Senate
Washington, DC 20510

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015). In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2015 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities. In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2015 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure. A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Harry Reid
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Harry Reid
Page Three

In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR **2 8** 2016

The Honorable Paul D. Ryan
Speaker
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Speaker:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015). In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2015 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities. In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2015 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure. A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Paul D. Ryan
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Paul D. Ryan
Page Three

     In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

     In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

     In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

     We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 8 2016

The Honorable Kevin McCarthy
Majority Leader
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Leader:

This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).  In accordance with those provisions, this report provides information regarding all applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance for foreign intelligence purposes under the Act, all applications made by the Government during calendar year 2015 for access to certain business records (including the production of tangible things) for foreign intelligence purposes, and certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while not required to do so by statute, the Government is providing information concerning the number of applications made during calendar year 2015 for authority to conduct physical searches for foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2015 (section 107 of the Act, 50 U.S.C. § 1807)**

During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure.  A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Kevin McCarthy
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Kevin McCarthy
Page Three

In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 3,746 different United States persons.[5]

In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons.  These sought information pertaining to 2,053 different non-United States persons.[6]

In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 3,347 persons.[7]

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 8 2016

The Honorable Nancy Pelosi
Minority Leader
U.S. House of Representatives
Washington, DC  20515

Dear Madam Leader:

    This report is submitted pursuant to sections 107 and 502 of the Foreign Intelligence
Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA
PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most
recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).  In
accordance with those provisions, this report provides information regarding all applications
made by the Government during calendar year 2015 for authority to conduct electronic
surveillance for foreign intelligence purposes under the Act, all applications made by the
Government during calendar year 2015 for access to certain business records (including the
production of tangible things) for foreign intelligence purposes, and certain requests made by the
Federal Bureau of Investigation pursuant to national security letter authorities.  In addition, while
not required to do so by statute, the Government is providing information concerning the number
of applications made during calendar year 2015 for authority to conduct physical searches for
foreign intelligence purposes.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2015** (section 107 of the Act, 50 U.S.C. § 1807)

    During calendar year 2015, the Government made 1,499 applications[1] to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes.  The 1,499 applications
include applications made solely for electronic surveillance, applications made solely for
physical search, and combined applications requesting authority for electronic surveillance and
physical search.  Of these, 1,457 applications included requests for authority to conduct
electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to
applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of
Procedure.  A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application
submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government
did not subsequently submit a signed, final application pursuant to Rule 9(b).

The Honorable Nancy Pelosi
Page Two

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2015** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2015, the Government made 142 applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such application filed by the Government during calendar year 2015. The FISC made modifications to five proposed orders in applications for access to business records.

One application made by the Government after the effective date of the business records provisions of the USA FREEDOM Act did not specifically identify an individual, account, or personal device as the specific selection term.[4] The FISC did not modify the proposed orders in this one application for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government after the effective date of the business records provisions of the USA FREEDOM Act.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2015** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

---

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an application made in a prior reporting period during the current reporting period.

[4] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Nancy Pelosi
Page Three

In 2015, the FBI made 9,418 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,746 different United States persons.[5]

In 2015, the FBI made 31,863 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,053 different non-United States persons.[6]

In 2015, the FBI made 7,361 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,347 persons.[7]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

---

[5] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[6] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[7] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. See Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

APR 2 8 2016

.The Honorable James C. Duff
Director
Administrative Office of the United States Courts
Washington, D.C. 20544

Dear Mr. Duff:

Pursuant to section 107 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., this report provides information regarding applications made by the Government during calendar year 2015 for authority to conduct electronic surveillance and physical search for foreign intelligence purposes.

During calendar year 2015, the Government made 1,499 applications[1] to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,499 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,457 applications included requests for authority to conduct electronic surveillance.

One of these 1,457 applications was withdrawn by the Government. The FISC did not deny any applications in whole, or in part. The FISC made modifications[2] to the proposed orders in 80[3] applications. Thus, the FISC approved collection activity in a total of 1,456 of the applications that included requests for authority to conduct electronic surveillance.

---

[1] In keeping with the Department's historical reporting practice, the number of applications listed in this report refers to applications that were filed in signed, final form pursuant to Rule 9(b) of the Foreign Intelligence Surveillance Court Rules of Procedure. A "denial" refers to a judge's formal denial of any such an application; it does not include a proposed application submitted pursuant to Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure for which the government did not subsequently submit a signed, final application pursuant to Rule 9(b).

[2] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the government after the submission of a proposed application submitted pursuant to Rule 9(a).

[3] In addition to the 80 orders modified with respect to applications made during the reporting period, the FISC modified one order for an application after first granting authorization. The FISC also modified one order for an applications made in a prior reporting period during the current reporting period.

The Honorable James C. Duff
Page Two

We hope that this information is helpful.  Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.

