JOSEPH H. HUNT
Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
ANTHONY J. COPPOLINO
Deputy Branch Director
JULIA A. HEIMAN
Senior Counsel
CHRISTOPHER HEALY
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch

P.O. Box 883
Washington, D.C.  20044
Telephone:  (202) 616-8480
Facsimile:  (202) 616-8470
Email: julia.heiman@usdoj.gov

Attorneys for Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TWITTER, INC.,<br><br>      Plaintiff,<br><br>           v.<br><br>WILLIAM P. BARR, Attorney<br>General of the United States, *et al.*,<br><br>      Defendants. | Case No. 14-cv-4480-YGR<br><br>**ERRATA TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR SUMMARY JUDGMENT**<br><br>Hon. Yvonne Gonzalez Rogers |

Defendants respectfully submit this errata to Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply in Support of Defendants' Renewed Motion for Summary Judgment ("Defendants' Opposition"), ECF No. 321.  After submitting Defendants'

*Twitter, Inc. v. Barr, et al.,* Case No. 14-cv-4480-YGR
Errata to Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment
and Reply in Support of Defendants' Renewed Motion for Summary Judgment                    1

1  Opposition, undersigned counsel realized that she had inadvertently failed to list the page

2  numbers to which four "*supra*" citations in the text of the submission were meant to refer; in the

3  attached version of Defendants' Opposition, which is otherwise identical to the version

4  previously filed by Defendants, those page numbers are provided.  Undersigned counsel

5  apologizes for her inadvertent omission and for any inconvenience that omission caused to the

6  Court or to Plaintiff.

7

8  Dated:  November 24, 2019                        Respectfully submitted,

9

10                                                 JOSEPH H. HUNT
                                                   Assistant Attorney General

11

12                                                 DAVID L. ANDERSON
                                                   United States Attorney

13

14                                                 ANTHONY J. COPPOLINO
                                                   Deputy Branch Director

15
                                                        */s/ Julia A. Heiman*
16                                                 JULIA A. HEIMAN, Bar No. 241415
                                                   Senior Counsel
17                                                 CHRISTOPHER HEALY

18                                                 Trial Attorney
                                                   U.S. Department of Justice
19                                                 Civil Division, Federal Programs Branch
                                                   P.O. Box 883
20                                                 Washington, D.C. 20044
21                                                 julia.heiman@usdoj.gov
                                                   *Attorneys for Defendants*
22

23

24

25

26

27

28
*Twitter, Inc. v. Barr, et al.,* Case No. 14-cv-4480-YGR
Errata to Defendants' Opposition to Plaintiff's Cross-Motion for Summary Judgment
and Reply in Support of Defendants' Renewed Motion for Summary Judgment                    2

1   JOSEPH H. HUNT
    Assistant Attorney General
2   DAVID L. ANDERSON
    United States Attorney
3   ANTHONY J. COPPOLINO
    Deputy Branch Director
4   JULIA A. HEIMAN
    Senior Counsel
5   CHRISTOPHER HEALY
    Trial Attorney
6
    United States Department of Justice
7   Civil Division, Federal Programs Branch
8
    P.O. Box 883
9   Washington, D.C.  20044
    Telephone:  (202) 616-8480
10  Facsimile:  (202) 616-8470
    Email: julia.heiman@usdoj.gov
11

12  Attorneys for Defendants

13              IN THE UNITED STATES DISTRICT COURT

14            FOR THE NORTHERN DISTRICT OF CALIFORNIA

15  _____

16                                )
    TWITTER, INC.,                )          Case No. 14-cv-4480-YGR
17                                )
           Plaintiff,             )
18                                )
                                  )
19            v.                  )
                                  )          **DEFENDANTS' OPPOSITION
20  WILLIAM P. BARR, Attorney     )          TO PLAINTIFF'S CROSS-
    General of the United States, *et al.*,  )          MOTION FOR SUMMARY
21                                )          JUDGMENT AND REPLY
           Defendants.            )          IN SUPPORT OF
22                                )          DEFENDANTS' RENEWED
                                  )          MOTION FOR
23                                )          SUMMARY JUDGMENT**
                                  )
24                                )
                                  )          No Hearing Scheduled
25                                )
                                  )
26                                )          Courtroom 1, Fourth Floor
                                  )          Hon. Yvonne Gonzalez Rogers
27  _____)

28

*Twitter, Inc. v. Barr, et al.*, Case No. 14-cv-4480-YGR
Defs.' Opp'n to Pl.'s Mot. for Summ. J. and Reply in Support of Defs' Renewed Mot. for Summ. J.

# **TABLE OF CONTENTS**

INTRODUCTION ....................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.  Plaintiff Does Not Have a First Amendment Right to Publish the Information at
Issue ................................................................................................................... 2

    A.  EAD Tabb's Assessment of the Harms that Reasonably Could Be
Expected to Result from Plaintiff's Proposed Disclosure is Based on his
Individualized Analysis of "the Speaker and the Speech at Issue." ...................... 4

    B.  Plaintiff's Argument Mischaracterizes the Data that It Seeks to Disclose ............. 7

    C.  The Court Should Give No Weight to Plaintiff's Speculation that Its
Proposed Disclosure Would Not Harm National Security ...................................... 9

    D.  The Harm Described by EAD Tabb Does Not Depend on Speculation
about Disclosures by Other Companies. ............................................................... 12

II.  The Court Should Not Reach Plaintiff's *Freedman* Argument; but, if It Does, the
Court Should Find that Framework Inapplicable in this Setting ...................................... 14

    A.  The Protection of Classified National Security Information Bears No
Resemblance to the Movie Censorship Scheme in *Freedman* ............................ 16

    B.  As the Ninth Circuit Explained in *In re NSL*, Precedent Does Not Support
Application of the *Freedman* Factors to a Provider's Reporting about its
Receipt of National Security Process ..................................................................... 18

    C.  Application of the *Freedman* Framework—Designed to Secure Swift
Judicial Review—Would Make Little Sense for Nondisclosure
Obligations that Have their Genesis in Court Proceedings .................................... 22

III.  Rule 56(d) Supplies No Grounds on Which to Postpone Further the Court's
Dispositive Ruling ............................................................................................... 24

CONCLUSION ....................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*Aptheker v. Secretary of State,*
  378 U.S. 500 (1964) ........................................................................................ 3

*Butterworth v. Smith,*
  494 U.S. 624 (1990) ..................................................................... 19, 20, 21, 22

*Dep't of Navy v. Egan,*
  484 U.S. 518 (1988) ...................................................................................... 16

*Doe, Inc. v. Mukasey,*
  549 F.3d 861 (2d Cir. 2008) ................................................................ 17, 18, 22

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.,*
  525 F.3d 822 (9th Cir. 2008) ......................................................................... 25

*Freedman v. Maryland,*
  380 U.S. 51 (1965) .................................................................................. 14, 17

*Gardels v. CIA,*
  689 F.2d 1100 (D.C. Cir. 1982) .................................................................... 10

*Haig v. Agee,*
  453 U.S. 280 (1981) ........................................................................................ 3

*Halperin v. Nat'l Sec. Council,*
  452 F. Supp. 47 (D.D.C. 1978), *aff'd,* 612 F.2d 586 (D.C. Cir. 1980) ............... 10

*Hamdan v. Dep't of Justice,*
  797 F.3d 759 (9th Cir. 2015) ......................................................................... 10

*Hoffmann-Pugh v. Keenan,*
  338 F.3d 1136 (10th Cir. 2003), *cert. denied,* 540 U.S. 1107 (2004) ............ 15, 20

*In re Certification of Questions of Law to Foreign Intelligence Surveillance Court of Review,*
  No. FISCR 18-01, 2018 WL 2709456 (F.I.S.C.-R. Mar. 16, 2018) ....................... 21

*In re Mot. for Release of Court Records,*
  526 F. Supp. 2d 484 (F.I.S.C. 2007) .......................................................... 21, 23

*In re National Security Letter,*
  863 F.3d 1110 (9th Cir. 2017) ................................................................ *passim*

*N.Y. Times Co. v. United States,*
  403 U.S. 713 (1971) ........................................................................................ 3

*Polk v. Creamer-Todd,*
  No. 14-CV-04375-YGR (PR), 2016 WL 771329 (N.D. Cal. Feb. 29, 2016) .......................... 25

*Seattle Times Co. v. Rhinehart,*
  467 U.S. 20 (1984) ...................................................................................................... 14, 19

