**MAYER BROWN LLP**
ANDREW JOHN PINCUS (*Pro Hac Vice*)
apincus@mayerbrown.com
1999 K Street, NW
Washington, DC 20006
Tel: (202) 263-3220 / Fax: (202) 263-3300

**MAYER BROWN LLP**
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
SAMANTHA C. BOOTH (SBN 298852)
sbooth@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Tel: (650) 331-2000 / Fax: (650) 331-2060

*Attorneys for Plaintiff Twitter, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| TWITTER, INC., | Case No. 14-cv-4480-YGR |
| Plaintiff, | **TWITTER'S REPLY IN SUPPORT OF (1) ITS CROSS-MOTION FOR SUMMARY JUDGMENT & (2) ITS RENEWED MOTION FOR ACCESS TO CLASSIFIED MATERIALS** |
| v. | |
| WILLIAM P. BARR, United States Attorney General, *et al.*, | Date:   To Be Determined by the Court |
| | Courtroom 1, Fourth Floor |
| Defendants. | Judge: Hon. Yvonne Gonzalez Rogers |

## TABLE OF AUTHORITIES

**Page(s)**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

A.   The Government Has Not Shown that Publication of the 2014 Transparency
     Report Would Cause Grave and Imminent Harm to National Security ............................ 2

     1.   The Court Has Already Resolved the Applicable Standard of Review ................ 2

     2.   The Government's Argument that Twitter Has No Role to Play in Testing
          Its Proffered Evidence Is Contrary to Law ........................................................ 2

     3.   The Government's Unclassified Submissions Are Devoid of the
          Individualized Analysis the Law Requires .......................................................... 4

     4.   Likewise, Speculation About Other Companies' Disclosures Cannot
          Justify the Government's Censorship of Twitter's Transparency Report ........... 9

     5.   The Lack of Durational Limitation on the Government's Censorship
          Further Precludes a Finding of Narrow Tailoring ............................................. 10

     6.   Twitter's Cross-Motion Is Properly Focused on the Transparency Report
          Before the Court ................................................................................................ 11

B.   The Government's Attempts to Evade Freedman Are Unavailing ................................. 12

     1.   The Government's Censorship of Aggregate Reporting Is Materially
          Identical, for Purposes of Freedman, to Its Censorship of NSLs ..................... 14

     2.   The Government's Analysis of Butterworth and Seattle Times Continues
          to Ignore the Touchstones of the Court's Freedman Jurisprudence ................. 16

     3.   The FISA Proceedings Do Not Obviate the Risk of Censorship ....................... 19

C.   The Government's Objections to Twitter's Alternative Request for Access to the
     Classified Tabb Declaration Are Meritless ................................................................... 21

CONCLUSION ................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Blount v. Rizzi,
400 U.S. 410 (1971)................................................................................................12

Brecht v. Abrahamson,
507 U.S. 619 (1993)................................................................................................18

Butterworth v. Smith,
494 U.S. 624 (1990)....................................................................................12, 16, 17

Carroll v. President & Comm'rs of Princess Anne,
393 U.S. 175 (1968)........................................................................12, 13, 19, 23

City of Lakewood v. Plain Dealer Pub. Co.,
486 U.S. 750 (1988)..........................................................................12, 13, 15

Doe v. Mukasey,
549 F.3d 861 (2d Cir. 2008)..........................................................12, 15, 18

Douglas Oil Co. of Cal. v. Petrol Stops Nw.,
441 U.S. 211 (1979) ..............................................................................................17

Epona, LLC v. Cty. of Ventura,
876 F.3d 1214 (9th Cir. 2017) .............................................................................13

Freedman v. Maryland,
380 U.S. 51 (1965)....................................................................................... passim

Gardels v. CIA,
689 F.2d 1100 (D.C. Cir. 1982) ............................................................................3

Halperin v. Nat'l Sec. Council,
452 F. Supp. 47 (D.D.C. 1978) ............................................................................3

Microsoft Corp. v. U.S. Dep't of Justice,
233 F. Supp. 3d 887 (W.D. Wash. 2017)............................................................12

In re Nat'l Sec. Letter,
863 F.3d 1110 (9th Cir. 2017) ...............................................................2, 10, 11

Nat'l Socialist Party of Am. v. Vill. of Skokie,
432 U.S. 43 (1977) (per curiam)....................................................................12, 13

Real v. City of Long Beach,
852 F.3d 929 (9th Cir. 2017) .............................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.,*
    487 U.S. 781 (1988)...........................................................................................12, 13

*Seattle Times Co. v. Rhinehart,*
    467 U.S. 20 (1984).......................................................................................12, 17, 18

*Snepp v. United States,*
    444 U.S. 507 (1980)..................................................................................................3

*United States v. Aguilar,*
    515 U.S. 593 (1995)............................................................................................4, 16

*United States v. L.A. Tucker Truck Lines, Inc.,*
    344 U.S. 33 (1952).................................................................................................18

*United States v. Nat'l Treasury Emps. Union,*
    513 U.S. 454 (1995)............................................................................................4, 16

*Vance v. Universal Amusement Co.,*
    445 U.S. 308 (1980)..........................................................................................12, 14

*Wilson v. CIA,*
    586 F.3d 171 (2d Cir. 2009)....................................................................................3

**Statutes, Rules & Orders**

18 U.S.C. § 2709 ...................................................................................................15

18 U.S.C. § 3511 .....................................................................................................6

50 U.S.C. § 1805 .....................................................................................................8

50 U.S.C. § 1824 .....................................................................................................8

50 U.S.C. § 1842 .....................................................................................................8

50 U.S.C. § 1861 .............................................................................................7, 8, 19

50 U.S.C. § 1874 ...............................................................................................15, 18

50 U.S.C. § 1881a ..............................................................................................8, 19

Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009)..................................... *passim*

Federal Rule of Civil Procedure 56(d) ..................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

Order, *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*,
No. Misc. 19-02 (FISA Ct. Dec. 17, 2019) .............................................................................20

**Other Authorities**

Bryon Tau & Dustin Volz, *Secretive Surveillance Court Rebukes FBI Over
Handling of Wiretapping of Trump Aide*, WALL ST. J. (Dec. 17, 2019),
available at https://www.wsj.com/articles/secretive-surveillance-court-
rebukes-fbi-over-handling-of-surveillance-of-trump-aide-11576615299 ..............................20

Charlie Savage, *We Just Got a Rare Look at National Security Surveillance. It
Was Ugly.*, N.Y. TIMES (Dec. 11, 2019), available at
https://www.nytimes.com/2019/12/11/us/politics/fisa-surveillance-
fbi.html?action=click&module=Top%20Stories&pgtype=Homepage ..................................20

1

## INTRODUCTION

2        The Government largely avoids addressing the central question in this case—whether

3 Twitter's publication of its now six-year-old 2014 Transparency Report ("Transparency

4 Report"), will "pose a clear and present danger or imminent harm to national security."  Order,

5 Dkt. No. 172, at 2.  Instead, the Government claims that, as a private litigant, Twitter has nothing

6 meaningful to say about whether the Government can censor its Transparency Report.  And it

7 seeks to justify its prior restraint by pointing to remedies that Twitter currently is not seeking

8 (*e.g.*, an injunction against Government censorship of all future transparency reports by Twitter),

9 as well as concerns about trends that are certainly not implicated by a single Transparency

10 Report.  As shown below, none of the Government's justifications for prohibiting Twitter's

11 publication of its Transparency Report can survive strict scrutiny.  Nor can the Government

12 identify any durational limitation on its restraint of the data in Twitter's Transparency Report—

13 or even point to any mechanism that would require the Government periodically to revisit the

14 ongoing need for nondisclosure.