Sincerely,

Peter J. Kadzik
Assistant Attorney General

# EXHIBIT L
to Twitter's Request for Judicial Notice



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Michael R. Pence
President                                                   **APR 2 8 2017**
United States Senate
Washington, DC  20510

Dear Mr. President:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006),
most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).
This report provides information regarding: (1) all final filed applications made by the
Government during calendar year 2016 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final filed applications
made by the Government during calendar year 2016 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of *final filed* applications, as has
been the Government's historical practice, this letter also includes for the first time statistics
published by the Director of the Administrative Office of the United States Courts (AOUSC).
Unlike the Government, AOUSC reports the number of *proposed applications* rather than the
number of *final filed* applications.  More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court.  The
statistics prepared by the AOUSC, which use the number of *proposed* applications rather than
final filed applications as their baseline, reflect this robust interaction between the Government
and the Court, and thus are included herein to provide important additional context.  The
AOUSC Director's full report is available on its website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2016, the Government filed 1,477 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Michael R. Pence
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Michael R. Pence
Page Three

these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

### Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016 (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Michael R. Pence
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                                      *Washington, D.C. 20530*

The Honorable Mitch McConnell                           **APR 2 8 2017**
Majority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006),
most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).
This report provides information regarding: (1) all final filed applications made by the
Government during calendar year 2016 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final filed applications
made by the Government during calendar year 2016 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of *final filed* applications, as has
been the Government's historical practice, this letter also includes for the first time statistics
published by the Director of the Administrative Office of the United States Courts (AOUSC).
Unlike the Government, AOUSC reports the number of *proposed applications* rather than the
number of *final filed* applications.  More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court.  The
statistics prepared by the AOUSC, which use the number of *proposed* applications rather than
final filed applications as their baseline, reflect this robust interaction between the Government
and the Court, and thus are included herein to provide important additional context.  The
AOUSC Director's full report is available on its website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2016, the Government filed 1,477 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Mitch McConnell
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Mitch McConnell
Page Three

these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Mitch McConnell
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Charles E. Schumer                    **APR 2 8 2017**
Minority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

     This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006),
most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).
This report provides information regarding: (1) all final filed applications made by the
Government during calendar year 2016 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final filed applications
made by the Government during calendar year 2016 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation pursuant to national security letter
authorities.

     In addition to reporting statistics based on the number of *final filed* applications, as has
been the Government's historical practice, this letter also includes for the first time statistics
published by the Director of the Administrative Office of the United States Courts (AOUSC).
Unlike the Government, AOUSC reports the number of *proposed applications* rather than the
number of *final filed* applications. More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court. The
statistics prepared by the AOUSC, which use the number of *proposed* applications rather than
final filed applications as their baseline, reflect this robust interaction between the Government
and the Court, and thus are included herein to provide important additional context. The
AOUSC Director's full report is available on its website.

     **Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

     During calendar year 2016, the Government filed 1,477 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Charles E. Schumer
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Charles E. Schumer
Page Three

these 21 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

> **Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons.  These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons.  These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful.  Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k).  For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Charles E. Schumer
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Paul D. Ryan
Speaker
U.S. House of Representatives
Washington, DC 20515

**APR 2 8 2017**

Dear Mr. Speaker:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006),
most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).
This report provides information regarding: (1) all final filed applications made by the
Government during calendar year 2016 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final filed applications
made by the Government during calendar year 2016 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of *final filed* applications, as has
been the Government's historical practice, this letter also includes for the first time statistics
published by the Director of the Administrative Office of the United States Courts (AOUSC).
Unlike the Government, AOUSC reports the number of *proposed applications* rather than the
number of *final filed* applications. More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court. The
statistics prepared by the AOUSC, which use the number of *proposed* applications rather than
final filed applications as their baseline, reflect this robust interaction between the Government
and the Court, and thus are included herein to provide important additional context. The
AOUSC Director's full report is available on its website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2016, the Government filed 1,477 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Paul D. Ryan
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

> **Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Paul D. Ryan
Page Three

these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Paul D. Ryan
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Kevin McCarthy
Majority Leader
U.S. House of Representatives
Washington, DC 20515

**APR 2 8 2017**

Dear Mr. Leader:

  This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015). This report provides information regarding: (1) all final filed applications made by the Government during calendar year 2016 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final filed applications made by the Government during calendar year 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.

  In addition to reporting statistics based on the number of *final filed* applications, as has been the Government's historical practice, this letter also includes for the first time statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). Unlike the Government, AOUSC reports the number of *proposed applications* rather than the number of *final filed* applications. More specifically, Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the FISC. Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of *proposed* applications rather than final filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on its website.

  **Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

  During calendar year 2016, the Government filed 1,477 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Kevin McCarthy
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Kevin McCarthy
Page Three

these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

> **Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Kevin McCarthy
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Nancy Pelosi                    **APR 2 8 2017**
Minority Leader
U.S. House of Representatives
Washington, DC  20515

Dear Madam Leader:

    This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq.*, and section 118 of
USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006),
most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).
This report provides information regarding: (1) all final filed applications made by the
Government during calendar year 2016 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final filed applications
made by the Government during calendar year 2016 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation pursuant to national security letter
authorities.