*SEC v. Stein,*
  906 F.3d 823 (9th Cir. 2018),
  *cert. denied*, No. 19-97, 2019 WL 4922724 (U.S. Oct. 7, 2019) ................................... 25

*Shaw v. Thomas*, No. 17-CV-00462-YGR (PR),
  2019 WL 162729 (N.D. Cal. Jan. 10, 2019) ......................................................... 25

*Snepp v. U.S.,*
  444 U.S. 507 (1980) ....................................................................................... 10

*Stillman v. CIA,*
  319 F.3d 546 (D.C. Cir. 2003) ................................................................... 24

*Tatum v. City & Cty. of S.F.,*
  441 F.3d 1090 (9th Cir. 2006) ................................................................... 25

*Times Mirror Co. v. United States,*
  873 F.2d 1210 (9th Cir. 1989) ................................................................... 22

*United States v. Marchetti,*
  466 F.2d 1309 (4th Cir. 1972) ................................................................... 10

*Wilson v. CIA,*
  586 F.3d 171 (2d Cir. 2009) ....................................................................... 10

**Executive Material**

Exec. Order No. 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ........................... 5, 10, 16, 18

**Statutes**

18 U.S.C. § 2709(c)(1) ................................................................................ 18

50 U.S.C. §1803 ......................................................................................... 21

50 U.S.C. §1861(f)(1) ................................................................................ 23

50 U.S.C. §1874(c) .............................................................................. 16, 17

50 U.S.C. §1881a(h)(4)(C) ........................................................................ 24

**Rules**

Fed. R. Civ. P. 56(d) ........................................................................... 24, 25

**INTRODUCTION**

On June 21, 2019, the Court issued an Order indicating that it was inclined to reconsider the Government's request for summary judgment after the Court's review of additional classified materials that explained the serious harms to national security that reasonably could be expected to result from the disclosure of the classified information in Plaintiff's draft Transparency Report.[1]  *See* ECF No. 301.  In the same Order, the Court announced its determination that the classified evidence at issue could not be shared with Plaintiff's counsel "based upon the national security concerns it raises."  *Id.* at 2.  Plaintiff's combined opposition to Defendants' renewed motion for summary judgment and cross-motion, ECF No. 311 ("Pl.'s Br."), fails to establish any First Amendment right to publish the classified information at issue in its Report, and its renewed demand for access to classified information is foreclosed by the Court's prior ruling.

First, the Court should find that Plaintiff has no First Amendment right to publish the information at issue, based on the unclassified and classified declarations of FBI Executive Assistant Director ("EAD") Tabb describing the national security harms reasonably likely to result from disclosure of the data redacted from Plaintiff's draft Transparency Report.  As discussed to the extent possible in unclassified terms in Defendants' renewed motion, EAD Tabb assessed the particular information that Plaintiff seeks to disclose and focused his discussion of the harm of disclosure on that particular data.  Plaintiff ignores the heart of EAD Tabb's analysis—which focuses specifically on Plaintiff's proposed disclosures—and instead argues that his analysis depends on the potential harm of disclosure by other companies.  As discussed herein, that simply is not so.  Indeed, Plaintiff's own presentation of its proposed disclosure strays significantly from the data actually at issue in its complaint.  Based on EAD Tabb's explanation of the harms reasonably likely to result from the disclosure of the classified data that Plaintiff actually seeks to publish, detailed herein and in his unclassified and classified declarations, the Court should find that the restriction on publication withstands any applicable

---

[1] As explained in the Government's renewed motion for summary judgment, ECF No. 309 ("renewed motion"), while the Court's Order addressed the classified declaration of Acting EAD McGarrity, the Government has now presented the evidence from that declaration germane to the Court's summary judgment determination in the classified declaration of EAD Tabb.  *See* ECF No. 309 at 11.

1  level of First Amendment scrutiny.

2  The Court also should reject Plaintiff's request that the Government be enjoined from

3  protecting classified national security information until the Government adopts the same

4  procedural safeguards the Supreme Court has found appropriate for movie censors and licensing

5  for adult theaters.  As the Ninth Circuit observed in *In re National Security Letter*, 863 F.3d 1100

6  (9th Cir. 2017) ("*In re NSL*"), the Supreme Court has never required such safeguards for

7  confidentiality restrictions pertaining to participation in governmental proceedings.  *Id.* at 1129.

8  Indeed, no case of which the Government is aware has ever imposed such procedures in

9  connection with restrictions on the publication of classified national security information.  This

10  Court should not be the first to issue such an order.

11  Second, the Court should reject Plaintiff's attempt to re-litigate the Court's prior decision

12  to deny its counsel access to the classified materials at issue.  This issue already has been

13  resolved, after extensive briefing, which encompassed more than nine submissions by the parties

14  and *amici*.  *See* ECF Nos. 250, 256, 264, 265, 269, 281, 292, 294-1, 298.  These submissions

15  included responses to an Order to Show Cause through which the Court required the parties to

16  address this very issue.  *See* ECF No. 261.  Plaintiff acknowledges neither this history nor the

17  Court's Order regarding access, *see* Pl.'s Br., *generally*, and treats as an open question whether

18  summary judgment should be denied so that Plaintiff's counsel may access the classified

19  evidence.  It is not.  Following years of litigation—including several intensive rounds of briefing

20  focused on this very issue—the Court determined that national security considerations preclude

21  counsel access here.  Plaintiff gives no reason to set aside that considered judgment or to further

22  delay the resolution of this case by restarting at square one the briefing regarding counsel access

23  that the Court only recently denied.

24  For all these reasons, and the reasons explained in Defendants' renewed motion, the

25  Court should grant summary judgment for the Government and deny Plaintiff's cross-motion.

## ARGUMENT

### I.  Plaintiff Does Not Have a First Amendment Right to Publish the Information at Issue.

28  Defendants explained in their renewed motion that, although they respectfully disagree

with the Court's prior holding that strict scrutiny should apply in this case, they nonetheless treated that holding as controlling for purposes of the cross-motions for summary judgment now before the Court, and demonstrated why the Government should prevail even under that standard. *See* Defs.' Mot. at 14. Plaintiff, for its part, urges an even higher standard of scrutiny. Instead of strict scrutiny, Plaintiff contends that one sentence lifted from Justice Stewart's concurrence in *N.Y. Times Co. v. United States* ("*Pentagon Papers*"), 403 U.S. 713 (1971), should be controlling here, and that the Government must show the proposed disclosure "will surely result in direct, immediate, and irreparable damage to our Nation or its people." Pl.'s Br. at 6, 7 (quoting *Pentagon Papers*, 403 U.S. at 730 (Stewart, J. concurring)).[2] But no court has ever applied such a standard in any other setting—including for purposes of deciding whether persons subject to nondisclosure obligations may publish classified information. Indeed, in its July 6, 2017 decision on Defendants' first summary judgment motion, this Court observed that "the most closely analogous cases . . . stopp[ed] short of unequivocally adopting the *Pentagon Papers* standard." ECF No. 172 at 12.

Defendants have explained in their prior submissions why neither the heightened *Pentagon Papers* standard, nor any form of strict scrutiny, should apply in the instant case. *See* ECF No. 145 at 11–15, 18–19; ECF No. 160 at 3–8. However, even if a heightened standard of scrutiny applies, the evidence demonstrates that the restriction on Plaintiff's speech at issue here comports with the First Amendment. First, as the Supreme Court has observed "[i]t is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)); *see also In re NSL*, 863 F.3d at 1123–24. Indeed, Plaintiff does not argue otherwise. *See* Pl.'s Br., *generally*. Instead, Plaintiff advances four arguments as to why it

---

[2] While Plaintiff contends that this standard, articulated in a concurrence, "is controlling because Justice Stewart's rationale offered the narrowest grounds (*i.e.*, the least expansive view of the First Amendment) that still supported the majority holding," Pl.'s Br. at 6 n.3, it is not clear by what logic Justice Stewart's rationale offers the "narrowest grounds." Other Justices offered different, and arguably narrower, grounds for rejecting the prior restraint at issue in that case. *See*, *e.g.*, *Pentagon Papers*, 403 U.S. at 741–47 (Marshall, J., concurring) (focusing on the fact that, in seeking an injunction, the Executive in that case was asking the Court to grant the Executive a power that Congress had considered and rejected).

contends the restrictions on publication of the classified information in its draft Transparency Report are not narrowly tailored to meet that compelling interest.  All of them are meritless.