15        Indeed, the Government does not dispute that its censorship of the Transparency Report

16 lacked *Freedman's* procedural safeguards.  Rather, the Government seeks to avoid the weight of

17 authority applying *Freedman* to publication of *individual* NSLs by arguing that the

18 Government's censorship here is meaningfully different when those NSLs (or FISA orders) are

19 *aggregated*.  That position is untenable, as is the Government's position that the precise source

20 of the Government's power to censor Twitter's speech—statutory versus Executive classification

21 authority—is dispositive of whether procedural safeguards are constitutionally required.  Like its

22 discretion to censor individual NSLs, the Government's discretionary restraint on Twitter's

23 aggregate reporting bears the hallmarks of a classic censorship scheme.

24        For these and other reasons discussed below, the Government's censorship of Twitter's

25 Transparency Report violates the First Amendment.

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ARGUMENT**

**A.    The Government Has Not Shown that Publication of the 2014 Transparency Report Would Cause Grave and Imminent Harm to National Security.**

**1.    The Court Has Already Resolved the Applicable Standard of Review.**

The Government's attempt to dilute the applicable standard of review (Opp. at 2–5) disregards governing law:  Both this Court and the Ninth Circuit have confirmed that restrictions on electronic communications service providers' ("ECSPs") speech about their receipt of national security process are "content-based prior restraint[s]" that must pass strict scrutiny.  Dkt. No. 172, at 2; *In re Nat'l Sec. Letter*, 863 F.3d 1110, 1114 (9th Cir. 2017) ["*In re NSL*"].  The Ninth Circuit has specifically directed that, in the context of as-applied challenges, strict scrutiny requires an "individualized analysis" of the speech and speaker in question.  *Id.* at 1125.  And this Court has squarely held that, in the context of its proposed speech here, Twitter is "akin to a newspaper or television network" to whom the *Pentagon Papers* standard applies; therefore, the Government's restraints are unconstitutional unless it can show that "grave and serious" or "imminent" harm to national security would flow from Twitter's proposed disclosures.  Dkt. No. 172, at 2, 14, 17, 20–21 (explaining why the "Government's efforts to distinguish *Pentagon Papers* fail").  Thus, contrary to the Government's effort to recast the prior holdings of this Court and the Ninth Circuit as unresolved disputes (Opp. at 2–3), *Pentagon Papers*' heightened application of strict scrutiny governs this case.[1]

**2.    The Government's Argument that Twitter Has No Role to Play in Testing Its Proffered Evidence Is Contrary to Law.**

As a threshold matter, the Government claims that Twitter's arguments are "speculative," that Twitter is asking the Court to substitute Twitter's judgment about national security for the Government's, and that Twitter's arguments are accordingly entitled to "no weight" because

---

[1] Simultaneously, the Government incorrectly treats the Court's "inclin[ation]" to reconsider its denial of the Government's motion for summary judgment (Dkt. No. 301), as a finding by the Court that the evidence in the Classified McGarrity Declaration meets the Government's burden under strict scrutiny.  Opp. at 6–7.  But the whole purpose of the Court's Order to Show Cause was to permit both parties opportunity to brief that very question.  *See generally id.*

1    Twitter is not a national security expert.  Opp. at 9–12.  That is a distortion of Twitter's position

2    and is contrary to law.

3         Twitter's briefing merely highlights the facial, logical defects in the Government's

4    unclassified declaration and suggests a roadmap that the Court may consider in assessing the

5    classified information and ultimately the constitutionality of the Government's censorship of

6    Twitter's Transparency Report.  Those arguments are not "speculative," and none of the

7    Government's cases hold that private litigants have no role to play in testing the sufficiency of

8    the Government's proffered showing.  The Government overreads *Halperin*, in which the court

9    simply noted that "nothing in this record or plaintiff's submissions justifie[d]" substituting the

10   court's or plaintiff's judgment for the government's *where the government had provided "more*

11   *than sufficient basis" to justify its classification of the information.*  *Halperin v. Nat'l Sec.*

12   *Council*, 452 F. Supp. 47, 51 (D.D.C. 1978) (emphasis added).  Nothing in *Halperin* supports the

13   Government's current claim that Twitter has nothing relevant to say about whether the record

14   constitutionally justifies the Government's censorship decision.

15        Nor does *Halperin*, or any authority cited by the Government, require the Court to turn a

16   blind eye to the totality of information in the public domain in assessing an ongoing need for

17   secrecy.  Both Twitter and the Court are as capable as the Government of assessing the

18   information that is publicly available via the FISA statutes, the governmental aggregate reporting

19   related to national security process, Dkt. No. 315, and other public disclosures (like the NSLs

20   Twitter has published, *see* Rubin Declaration ISO Cross-Motion ("Rubin Decl.") Ex. 13 (Dkt.

21   No. 312-13)).

22        The Government's remaining appeals for deference rest on authorities involving

23   restraints on speech by former *government employees*.[2]  Both the Supreme Court and this Court

24   have found that the deference in that setting does not apply to "restrictions on unwilling

25   members of the public" because "a government employee 'voluntarily assume[s] a duty of

26

27   ─────────────
     [2] *E.g.*, *Snepp v. United States*, 444 U.S. 507, 512 (1980) (speech by former CIA agent); *Gardels*
     *v. CIA*, 689 F.2d 1100 (D.C. Cir. 1982) (same); *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009)

28   (same).

confidentiality.'"  Order, Dkt. No. 172, at 19 (quoting *United States v. Aguilar*, 515 U.S. 593, 606 (1995)).  Thus, "Congress may impose restraints on the job-related speech of public employees that would be plainly unconstitutional if applied to the public at large."  *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 465–66 (1995).

### 3. The Government's Unclassified Submissions Are Devoid of the Individualized Analysis the Law Requires.

As explained in Twitter's Cross-Motion (at 7–14), the Government has not engaged in the kind of individualized analysis of Twitter's Transparency Report that the First Amendment requires—much less shown that such an analysis could ultimately justify its ongoing censorship of that Report.[3]  As examples of its supposed "individualized analysis," the Government continues to point to harm that could flow from publication of *numerous* aggregate reports "over time."  Opp. at 6 (citing Unclassified Tabb Declaration ("Tabb Decl."), Dkt. No. 309-1 ¶¶ 7, 17, 18); *see, e.g.*, *id.* ¶ 7 ("Disclosure of the information Twitter seeks to publish would provide highly valuable insights into . . . how [the Government's] surveillance activities change *over time*"); *id.* ¶ 17 (claiming that Twitter's disclosures would reveal "incremental increases or decreases in collection *over time*"); *id.* ¶ 21 (claiming that numerous aggregate reports could "tend to reveal an increase or decrease in collection") (emphases added).  None of these arguments provides a justification for censoring the 2014 Transparency Report.