    In addition to reporting statistics based on the number of *final filed* applications, as has
been the Government's historical practice, this letter also includes for the first time statistics
published by the Director of the Administrative Office of the United States Courts (AOUSC).
Unlike the Government, AOUSC reports the number of *proposed applications* rather than the
number of *final filed* applications.  More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court.  The
statistics prepared by the AOUSC, which use the number of *proposed* applications rather than
final filed applications as their baseline, reflect this robust interaction between the Government
and the Court, and thus are included herein to provide important additional context.  The
AOUSC Director's full report is available on its website.

    **Applications Made to the Foreign Intelligence Surveillance Court During Calendar
    Year 2016** (section 107 of the Act, 50 U.S.C. § 1807)

    During calendar year 2016, the Government filed 1,477 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic

The Honorable Nancy Pelosi
Page Two

surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement

The Honorable Nancy Pelosi
Page Three

these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if

---

mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).

The Honorable Nancy Pelosi
Page Four

we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**APR 2 8 2017**

The Honorable Charles E. Grassley
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Robert W. Goodlatte
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Richard Burr
Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C. 20510

The Honorable Devin Nunes
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, D.C. 20515

Dear Messrs. Chairmen:

This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006), most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015). This report provides information regarding: (1) all final filed applications made by the Government during calendar year 2016 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final filed applications made by the Government during calendar year 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation pursuant to national security letter authorities.

In addition to reporting statistics based on the number of *final filed* applications, as has been the Government's historical practice, this letter also includes for the first time statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). Unlike the Government, AOUSC reports the number of *proposed applications* rather than the number of *final filed* applications. More specifically, Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the FISC. Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of *proposed* applications rather than final filed applications as their baseline, reflect this robust interaction between the Government

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Two

and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on its website.

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2016 (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2016, the Government filed 1,477 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

None of these final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications to the proposed orders in 112[1] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, the AOUSC reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

### Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2016 (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2016, the Government filed 124 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final filed application by the Government during calendar year 2016. The FISC made modifications to one of the proposed orders in a final application for access to business records.
The Honorable Charles E. Grassley

---

[1] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Three

The AOUSC, applying the methodology outlined above, has reported that the FISC received 125 proposed applications in 2016 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 108 proposed orders were granted, 16 proposed orders were modified, zero proposed applications were denied in part, and one proposed application was denied in full.

Twenty-one final filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[2] The FISC did not modify the proposed orders in these 21 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Concerning Different United States Persons Pursuant to National Security Letter Authorities During Calendar Year 2016** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended the Department of Justice provides Congress with annual reports regarding requests made by the Federal Bureau of Investigation (FBI) pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

In 2016, the FBI made 8,727 NSL requests (excluding requests for subscriber information only) for information concerning United States persons. These sought information pertaining to 3,117 different United States persons.[3]

In 2016, the FBI made 6,651 NSL requests (excluding requests for subscriber information only) for information concerning non-United States persons. These sought information pertaining to 2,310 different non-United States persons.[4]

---

[2] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[3] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its National Security Letter statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using National Security Letters. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Four

In 2016, the FBI made 9,423 NSL requests for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 3,725 persons.[5]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

cc:     The Honorable Dianne Feinstein
        Ranking Minority Member
        Senate Committee on the Judiciary

        The Honorable Mark Warner
        Vice Chairman
        Senate Select Committee on Intelligence

        The Honorable John Conyers, Jr.
        Ranking Minority Member
        House Committee on the Judiciary

        The Honorable Adam Schiff
        Ranking Minority Member
        House Permanent Select Committee on Intelligence

---

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as most recently amended by the USA FREEDOM Act, Pub. L. No. 114-23, 129 Stat. 268 (2015).



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**APR 2 8 2017**

The Honorable James C. Duff
Director
Administrative Office of the United States Courts
Washington, D.C. 20544

Dear Mr. Duff:

Pursuant to section 107 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, this report provides information regarding applications made by the Government during calendar year 2016 for authority to conduct electronic surveillance and physical search for foreign intelligence purposes.

As you are aware, it has been the Government's historical practice to report statistics based on the number of *final* filed applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC"). Whereas, the statistics published in your report are based on the number of *proposed applications and orders*. More specifically, Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the FISC. Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. Because the methodology utilized in your report reflects this robust interaction between the Government and the Court, we have repeated that information herein to provide important additional context.

During calendar year 2016, the Government filed 1,477 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,477 final filed applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,446 final filed applications included requests for authority to conduct electronic surveillance.

No final filed applications were withdrawn by the Government. The FISC did not deny any final filed applications in whole, or in part. The FISC made modifications[1] to the proposed

---

[1] A "modification" includes any substantive disparity between the authority requested by the Government in a final application filed pursuant to Rule 9(b) and the authority granted by the FISC. It does not include changes made by the Government after the submission of a proposed application submitted pursuant to Rule 9(a).