First, Plaintiff argues that Defendants did not engage in an individualized analysis of the data that Plaintiff seeks to publish or of Plaintiff as a potential speaker.  But, in so arguing, Plaintiff overlooks much of the content of EAD Tabb's unclassified declaration, which focuses specifically on Plaintiff's proposed disclosures and includes detail as to why Plaintiff's role as speaker is significant in EAD Tabb's analysis.  Second, Plaintiff purports to discuss why its proposed disclosure would not harm national security, but ends up advocating for the disclosure of a set of data different from—and less sensitive than—the information that is actually at issue here.  Third, Plaintiff offers its speculation as to why, in its view, its proposed disclosure would cause no national security harm.  The case law gives such lay opinions no weight in national security matters, and the evidence before the Court demonstrates, in any event, why Plaintiff errs in its assessment.  Finally, Plaintiff contends that EAD Tabb's analysis of its proposed disclosure is not narrowly tailored because it is based on "hypothetical" harm that would result from other companies' disclosure of analogous data.  In this argument, Plaintiff is twice mistaken because (1) EAD Tabb's assessment of harm is not grounded solely, or even primarily, in the likelihood that other companies will follow if Plaintiff is permitted to disclose the data at issue; and also because (2) the determination that other providers will follow suit is not mere speculation as Plaintiff contends, but a near certainty as demonstrated by the evidence before this Court.

In sum, all of Plaintiff's objections to EAD Tabb's analysis miss the mark.  For the reasons explained herein and in Defendants' renewed motion, the restriction on publication at issue here does not abridge First Amendment protections, even under strict scrutiny.

## A. EAD Tabb's Assessment of the Harms that Reasonably Could Be Expected to Result from Plaintiff's Proposed Disclosure is Based on his Individualized Analysis of "the Speaker and the Speech at Issue."

To begin with, Plaintiff objects that "[t]he Government cannot carry [its] burden simply by asserting that the information [at issue] was properly classified under the Executive Order," Pl.'s Br. at 6 (quotation omitted); rather, Plaintiff insists that "narrow tailoring requires" that the Government justify the restriction on speech "based on 'an individualized analysis of' the

speaker and speech at issue." *Id.* (quoting *In re NSL*, 863 F.3d at 1125); *see also id.* at 13 ("the Government has never engaged in the kind of individualized analysis of proposed aggregate reporting that strict scrutiny demands").[3]  But, assuming that kind of analysis is required, that is just what the Government has done here.  The Government submitted alongside its renewed motion for summary judgment the classified and unclassified declarations of EAD Tabb, specifically addressing Plaintiff's proposed speech including with specific reference to Plaintiff as the proposed speaker.  *See* Tabb Decl., ECF No. 309-1, Notice of Lodging of Classified Tabb Decl., ECF No. 310.  Of course, the explanation that EAD Tabb could include in the unclassified setting was limited; stating in full the harm that reasonably could be expected to result from Plaintiff's proposed disclosure would reveal the very information that the Government is seeking to protect.  However, to the extent possible without divulging the information at issue, EAD Tabb's unclassified declaration details the harms that reasonably could be expected to result from Plaintiff's proposed speech.

As EAD Tabb explains:  "disclosure of the information at issue here would provide international terrorists, terrorist organizations, foreign intelligence services, cyber threat actors, and other persons or entities who pose a threat to the national security . . . (collectively, "adversaries") with a roadmap to the existence or extent of Government surveillance and capabilities *associated with Twitter*."  Tabb Decl. ¶ 5 (emphasis added).  In particular, the information that would be revealed by Plaintiff's proposed disclosures would provide adversaries

---

[3] Plaintiff also reiterates its claim that "the absence of any durational limit on the Government's restraint" supports its position that the restriction on its speech is not narrowly tailored.  Pl.'s Br. at 13.  But, as Defendants have previously explained, it simply is not true that there is no durational limit on the restriction at issue here.  Indeed, as Plaintiff notes in its complaint, classification cannot be indefinite. See SAC ¶ 39 (citing Exec. Order No. 13526, § 2.2(f)); *see also id.*, § 1.5(d) ("No information may remain classified indefinitely").  Furthermore, the Government has long interpreted FISA nondisclosure obligations, if applicable, as protecting only information that is classified.  *See*, *e.g.*, Notice, In re Mot. for Decl. J. (Jan. 27, 2014), submitted as Compl. Ex 2, ECF No. 1-1, at 2 (explaining that because the DNI had declassified aggregate data reported in a manner consistent with the January 27, 2014 framework, the Government would "therefore treat such disclosures as no longer prohibited under any legal provision that would otherwise prohibit the disclosure of classified data, including data relating to FISA surveillance").  Thus, when any pertinent data at issue are no longer classified, FISA also would no longer prevent their publication.

"highly valuable insights into where and how the United States is or is not deploying its investigative and intelligence resources, and would tend to reveal which communications services may or may not be secure, which types of information may or may not have been collected, and thus whether or to what extent the United States is or is not aware of the activities of these adversaries." *Id.* ¶ 7; *see also id.* ¶¶ 17, 21.  Disclosure of such information for subsequent reporting periods—which Plaintiff also seeks to publish, *see* SAC ¶¶ 86, 91; SAC, Prayer for Relief A(x), C—would reveal, *inter alia*, "incremental increases or decreases in collection over time" and "the extent to which Twitter was or was not a safe channel of communication for our adversaries."  Tabb Decl. at ¶¶ 17, 18; *see also id.* ¶ 21.  EAD Tabb also explains the ways in which adversaries reasonably could be expected to exploit the information they would learn from Plaintiff's proposed disclosures.  *See id.* ¶¶ 9, 24–26.  Adversaries could use such information to:  take steps to avoid collection; engage in deceptive tactics or disinformation campaigns that could undermine lawful intelligence operations of the United States; or, even to carry out hostile actions that expose Government personnel and their families to the risk of physical harm.  *Id.* ¶ 9.

Additionally, even in his unclassified declaration, EAD Tabb explains why disclosure of such information by Plaintiff in particular would be so harmful.  *See id.* ¶ 22.  EAD Tabb indicates that his analysis is informed by the use of social media, including Twitter, by adversaries of the United States.  *Id.*  "For example, with respect to Twitter in particular, the Islamic State of Iraq and Syria ("ISIS") has used Twitter extensively to broadcast videos of beheadings of Western hostages and others."  *Id.*  Underscoring the importance of the platform for ISIS, when Twitter removed such videos from its platforms, ISIS threatened to retaliate by murdering Twitter employees.  *Id.*  That reality—that terrorist organizations use Twitter to further their illicit aims and efforts to harm the United States—shaped EAD Tabb's assessment of the harm that reasonably could be expected to arise from disclosure of the information that Plaintiff seeks to publish.  *Id.* at ¶¶ 22–23.

EAD Tabb's classified declaration provides still further detail about the harms that reasonably could be expected to result from Plaintiff's proposed disclosures, including in light of

the particular information and speaker at issue.  Indeed, in ordering reconsideration of summary judgment, the Court observed that such evidence "provides an explanation of the Government's basis for restricting the information that can be published in the Draft Transparency Report, and the grave and imminent harm that could reasonably be expected to arise from its disclosure." ECF No. 301 at 2.  The Court further observed that that evidence "meets the Government's burden under strict scrutiny to justify classification and restrict disclosure of information in the Draft Transparency Report, based upon a reasonable expectation that its disclosure would pose grave or imminent harm to national security, and that no more narrow tailoring of the restrictions can be made."  *Id.*  The Court should hold to that assessment now in resolving the case on summary judgment.  Thus, even if a heightened test is drawn from the *Pentagon Papers* case and applied to the instant case, the restriction on Plaintiff's speech would be constitutional.

**B.  Plaintiff's Argument Mischaracterizes the Data that it Seeks to Disclose.**

EAD Tabb's analysis in his classified and unclassified declarations focuses on the data that Plaintiff seeks to disclose in this case, as set forth in its operative complaint and in Plaintiff's draft Transparency Report.  Evidently now at a loss as to how to defend certain facets of its proposed disclosure, Plaintiff asks the Court to focus solely on the potential harm of disclosing: (1) whether it has received any FISA process at all during the period covered by its draft Transparency Report, and (2) the aggregate number of FISA orders, if any, it has received across all FISA titles, and urges that such disclosures would not harm national security.[4]  *See* Pl.'s Br. at 8–9, 10.  But these disclosures are not—and never have been—all that is at issue in this litigation.