Moreover, the Government continues to point to the same assertions that this Court previously rejected as "boilerplate," Order, Dkt. No. 172, at 18, and which could be applied to literally *any* ECSP simply by substituting the company name.  Specifically, the Government quotes statements in the Unclassified Tabb Declaration that Twitter's disclosures would give adversaries an effective "roadmap to the existence or extent of Government surveillance" on

---

[3] Twitter continues to maintain that the Government cannot satisfy its burden, under strict scrutiny, solely by reference to *post-hoc* rationalizations like those offered in the Tabb Declarations.  At minimum, the Court should take into consideration the Government's consistent refusal to produce one shred of documentation regarding its *actual* reasons, in 2014, for classifying Twitter's Transparency Report in assessing the credibility of the post-hoc justifications offered in the Tabb Declarations.

Twitter, including "highly valuable insights" into (1) "where and how the United States is or is not deploying its investigative and intelligence resources"; (2) "which communications services may or may not be secure"; (3) "which types of information may or may not have been collected"; and (4) "to what extent the United States is or is not aware of the activities of these adversaries."  Opp. at 5–6 (quoting Tabb Decl., Dkt. No. 309-1 ¶¶ 5, 7).  But the Government stops short of actually *tethering* any of these broad assertions to any piece of specific information sought to be disclosed in Twitter's Transparency Report.  The Government's failure to do so is fatal under strict scrutiny.

For example, the Government's Unclassified Tabb Declaration does not provide a clue as to *how* the mere disclosure that Twitter received (hypothetically) 60 NSLs or FISA orders during a single six-month reporting period more than *six years ago* could reveal anything meaningful about how the Government is deploying its intelligence resources today and whether Twitter is "secure."  And this omission is particularly glaring given the infinitesimally small numbers that, as the Government has acknowledged, Twitter is proposing to disclose.  For example, the Government has authorized Twitter to disclose that "only 0.0000919 percent . . . of Twitter's total users" were "affected" by national security process during the period covered by the Transparency Report.  *See* Rubin Decl., Ex. 3, at p. 2 (Dkt. No. 312-3). The Government calculated that percentage by taking the upper limit of one of its reporting bands (249) and dividing that figure by Twitter's user base.  *Id.*  But with percentages this small, it seems inconceivable that more specific figures—*e.g.*, that only 0.00000919 percent of Twitter users were affected by national security process in a reporting period—would impose any materially different risk to national security.

The Government likewise has not supported its boilerplate claim that any disclosure in the Transparency Report could reveal non-public insights into the "types of information" the Government has collected from Twitter.  The individual NSLs that Twitter has published already reveal the specific categories of information the Government seeks with NSLs.  *See* Rubin Decl., Ex. 13 (Dkt. No. 312-9); Cross-Motion at 8–9.  Merely disclosing the *total* number of NSLs that Twitter has received—without any disclosure of their content—tells the public far *less* about the

1    types of information the Government may collect than the public already knows.  Thus, if the

2    content of individual NSLs may be revealed without harm to national security, then it must be

3    the case that the generic *aggregate* data Twitter seeks to disclose would not cause grave or

4    imminent harm.

5        The same analysis applies to any disclosures in the Transparency Report about the total

6    amount of FISA process Twitter may have received.  The Government has never plausibly

7    explained why the bare *fact* of whether Twitter has ever received FISA process must be a secret[4]

8    —especially when the public knows both that Twitter is a recipient of NSLs, and even the

9    categories of information the Government has sought from Twitter using NSLs.  Indeed, the fact

10   that Twitter had received NSLs used to be a secret as well.  But the recent modification of the

11   NSL regime to incorporate *Freedman*-compliant judicial review (18 U.S.C. § 3511) has led

12   directly to increased disclosure of the Government's use of this investigative method.  It is telling

13   that, now subject to that constitutionally required scrutiny, the Government on multiple

14   occasions has been unable to justify its restraint on the disclosure of individual NSLs after the

15   surveillance they authorized has concluded.  Equally important, the Government has pointed to

16   no grave or imminent harm that has flowed from the disclosure of individual NSLs.  That recent

17   experience in the NSL context therefore casts serious doubt on the Government's claim that far

18   less detailed information—the mere fact of whether Twitter received any FISA process during

19   one reporting period more than six years ago—would harm national security.

20       The Government's argument also focuses on the harm that would supposedly flow from a

21   revelation that an ECSP like Twitter received no process pursuant to a particular FISA title.

22   Opp. at 8 & nn. 5–6.  But like its other claims of harm, the Government fails to connect this

23   abstract concern to the Twitter-specific disclosures in the Transparency Report (some of which

24   do not even relate to Twitter's receipt of FISA process) or to explain how a title-specific

25   aggregate disclosure of zero would tell adversaries anything meaningful.

26

27   ───────────────
     [4] *See* Opp. at 8 n. 6 (information the Government seeks to protect includes "whether . . . FISA
28   process, if any, Plaintiff has received").

1      Take for example Title V, which authorizes the collection of business records.  50 U.S.C.

2 § 1861(a).  A hypothetical disclosure that six years ago, Twitter received *zero* requests under

3 Title V would not mean that the Government was incapable of subpoenaing those records, only

4 that the Government did not have the requisite probable cause under Title V to gather

5 information with respect to any Twitter user (or had otherwise not yet obtained the FISA order).

6 And to the extent Twitter seeks to disclose that it has received "zero" of any particular type of

7 process in the Transparency Report, the Government has not shown how grave or imminent

8 harm would flow from that singular disclosure.  Indeed, companies have disclosed when they

9 received zero national security requests or zero of a particular kind of request (*e.g.*, requests for

10 content versus non-content), and the Government has neither prohibited those disclosures nor

11 shown any resulting harm.  *See* Twitter Supplemental Request for Judicial Notice ("Supp. RJN")

12 Exs. A–E.

13      The Government argues nevertheless that, by process of elimination, disclosing the

14 *absence* of process under particular FISA titles, coupled with aggregate data, could tend to reveal

15 *which* titles Twitter must have received process under.  Opp. at 8 & n.5.  But as discussed above,

16 the Government has not shown that simply confirming Twitter's receipt of FISA process

17 generally or under any particular FISA provision—*i.e.*, the same information that is already

18 publicly available in the NSL context—would cause grave and imminent harm to national

19 security.  Thus, whether disclosure of the "zero" would tend to reveal that information is

20 irrelevant.[5]

21      The Government also argues that Twitter's disclosures would reveal insights into whether

22 a platform is "safe," "secure," or has become "more or less safe over time."  Opp. at 6, 11.  In

23 assessing these claims (including whatever additional detail is included in the Classified Tabb

24 Declaration), the Court should consider that, under the FISA's plain text, surveillance or

25

---

26 [5] As important, the Government's argument provides no basis for restricting Twitter's proposed
disclosure of the total number of *NSL* orders it has received, much less the aggregate amount of
27 *national security process* it has received (both pieces of information Twitter seeks to disclose in
28 the Transparency Report).