The Honorable James C. Duff
Page Two

orders in 112[2] final filed applications. Thus, the FISC approved collection activity in a total of 1,446 of the final filed applications that included requests for authority to conduct electronic surveillance.

Your office, applying the methodology outlined above, reported that the FISC received 1,485 proposed applications in 2016 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, you reported that 1,141 proposed orders were granted, 310 proposed orders were modified, 26 proposed applications were denied in part, and eight proposed applications were denied in full. As noted above, those statistics include modifications made to applications between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

We hope that this information is helpful. Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.

Sincerely,

Samuel R. Ramer
Acting Assistant Attorney General

---

[2] Additionally, the FISC issued a second supplemental order, *nunc pro tunc*, to correct a typographical error in the original supplemental order. This second supplemental order is not included in the 112 substantive modifications being reported.

# EXHIBIT M
## to Twitter's Request for Judicial Notice



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Michael R. Pence                    **APR 3 0 2018**
President
United States Senate
Washington, DC  20510

     This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2017 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

     In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (FISC). Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

     During calendar year 2017, the Government filed 1,349 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,349 applications include applications made solely for electronic surveillance, applications made solely for

The Honorable Michael R. Pence
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Michael R. Pence
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

### Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017 (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Michael R. Pence
Page Four

   We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.


                              Sincerely,

                              Stephen E. Boyd
                              Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Mitch McConnell
Majority Leader                                      **APR 3 0 2018**
United States Senate
Washington, DC  20510

Dear Mr. Leader:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and
section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended.
This report provides information regarding: (1) all final, filed applications made by the
Government during calendar year 2017 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final, filed applications
made by the Government during calendar year 2017 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of final filed applications this
report also includes statistics published by the Director of the Administrative Office of the
United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather
than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance
Court Rules of Procedure requires the Government to submit proposed applications at least seven
days before the Government seeks to have a matter entertained by the Foreign Intelligence
Surveillance Court (FISC).  Modifications or withdrawals of applications may occur between the
filing of a proposed application and the filing of a final application for a variety of reasons,
including the Government modifying a proposed application in response to questions or concerns
raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed
applications rather than final, filed applications as their baseline, reflect this robust interaction
between the Government and the Court, and thus are included herein to provide important
additional context.  The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2017, the Government filed 1,349 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes.  The 1,349 applications
include applications made solely for electronic surveillance, applications made solely for

The Honorable Mitch McConnell
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Mitch McConnell
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Mitch McConnell
Page Four

    We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General          *Washington, D.C. 20530*

The Honorable Charles E. Schumer       **APR 3 0 2018**
Minority Leader
United States Senate
Washington, DC 20510

Dear Mr. Leader:

      This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2017 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

      In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (FISC). Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

      During calendar year 2017, the Government filed 1,349 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,349 applications include applications made solely for electronic surveillance, applications made solely for

The Honorable Charles E. Schumer
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Charles E. Schumer
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

### Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017 (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Charles E. Schumer
Page Four

     We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Paul D. Ryan
Speaker                                          **APR 3 0 2018**
U.S. House of Representatives
Washington, DC 20515

Dear Mr. Speaker:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and
section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended.
This report provides information regarding: (1) all final, filed applications made by the
Government during calendar year 2017 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final, filed applications
made by the Government during calendar year 2017 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of final filed applications this
report also includes statistics published by the Director of the Administrative Office of the
United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather
than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance
Court Rules of Procedure requires the Government to submit proposed applications at least seven
days before the Government seeks to have a matter entertained by the Foreign Intelligence
Surveillance Court (FISC). Modifications or withdrawals of applications may occur between the
filing of a proposed application and the filing of a final application for a variety of reasons,
including the Government modifying a proposed application in response to questions or concerns
raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed
applications rather than final, filed applications as their baseline, reflect this robust interaction
between the Government and the Court, and thus are included herein to provide important
additional context. The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar
Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2017, the Government filed 1,349 final applications to the Foreign
Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic
surveillance and/or physical searches for foreign intelligence purposes. The 1,349 applications
include applications made solely for electronic surveillance, applications made solely for

The Honorable Paul D. Ryan
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

### Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017 (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Paul D. Ryan
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Paul D. Ryan
Page Four

   We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

                              Sincerely,

                              Stephen E. Boyd
                              Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Kevin McCarthy
Majority Leader                              **APR 3 0 2018**
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Leader:

This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2017 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (FISC). Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2017, the Government filed 1,349 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,349 applications include applications made solely for electronic surveillance, applications made solely for

The Honorable Kevin McCarthy
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Kevin McCarthy
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Kevin McCarthy
Page Four

We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Nancy Pelosi
Minority Leader                                      **APR 3 0 2018**
U.S. House of Representatives
Washington, DC  20515

Dear Madam Leader:

    This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 et seq., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2017 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

    In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (FISC).  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

**Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2017** (section 107 of the Act, 50 U.S.C. § 1807)

    During calendar year 2017, the Government filed 1,349 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,349 applications include applications made solely for electronic surveillance, applications made solely for

The Honorable Nancy Pelosi
Page Two

physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

The Honorable Nancy Pelosi
Page Three

in these 25 applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

> **Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons.  These sought information pertaining to 2,983 different United States persons.[2]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons.  These sought information pertaining to 3,084 different non-United States persons.[3]

The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,598 persons.[4]

---

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Nancy Pelosi
Page Four

     We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

                 Sincerely,

                 Stephen E. Boyd
                 Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

**APR 3 0 2018**

The Honorable Charles E. Grassley          The Honorable Richard Burr
Chairman                                   Chairman
Committee on the Judiciary                 Select Committee on Intelligence
United States Senate                       United States Senate
Washington, D.C. 20510                     Washington, D.C. 20510

The Honorable Robert W. Goodlatte          The Honorable Devin Nunes
Chairman                                   Chairman
Committee on the Judiciary                 Permanent Select Committee on Intelligence
U.S. House of Representatives              U.S. House of Representatives
Washington, D.C. 20515                     Washington, D.C. 20515

Dear Messrs. Chairmen:

This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2017 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (FISC). Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on the AOUSC website.

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Two

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2017 (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2017, the Government filed 1,349 final applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC") for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,349 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,321 applications included requests for authority to conduct electronic surveillance.

Two of these applications were withdrawn by the Government. The FISC did not deny any final, filed applications in whole, or in part. The FISC made modifications to the proposed orders in 154 final, filed applications. Thus, the FISC approved collection activity in a total of 1,319 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

### Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2017 (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2017, the Government filed 117 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2017. The FISC did not modify any of the proposed orders in a final application for access to business records.

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Three

The AOUSC, applying the methodology outlined above, has reported that the FISC received 118 proposed applications in 2017 for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 92 proposed orders were granted, 23 proposed orders were modified, two proposed applications were denied in part, and one proposed application was denied in full.

Twenty-five final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC did not modify the proposed orders in these 25 applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2017** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports[2] regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 9,006 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning United States persons. These sought information pertaining to 2,983 different United States persons.[3]

The FBI reports it made 14,861 NSL requests (excluding requests for subscriber information only) in 2017 for information concerning non-United States persons. These sought information pertaining to 3,084 different non-United States persons.[4]

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[2] While compiling statistics for this year's report, the FBI discovered that certain NSL statistics provided for past semi-annual reports may contain inaccuracies. We will provide updated reports, if necessary.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[4] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same non-U.S. person and that include

The Honorable Charles E. Grassley
The Honorable Richard Burr
The Honorable Robert W. Goodlatte
The Honorable Devin Nunes
Page Four

    The FBI reports it made 17,712 NSL requests in 2017 for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 4,598 persons.[5]

    We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

cc:    The Honorable Dianne Feinstein
        Ranking Minority Member
        Senate Committee on the Judiciary

        The Honorable Mark Warner
        Vice Chairman
        Senate Select Committee on Intelligence

        The Honorable Jerrold Nadler
        Ranking Minority Member
        House Committee on the Judiciary

        The Honorable Adam Schiff
        Ranking Minority Member
        House Permanent Select Committee on Intelligence

---

different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[5] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable James C. Duff
Director
Administrative Office of the United States Courts          **APR 3 0 2018**
Washington, D.C. 20544

Dear Mr. Duff:

    Pursuant to section 107 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"),
as amended, 50 U.S.C. § 1801 *et seq*., this report provides information regarding applications
made by the Government during calendar year 2017 for authority to conduct electronic
surveillance and physical search for foreign intelligence purposes.

    As you are aware, it has been the Government's historical practice to report statistics
based on the number of *final*, filed applications to the Foreign Intelligence Surveillance Court
(hereinafter "FISC").  Whereas, the statistics published in your report are based on the number of
*proposed applications and orders*.  More specifically, Rule 9(a) of the Foreign Intelligence
Surveillance Court Rules of Procedure requires the Government to submit proposed applications
at least seven days before the Government seeks to have a matter entertained by the FISC.
Modifications or withdrawals of applications may occur between the filing of a proposed
application and the filing of a final application for a variety of reasons, including the Government
modifying a proposed application in response to questions or concerns raised by the Court.
Because the methodology utilized in your report reflects this robust interaction between the
Government and the Court, we have repeated that information herein to provide important
additional context.

    During calendar year 2017, the Government filed 1,349 final applications to the FISC for
authority to conduct electronic surveillance and/or physical searches for foreign intelligence
purposes.  The 1,349 applications include applications made solely for electronic surveillance,
applications made solely for physical search, and combined applications requesting authority for
electronic surveillance and physical search.  Of these, 1,321 applications included requests for
authority to conduct electronic surveillance.