The data that Plaintiff seeks to publish in its draft Transparency Report is significantly more revealing:  Plaintiff "seeks to disclose that it received 'zero' FISA orders, or 'zero' of a specific *kind* of FISA order, for that period, if either of those circumstances is true."  SAC, ECF No. 114, ¶ 4 (emphasis in original); *see also id.* ¶ 56.  Furthermore, Plaintiff seeks to disclose "[t]he number of NSLs and FISA orders received, if any, reported separately, in ranges of one hundred, beginning with 1–99," and "the combined number of NSLs and FISA orders received,

---

[4] As with all of the Government's submissions in this litigation, the discussion herein is not meant to confirm or deny whether Plaintiff has received FISA process.

if any, in ranges of twenty-five, beginning with 1–24." *Id.* ¶ 56.  It takes little imagination to see how such disclosures—reporting that Twitter has received "zero" of a particular kind or kinds of FISA order, if that is the case—together with the specific number of orders received under the remaining FISA titles, if any, would reveal substantially more information than whether or not Plaintiff has received any FISA process at all, and, if so, how much.

Indeed, Plaintiff concedes that "if a speaker sought to publish . . . more granular information—such as total orders received, broken down by specific FISA provisions" that "might permit the Government to show harm to national security in another case." Pl.'s Br. at 12.  Plaintiff fails to realize that its hypothetical case is this one.  Plaintiff's request to publish that it received "zero" of a particular kind of process, if applicable, would reveal the total orders received under that provision, *i.e.* none.  Moreover, since there are only five titles of FISA under which a provider may receive process, a disclosure of "zero" for any particular title, would make significantly more specific the information revealed by the aggregate number for any remaining titles of FISA.[5]  Importantly, because FISA identifies the kind of information that the Government may be obtain pursuant to each of its titles, it is critical to protect such granular detail from disclosure.  *See* Tabb Decl. ¶¶ 7, 17–18.[6]

Beyond failing to acknowledge the specificity of the data that it seeks to publish in the draft Transparency Report, Plaintiff also suggests that the Court should now ignore Plaintiff's request to publish analogous data for subsequent periods.  *See* Pl.'s Br. at 11 n.7, 25.  Although the operative complaint plainly seeks such relief, SAC ¶¶ 86, 91, Plaintiff contends that the Court should not consider those requests in addressing the parties' dispositive motions.  *See* Pl.'s

---

[5] For example, if a provider hypothetically received "zero" orders under one title, then the aggregate number provided for the other titles would address only the remaining four titles of FISA.  If a provider had received "zero" orders under two titles, then the aggregate number for the other titles would address only orders under the remaining three.  In short, with each disclosure of "zero," substantially more information would be packed into the disclosure of the aggregate number of orders that a provider did receive.

[6] Plaintiff mistakenly ascribes to the Government the position that "the type of information that it can obtain under each FISA title is a secret." Pl.'s Br. at 9.  On the contrary, it is precisely because it is publicly known what type of information may be obtained under each FISA provision that it is important to protect specific information about not only whether but what kinds of FISA process, if any, Plaintiff has received.  *See* Tabb Decl. ¶¶ 7, 17–18.

Br. at 11 n.7.  Plaintiff's position is puzzling.  Plaintiff states that it seeks summary judgment only as to the "portions of Counts I and II discussed [in its brief]," *id.* at 25, and argues that the Court—in assessing the Government's renewed motion for summary judgment—also should ignore the facets of the complaint that Plaintiff has now decided to leave aside.  *See*, *e.g.*, *id.* at 11.  Plaintiff cites no authority to so cabin the Court's analysis.  Of course, Plaintiff's cross-motion may be as limited as Plaintiff chooses, but Plaintiff cannot excise portions of its complaint out of the Government's renewed summary judgment motion.[7]  Although Plaintiff now wishes to jettison its request to publish analogous data for subsequent reporting periods in its cross-motion, that request remains part of Plaintiff's complaint, *see id.* at 11 n.7, and is properly part of the Government's renewed motion for summary judgment.  The Court, therefore, in addressing the Government's motion, should continue to consider the harms that reasonably could be expected to result from the disclosure of such information.

### C.  The Court Should Give No Weight to Plaintiff's Speculation that Its Proposed Disclosure Would Not Harm National Security.

Plaintiff also offers its own unsupported opinion contradicting EAD Tabb's detailed explanation of the harm that reasonably could be expected to arise from its proposed disclosure. Plaintiff argues that, in its view, the data is too old for its disclosure to cause harm, and that disclosure of the data at issue would not be revealing in light of the information that is already publicly available.  *See* Pl.'s Br. at 8–11.

The case law is clear that such speculation is entitled to no weight; the nature of predictive judgments about national security harm precludes any role for private plaintiffs in aiding the Court's analysis.  Only with the broad view of current national security information available exclusively to Government personnel can the likely harms of disclosure be determined.

---

[7] Similarly, Plaintiff now asks the Court to ignore as a "red herring" the Government's explanation that the Legislative and Judicial Branches may take steps to safeguard national security information, Pl.'s Br. at 22 (referring to Defs.' Mot. at 22–24), because Plaintiff evidently has chosen not to pursue in its cross-motion its request that the Court declare classification the only valid basis on which publication of the information at issue may be restricted.  *See* SAC ¶¶ 85, 90.  But the operative complaint continues to include that request for relief, and the Government's dispositive motion seeking judgment as to all of Plaintiff's claims properly includes an explanation of these other potential sources of restrictions on disclosure.

*See, e.g.*, *Hamdan v. Dep't of Justice*, 797 F.3d 759, 770 (9th Cir. 2015) ("[I]t is in the nature of intelligence data that disclosure of small pieces of a puzzle may be aggregated and considered in context by an adversary"); *Wilson v. CIA*, 586 F.3d 171, 194 (2d Cir. 2009) ("seemingly trivial details may be of great significance to foreign intelligence services with a broad view of the intelligence landscape").[8]  Thus, consistent with the Executive Branch's constitutional authority and unique expertise, *see* ECF No. 145 at 11–13 (discussing case law), courts have routinely rejected the relevance of arguments presented by private individuals regarding the likely harms of disclosure, even when those individuals have a background in national security matters.  *See, e.g.*, *Snepp v. United States*, 444 U.S. 507, 512 (1980) ("When a former agent relies on his own judgment about what information is detrimental, he may reveal information that the CIA – with its broader understanding . . . could have identified as harmful."); *Gardels v. CIA*, 689 F.2d 1100, 1106 & n.5 (D.C. Cir. 1982) (former agent's "own views as to the lack of harm which would follow the disclosure" are insufficient to justify further inquiry beyond the Government's "plausible and reasonable" informed position).[9]

       Moreover, the evidence demonstrates that Plaintiff is mistaken in its contention that no harm would result from disclosure of the particular data at issue, as explained in the classified and unclassified declarations of EAD Tabb.  While Plaintiff emphasizes that that data is six years old, *see*, *e.g.*, Pl.'s Br. at 1, 5, 8, 9, 13, there is nothing anomalous about information retaining national security significance over a number of years.  For example, when an earlier date for declassification cannot be determined, Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009), provides that information shall be marked for declassification ten years from the date of

---

[8] The harm caused by the disclosure "of one item of information may frequently depend upon knowledge of many other items of information. What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context." *United States v. Marchetti*, 466 F.2d 1309, 1318 (4th Cir. 1972).

[9] *See also*, *e.g.*, *Halperin v. Nat'l Sec. Council*, 452 F. Supp. 47, 51 (D.D.C. 1978) (Even though plaintiff was a self-proclaimed "scholar and actor in the field of foreign policy and national security," nothing in "plaintiff's submissions justifie[d] the substitution of this Court's judgment or the informed judgment of plaintiff for that of the officials constitutionally responsible for the conduct of United States foreign policy as to the proper classification of [documents]."), *aff'd*, 612 F.2d 586 (D.C. Cir. 1980).

original classification, unless the sensitivity of the information requires that it be marked for declassification after 25 years. *Id.* §§ 1.5(b), (c). Indeed, certain categories of information are exempt from automatic declassification after even 50 years. *See id.* § 3.3(h). While the specific reasons why the data at issue here remains sensitive are enumerated in EAD Tabb's declarations, these guidelines show that, as a general matter, national security information may be revealing—and its disclosure harmful—well after the specific year to which it pertains.