1    information-gathering activity is driven by whether the Government has "probable cause" to

2    believe that the "target" of surveillance "is a foreign power or an agent of a foreign power," or

3    that surveillance of the target will reveal "foreign intelligence information" or otherwise "protect

4    against international terrorism or clandestine intelligence activities."[6]  As a consequence, the

5    revelation that the Government had the requisite evidence to justify FISA surveillance on a

6    particular number of Twitter accounts six years ago would appear to say absolutely nothing

7    about whether the Government would have an evidentiary basis to target the same (or a greater

8    or lesser) number of Twitter users today.

9         Independently, because of the sheer size of Twitter's platform (more than a hundred

10    million daily active users)—and because the public already knows that Twitter is a recipient of

11    national security process—no foreign adversary could rationally believe that they could use

12    Twitter's platform without risk of Government surveillance (*i.e.*, that the platform is "safe" or

13    "secure" for terrorist communications).[7]  There is thus no meaningful risk that any disclosure in

14    Twitter's Transparency Report would reveal anything beyond what foreign adversaries already

15    know about the Government's ability to gather information that they share with Twitter pursuant

16    to the FISA and NSL regimes.

17         Finally, the Court should closely scrutinize the Government's claim that the disclosures

18    in the Transparency Report could permit adversaries to glean valuable insights into the extent to

19    which "the United States is or is not aware of the activities of these adversaries."  Opp. at 6

20    (quoting Tabb Decl. ¶ 7).  As explained above, disclosures about the total number of accounts or

---

[6] *See, e.g.*, 50 U.S.C. §§ 1805(a)(2) (Title I), 1824(a)(2) (Title III) (requiring "probable cause"); *id.* §§ 1842(c)(2) (Title IV), 1861(b)(2) (Title V) (requiring certification that the target likely has or will receive "foreign intelligence information" and that surveillance be "relevant to an ongoing investigation to protect against international terrorism or clandestine intelligence activities");  *id.* § 1881a (Title VII) (authorizing the "targeting of persons reasonably believed to be located outside the United States to acquire foreign intelligence information").

[7] Notably, the Government's use of the "secure" platform concept to describe Twitter is a misnomer that appears intended to lend undue credence to its argument.  In the Department of Justice, the term "secure communications" is typically reserved for communications conducted over a secure, encrypted form of communication.  That term would never apply to communication via Twitter—a *public* platform—as that term is generally understood in Department of Justice parlance.

persons under surveillance do not reveal *which* accounts are under surveillance—particularly when, as here, the aggregate number of orders received corresponds to an extremely small percentage of users.  *See* Rubin Decl. Ex. 3, at 2 (Dkt. No. 312-3) (September 9, 2014 FBI letter authorizing Twitter to disclose that only "[up to] 0.0000919 percent" of users were subject to surveillance).

The Government's final attempt to show that its analysis is "individualized" rests on claims that members of ISIS have used social media, including Twitter, to broadcast their terrorist messages.  Opp. at 5–6; Tabb Decl. ¶¶ 22–23 (Dkt. 309-1).  The Government claims that it therefore must be able to surveil Twitter "without disclosures" that would "reveal the extent and nature of such surveillance and capabilities."  Tabb Decl. ¶ 23 (Dkt. 309-1).  But, certainly nothing in the Unclassified Tabb Declaration demonstrates that the *specific* disclosures in the Transparency Report would reveal any harmful information about the scope of its surveillance of ISIS members on Twitter, or of any other Twitter user.  Neither can Twitter conceive of anything in the Classified Tabb Declaration that would demonstrate that the disclosure of the Transparency Report would jeopardize any ongoing surveillance of ISIS.

### 4.   Likewise, Speculation About Other Companies' Disclosures Cannot Justify the Government's Censorship of *Twitter's* Transparency Report.

Though the Government downplays its reliance on hypothetical disclosures by *other* ECSPs, it ultimately concedes that "the likelihood of additional disclosures by other companies" is a basis for its ongoing restrictions on Twitter's Transparency Report.  Opp. at 14.  But that reasoning rests on a chain of conjecture about what other ECSPs might do if Twitter were permitted to publish its Transparency Report, how the Government might respond, and whether the Government could carry its burden with respect to different information, a different speaker, and under different circumstances.  Cross-Motion at 11–12.  Such broad-scale speculation is the antithesis of narrow tailoring, and cannot possibly serve as a basis to suppress the Transparency Report.

The Government claims that Executive Assistant Director Tabb's "slippery slope" predictions are not speculative because Google, Microsoft, and others sued the Government over

aggregate reporting restrictions six years ago.  Opp. at 13.  But that history does not change the speculative nature of the Government's predictions of what may happen in the future.  Moreover, the possibility that the Government is *also* imposing unconstitutional restraints on other ECSPs is hardly a reason to find the restraint on Twitter constitutional.  It would be ironic to allow the Government to justify its censorship of Twitter's Transparency Report on the basis of prior challenges to its speech restraints, given that those challenges led to greater transparency—*i.e.*, strong evidence that those restraints were unconstitutional.[8]

### 5.    The Lack of Durational Limitation on the Government's Censorship Further Precludes a Finding of Narrow Tailoring.

The Government cannot dispute that, to be narrowly tailored, secrecy obligations must end when nondisclosure is no longer necessary to protect national security.  Order, Dkt. No. 186, at 9 (citing *In re NSL*, 863 F.3d at 1126–27).  The censorship here fails that requirement in two respects.  First, the Government simply has not "justif[ied] the continued necessity of nondisclosure" of Twitter's now six- to seven-year-old data, as it must to survive an as-applied challenge.  *In re NSL*, 863 F.3d at 1127.  Second, the Government has "offered no evidence regarding when the classification decision at issue here was made, nor  . . .  when or if it will expire," Dkt. No. 186, at 9, nor identified any applicable review procedures that reasonably assure the nondisclosure obligation will expire when no longer necessary, 863 F.3d at 1126–27.

In urging to the contrary, the Government points only to (a) the bromide that "classification cannot be indefinite" (Executive Order 13526, 75 Fed. Reg. 707 (Dec. 29, 2009) ("E.O. 13526")  § 1.5(d)); (b) that derivative classifications generally cannot "exceed 25 years" (*id.* § 2.2(f)) (with some exceptions); and (c) that it has unilateral authority to declassify data

---

[8] The Government's argument also fails to respond to Twitter's point (supported by the June 2013 letters, Rubin Decl. Exs. 6–10)—that the Government has consistently failed to engage in the individualized analysis that strict scrutiny requires.  Cross-Motion 13; *see also* Dkt. No. 322 (conceding no fact dispute with respect to Twitter's stated facts on this topic).  Indeed, the Government's ongoing refusal to produce a shred of evidence regarding its original bases or process for classifying Twitter's Transparency Report provides serious reason to doubt that the Government engaged in the narrow tailoring and individualized scrutiny the First Amendment requires.

about ECSPs' receipt of national security process, as the Director of National Intelligence ("DNI") did back in 2014 following the Snowden leaks about the Government's sweeping surveillance of Americans' phone records.  Opp. at 5 n.3.  Notably absent is any durational limitation on the censorship of the Transparency Report *itself*.