    Two of these applications were withdrawn by the Government.  The FISC did not deny
any final, filed applications in whole, or in part.  The FISC made modifications[1] to the proposed

---

[1] A "modification" includes any substantive disparity between the authority requested by the Government in a final application
filed pursuant to Rule 9(b) and the authority granted by the FISC.  It does not include changes made by the Government after
the submission of a proposed application submitted pursuant to Rule 9(a).

The Honorable James C. Duff
Page Two

orders in 154 applications.  Thus, the FISC approved collection activity in a total of 1,319 of the final filed applications that included requests for authority to conduct electronic surveillance.

Your office, applying the methodology outlined above, reported that the FISC received 1,372 proposed applications in 2017 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  In these matters, you reported that 948 proposed orders were granted, 353 proposed orders were modified, 47 proposed applications were denied in part, and 24 proposed applications were denied in full.  As noted above, those statistics include modifications made to applications between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2017, the total number of persons targeted for orders for electronic surveillance was between 1,000 and 1,499.  The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

We hope that this information is helpful.  Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

# EXHIBIT N
to Twitter's Request for Judicial Notice



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                                 *Washington, D.C. 20530*

The Honorable Michael R. Pence
President
United States Senate
Washington, DC  20510

Dear Mr. President:

This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC").  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018 (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Michael R. Pence
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search.  Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government.  The FISC denied one final, filed application in whole and one final, filed application in part.  The FISC made modifications to the proposed orders in 119 final, filed applications.  Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full.  As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999.  The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018.  The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes.  In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1]  The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C).  Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k).  For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Michael R. Pence
Page Three

these applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

> **Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons.  These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons.  These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Michael R. Pence
Page Four

      We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Mitch McConnell
Majority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

   This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

   In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC"). Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context. The AOUSC Director's full report is available on the AOUSC website.

   **Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018** (section 107 of the Act, 50 U.S.C. § 1807)

   During calendar year 2018, the Government filed 1,117 final applications to FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Mitch McConnell
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1]  The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Mitch McConnell
Page Three

these applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons.  These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons.  These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Mitch McConnell
Page Four

   We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

                              Sincerely,

                              Stephen E. Boyd
                              Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Charles E. Schumer
Minority Leader
United States Senate
Washington, DC  20510

Dear Mr. Leader:

      This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

      In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC").  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018 (section 107 of the Act, 50 U.S.C. § 1807)

      During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Charles E. Schumer
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1]  The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Charles E. Schumer
Page Three

these applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons. These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons. These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Charles E. Schumer
Page Four

     We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                                      *Washington, D.C. 20530*

The Honorable Nancy Pelosi
Speaker
U.S. House of Representatives
Washington, DC  20515

Dear Madam Speaker:

   This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

   In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC").  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

   **Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018** (section 107 of the Act, 50 U.S.C. § 1807)

   During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Nancy Pelosi
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Nancy Pelosi
Page Three

these applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

### Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018 (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons.  These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons.  These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Nancy Pelosi
Page Four

　　　We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

---

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable Steny Hoyer
Majority Leader
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Leader:

   This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq*., and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

   In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC").  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018 (section 107 of the Act, 50 U.S.C. § 1807)

   During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Steny Hoyer
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Steny Hoyer
Page Three

these applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons.  These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons.  These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Steny Hoyer
Page Four

    We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                          *Washington, D.C. 20530*

The Honorable Kevin McCarthy
Minority Leader
U.S. House of Representatives
Washington, DC  20515

Dear Mr. Leader:

       This report is submitted in accordance with sections 107 and 502 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended. This report provides information regarding: (1) all final, filed applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and/or physical search for foreign intelligence purposes under the Act; (2) all final, filed applications made by the Government during calendar year 2018 for access to certain business records (including the production of tangible things) for foreign intelligence purposes; and (3) certain requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter authorities.

       In addition to reporting statistics based on the number of final filed applications this report also includes statistics published by the Director of the Administrative Office of the United States Courts (AOUSC).  The AOUSC reports the number of proposed applications rather than the number of final, filed applications.  Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the Foreign Intelligence Surveillance Court (hereinafter "FISC").  Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court.  The statistics prepared by the AOUSC, which use the number of proposed applications rather than final, filed applications as their baseline, reflect this robust interaction between the Government and the Court, and thus are included herein to provide important additional context.  The AOUSC Director's full report is available on the AOUSC website.

      **Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018** (section 107 of the Act, 50 U.S.C. § 1807)

       During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes.  The 1,117 applications include applications made solely for electronic surveillance,

The Honorable Kevin McCarthy
Page Two

applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

**Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018** (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1] The FISC modified the proposed orders in one of

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection

The Honorable Kevin McCarthy
Page Three

these applications for access to business records.  Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons.  These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons.  These sought information pertaining to 2,717 different non-United States persons.[3]

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons.  These sought information pertaining to 4,432 persons.[4]

---

term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs.  For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons.  *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.