Plaintiff also errs in its argument that adversaries already know far more information than would be revealed by the disclosure of the data at issue. That, again, is a judgment for the Executive Branch, not a private party. And whatever Twitter thinks foreign adversaries may already know, the disclosures it demands would serve to expand that knowledge or confirm specific facts. Moreover, any information already available to the public is altogether different from the information at issue here. First, Plaintiff argues that it is a matter of public record that it has received national security process. *See* Pl.'s Br. at 8. While that is so, the mere fact that Plaintiff has received *any* form of national security process is not—and never has been—the information that the Government seeks to protect here. Nor do Plaintiff's disclosures regarding certain specific NSLs it has received, *see id.* at 8–9, reveal whether it has received any particular form of FISA process, and the amount of process, if any, that it has received. Finally, reporting that Plaintiff cites about national security process served by the Government as a whole, *see id.* at 9–10—rather than on Plaintiff in particular—is simply inapposite to the question of what harms to national security reasonably could be expected to result from the company-specific disclosures at issue here. While Plaintiff contends that the Government-wide disclosures "already tell adversaries far more about the Government's collection capabilities and *how* the Government uses its authority under various *specific* FISA titles than Twitter's far higher-level disclosures could," *id.* at 10 (emphasis in original), *see also id.* at 12–13, Plaintiff is wrong. Those Government-wide disclosures do not reveal how the Government uses its authorities on a particular platform, what information is collected on that platform, whether that platform is safe, and whether that particular platform has become more or less safe over time. Such general, Government-wide information would have far less utility than the kind of company-specific

information that Plaintiff seeks to disclose.  As EAD Tabb explains, it is precisely because the proposed disclosures at issue here would reveal such information about Twitter—and the use to which adversaries could therefore put such information—that the publication of the data at issue reasonably could be expected to cause harm to the national security.  *See supra* at 5–6.

Moreover, rather than undermining the constitutionality of the restrictions on Plaintiff's speech, the fact that the Government has permitted the publication of certain information about national security process—both that received by Twitter and Government-wide—is further evidence that the particular restrictions at issue here are narrowly tailored to meet the compelling governmental interest of protecting the national security.

### D.  The Harm Described by EAD Tabb Does Not Depend on Speculation about Disclosures by Other Companies.

Plaintiff also argues that the EAD Tabb's assessment of the harm that reasonably could be expected to arise from the disclosure of the information at issue is based on "mere speculation" that other companies would follow suit if Plaintiff were permitted to publish the information redacted from its draft Transparency Report.  Pl.'s Br. at 2.  Plaintiff is wrong for two reasons.

First, Plaintiff misapprehends the basis of EAD Tabb's analysis.  EAD Tabb focuses primarily on the harm that reasonably could be expected to result from Plaintiff's proposed disclosure in particular; as explained above, his assessment was based on an individualized examination of the particular data and company at issue.  *See supra* (discussing Tabb Decl. ¶¶ 5, 7, 17, 21).  Thus, although Plaintiff dismisses the analysis of harm in paragraph 17 of EAD Tabb's unclassified declaration as addressing "macro trends regarding the Government's overall use of national security surveillance" based on the "potential national security implications of *all* ECPS publishing similar data over an extended period of time," Pl.'s Br. at 11 (citing Tabb Decl. ¶ 17), that simply is not an accurate description of that facet of EAD Tabb's analysis.  Paragraph 17 is addressed to the information that would be revealed by the "[d]isclosure of the kind of granular data regarding the national security legal process *received by Twitter*, *as set forth in its draft Transparency Report*."  Tabb Del. ¶ 17 (emphasis added).  Likewise, in the subsequent paragraphs, EAD Tabb discusses the potential disclosure by Twitter, *id.* ¶¶ 18–19, and does not

turn to the potential harm of disclosure by other companies until later in the discussion, when he explains that "the harms from such disclosures would be compounded if other electronic communication service providers were permitted to make similar detailed disclosures." *Id.* ¶ 20.

Furthermore, Plaintiff is also mistaken in discounting EAD Tabb's predictions regarding other companies as "mere speculation" or "hypothetical." Pl.'s Br. at 2, 11. EAD Tabb's prediction that "other providers would almost certainly seek to make the same types of disaggregated granular disclosures" if the Court granted Plaintiff the relief requested here, Tabb Decl. ¶ 20, is not only grounded in experience and common sense, but the evidence as well. For example, in the five letters to other providers that Plaintiff put before the Court, *see* Rubin Decl. Exs. 6–10, the Government agreed to permit those providers to make the disclosures that they had then proposed regarding their respective receipt about national security legal process. Each of those letters reflects that Facebook, Microsoft, Apple, AOL, and Yahoo were pursuing disclosures substantially similar to that which the others had requested at that time—disclosure of all legal process that the provider received, in bands of 1000, starting at zero, pertaining to six month periods. *See id.* Plaintiff mistakenly asserts that these letters show that the Government denied requests substantially similar to Plaintiff's in those letters, *see* Pl.'s Br. at 13, but, in fact, the Government made allowances in response to the requests of those companies in June 2013 (which were all substantially similar to each other at the time, but substantially different from Plaintiff's request at issue here). *See, e.g.*, Rubin Decl., Ex. 6 at 1 (setting forth the framework for the disclosure that would be permitted); *id.* at 2 (thanking Facebook for "coordinating [its] proposal with [the FBI]" and for its "efforts to reach an agreement that promotes transparency without jeopardizing [the FBI's] national security responsibilities to the public"); *see also* Exs. 7–10 (memorializing similar agreements with Microsoft, Apple, AOL, and Yahoo). Also in June 2013, shortly after the agreement reflected in those letters, however, Google filed suit before the FISC demanding the right to publish even more detailed data about its receipt of national security process. *See* SAC ¶ 46. By September 2013, four other companies, including Facebook, Microsoft, and Yahoo—all three of which had reached agreements with the Government just months earlier, *see* Rubin Decl., Exs. 6, 7, 10—had filed similar motions, *see*

SAC ¶ 46; and Apple, *see* Rubin Decl., Ex. 8, entered the litigation by filing an *amicus* brief. Thus, an agreement among companies to one disclosure regime was soon followed by a decision to pursue litigation to demand a more permissive disclosure framework.  While the likelihood of additional disclosures by other companies does not form the primary basis for EAD Tabb's judgment, it is certainly one more valid, logical, and compelling reason why the specific disclosure Plaintiff seeks would not only harm national security in itself, but would also lead to similar harmful disclosures.

* * * * * * *

For all these reasons, and the reasons explained in Defendants' renewed motion, the evidence provided by EAD Tabb demonstrates that the restriction on Plaintiff's publication of the information at issue is narrowly tailored to meet a compelling governmental interest.

## II.   The Court Should Not Reach Plaintiff's *Freedman* Argument, but, if It Does, the Court Should Find that Framework Inapplicable in this Setting.

In their renewed motion, Defendants explained that because Plaintiff did not plead a procedural challenge under *Freedman v. Maryland*, 380 U.S. 51 (1965) and made no reference to the swift judicial review the *Freedman* framework is designed to ensure, the Court should decline to reach the question of whether that framework applies or whether its requirements are satisfied here.  *See* Defs.' Mot. at 18–19.  Plaintiff, citing its allegations that it has been subject to a prior restraint, argues:  "it is hornbook law that prior restraints on speech will pass constitutional muster only if they comply with both *Freedman*'s procedural safeguards and substantive strict scrutiny requirements."  Pl.'s Br. at 15 (quotation omitted).  But that is not so.

Not every challenge to an alleged prior restraint includes a procedural challenge under *Freedman*.  For example, in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984), the Supreme Court upheld a protective order prohibiting disclosure of information obtained through civil discovery that had been challenged as an unconstitutional prior restraint on a litigant's speech. *See id.* at 33–34.  At no point did the Supreme Court apply—or even discuss—the *Freedman* safeguards.  *See id.*  In fact, the Supreme Court went no further than to observe:  "an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires exacting First Amendment scrutiny."  *Id.* at 33; *see also*, *e.g.*, *Hoffmann-*

*Pugh v. Keenan*, 338 F.3d 1136 (10th Cir. 2003) (holding that restraint on a witness's ability to disclose information learned through participation in grand jury proceedings withstood First Amendment challenge without reference to or consideration of the *Freedman* framework), *cert. denied*, 540 U.S. 1107 (2004).