In any event, none of these identified provisions comes anywhere close to resembling the review procedures found to satisfy narrow tailoring in *In re NSL*.  Dkt. No. 186, at 9.  NSL nondisclosure obligations must be re-reviewed both at the conclusion of the related investigation *and* "three years after an investigation is begun," *In re NSL*, 863 F.3d at 1126—far earlier than the 25 years contemplated by E.O. 13526.[9]  Those procedures are further "supplemented" by the availability of *Freedman*-compliant judicial review, *id.* at 1126–27—yet another feature lacking here.  And they are *mandatory*.  If the DNI's 2014 declassification illustrates anything, it is that the Government will not voluntarily reconsider the need for secrecy outside of extreme public pressure or judicial intervention.  That history underscores why the Executive's unilateral discretion in deciding whether and when to lift the veil of secrecy on more granular aggregate reporting is not constitutionally sufficient to ensure narrow tailoring.

### 6. Twitter's Cross-Motion Is Properly Focused on the Transparency Report Before the Court.

The Government attempts to distract from its inability to justify its censorship of the Transparency Report by pointing to other relief sought in the SAC—including Twitter's request to publish similar data in subsequent years.  But that prayer for relief is irrelevant to whether the Government has justified its censorship of the 2014 Transparency Report.  Twitter confined its Cross-Motion to that question because the record as to other reporting periods has not been developed, which is necessary for the Court to conduct the "individualized analysis" that governing law requires.  *See In re NSL*, 863 F.3d at 1125.  It is not a "mischaracteriz[ation]" of

---

[9] Indeed, the Termination Procedures' provision requiring prompt re-review for individual NSLs casts serious doubt on the Government's suggestion that nondisclosure of aggregate data that is 10, 25, or even 50 years old could be justified.  *See* Opp. at 10–11.

1   Twitter's pleading (*see* Opp. at 7) for Twitter to confine its Cross-Motion to the Transparency

2   Report that has always been the centerpiece of this litigation.

3   **B.      The Government's Attempts to Evade *Freedman* Are Unavailing**

4           The Government does not dispute that its censorship of the Transparency Report lacked

5   any of the procedural safeguards required by *Freedman v. Maryland*, 380 U.S. 51, 58–60 (1965).

6   Rather, the Government argues only that *Freedman* should not apply at all.  But that position is

7   contrary to the analysis applied by *every other court* that has addressed on the merits whether

8   *Freedman* applies to nondisclosure obligations issued in connection with national security

9   process.  *See, e.g.*, *Doe v. Mukasey*, 549 F.3d 861, 877 (2d Cir. 2008); *Microsoft Corp. v. U.S.

10  Dep't of Justice*, 233 F. Supp. 3d 887, 905–07 (W.D. Wash. 2017).

11          In advocating its anomalous position, the Government presents narrow exceptions to the

12  *Freedman* doctrine as rules, and dicta as holding.  The Government points to *Seattle Times Co. v.

13  Rhinehart*, 467 U.S. 20 (1984) and *Butterworth v. Smith*, 494 U.S. 624 (1990) as supposed

14  exemplars of the Court's *Freedman* jurisprudence.  But those cases do not even mention

15  *Freedman*—much less call into question the deeply rooted rule (recognized by this Court) that

16  prior restraints must comport with "both the procedural safeguards [in *Freedman v. Maryland*]

17  and [with] substantive strict scrutiny requirements."  Dkt. No. 172, at 8; *see e.g.*, *City of

18  Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (applying *Freedman* to ordinance

19  regulating placement of news racks); *Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*, 487

20  U.S. 781, 801–02 (1988) (applying *Freedman* to licensing scheme); *Vance v. Universal

21  Amusement Co.*, 445 U.S. 308, 317 (1980) (applying *Freedman* to judicial restraints imposed

22  pursuant to nuisance statute); *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43–44

23  (1977) (per curiam) (applying *Freedman* to refusal to stay restraining order that prohibited First

24  Amendment-protected activity); *Blount v. Rizzi*, 400 U.S. 410 (1971) (applying *Freedman* to

25  Postmaster discretion to censor mail); *Carroll v. President & Comm'rs of Princess Anne*, 393

26  U.S. 175, 181 (1968) (applying *Freedman* to restraining order).

27

28

1    Nor has *Freedman* been generally confined to movie censorship schemes, as the

2    Government claims. *See* Opp. at 17 n.10. The Supreme Court has applied *Freedman* broadly,

3    including to a mayor's discretion over the placement of news racks on city sidewalks, *City of

4    Lakewood*, 486 U.S. at 771–72, to a restraining order that precluded political parties from

5    holding rallies, *Carroll*, 393 U.S. at 181, to a state's imposition of licensing requirements on

6    professional fundraisers, *Riley*, 487 U.S. at 801, and even to the denial of a request to stay an

7    injunction pending appeal, *National Socialist Party*, 432 U.S. at 43. Likewise, the Ninth Circuit

8    has applied *Freedman* to a licensing scheme governing commercial weddings. *Epona, LLC v.

9    Cty. of Ventura*, 876 F.3d 1214, 1221–22, 1225 (9th Cir. 2017).

10    In each of these cases, the Court's application of *Freedman* did not, as the Government

11    suggests, turn on whether the restraint at issue superficially resembled what the Government

12    deems a "classic" movie censorship scheme. Rather, the Supreme Court's decisions have been

13    consistently guided by "the time-tested knowledge that in the area of free expression . . . placing

14    unbridled discretion in the hands of a government official or agency … may result in

15    censorship." *City of Lakewood*, 486 U.S. at 757, 762 (also emphasizing that the Court's

16    jurisprudence is guided by "the unique risks associated with censorship"); *accord Riley*, 487 U.S.

17    at 801–02 (applying *Freedman* specifically because the State authority at issue "carrie[d] with it

18    (unless properly constrained) the power directly and substantially to affect the speech" of

19    regulated parties); *see also Real v. City of Long Beach*, 852 F.3d 929, 935 (9th Cir. 2017)

20    (recognizing that *Freedman* applies to prior restraints that "create[] the possibility that

21    constitutionally protected speech will be suppressed").

22    Indeed, far from limiting *Freedman* to the obscenity context, the Supreme Court has

23    recognized that prompt and adversarial judicial proceedings are *even more* important in cases

24    involving restraints on "political" speech, for which "timeliness may be [more] important" than it

25    is for publication of "allegedly obscene books." *Carroll*, 393 U.S. at 182.

26

27

28

1

2

      **1.**      **The Government's Censorship of Aggregate Reporting Is Materially Identical, for Purposes of *Freedman*, to Its Censorship of NSLs.**

3

      The Government's attempts to distinguish cases applying *Freedman* to censorship of

4

speech under the NSL law are equally unavailing.  The Government argues that restraints on

5

aggregate data (like the proposed disclosures in the 2014 Transparency Report) are imposed

6

pursuant to its discretionary "classification" guidelines, whereas restraints on individual NSLs

7

are imposed pursuant to statutory discretion (under the NSL law).  The Government further

8

argues that its authority to classify information flows primarily from Article II of the

9

Constitution—not from any particular statute.