The Honorable Kevin McCarthy
Page Four

     We hope that this information is helpful.  Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                 *Washington, D.C. 20530*

The Honorable Lindsey Graham
Chairman
Committee on the Judiciary
United States Senate
Washington, D.C. 20510

The Honorable Richard Burr
Chairman
Select Committee on Intelligence
United States Senate
Washington, D.C. 20510

The Honorable Jerrold Nadler
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

The Honorable Adam Schiff
Chairman
Permanent Select Committee on Intelligence
U.S. House of Representatives
Washington, D.C. 20515

Dear Messrs. Chairmen:

This report is submitted in accordance with sections 107 and 502 of the Foreign
Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, and
section 118 of USA PATRIOT Improvement and Reauthorization Act of 2005, as amended.
This report provides information regarding: (1) all final, filed applications made by the
Government during calendar year 2018 for authority to conduct electronic surveillance and/or
physical search for foreign intelligence purposes under the Act; (2) all final, filed applications
made by the Government during calendar year 2018 for access to certain business records
(including the production of tangible things) for foreign intelligence purposes; and (3) certain
requests made by the Federal Bureau of Investigation (FBI) pursuant to national security letter
authorities.

In addition to reporting statistics based on the number of final filed applications this
report also includes statistics published by the Director of the Administrative Office of the
United States Courts (AOUSC). The AOUSC reports the number of proposed applications rather
than the number of final, filed applications. Rule 9(a) of the Foreign Intelligence Surveillance
Court Rules of Procedure requires the Government to submit proposed applications at least seven
days before the Government seeks to have a matter entertained by the Foreign Intelligence
Surveillance Court ("FISC"). Modifications or withdrawals of applications may occur between
the filing of a proposed application and the filing of a final application for a variety of reasons,
including the Government modifying a proposed application in response to questions or concerns
raised by the Court. The statistics prepared by the AOUSC, which use the number of proposed
applications rather than final, filed applications as their baseline, reflect this robust interaction
between the Government and the Court, and thus are included herein to provide important
additional context. The AOUSC Director's full report is available on the

The Honorable Lindsey Graham
The Honorable Richard Burr
The Honorable Jerrold Nadler
The Honorable Adam Schiff
Page Two

AOUSC website (www.uscourts.gov)

### Applications Made to the Foreign Intelligence Surveillance Court During Calendar Year 2018 (section 107 of the Act, 50 U.S.C. § 1807)

During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,117 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The AOUSC, applying the methodology outlined above, has reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The AOUSC reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, the AOUSC statistics include modifications made to proposed orders between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

### Applications for Access to Certain Business Records (Including the Production of Tangible Things) Made During Calendar Year 2018 (section 502 of the Act, 50 U.S.C. § 1862(c)(1))

During calendar year 2018, the Government filed 70 final applications to the FISC for access to certain business records (including the production of tangible things) for foreign intelligence purposes. The FISC did not deny, in whole or in part, any such final, filed application by the Government during calendar year 2018. The FISC modified the proposed orders submitted with one final application for access to business records.

The Honorable Lindsey Graham
The Honorable Richard Burr
The Honorable Jerrold Nadler
The Honorable Adam Schiff
Page Three

The AOUSC, applying the methodology outlined above, has reported that the FISC received 73 proposed applications for access to certain business records (including the production of tangible things) for foreign intelligence purposes. In these matters, the AOUSC reported that 61 proposed orders were granted, nine proposed orders were modified, and three proposed applications were denied in full.

Twenty final, filed applications did not specifically identify an individual, account, or personal device as the specific selection term.[1]  The FISC modified the proposed orders in one of these applications for access to business records. Separately, the FISC did not direct additional, particularized minimization procedures beyond those adopted pursuant to section 1861(g) to the proposed orders in applications made by the Government.

**Requests Made for Certain Information Pursuant to National Security Letter Authorities During Calendar Year 2018** (USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177 (2006))

Pursuant to Section 118 of the USA PATRIOT Improvement and Reauthorization Act, Pub. L. 109-177 (2006), as amended, the Department of Justice provides Congress with annual reports regarding requests made by the FBI pursuant to the National Security Letter (NSL) authorities provided in 12 U.S.C. § 3414, 15 U.S.C. § 1681u, 15 U.S.C. § 1681v, 18 U.S.C. § 2709, and 50 U.S.C. § 436.

The FBI reports it made 11,454 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning United States persons. These sought information pertaining to 2,768 different United States persons.[2]

The FBI reports it made 14,481 NSL requests (excluding requests for subscriber information only) in 2018 for information concerning non-United States persons. These sought information pertaining to 2,717 different non-United States persons.[3]

---

[1] Notably, the definition of "specific selection term" for obtaining an order for the production of tangible things is "a term that specifically identifies a person, account, address, or personal device, or any other specific identifier," 50 U.S.C. § 1861(k), whereas the definition of "specific selection term" for the reporting requirement encompasses a smaller group of terms, to include only "an individual, account, or personal device," 50 U.S.C. § 1862(c)(1)(C). Thus, the reporting requirement mandates inclusion in this report of certain requests that otherwise meet the definition of specific selection term in 50 U.S.C. § 1861(k). For example, the reporting requirement mandates inclusion of requests in which the specific selection term was an "address."