Moreover, even in cases squarely addressing the *Freedman* framework, the rule is not, as Plaintiff contends, that "prior restraints on speech will pass constitutional muster only if they comply with . . . *Freedman*'s procedural safeguards." Pl.'s Br. at 15 (quotation omitted). Rather, even where a challenge under *Freedman* is clearly stated, a court must "determine whether the [challenged] nondisclosure requirement constitutes the type of restraint for which the procedural safeguards are required." *In re NSL*, 863 F.3d at 1122. Although this Court previously held that it should take into account "both the procedural safeguards and substantive strict scrutiny requirements," ECF No. 172 at 8, Defendants respectfully submit that an examination of the jurisprudence surrounding procedural safeguards—including the Ninth Circuit's guidance in *In re NSL*—demonstrates that they have no application in this setting. Indeed, the circumstances before the Court stand in sharp contrast to the setting of subjective censorship and licensing in which the Supreme Court has found the *Freedman* framework to apply. As discussed below, the Supreme Court has not applied the *Freedman* framework to restrictions on speech about information learned solely through participation in legal proceedings. Moreover, to the Defendants' knowledge, no court has ever held that those procedural safeguards apply—and the Government therefore must seek swift judicial review— whenever the Government seeks to protect classified national security information.

Plaintiff attempts to distinguish those restraints on speech that have not been subject to the *Freedman* framework as being contexts in which "the justifications for secrecy 'inherent in the nature of the proceeding[s]' themselves." Pl.'s Br. at 20 (quoting *Doe, Inc. v. Mukasey*, 549 F.3d 861, 876 (2d. Cir. 2008)). But if there is *any* context in which the nature of the proceedings requires secrecy, it is in the issuance of national security legal process, including under FISA, where Congress has enacted an entire statutory scheme and created a specialized Article III court to protect the sensitive national security information that such proceedings implicate. For all the

reasons explained herein, it would be anomalous, and, indeed, unprecedented, to apply the *Freedman* framework in that setting.

### A. The Protection of Classified National Security Information Bears No Resemblance to the Movie Censorship Scheme in *Freedman*.

First, Plaintiff argues that this Court should apply the *Freedman* framework here because Plaintiff has been prevented from publishing the information redacted from its draft Transparency Report in a "censorship system" analogous to that in *Freedman*. *See* Pl.'s Br. at 16–17. But, as the Supreme Court has explained, the authority to "classify and control access to information bearing on national security . . . flows primarily from [the Article II, Section 2] constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Dep't of Navy v. Egan*, 484 U.S. 518, 527 (1988). It is the Constitution—not a statutory grant of authority—that gives the Government the discretion to classify or declassify information bearing on the national security, in accordance with the judgment of the original classification authorities responsible for the protection of such information.

In trying to draw a parallel to the censorship of movies in *Freedman*, Plaintiff contorts the relevant legal framework beyond recognition. According to Plaintiff, it is subject to a censorship scheme because "Section 1874(c) [of the USA FREEDOM Act] authorizes 'the Government' to permit 'the publication of information' related to NSLs and FISA Orders in any other 'form' [beyond those forms enumerated in Section 1874]," Pl.'s Br. at 17 n.11 (quoting 50 U.S.C. §1874(c)), but "any speaker who wishes to publish more granular data about its receipt of national security process still bears the initial burden of seeking permission from the Executive under §1874(c)." *Id.* at 16–17; *see also id.* at 18 (arguing that Section 1874(c) "specifically contemplate[s] pre-publication submission and review of publication requests for government censorship"); *id.* at 18 n.12 (referring to the Government's "appl[ication of] its classification guidelines (in EO 13526), pursuant to its authority under 50 U.S.C. §1874(c)").

In fact, Section 1874(c) does not set up a censorship scheme any more than it "authorizes," Pl.'s Br. at 17 n.11, the Government to declassify information. Indeed, it does not operate affirmatively at all; rather, this provision only clarifies what Section 1874 *does not do*: after the preceding sections set forth the reporting bands that the DNI has declassified, Section

1874(c) states that "[n]othing in this section prohibits the Government and any person from

jointly agreeing to the publication of information referred to in this subsection in a time, form, or

manner other than as described in this section."  50 U.S.C. §1874(c).  Nowhere does this section

create a requirement that proposed speech be submitted to the Government for licensing, or for

any other purpose.  Nor does it "authorize" declassification.

   Plaintiff equates the Government's constitutionally-based authority to control classified

information with the state law in *Freedman*, which required films to be submitted to a censorship

board for a determination as to whether the films were sufficiently "moral and proper" for

exhibition.  *Freedman*, 380 U.S. at 52 n.2 (quoting Md. Ann. Code, 1957, Art. 66A, s 6).[10]

But—setting aside the problems in likening national security judgments to a censor's subjective

moral sense—there is a critical procedural difference between the two situations:  Plaintiff, as a

provider in possession of aggregate data about its receipt of national security process, is not

subject to any special requirement that it submit proposed speech for licensing or censorship

prior to speaking; rather, it is under the same nondisclosure obligations and restrictions binding

any authorized holder of national security information.  Plaintiff, then, is asking this Court to

hold that the *Freedman* procedural safeguards attach whenever the Government seeks to protect

properly classified information from disclosure, and to enjoin the restrictions on publishing such

classified information until such safeguards are introduced, Pl.'s Br. at 23.  Such a ruling would

be unprecedented.

   As Defendants explained in their renewed motion, no court has ever held that the

*Freedman* procedural safeguards apply to restrictions on the disclosure of classified information.

*See* Defs.' Mot. at 21.  Plaintiff argues that "[t]hat is precisely the holding of *Doe v. Mukasey*,

which found that *Freedman* applies to restrictions on disclosure of individual NSLs (which are

also 'classified')."  Pl.'s Br. at 22 (citing *Doe*, 549 F.3d at 879–81).  It is not clear what Plaintiff

---

[10] With few exceptions, the other settings in which the Supreme Court has applied the
*Freedman* framework closely resembled the above-described movie censorship scheme.  *See In
re NSL*, 863 F.3d at 1127–28 (collecting cases, including, *inter alia*, several addressing
censorship schemes dealing with obscenity determinations as to books or movies; licensing for
adult entertainment; and licensing for professional fundraisers to solicit money).

means to convey by placing quotation marks around the word "classified." However, if Plaintiff intends to say that NSLs constitute classified information under Executive Order 13526, Plaintiff is wrong. NSLs are not classified under the Executive Order but protected pursuant to statutory law. As the Second Circuit in *Doe v. Mukasey* explained, the NSL statute permits a nondisclosure order to accompany an NSL only "upon certification by senior FBI officials that 'otherwise there may result a danger to the national security of the United States, interference with a criminal, counterterrorism, or counterintelligence investigation, interference with diplomatic relations, or danger to the life or physical safety of any person.'" *Doe*, 549 F.3d at 866–67(quoting 18 U.S.C. § 2709(c)(1), referring to these factors as "enumerated harms"). That is, unlike with classified information—which, by definition, requires that an original classification authority has found that its disclosure would cause an identifiable harm to the national security, and which therefore requires safeguarding from disclosure under, *inter alia*, the applicable Executive Order, *see* Exec. Order 13526, §§ 1.1, 4.1—as to NSLs, "secrecy might or might not be warranted." *Doe*, 549 F.3d at 877.

The Ninth Circuit has recognized that even for NSLs, which "might or might not" require secrecy, *id.*, no precedent requires application of the *Freedman* procedural safeguards to a nondisclosure obligation in that setting. *See In re NSL*, 863 F.3d at 1129 ("[T]he [Supreme] Court has not held that these sorts of government confidentiality restrictions must have the sorts of procedural safeguards required for censorship and licensing schemes."). Even more so, then, would it be anomalous to require the Government to seek swift judicial review under a *Freedman*-like process every time it sought to protect classified information related to any FISA process at issue. This Court should not be the first to impose such a requirement here.