10

      But even assuming that is so,[10] the Government has not shown how the claimed

11

constitutional origin of its authority to prohibit speech in any way mitigates *either* (1) the initial

12

burden on the speaker to seek permission to speak *or* (2) the danger that, because the Justice

13

Department's "business is to censor," it will "be less responsive than a court . . . to the

14

constitutionally protected interests in free expression."  *Freedman*, 380 U.S. at 57–58.

15

Moreover, the Supreme Court has specifically held that the source of the restraint does not matter

16

as long as it carries a risk of "unconstitutional" suppression of speech "if erroneously entered."

17

*Vance*, 445 U.S. 308, 317 (1980) (state nuisance statute authorizing suits in the name of the state

18

to abate obscene material were subject to *Freedman*—even though "the temporary prior restraint

19

[on speech] [wa]s entered by a state trial judge rather than an administrative censor"; that did not

20

"sufficiently distinguish this case from *Freedman v. Maryland*" because it "does not change the

21

unconstitutional character of the restraint if erroneously entered.").  Thus, even if Article II and

22

E.O. 13526 were the sole sources of the Government's authority to censor aggregate reporting,

23

that scheme *still* bears the hallmarks of a censorship system.  In these circumstances, the lack of

24

*any* mechanism for an ECSP like Twitter to obtain prompt, Government-initiated judicial review

25

of restraints on aggregate reporting—whether under E.O. 13526, § 1874(c), *or any other*

26

*statute*—renders the restraint on Twitter's Transparency Report unconstitutional.

27

28

          

---

[10] E.O. 13526 expressly purports to be based on the Executive's authority under "the laws of the United States"—not only under the Executive's constitutional authority.  *Id.* (preamble).

1    The Government also argues that § 1874(c) does not set up a censorship scheme because

2    it is framed permissively and does not explicitly use the word "declassification." Opp. at 16–17.

3    But that argument likewise ignores the import of subsection (c), which confirms that, for

4    disclosures outside the safe harbor bands codified in § 1874(a), the Government has unilateral

5    discretion to decide whether to permit more up-to-date or specific disclosures with respect to

6    individual ECSPs. That authority to permit disclosures necessarily encompasses the authority to

7    deny them, too. Such unilateral discretion to permit or deny speech, based on its content, is the

8    hallmark of a traditional censorship scheme. *See, e.g.*, *City of Lakewood*, 486 U.S. at 763.

9    These same defects preclude the Government's attempt to distinguish *Doe v. Mukasey* as

10   involving the Government's exercise of its statutory discretion under the NSL law, rather than its

11   purportedly constitutional discretion under its classification guidelines. Opp. at 16–18. The

12   Government's unilateral discretion to restrain speech it deems "classified" under E.O. 13526[11] is

13   materially identical to its unilateral discretion to restrain speech because it meets the

14   "certification" criteria in the NSL law.[12] The essence of both schemes is that the Government

15   may forbid speech if the Government decides that its content would harm the national security,

16   including the Government's counter-intelligence and surveillance efforts. Because the *character*

17   of the prior restraint is the same, there is nothing "unprecedented" about applying *Freedman* to

18   Government censorship of Twitter's speech about the national security process that it has

19   received.[13]

20   _____

21   [11] E.O. 13526 permits information to be classified if its "unauthorized disclosure . . . reasonably
     could be expected to cause damage," "serious damage," or "exceptionally grave damage to the

22   national security" of the United States, E.O. 13526 § 1.2, and the information pertains to one or
     more of eight categories, including "intelligence activities," and "foreign relations or foreign

23   activities of the United States, including confidential sources." *Id.* § 1.4.

24   [12] The NSL law vests the Government with discretion to require nondisclosure provisions be
     included in individual NSLs if the FBI "certifies that [disclosure] may result in—(i) a danger to

25   the national security of the United states; (ii) interference with a criminal, counterterrorism, or
     counterintelligence investigation; (iii) interference with diplomatic relations; or (iv) danger to the

26   life or physical safety of any person." 18 U.S.C. § 2709(c)(1).

27   [13] The logical flaw in the Government's position that *Freedman's* applicability turns on the
     source of the Government's censorship authority is highlighted by its self-described authority for

28   regulating disclosure of NSLs. It emphatically insists that its power to prohibit the disclosure of

1    Nor would applying *Freedman*'s procedural safeguards to restraints on aggregate

2  reporting mean that *Freedman* attaches "whenever the Government seeks to protect . . .

3  classified information from disclosure," as the Government claims.  Opp. at 17.  Given the

4  substantially diminished First Amendment protection accorded government employees and

5  contractors (*see* discussion *supra*, at 3–4), a ruling applying *Freedman* here obviously would *not*

6  require its application to the flow of classified information *within* the Government and between

7  the Government and its contractors.

8    The present use of the Government's classification authority is fundamentally different

9  from the Government's typical exercise of its classification authority because it is directed at an

10  "*unwilling member[] of the public*."  *Aguilar*, 515 U.S. at 606 (emphasis added); *accord Nat'l*

11  *Treasury Emps. Union*, 513 U.S. at 465–66.  Twitter is unaware of any circumstances—outside

12  the use of compulsory process—in which the Government uses its classification authority to

13  censor members of the general public who have not voluntarily assumed a relationship with the

14  Government.  The Government's parade-of-horribles is accordingly misplaced.

15    **2.    The Government's Analysis of *Butterworth* and *Seattle Times* Continues to**

16  **Ignore the Touchstones of the Court's *Freedman* Jurisprudence.**

17    The Government's superficial analogies to *Butterworth* and *Seattle Times* continue to

18  ignore the guiding principles of those cases and *Freedman*.  The Court's concern in *Freedman*

19  was that schemes which require pre-publication discretionary review inherently create a "danger

20  that [the censor will] be less responsive than a court—part of an independent branch of

21  government—to the constitutionally protected interests in free expression."  *Freedman*, 380 U.S.

22  at 57–58.

23

24  ───────────────

individual NSLs is statutory (Opp. at 17–18), yet it has censored Twitter's proposed aggregate
25  reporting of NSLs pursuant to its classification authority.  *See* Rubin Decl. Ex. 3 (Dkt. No. 312-
3).  But it would make no sense to treat the Government's ability to censor Twitter from
26  disclosing the receipt of one NSL any differently from the Government's ability to restrain
Twitter from saying it received 100 NSLs.  The First Amendment framework applicable to both
27  disclosures—as well as to aggregate disclosures about an ECSP's receipt of FISA process—is
the same.
28

1    In *Butterworth*, the Court likewise noted "[t]he potential for abuse of" Florida's

2    prohibition on "disclosure by a witness of his own [grand jury] testimony": that law enforcement

3    could use grand jury proceedings "as a device to silence those who know of unlawful conduct or

4    irregularities on the part of public officials."  494 U.S. 624, 633, 635–36 (1990).  Relying in part

5    on that concern, the Court struck down Florida's restraint on an individual's *own* grand jury

6    testimony as unconstitutional.[14]  But the Court found those same concerns absent in the

7    prohibition on disclosure of *other* witnesses' testimony—which the Court found justified by

8    countervailing interests in "the proper functioning" and integrity of the "grand jury system."  *Id.*

9    at 630–31 (quoting *Douglas Oil Co. of Cal. v. Petrol Stops Nw.*, 441 U.S. 211, 218 (1979)).  The

10   latter speech restriction also does not involve any discretionary, content-based judgments about

11   what information can or cannot be safely disclosed and therefore does not carry the same risk of

12   over-censorship identified in *Freedman*.[15]

13   Conversely, here, the Government is afforded unilateral discretion to make content-based

14   determinations about whether ECSPs may publish aggregate information about their receipt of

15   process that is more granular than the USAFA reporting bands.  That discretionary scheme

16   necessarily puts the Government in the position of a paradigmatic censor.