[2] In the course of compiling its NSL statistics, the FBI may over-report the number of United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same U.S. person and that include different spellings of the U.S. person's name would be counted as separate U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same U.S. person would be counted as two U.S. persons.

[3] In the course of compiling its NSL statistics, the FBI may over-report the number of non-United States persons about whom it obtained information using NSLs. For example, NSLs that are issued concerning the same non-U.S. person and that include different spellings of the non-U.S. person's name would be counted as separate non-U.S. persons, and NSLs issued under two different types of NSL authorities concerning the same non-U.S. person would be counted as two non-U.S. persons.

The Honorable Lindsey Graham
The Honorable Richard Burr
The Honorable Jerrold Nadler
The Honorable Adam Schiff
Page Four

The FBI reports it made 12,937 NSL requests in 2018 for information concerning only subscriber information for United States persons and non-United States persons. These sought information pertaining to 4,432 persons.[4]

We hope that this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General

cc:  The Honorable Dianne Feinstein
     Ranking Member
     Senate Committee on the Judiciary

     The Honorable Mark Warner
     Vice Chairman
     Senate Select Committee on Intelligence

     The Honorable Doug Collins
     Ranking Member
     House Committee on the Judiciary

     The Honorable Devin Nunes
     Ranking Member
     House Permanent Select Committee on Intelligence

---

[4] Because Congress has recognized that the FBI typically knows little about the user of a facility when requests for only subscriber information are made, Section 118(c)(2)(B) does not require the number of requests for NSLs seeking only subscriber information to be broken down to identify the number of requests related to United States persons and non-United States persons. *See* Section 118(c)(2)(B), USA Patriot Act Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 217 (2006), as amended.



**U.S. Department of Justice**

Office of Legislative Affairs

Office of the Assistant Attorney General                    *Washington, D.C. 20530*

The Honorable James C. Duff
Director
Administrative Office of the United States Courts          MAY 0 3 2019
Washington, D.C. 20544

Dear Mr. Duff:

   Pursuant to section 107 of the Foreign Intelligence Surveillance Act of 1978 (the "Act"), as amended, 50 U.S.C. § 1801 *et seq.*, this report provides information regarding applications made by the Government during calendar year 2018 for authority to conduct electronic surveillance and physical search for foreign intelligence purposes.

   As you are aware, it has been the Government's historical practice to report statistics based on the number of *final,* filed applications to the Foreign Intelligence Surveillance Court (hereinafter "FISC"). Whereas, the statistics published in your report are based on the number of *proposed applications and orders.* More specifically, Rule 9(a) of the Foreign Intelligence Surveillance Court Rules of Procedure requires the Government to submit proposed applications at least seven days before the Government seeks to have a matter entertained by the FISC. Modifications or withdrawals of applications may occur between the filing of a proposed application and the filing of a final application for a variety of reasons, including the Government modifying a proposed application in response to questions or concerns raised by the Court. Because the methodology utilized in your report reflects this robust interaction between the Government and the Court, we have repeated that information herein to provide important additional context.

   During calendar year 2018, the Government filed 1,117 final applications to the FISC for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. The 1,117 applications include applications made solely for electronic surveillance, applications made solely for physical search, and combined applications requesting authority for electronic surveillance and physical search. Of these, 1,081 applications included requests for authority to conduct electronic surveillance.

   One of these applications was withdrawn by the Government. The FISC denied one final, filed application in whole and one final, filed application in part. The FISC made modifications to the proposed orders in 119 final, filed applications. Thus, the FISC approved collection activity in a total of 1,079 of the applications that included requests for authority to conduct electronic surveillance.

The Honorable James C. Duff
Page Two

Your office, applying the methodology outlined above, reported that the FISC received 1,142 proposed applications in 2018 for authority to conduct electronic surveillance and/or physical searches for foreign intelligence purposes. In these matters, you reported that 830 proposed orders were granted, 245 proposed orders were modified, 40 proposed applications were denied in part, and 27 proposed applications were denied in full. As noted above, those statistics include modifications made to applications between the filing of the proposed application and the final application, as well as proposed applications withdrawn by the Government in full or in part after being advised that the Court would not grant the proposed application as initially submitted by the Government.

During calendar year 2018, the total number of persons targeted for orders for electronic surveillance was between 1,500 and 1,999. The aggregate number of United States persons targeted for orders for electronic surveillance was between zero and 499.

We hope that this information is helpful. Please do not hesitate to contact this office if you would like additional assistance regarding this or any other matter.

Sincerely,

Stephen E. Boyd
Assistant Attorney General