**B. As the Ninth Circuit Explained in *In re NSL*, Precedent Does Not Support Application of the *Freedman* Factors to a Provider's Reporting about its Receipt of National Security Process.**

Confronted with the Ninth Circuit's analysis in *In re NSL* and other applicable precedent, Plaintiff urges the Court to reject authority on point and to accept, instead, Plaintiff's contrary interpretation of the law. Pl.'s Br. at 18–19. Specifically, Defendants' opening motion summarized the reasoning in *In re NSL*, where the Ninth Circuit distinguished cases in which the

Supreme Court has applied the *Freedman* framework from the setting in *In re NSL*, where

providers sought to report information about their receipt of national security legal process. *See*

Defs.' Mot. at 20 (discussing *In re NSL*, 863 F.3d at 1127–29).[11]  Instead, the Ninth Circuit

analogized to two Supreme Court cases addressing "government confidentiality restrictions"

where the Supreme Court had not required "the sorts of procedural safeguards required for

censorship and licensing schemes." *See In re NSL*, 863 F.3d at 1129 (discussing *Butterworth v.*

*Smith*, 494 U.S. 624 (1990) and *Seattle Times Co. v. Rhinehart*, 467 U.S. 20 (1984)).  While

Plaintiff contends that the Ninth Circuit misunderstood "the principal rationales behind those

decisions," *id.* at 18, it is, in fact, Plaintiff's analysis that is in error.

     As to *Butterworth*, Plaintiff argues that that decision actually "favors" its position that a

provider should be permitted to speak "about its *own* experience as the recipient of coercive

national security process," *Id.* at 18–19, reasoning that a restriction on such speech is akin to the

restriction struck down as unconstitutional in *Butterworth*. *Id.*  But it is Plaintiff—rather than the

Ninth Circuit—that misreads the Supreme Court's reasoning.  In *Butterworth*, the Supreme Court

did not hold that the First Amendment permitted a grand jury witness to discuss "his experience"

in testifying before the grand jury, or even to disclose the fact that he had been called to testify.

The Court was clear that it was "deal[ing] *only* with respondent's right to divulge information of

which he was in possession *before he testified before the grand jury*, and not information which

he may have obtained as a result of his participation in the proceedings of the grand jury."

*Butterworth*, 494 U.S. at 632 (emphasis added); *see id.* at 636 (discussing the respondent's right

to disclose "information he acquired on his own").  Justice Scalia wrote separately to emphasize

this limit on the Court's holding:  "[q]uite a different question is presented . . . by a witness'

disclosure of the grand jury proceedings, which is knowledge he acquires not 'on his own' but

only by virtue of being made a witness." *Id.* at 636 (Scalia, J., concurring).  The Tenth Circuit in

---

[11] Contrary to Plaintiff's contention, this analysis was not "in tension," Pl.'s Br. at 18, with the Ninth Circuit's holding.  Rather, the Ninth Circuit stated that it ultimately did not need to decide the question of whether the *Freedman* framework applied to the challenged NSL law because the Court found that the NSL law "in fact" provided all of the *Freedman* safeguards. *In re NSL*, 863 F.3d at 1129.  That the Court declined to decide a constitutional issue ahead of the necessity of doing so in no way undermines its instructive analysis of the relevant Supreme Court precedent.

*Hoffmann-Pugh v. Keenan* relied on that very distinction in rejecting a First Amendment challenge to a law that prohibited a grand jury witness from publishing detail about "her appearance before a Boulder grand jury," "recount[ing] her testimony," and disclosing "questions addressed to her before the Boulder grand jury and her answers."  338 F.3d at 1139–40.  According to the Tenth Circuit, "*Butterworth* makes clear that the state cannot, by calling a person as a witness, prohibit her from disclosing information she possessed beforehand, that is, the substance itself of the information the witness was asked to divulge to the grand jury," *id.* at 1139; but information about the witness's "own experience" as a participant in the proceedings, Pl.'s Br. at 18, is another matter entirely.[12]  *Butterworth* thus supports the conclusion that where a person obtains information through a closed legal proceeding, it cannot pass off a disclosure of that information as that person's "own experience."

As to *Seattle Times*, Plaintiff overlooks that the Supreme Court in that case upheld a restriction on speech—a prohibition on the disclosure of materials gained through the discovery process—without application of the *Freedman* framework.  Instead, Plaintiff focuses on policy reasons why it contends its situation is different from the would-be speaker in *Seattle Times*.  *See* Pl.'s Br. at 19.  Plaintiff emphasizes that in *Seattle Times*, there was concern that the would-be speaker might "abuse its access to coercive discovery," *id.* (quotation omitted), while, in the instant case, it is Plaintiff that is subject to coercive process that the Government may, according to Plaintiff, abuse.  *Id.*  Plaintiff argues that disclosure should be permitted here as "the best defense against Executive abuses."  *Id.* at 19 n.14.  Here, of course, the protection of information about national security legal process, subject to statutory, judicial, and classification secrecy requirements, differs markedly from the protection of mere civil discovery information.  Moreover, in advancing its argument, Plaintiff loses sight of its own case.  According to Plaintiff's complaint, there is no allegation that the Government has overreached in its use of national security process, or that Twitter seeks to disclose anything of the kind, but quite the opposite; Plaintiff is pursuing its claims to "provid[e] more complete information about the

---

[12] Plaintiff also observes that "*Butterworth* made no mention of *Freedman*."  Pl.'s Br. at 19 n.13.  While that is so, that only serves to underscores that Plaintiff is mistaken in arguing that every challenge to a prior restraint must include analysis under the *Freedman* framework.

*limited* scope of U.S. government surveillance of Twitter user accounts." SAC ¶ 10 (emphasis added). This is not a situation in which data "necessary to hold [the Government] accountable," Pl.'s Br. at 19, is being hidden from the public and Government surveillance is actually more extensive than the public is aware; on the contrary, Plaintiff seeks only to divulge precisely how *little* process it has received. As Plaintiff states in its draft Transparency Report: Plaintiff "want[s] everyone to know that the U.S. government's surveillance of Twitter users through NSLs and FISA orders is quite limited." ECF No. 21-1; *see also id.* ("These are small numbers, whether considered individually, in the aggregate, or as a percentage of Twitter's total active users.").

Finally, Plaintiff also attempts to distinguish *Butterworth* and *Seattle Times* on the grounds that, in those cases, "the justifications for secrecy 'inhere[d] in the nature of the proceeding[s]' themselves." Pl.'s Br. at 20 (quoting *Doe*, 549 F.3d at 876). The baffling implication is that—in Plaintiff's view—as to FISA process, there is no analogous "inherent" need for secrecy. It would seem that Plaintiff posits that grand jury and civil discovery proceedings are sensitive settings in which the need for secrecy is clear, while the need for secrecy in foreign intelligence collection is less certain.

Overwhelming evidence shows Congress disagrees. To protect foreign intelligence information Congress created the Foreign Intelligence Surveillance Court (FISC), *see* 50 U.S.C. §1803, "a unique court" the "entire docket [of which] relates to the collection of foreign intelligence by the federal government." *In re Mot. for Release of Court Records*, 526 F. Supp. 2d 484, 487 (F.I.S.C. 2007). "The applications submitted to it by the government are classified, as are the overwhelming majority of the FISC's orders." *Id.* "The operations of the FISC are governed by . . . a comprehensive scheme for the safeguarding and handling of FISC proceedings and records." *Id.* at 488. In sum, "[i]n the FISA context, there is an unquestioned tradition of secrecy, based on the vitally important need to protect national security." *Id.* at 490–91; *see also id.* at 490 ("It is this highly classified, and fundamentally secret, nature of FISC

records that distinguishes them from the records of other courts.").[13]  In holding that there is no

public right of access to FISC records, the FISC analogized to materials "'which have

traditionally been kept secret for important policy reasons,' such as records that would disclose

grand jury proceedings."  *Id.* at 490 (quoting *Times Mirror Co. v. United States*, 873 F.2d 1210,

1219 (9th Cir. 1989)); *see also id.* at 493 n.23.  After enumerating just some of the potential

"detrimental consequences" that would be wrought by the disclosure of FISC proceedings or

records, the FISC concluded "[a]ll these possible harms are real and significant, and, quite

frankly, beyond debate."  *Id.* at 494.

In sum, then, to the extent that policy reasons favoring secrecy supported the outcomes in

*Butterworth* and *Seattle Times*—where the Supreme Court did not apply the *Freedman*

framework to confidentiality requirements—such considerations are stronger still in the realm of

foreign intelligence gathering.[14]

## C. Application of the *Freedman Framework*—Designed to Secure Swift Judicial Review—Would Make Little Sense for Nondisclosure Obligations that Have their Genesis in Court Proceedings.

In their renewed motion, Defendants explained that the *Freedman* framework would be a

poor fit for the instant setting because, if it were applied, it would immediately be satisfied since

the nondisclosure obligations at issue here arise either from NSLs, which are accompanied by

process comporting with the *Freedman* framework, *see In re NSL*, 863 F.3d at 1129, or they

emanate from FISC process, fulfilling at the outset the purpose of *Freedman*, *i.e.* securing

prompt judicial review.  *See* Defs.' Mot. at 21.  Plaintiff responds with three objections.