17   Equally fatal to the Government's position, neither *Butterworth* nor *Seattle Times*

18   actually addressed whether *Freedman* applied to the restraints before them—much less held that

19   it did not.  The Government treats the Court's silence in these two cases as authority that

20

21   ---

[14] Though ultimately irrelevant, the Government's narrow reading of *Butterworth* as *not*
22   extending to a witness's *testimony* before a grand jury is inconsistent with the Court's statement
     that "we do not believe [Florida's] interests warrant a permanent ban on the disclosure by a
23   witness *of his own testimony* once a grand jury has been discharged."  *Id.* at 632 (emphasis
     added).  The Government relies on Justice Scalia's concurrence, in which no other Justice joined.
24   *Id.* at 636.  But the very fact that the Government's reading depends on a one-Justice
     concurrence confirms that its view failed to persuade the remainder of the Court.
25

[15] *Seattle Times* was likewise concerned about the "significant potential for abuse" of the
26   discovery process to cause "delay and expense," and to invade "privacy interests of litigants and
     third parties."  467 U.S. 20, 34–35 (1984).  The court accordingly found the need to preserve the
27   integrity of the judicial process (to prevent it from becoming a forum for abuse) to justify
     conferring "substantial latitude" in "trial court[s] . . . to fashion protective orders."  *Id.* at 36.
28

1  *Freedman* was held to be inapplicable.[16]  But that is contrary to the fundamental principle that

2  issues not "squarely addressed" are not *stare decisis* in later cases.  *Brecht v. Abrahamson*, 507

3  U.S. 619, 631 (1993); *accord United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 38

4  (1952) (Where an issue was neither "raised in briefs or argument nor discussed in the opinion of

5  the Court . . . . the case is not a binding precedent on th[at] point.").

6  In any event, a principal rationale of *Freedman* is that those tasked with making

7  censorship decisions are inherently less likely than an independent court to robustly protect free

8  expression.  380 U.S. at 57–58.  This case, and the history that precipitated it, is a case in point.

9  In 2013, the Government took the position that any disclosures by ECSPs about their receipt of

10  process in bands smaller than 0-1000 was classified and would harm national security.  Rubin

11  Decl. Exs. 6–10.  When faced with the prospect of judicial scrutiny, however, those bands were

12  reduced, including to bands of 0-99, and 0-250 (depending on how the information is

13  aggregated).  50 U.S.C. § 1874(a); *cf.* Rubin Decl. Ex. 1 (Dkt. No. 312-1).  Similarly, it was the

14  Second Circuit's ruling in *Doe v. Mukasey* that led to the incorporation, in the NSL law, of a

15  *Freedman*-compliant mechanism for prompt judicial review.  And it has been the as-applied

16  challenges to individual NSLs, brought pursuant to that mechanism, that have led to greater

17  transparency of the Government's use of NSLs.  History therefore shows that the Government,

18  when left to its own devices, is far less sensitive than the courts to the public's "constitutionally

19  protected interests in free expression."

20  The Government's subjective view that the speech in Twitter's Transparency Report does

21  not enhance public debate because it does not accuse the Government of misconduct is entirely

22  irrelevant and, in any event, misses the point.  Opp. at 20–21.  *Freedman*'s application does not

23  turn on the content of individual speech, but on whether the *system of prior restraint* bears the

24

25

26  [16] Though *Seattle Times* stated that prohibitions on "dissemination of discovered information"
27  were not "classic prior restraint[s]" that required the typical "exacting" *substantive* scrutiny
   afforded prior restraints, the Court said nothing about *Freedman*'s procedural requirements.  467
28  U.S. 20, 33 (1984).

1  classic dangers of a censorship system.  Here, for the reasons shown above, the Government's

2  prior restraint possesses the key attributes of a traditional censorship scheme.

3          **3.**        **The FISA Proceedings Do Not Obviate the Risk of Censorship.**

4          The Government continues erroneously to suggest that *Freedman* is somehow satisfied

5  here by virtue of the judicial review provisions applicable to *individual* NSLs and FISA orders.

6  Opp. at 22–23.  But as this Court has previously recognized (Dkt. No. 172, at 18), that argument

7  "does not address the question of whether the Government's prohibition on publication of a

8  completely different set of information—the aggregate numbers, whether actual numbers or in

9  ranges—requires judicial review be provided."  Dkt. No. 186, at 9; *see also* Cross-Motion at 15.

10          It is equally irrelevant that every FISA order begins with judicial proceedings before the

11  Foreign Intelligence Surveillance Court ("FISC").  That procedure would provide the requisite

12  check against Executive censorship as to particular FISA orders only if the FISC courts *actually*

13  *reviewed* the constitutionality of nondisclosure obligations imposed by the Executive in

14  individual FISA orders *before those orders issued*.  But as already explained, they do not.  *See*

15  Cross-Motion at 21 & n.16.  Attempting to obfuscate that fact, the Government points to

16  provisions authorizing FISC courts to review "challenge[s]" to "the legality of . . . any

17  nondisclosure order imposed in connection with the [FISA] order" by *recipients* of the FISA

18  orders—*i.e.*, *after those orders have already been issued*.  50 U.S.C. § 1861(f) (cited Opp. at 23);

19  *accord* 50 U.S.C. § 1881a(i)(4)(C).  But those provisions, which permit judicial review only if an

20  individual recipient affirmatively challenges a nondisclosure obligation, do not support the

21  Government's argument that FISC proceedings *inherently* satisfy *Freedman*'s concerns about

22  censorship as to *each and every* order that emanates from that process.  Furthermore, as

23  discussed above, none of the Government's cited authority provides a mechanism for judicial

24  review of restrictions on *aggregate* reporting.