---

[13] *See also In re Certification of Questions of Law to Foreign Intelligence Surveillance Court of Review*, No. FISCR 18-01, 2018 WL 2709456, at *1 (F.I.S.C.-R. Mar. 16, 2018) ("The FISC is a unique court. It is responsible for reviewing applications for surveillance and other investigative activities relating to foreign intelligence collection.  The very nature of that work, unlike the work of more conventional courts, requires that it be conducted in secret.")

[14] Plaintiff notes that the Second Circuit in *Doe v. Mukasey* distinguished such cases and found that *Freedman* must apply to the NSL setting.  Pl.'s Br. at 20.  The reasoning in *In re NSL* suggests that the Ninth Circuit did not agree with that analysis.  *See supra* at 18–19.  But, moreover, *Doe* did not deal with classified national security information pertaining to foreign intelligence gathering; potential FISA process was not at issue there.  Rather, *Doe* addressed only disclosure regarding the receipt of an NSL, a form of process as to which—instead of a tradition of classification—there "might or might not" be a need for secrecy depending upon whether one of the "enumerated harms" may result from disclosure.  *See supra* at 18.  Plaintiff's request here to disclose information about its receipt of FISA process, if any, makes this a very different case.

First, Plaintiff complains that, regardless of what procedural safeguards accompany individual pieces of national security process from which its nondisclosure obligations stem, the Government has not provided such procedural safeguards "applicable to the aggregate reporting restrictions in the statutory scheme here."  Pl.'s Br. at 20 (quotation omitted).  As explained above, however, there *is no* aggregate reporting restriction in a statutory scheme applicable to Plaintiff.  *See supra* at 16–17.  As Plaintiff acknowledges in its complaint:  "the [USA FREEDOM Act] is permissive: that is, it allows communications providers to use one of the reporting options it provides, but it contains no express prohibition on other disclosures, and it does not amend or otherwise affect any of the nondisclosure requirements in FISA."  SAC ¶ 65. The reporting restrictions on aggregate data are not based on a single statutory provision to which the *Freedman* framework easily could be appended, but are—like the data itself—an aggregation, derivative of each of the individual pieces of secret national security process that Plaintiff may have received, and based upon consideration and assessment of the national security harms associated with the disclosure of such data.

Second, Plaintiff objects that at least some of the process it has received emanated from the NSL statute rather than FISA.  *See* Pl.'s Br. at 21.  This objection is puzzling.  As Defendants noted in their renewed motion, to the extent that Plaintiff's nondisclosure obligations arise from NSLs, such process is already accompanied by all of the procedural safeguards that might be required under *Freedman*.  *See* Defs.' Mot. at 21 (citing *In re NSL*, 863 F.3d at 1129).

Finally, Plaintiff argues that it is of no moment that FISA process begins before a court, because, according to Plaintiff, the FISC has no role in reviewing nondisclosure obligations accompanying FISA process.  But the FISC has the authority to review nondisclosure obligations accompanying FISA process.  *See, e.g.*, 50 U.S.C. §§1861(f)(1), §1881a(h)(4)(C); *see also In re Mot. to Disclose Aggregate Data Regarding FISA Orders*, Misc. No. 13-04 (F.I.S.C.) (challenging before the FISC restrictions on disclosure of aggregate data).  And the genesis of the non-disclosure obligations that would be implicated by disclosures in a transparency report derive from an initial judicial proceeding.  Plaintiff argues, in sum, that where the Government has already initiated a judicial proceeding and obtained national security legal process subject to

secrecy obligations, it must later again initiate some other judicial process to protect information about legal process previously ordered by a court to be maintained as secret.  That makes no sense, and is not a remotely reasonable extension of *Freedman* to such a national security setting.

### III.  Rule 56(d) Supplies No Grounds on Which to Postpone Further the Court's Dispositive Ruling.

Plaintiff has argued, in the alternative, that Defendants' renewed motion should be denied under Federal Rule of Civil Procedure 56(d), because Plaintiff believes it should have access to the classified information the Government submitted in support of its renewed motion.  *See* Pl.'s Br. at 1.  Plaintiff asserts as to its request for classified information that "this dispute remains live," *id.* at 24, without so much as acknowledging the Court's determination that that classified evidence presented in the Classified McGarrity Declaration "cannot be disclosed to counsel for Twitter based upon the national security concerns it raises."  *See* ECF No. 301 at 2 (referring to the McGarrity declaration).  That the classified declaration of EAD Tabb Declaration, submitted in support of Defendants' renewed summary judgment motion, reiterates some of the reasons previously discussed by then-Acting EAD McGarrity serves to support, not detract from, the Court's conclusion that Plaintiff's counsel should not be granted access. *See id.*; *see also*, *e.g.*, *Stillman v. CIA*, 319 F.3d 546 (D.C. Cir. 2003) (requiring *ex parte* review of the classified submission explaining the national security harm of the plaintiff's proposed disclosure).

Moreover, Rule 56(d) does not entitle Plaintiff to any further discovery.  Under that rule, a party requesting discovery must identify by affidavit "the specific facts that further discovery would reveal, and explain why those facts would preclude summary judgment." *Tatum v. City & Cty. of S.F.*, 441 F.3d 1090, 1100 (9th Cir. 2006) (discussing "Rule 56(f)," which was renumbered as Rule "56(d)" in the 2010 Amendments to the Rules).  Moreover, "the facts sought must be 'essential' to the party's opposition to summary judgment, and it must be 'likely' that those facts will be discovered during further discovery." *SEC v. Stein*, 906 F.3d 823, 833 (9th Cir. 2018), *cert. denied*, 140 S. Ct. 245 (2019) (citations omitted).  "[M]ere speculation" is not sufficient to preclude summary judgment, and the facts likely to be discovered must be "identif[ied] with specificity." *Id.*  In other words, as this Court has recognized, the supporting

affidavit must not only specify the facts that a party hopes to elicit from further discovery; it must also show that "the facts sought exist" and that they are "essential to oppose summary judgment." *Polk v. Creamer-Todd*, No. 14-CV-04375-YGR (PR), 2016 WL 771329, at *10 (N.D. Cal. Feb. 29, 2016) (quoting *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008)). "Failure to comply with the requirements of Rule 56(d) is a proper ground for denying discovery and proceeding to summary judgment." *Id.* (quotation omitted).

Here, Plaintiff has not filed the required affidavit, "a deficiency that itself justifies denying [a] Rule 56(d) request." *Shaw v. Thomas*, No. 17-CV-00462-YGR (PR), 2019 WL 162729, at *2 (N.D. Cal. Jan. 10, 2019). Moreover, Plaintiff has not identified—with specificity or otherwise—what further "essential" facts for its opposition to summary judgment Plaintiff views as "likely" to exist in the classified declaration to which it seeks access. Indeed, it is pure speculation, *at best*, to suppose that the description of harm submitted in the Government's classified declaration—which the Court has already observed "meets the Government's burden under strict scrutiny to justify classification and restrict disclosure of information in the Draft Transparency Report, based upon a reasonable expectation that its disclosure would pose grave or imminent harm to national security, and that no more narrow tailoring of the restrictions can be made," ECF No. 301 at 2—would actually reveal information not only helpful to Plaintiff's case, but would be so contrary to the Court's characterization that it would actually *preclude* summary judgment for the Government. Rule 56(d) does not permit such a fishing expedition.

Plaintiff has neither made the showing that would be required for Rule 56(d) discovery nor so much as acknowledged—much less explained why the Court should reconsider—the Court's recent order denying Plaintiff access to the same classified information it again seeks obtain. For these reasons, Plaintiff's request for Rule 56(d) discovery should be denied.

## CONCLUSION

For the foregoing reasons, and the reasons explained in Defendants' renewed motion and the classified and unclassified declarations of EAD Tabb, the Court should grant Defendants' renewed motion for summary judgment and dismiss the Plaintiff's Second Amended Complaint.

Dated:  November 22, 2019

Respectfully submitted,

JOSEPH H. HUNT
Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

ANTHONY J. COPPOLINO
Deputy Branch Director

_____/s/ Julia A. Heiman_____
JULIA A. HEIMAN, Bar No. 241415
Senior Counsel
CHRISTOPHER HEALY
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
julia.heiman@usdoj.gov
*Attorneys for Defendants*