25          More fundamentally, the wholly *ex parte* nature of FISC proceedings is inherently

26  incompatible with the safeguards *Freedman* requires.  *Carroll*, 393 U.S. at 181 (government's

27  use of *ex parte* proceedings to obtain a restraining order violated *Freedman* because, in the

28

context of prior restraints, "the Court has insisted upon careful procedural provisions, designed to assure the fullest presentation and consideration of the matter which the circumstances permit.").  Inspector General Michael Horowitz's recent report ("Horowitz Report") underscores how the Government's one-sided FISA process fails to guard against abuse.  The Horowitz Report chronicles a litany of "errors and omissions," including numerous applications in which FBI agents "cherry-picked . . . evidence," "omitting material that cut" against their application, and "passed that misleading portrait onto the court" in order to obtain permission to conduct various surveillance.  *See* Charlie Savage, *We Just Got a Rare Look at National Security Surveillance.  It Was Ugly.*, N.Y. TIMES (Dec. 11, 2019), available at https://www.nytimes.com/2019/12/11/us/politics/fisa-surveillance-fbi.html?action=click&module=Top%20Stories&pgtype=Homepage.  In response, the FISC issued a rare public order directing the FBI to submit, by January 10, 2020, a "sworn written submission of what it has done, and plans to do, to ensure that the statement of facts in each FBI application accurately and completely reflects information possessed by the FBI that is material to any issue presented by the application." Order, *In re Accuracy Concerns Regarding FBI Matters Submitted to the FISC*, No. Misc. 19-02 (FISA Ct. Dec. 17, 2019) (finding that the FBI's handling of the FISA applications described in the Horowitz Report "was antithetical to the [Government's] heightened duty of candor"); Bryon Tau & Dustin Volz, *Secretive Surveillance Court Rebukes FBI Over Handling of Wiretapping of Trump Aide*, WALL ST. J. (Dec. 17, 2019), available at https://www.wsj.com/articles/secretive-surveillance-court-rebukes-fbi-over-handling-of-surveillance-of-trump-aide-11576615299.

　　　　And finally, the Government's attempt to paint the FISA process as a built-in, constitutionally adequate safeguard against censorship is inconsistent with the Government's position that restraints on *aggregate* reporting *do not emanate from the FISA or NSL statutes at all*—but rather from the Government's separate "classification" authority.  *See, e.g.*, Rubin Decl. Ex. 3 (Dkt. No. 312-3) (FBI letter to Twitter).  In light of the Government's position, it would not matter if, hypothetically, the FISC conducted a review of *every single* restraint on disclosure of individual FISA orders.  The FISC still would not have conducted any review of the

1  Government's purported exercise of its discretion, under E.O. 13526, to classify *aggregate*

2  information about Twitter's receipt of FISA process (if any), like its purported classification of

3  Twitter's 2014 Transparency Report.

4       The Government's argument that no such mechanism should be required for restraints on

5  aggregate reporting because the USAFA does not *forbid* aggregate reporting is equally

6  misplaced.  Opp. at 16–17.  As long as the Government chooses to "classify," and thereby

7  censor, all aggregate data about ECSPs' receipt of process outside of the USAFA bands,

8  *Freedman* requires a mechanism for would-be speakers like Twitter to seek and obtain prompt,

9  Government-initiated judicial review of prior restraints imposed under the USAFA and E.O.

10  13526.  Nor does the Government's claim that the restraint derives from its classification

11  authority (E.O. 13526) somehow make it impossible for the Government to comply with

12  *Freedman*.  Opp. at 23.  On the contrary, the Government already has a roadmap, in the NSL

13  law, as to what changes would bring its censorship scheme over the reporting of aggregate data

14  into compliance with *Freedman*.

15  **C.**    **The Government's Objections to Twitter's Alternative Request for Access to the**

16        **Classified Tabb Declaration Are Meritless.**

17       In its Opposition to the Government's Renewed Motion, Twitter also renewed its prior

18  request for access to the classified evidence—now contained in the Classified Tabb

19  Declaration—that the Government claims requires judgment in its favor.

20       The Government objects, first, that the Court's Order to Show Cause precludes that

21  request.  Opp. at 24.  But the Order merely states that the "Court is inclined to conclude that the

22  classified McGarrity Declaration cannot be disclosed to counsel for Twitter based upon the

23  national security concerns it raises" and invited the parties' views on that tentative position.  Dkt.

24  No. 301, at 2.  Moreover, because the Classified Tabb Declaration was first submitted *after* that

25  Order, in support of the Government's current motion for summary judgment, the Court has yet

26  to consider whether this declaration—either in whole or in part—could be disclosed to Twitter's

27  cleared counsel without implicating national security concerns.

28

1    The Government's second objection is equally meritless.  The Government claims that

2    Twitter's request is not supported by the requisite affidavit or declaration specifying the facts

3    Twitter would seek through further discovery and why those facts would preclude summary

4    judgment.  Opp. at 24.  The Government's argument disregards the extended record in this

5    case—which dates back to *September 2016* when Twitter first moved for an order requiring

6    Defendants to initiate an expedited security clearance process.  Dkt. No. 124.  In particular, in

7    December 2018, Twitter submitted its Request for Access to the Classified Steinbach

8    Declaration (Dkt. No. 250), which was supported by a detailed declaration from Twitter's

9    cleared counsel (Dkt. No. 250-1).  These and other submissions make abundantly clear (a) the

10   "specific facts" to which Twitter is seeking access (those in the Classified Tabb Declaration),

11   and (b) and why Twitter believes access to those facts is essential to Twitter's ability to make its

12   case.

13           Furthermore, Twitter's Cross-Motion repeats the reasons that it previously identified in

14   seeking access to the Classified Steinbach Declaration (Dkt. Nos. 265, 292): that it "needs access

15   to the Classified Tabb Declaration—the core of the Government's defense—in order to

16   meaningfully counter the Government's claim that its prior restraint is constitutional."  Cross-

17   Motion at 24.  These reasons have not materially changed, even if the Government's current

18   justification for its censorship of the Transparency Report is now embodied in the Classified

19   Tabb Declaration in lieu of the Classified Steinbach Declaration.  The Government's authorities

20   are inapposite:  Each addressed circumstances in which no declaration was ever filed or in which

21   the party failed to specify the discovery to which it claimed to be entitled.[17]

22           Moreover, Rule 56(d) is not even necessary to Twitter's request for access, as Twitter's

23   request separately "is supported by fundamental principles of due process."  Cross-Motion at 24.

24   Thus, while framed in this setting as a Request under Rule 56(d), Twitter independently is

25   seeking access to the Classified Tabb Declaration on the basis of its fundamental right to be able

26   _____

27   [17] In *Shaw v. Thomas*, for example, the Plaintiff had failed to request *any discovery at all*; the
     Court denied the plaintiff's Rule 56(d) motion because "the parties agree that no pending

28   discovery matters need to be resolved."  2019 WL 162729, at *3 (N.D. Cal. Jan. 10, 2019).

1   to review (and directly respond to) the evidence the Government has offered against Twitter in

2   this litigation.  *Cf. Carroll*, 393 U.S. at 181.

3                                   **CONCLUSION**

4          For the reasons set forth herein, the Court should *grant* Twitter's Cross-Motion for

5   Summary Judgment and *deny* the Government's Motion.  Specifically, Twitter seeks judgment in

6   its favor on the portions of Counts I and II discussed herein, as well as on Count III to the extent

7   derivative of any relief granted under Twitter's Counts I and II.

8

9    Dated:  December 18, 2019                    MAYER BROWN LLP

10                                                /s/ Lee H. Rubin
                                                  _____
                                                  LEE H. RUBIN (SBN 141331)
11                                                SAMANTHA C. BOOTH (SBN 298852)
                                                  *Attorneys for Plaintiff Twitter, Inc.*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28